IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LIQWD, INC. and OLAPLEX LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC, L'ORÉAL USA S/D, INC., L'ORÉAL, S.A., and REDKEN 5TH AVENUE NYC, L.L.C.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>) Civ. No. 17-14-SLR<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM ORDER**

At Wilmington this 6th day of July, 2017, having reviewed the papers submitted in connection with plaintiffs' motion for a preliminary injunction (D.I. 14), the court issues its decision as follows:

1. **Introduction.** On January 5, 2017, plaintiffs Liqwd, Inc. ("Liqwd") and Olaplex, LLC ("Olaplex") (collectively "plaintiffs") filed a complaint against defendants L'Oréal USA, Inc. ("L'Oréal"), L'Oréal USA Products, Inc, L'Oréal USA S/D, Inc., and Redken 5th Avenue NYC L.L.C. (collectively "defendants"), alleging infringement of U.S. Patent No. 9,498,419 ("the '419 patent"), misappropriation of trade secrets under 18 U.S.C. § 1836 and Delaware law, breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing. (D.I. 2) Plaintiffs amended their complaint on March 20, 2017 to include L'Oréal S.A. as a defendant. (D.I. 53) Presently before the court is plaintiffs' motion for a preliminary injunction,[1] which was

---

[1] Defendants have moved to dismiss and have briefed the motion. (D.I. 66, 67) In their brief on plaintiffs' motion for preliminary injunction, defendants have presented

argued on June 8, 2017. (D.I. 14) This court has jurisdiction under 28 U.S.C. §§ 1331 and 1338.

2. **Background.** Liqwd is the assignee of the '419 patent. (D.I. 53 at ¶ 27; '419 patent, cover page) Olaplex is the "exclusive licensee of the '419 patent with full rights of enforcement and recovery, including the right to pursue recovery of royalties and damages for infringement of the '419 patent." (D.I. 53 at ¶ 27) The '419 patent, entitled "Keratin treatment formulations and methods," was filed on March 31, 2016 and was issued on November 22, 2016.[2] ('419 patent, cover page) The '419 patent claims "a method for bleaching hair" employing specific concentrations of maleic acid "or salts thereof" in a "mixture [that] does not contain a hair coloring agent." ('419 patent, 25:41-26:5 (claim 1))

3. In 2014, Olaplex successfully launched hair styling products in the newly-created "bond builder" market category. (D.I. 53 at ¶¶ 30, 33) Olaplex revenues quickly grew to the tens of millions of dollars. (D.I. 60 at 4) Beginning in January 2015, various L'Oréal representatives and Olaplex CEO Dean Christal ("Christal") discussed the potential for L'Oréal to purchase Olaplex. (*Id.* at ¶¶ 41-45) In March 2015, a L'Oréal representative attempted to recruit Craig J. Hawker, PhD ("Dr. Hawker") and Eric D. Pressly, PhD ("Dr. Pressly"), the inventors of the '419 patent. (*Id.* at ¶ 40) In May 2015, Olaplex and L'Oréal executed a non-disclosure agreement ("NDA"). (*Id.* at ¶ 47) In May and June 2015, pursuant to the NDA with L'Oréal, Christal and Dr. Pressly disclosed Olaplex's financial information, pending but unpublished patent applications licensed to Olaplex, and detailed technical information about Olaplex's products. (*Id.* at

---

redundant arguments related to their motion to dismiss. (D.I. 60 at 7-8) The court will address the motion to dismiss separately.

[2] The '419 patent is a continuation of application No. 14/713,885 (now U.S. Pat. No. 9,326,926) and was filed under the U.S. Patent & Trademark Office's "Track One" expedited examination program.

2

¶¶ 48-59) A L'Oréal representative met with Christal in September 2015 and informed him that "L'Oréal was no longer interested in acquiring Olaplex." (*Id.* at ¶ 60)

4. Subsequently, L'Oréal USA introduced three products that compete directly with Olaplex in the U.S. market. These products include: Matrix Bond Ultim8 Step 1 Amplifier, Redken pH-Bonder #1 Bond Protecting Additive, and L'Oréal Professionnel Smartbond Step 1 Additive (the "accused products"). (D.I. 60 at 5) Plaintiffs contend that defendants' use of the accused products directly infringes claims 1 and 10 of the '419 patent. (D.I. 53 at ¶ 109) Moreover, plaintiffs assert that defendants, through product literature, instructions, in-person training sessions, and training videos, induce others to infringe claims 1 and 10 of the '419 patent. (D.I. 53 at ¶ 110)

5. **Motion for preliminary injunction – standard of review.** As explained by the United States Court of Appeals for the Third Circuit,

> [p]reliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." . . . "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." . . . The "failure to establish any element . . . renders a preliminary injunction inappropriate." . . . The movant bears the burden of showing that these four factors weigh in favor of granting the injunction.

*Ferring Pharms., Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citations omitted). "[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and . . . such discretion must be exercised consistent with traditional principles of equity." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

6. **Likelihood of success on the merits.** Plaintiffs argue that a preliminary injunction is appropriate, because plaintiffs are likely to succeed in their claim of infringement of claim 1 of the '419 patent. (D.I. 15 at 8) Moreover, plaintiffs aver that

3

defendants are "unlikely to prove" invalidity. (*Id.*) Plaintiffs contend that defendants directly infringe claim 1 of the '419 patent and induce their customers to infringe. (D.I. 53 at ¶ 109-110) The parties' infringement dispute centers on the "hair coloring agent" term found in claim 1. ('419 patent, 26:4-5) Defendants argue that plaintiffs have not shown direct infringement or inducement. (D.I. 60 at 20, 24)

7. **Direct infringement – "hair coloring agent."** Claim 1 of the '419 patent recites:

> A method for bleaching hair comprising:
>
> (a) mixing a formulation comprising an active agent with a bleaching formulation, wherein the active agent has the formula:
>
> [chemical structure showing a cyclohexene ring with OH, O, and OH substituents]
>
> or salts thereof;
>
> and
>
> (b) applying the mixture to the hair;
>
> wherein the active agent in the mixture is at a concentration ranging from about 0.1 % by weight to about 50% by weight; and
>
> **wherein the mixture does not contain a hair coloring agent**.

('419 patent, 25:42-26:5 (emphasis added)) Claim 10 is dependent on claim 1. Plaintiffs have proposed that the term "hair coloring agent" be construed to mean "a colorant or pigment that is customarily used in hair care products, which changes the color or tone of the hair it is applied to based on visual inspection."[3] (D.I. 15 at 10) The parties submitted letter briefs to address the question of whether applicant's statements during prosecution were sufficient, as plaintiffs contend, for applicant to act as its own

---

[3] Defendants argue that plaintiffs' construction is indefinite. (D.I. 60 at 9) Defendants proposed "a substance that alters or changes, or is capable of altering or changing, the color of hair." (D.I. 62 at ¶ 63)

4

lexicographer.[4] (D.I. 112; D.I. 123; D.I. 125) However, plaintiffs have proposed constructions based upon the intrinsic record according to two theories: plain and ordinary meaning, and applicant as lexicographer. (D.I. 15 at 10-11; D.I. 96 at 1) As a result, the court addresses infringement according to each of plaintiffs' constructions.[5]

    8. **Plain and ordinary meaning.** Plaintiffs' expert, Edward T. Borish, PhD ("Dr. Borish"), performed a limitation-by-limitation comparison between claim 1 and the accused products. With respect to the "hair coloring agent" limitation, he opined that:

> I have been told and understand that L'Oréal may claim that dyes present in the Accused Products allegedly constitute hair coloring agents. In particular, each contains three chemicals identified as CI 19140/Yellow 5, CI 14700/Red 4, CI 42090/Blue 1. These are common dyes for coloring products, but I am not aware of any hair dye product which uses these chemicals to actually impart color to hair **in the low concentrations** that I believe these chemical are used in the Accused Products. Moreover, all three of these dyes are used in various L'Oréal shampoo and conditioner products which are neither intended to color hair, nor labeled as coloring hair, as demonstrated below.

(D.I. 16 at ¶ 94 (emphasis added)) Dr. Borish acknowledges that these dyes are present in the accused products, and he appears to suggest that, in higher concentrations, these dyes could impart color to hair.[6] Defendants' expert, Robert J. W. Hefford, PhD ("Dr. Hefford"), explains that a person having ordinary skill in the art "would know and recognize that the Yellow 5, Red 4, and Blue 1 dyes in the accused products are direct action dyes and are known to be used for coloring hair, and are each

---

[4] During patent prosecution, applicant made numerous additional statements about prior art that may factor into a claim construction.

[5] For the purposes of this proceeding, the court does not independently construe the "hair coloring agent" term.

[6] Plaintiffs argue that "the accused products would not cause a visually perceptible change in hair color unless the amount of colorant in the product formulations was increased at least 5,000 fold." (D.I. 96 at 5)

5

capable of changing the color [of] hair."⁷ (D.I. 62 at ¶ 106, ¶¶ 107-114) The parties acknowledge that the dyes can be used to color hair and are present in the accused products. Factoring in plaintiffs' construction and the plain and ordinary meaning, the claim limitation, "wherein the mixture does not contain a hair coloring agent," can be read as "wherein the mixture does not contain a colorant or pigment that is customarily used in hair care products, which changes the color or tone of the hair it is applied to based on visual inspection." Under this construction, the accused products contain a "hair coloring agent" and do not likely infringe.

9. **Applicant as lexicographer.** In response, plaintiffs argue that applicant acted at its own lexicographer and "hair coloring agent" is defined by its function, namely that it must result in a visually perceptible change to "the color or tone of the hair."⁸ For example, plaintiffs assert that "a 'hair coloring agent' is not capable of visually 'coloring' the hair, . . . if its concentration is so diluted that it does not actually color the hair."⁹ (D.I. 96 at 3-4) Plaintiffs contend that applicant's "lexicography is consistent with the patent specification, which . . . . teaches that the invention is assessed through visual inspection of the treated hair." (D.I. 96 at 1-2 (citing examples 2 and 7 in the '419 patent)) With reference to example 2, the specification states "[t]he hair sample treated with the active agent formulation displayed a color closer in intensity

---

⁷ Defendants contend that the bleach in the accused products is a "hair coloring agent;" therefore, the accused products do not infringe. (D.I. 60 at 20) This argument is not based upon plaintiffs' proposed construction, and the court declines to consider it.

⁸ Defendants argue that plaintiffs' "contention that 'hair coloring agents' should not be defined in terms of underlying properties is inconsistent with a tenet of patent law–'a compound and all of its properties are inseparable.'" (D.I. 103 at 2, citing *In re Papesch*, 315 F.2d 381, 391 (C.C.P.A. 1963)) *Papesch* is inapposite, because the specification does not identify a "hair coloring agent" as a specific chemical compound; therefore, there is no single set of properties to associate with the "hair coloring agent."

⁹ This appears to be an attempt to parse the meaning of "capable" to exclude infringement under defendants' construction.

6

to the hair sample prior to the first washing, compared to the hair treated with hydrogen peroxide." ('419 patent, 22:15-18) Similarly, with reference to example 7, the specification recites that "[u]pon visual inspection[], the second hair sample treated with the active agent formulation showed little or no signs of breakage." (*Id.*, 25:4-6) Examples 2 and 7 relate to permanent wave treatments and not methods of bleaching or coloring. With respect to color, example 2 addresses "color retention" for hair in general but does not discuss hair treated with a "hair coloring agent." The cited passages in the specification do not limit "hair coloring agent" to results that may be assessed through visual inspection after performance of a method. Therefore, applicant's lexicography is not consistent with the specification.

10. Moreover, applicant's lexicography directly contradicts other "agent" terms in the specification. For example, the specification describes an "active agent" in terms of specific formulations ('419 patent, 7:42-11:18) and acceptable concentration ranges (*id.*, 7:26-34; 15:29-38; 15:40-51; 15:62-16:4; 16:21-25; 16:30-36). Claim 1 recites "wherein the active agent in the mixture is at a concentration ranging from about 0.1 % by weight to about 50% by weight." (*Id.*, 26:1-3) The specification also identifies a "bleaching agent" and states that "[t]he bleaching formulation typically contains a bleaching agent to lighten the hair and produce free thiol groups." (*Id.*, 16:54-55) The "bleaching agent" is identified as "bleach powder" (*id.*,16:57), "powder bleach" (*id.*, 22:39; 22:52), and "powder lightener" (*id.*, 23:15; 23:49). In claim 1, the method recites "mixing a formulation comprising an active agent with a bleaching formulation." (*Id.*, 25:43-44) The specification explains that in "hair color treatments . . . a bleaching formulation [is used] to bleach the hair's natural pigment and/or other artificial pigments present in the hair." (*Id.*, 16:47-49) While the intrinsic record identifies the purposes for using these substances, neither the specification nor the claims define "bleaching agent" or

7

"bleaching formulation" in terms of results that may be assessed through visual inspection after performance of a process.

11. Defendants argue that plaintiffs' visual inspection "construction fails to inform 'those skilled in the art about the scope of [claim 1] with reasonable certainty' and results in a claim that is indefinite."[10] (D.I. 123 at 2, citing Nautilus, Inc. v. Biosig Instruments, Inc., 134 S.Ct. 2120, 2124 (2014)) Plaintiffs contend that "**the invention** is assessed through visual inspection of the treated hair." (D.I. 96 at 2 (emphasis added) (citing D.I. 98 at ¶148)) As discussed above, nothing in the intrinsic record suggests that "hair coloring agent" is "the invention" or that applicant intended for any substance to be defined in functional terms. Claim 1 specifically excludes a "hair coloring agent" from the claimed method, so the "hair coloring agent" is explicitly not "the invention." Moreover, it is impossible to define a hair coloring agent in terms of its performance in a method that excludes its use. Clearly, some other method may be necessary, but applicant did not identify a method, standard, or any other objective measure for identifying when a colorant or dye is a "hair coloring agent" and when it is not.

12. The patent statute states, in relevant part, that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b) As asserted, applicant's lexicography requires a person of ordinary skill in the art to guess about the meaning of the "hair coloring agent" term, which leaves that person uncertain about the scope of claim 1. Were the court inclined to accept plaintiffs' contention that applicant acted as its own lexicographer, the court would most likely conclude that claim 1 is indefinite.

---

[10] The court does not address the alternative chemistries for fixing colorants to hair identified by both Drs. Borish and Hefford. (D.I. 16 at ¶ 39; D.I. 62 at ¶¶ 39-42)

8

13. **Inducement.** Plaintiffs contend, in a footnote, that defendants "directly infringe[] the '419 patent through [their] use and testing of the accused products, and with knowledge of the patent, induce[] hair care professionals to infringe the '419 patent through [their] explicit instructions for use of the accused products as described herein." (D.I. 15 at 9 n.7) Defendants argue that plaintiffs fail to show that defendants "acted with 'knowledge that the induced acts constitute patent infringement,' as required under § 271(b)." (D.I. 60 at 24, citing *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)) Plaintiffs respond that, according to *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1056-61 (Fed. Cir. 2010), defendants' knowledge of the patent, plaintiffs' communications about infringement, and defendants' efforts to educate and train hair professionals about how to use the accused products "is sufficient to show both knowledge and intent to induce infringement." (D.I. 96 at 5) Plaintiffs aver that "there is ample evidence that [defendants] w[ere] on actual notice of [] infringement." (*Id.*) In the case at bar, plaintiffs have shown that defendants knew about the '419 patent and that plaintiffs intended to sue them for infringement. (D.I. 96, ex. D at 56:5-24; *see also id.*, exs. F, G, H) However, plaintiffs have not demonstrated that defendants knew that their customers' acts constitute infringement.

14. **Analysis – infringement.** Plaintiffs bear the burden of demonstrating a likelihood of success on the merits. In the case at bar, plaintiffs have proposed a construction for the only limitation of claim 1 in dispute. Under the plain and ordinary meaning, plaintiffs have not demonstrated likely infringement by the accused products. Under applicant's lexicon, the specification does not support the meaning plaintiffs now assert. Moreover, claim 1 may be indefinite under 35 U.S.C. § 112(b). Based upon either approach to interpreting plaintiffs' proposed claim construction, plaintiffs have failed to demonstrate a likelihood that they will prove direct infringement of claim 1. As for inducement, plaintiffs have not satisfied the knowledge requirement. For these

9

reasons, plaintiffs have not established a likelihood of success with respect to either direct or induced infringement.

15. **Invalidity.** Defendants assert that claim 1 is invalid as obvious over Kim in view of Ogawa and anticipated by Ogawa.[11] (D.I. 60 at 13-20) Plaintiffs argue that "there is a strong likelihood of prevailing on validity," because the '419 patent is presumed valid and because it issued after overcoming numerous prior art references, including "four separate third-party prior art submissions," which plaintiffs contend is a "competitor's likely best prior art." (D.I. 15 at 12)

16. **Invalidity – standard.** Because a patent is presumed valid under 35 U.S.C. § 282, a challenger must prove invalidity by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2245 (2011); *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004). Further, "[w]hen the prior art was before the examiner during prosecution of the application, there is a particularly heavy burden in establishing invalidity." *Impax Labs., Inc. v. Aventis Pharms. Inc.*, 468 F.3d 1366, 1378 (Fed. Cir. 2006) (citing *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990)). If a reference was not before the examiner during prosecution but is cumulative of others that were before the examiner, the heavy burden of proof still applies. *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed. Cir. 2004).

17. **Anticipation.** Defendants' arguments with respect to anticipation are duplicative of the third party's contention presented to the examiner in the third-party submission. U.S. Pat. Appl. No. 15/087,415, *Concise Description of Relevance* at 3-4, Aug. 29. 2016 (submitting U.S. Pat. No. 7,044,986 to Ogawa ("Ogawa") under 37 C.F.R. § 1.290). Defendants argue that Ogawa "was only reviewed in the context of an

---

[11] Plaintiffs argue obviousness before anticipation.

obviousness analysis with another reference" and, therefore, the court should consider their anticipation analysis. (D.I. 60 at 18) The prosecution history shows otherwise – namely that the examiner considered Ogawa in terms of anticipation, "US Patent No. 7044986 while teaching maleic acid, also teaches it in a list which would be overcome [by] the [Christal] declaration." U.S. Pat. Appl. No. 15/087,415, *Applicant-Initiated Interview Summary* at 3, Sep. 7, 2016. Defendants aver that Ogawa anticipates under a definition in which "hair dye compositions encompass hair bleach compositions." (D.I. 103 at 3) Claim 1 includes "a bleaching formulation" and excludes "hair coloring agents." Defendants have not explained how Ogawa applies in light of either of plaintiffs' claim constructions. Therefore, defendants have not adequately shown a likelihood that they will demonstrate that claim 1 is anticipated by Ogawa.

18. **Obviousness.** As for obviousness, Korean Pat. Appl. No. 2003-0003970 to Kim, et al. ("Kim") was considered extensively by the examiner during prosecution. Defendants argue that "[i]n allowing the '419 patent, the examiner relied extensively on Christal's [rule 132] declaration. Applied to Kim, Christal's explanation of hair dyeing was wrong because Kim only teaches oxidative hair dyeing where no reducing agent is applied." (D.I. 60 at 17) At this stage in the proceedings, the court is not inclined to second guess the assessment of the examiner, who had the Ogawa and Kim references before her, and who "we assume has some expertise in interpreting the references and some familiarity with the level of skill in the art." *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 447 (Fed. Cir. 1986). Defendants have not shown that they could carry their burden to prove obviousness by clear and convincing evidence. For these reasons, it is unlikely that defendants would be able to show that claim 1 of the '419 patent is invalid as anticipated or obvious.

19. **Inventorship.** Similarly, the court is not persuaded that defendants will succeed in their claim of improper inventorship. Defendants' evidence is a Facebook

11

post stating that Joe Santy ("Santy") is "THE original tester for Olaplex[12] and THE man behind the discovery of adding it to color and lightener." (D.I. 61, ex. A at 44) Defendants did not depose Santy, nor did they find any other evidence corroborating his alleged inventorship. In addition, "[t]he error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section." 35 U.S.C. § 256(b). Defendants have not demonstrated that plaintiffs could not correct inventorship if a trier of fact were to determine that Santy is an inventor of claim 1 of the '419 patent. For these reasons, defendants have not shown that the '419 patent is invalid for improper inventorship.

20. **Likelihood of success on the merits – conclusion**. While defendants have failed to demonstrate that they are likely to show invalidity by anticipation, obviousness, or improper inventorship, plaintiffs have not shown that they are likely to prevail on their patent infringement claims. For these reasons, the court concludes that plaintiffs have failed to show that they are likely to succeed on the merits.

21. **Irreparable harm.** Even if a movant demonstrates a likelihood of success on the merits, there is no presumption of irreparable harm. *See, e.g., eBay*, 547 U.S. at 393. To establish irreparable harm, the movant must "clearly establish[ ] that monetary damages could not suffice." *Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) Moreover, Federal Circuit precedent requires a showing of some causal nexus between the alleged infringement and the alleged harm. *See Apple, Inc. v. Samsung Elec. Co., Ltd.*, 735 F.3d 1252, 1359-60 (Fed.Cir.2013) ("Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented features.").

---

[12] Plaintiffs contend that the "parties agree" that Olaplex "does not use the maleic acid formulation claimed in the '419 Patent." (D.I. 96 at 9)

12

22. Based upon the record, the Olaplex product was a marketplace innovation when it appeared on the market in 2014. (See, e.g., D.I. 17, ex. D at 1-4) Since then, numerous competitors have appeared. (Id.; see also D.I. 63, ex. E-1 at 3-4) There is no dispute that Olaplex sells its products as a family and is effectively a single-product company. (D.I. 17 at ¶ 5) Olaplex created what is now a growing market category. (See, e.g., D.I. 17, ex. D at 1-4) Plaintiffs contend that the market for Olaplex products is the "bond builder product category." (D.I. 15 at 19; see also D.I. 17 at ¶ 5) Defendants expand the category to be "the bond builder/additive market," which appears to also encompass conditioners. (D.I. 63 at ¶ 23) While part "No. 3" of the Olaplex product is a conditioning product for home use, and defendants identify numerous products that could fit into this broader category, the scope of claim 1 and the relevant accused products are not conditioners and are, instead, focused treatments applied alongside hair lightening products, often in a salon setting.[13] In light of the expert declarations, the court concludes that defendants are Olaplex's direct competitor in what is a two-player national market. (D.I. 17 at ¶¶ 11-17) Given that defendants have been Olaplex's primary distribution channel (D.I. 18 at ¶ 5), the record shows that Olaplex will continue to face price pressures and declining revenues based upon competition by the accused products. (See, e.g., D.I. 17 at ¶ 8) The price pressure is significant, because "hair stylists, salons and clients are typically very loyal to particular brands and often price conscious." (D.I. 18 at ¶ 13) As the "bond builder" market category is new and growing, it is likely that plaintiffs will be harmed by direct competition in their primary market. Moreover, this direct competition will also effect

---

[13] Given the volume of data presented, the court credits the testimony of plaintiffs' expert, Nisha Mody, PhD ("Dr. Mody"), over defendants' expert W. Todd Schoettlekotte ("Schoettlekotte"), as to the market categories.

plaintiffs' opportunities for long-term success in the bond-builder market. (D.I. 18 at ¶¶ 6, 12-14; D.I. 17 at ¶ 25) Therefore, irreparable harm weighs in favor of plaintiffs.

23. **Balance of the equities.** In assessing the balance of the equities, the court "must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988). Olaplex is a one-product company focused on a specific market category from which it derives all of its revenues. (D.I. 15 at 19; D.I. 18 at ¶ 15) Defendants are elements of a multinational corporate entity, and the accused products account for a small percentage of revenues. (D.I. 96 at 15) Plaintiffs argue that defendants "avoided research and development costs by misappropriating and copying [plaintiff]'s technology" and, therefore, their "investment is limited." (D.I. 15 at 19) Defendants contend that because the accused products do not infringe, plaintiffs "would not be harmed if a preliminary injunction does not issue." (D.I. 60 at 29-30) In the case at bar, plaintiffs will be harmed more if the preliminary injunction is denied than defendants would be harmed if the preliminary injunction is granted. Therefore, the balance of the equities weigh in favor of plaintiffs.

24. **Public interest.** "Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech*, 849 F.2d at 1458. While the public interest favors the protection of patent rights, the public interest is not served by protecting valid patents as against noninfringing uses. In the case at bar, plaintiffs have not demonstrated a likelihood of success on the merits with respect to induced patent infringement, therefore, the public interest weighs against an injunction.

25. **Analysis.** Of the four factors, irreparable harm and the balance of the equities weigh in favor of plaintiffs. The other factors, likelihood of success on the merits and the public interest, weigh in favor of defendants. Given that plaintiffs have not demonstrated a likelihood of success on the merits, a preliminary injunction is inappropriate.

THEREFORE, IT IS ORDERED that plaintiffs' motion for a preliminary injunction (D.I. 14) is denied.

_____
Senior United States District Judge