IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIQWD, INC. and OLAPLEX LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. No. 17-14 (JFB) (SRF) |
| | ) | |
| L'ORÉAL USA, INC., L'ORÉAL USA | ) | **REDACTED –** |
| PRODUCTS, INC, L'ORÉAL USA S/D, | ) | **PUBLIC VERSION** |
| INC., L'ORÉAL S.A. and REDKEN 5TH | ) | |
| AVENUE NYC, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

**LETTER TO THE HONORABLE SHERRY R. FALLON FROM
<u>JEREMY A. TIGAN IN RESPONSE TO DEFENDANTS' AUGUST 8, 2018 LETTER</u>**

OF COUNSEL:

Joseph M. Paunovich
Ali Moghaddas
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000

Adam J. DiClemente
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
55 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849 7000

Matthew K. Blackburn
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA  94111
(415) 692-5202

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com

*Attorneys for Plaintiffs*

Original Filing Date:  August 15, 2018
Redacted Filing Date:  August 23, 2018

# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

————

302 658 9200
302 658 3989 FAX

JEREMY A. TIGAN
302 351 9106
jtigan@mnat.com

August 15, 2018

**BY E-FILING AND HAND DELIVERY**   ████████████████

The Honorable Sherry R. Fallon
J. Caleb Boggs Federal Building
844 N. King Street, Room 6100, Unit 14
Wilmington, DE 19801-3555

> Re:   *Liqwd, Inc. et al. v. L'Oréal USA, Inc., et al.*,
>       C.A. No. 17-14 (JFB) (SRF)

Dear Judge Fallon:

Appearing before Your Honor on August 1, 2018, counsel for L'Oréal represented as follows: "I just want to be clear we're not accusing anyone, you know, of wrongdoing here." Ex. A at Tr. 65:8–10. No new facts have developed in the two weeks since that representation. Nevertheless, L'Oréal seeks the drastic remedy of ***disqualifying*** Olaplex's long-time lead counsel in the PGR proceedings, and barring Olaplex's ***only*** in-house attorney from full participation in this litigation. L'Oréal ignores the plain language and intent of the heavily-negotiated Protective Order, attempting to wield it as a litigation weapon rather than holding it as a shield for its confidential information.

The relief requested is not only unnecessary—the Protective Order has not been violated, and L'Oréal identifies no harm—but it also would impose significant hardship, including significant financial costs to replace outside and in-house counsel and the loss of institutional knowledge necessary for advancing Olaplex's legal rights. The requests should be denied.

## I.   MR. BLACKBURN DID NOT VIOLATE THE PROTECTIVE ORDER AND SHOULD NOT BE DISQUALIFIED

Mr. Blackburn is a litigator with extensive institutional knowledge of Olaplex's business and experience in post-grant proceedings. He has represented Olaplex as its lead PGR counsel in opposing L'Oréal's petitions for more than 16 months. While L'Oréal now asks this Court to bar him from continuing to serve as Olaplex's lead PGR counsel, it does not—and cannot—show that he has violated the terms of the Protective Order. Mr. Blackburn has committed no wrongdoing, and L'Oréal's contrary assertion is baseless.

The Honorable Sherry R. Fallon
August 15, 2018
Page 2

Section 12(c) of the Protective Order defines the scope of "Post Grant Activity" which is subject to the Post Grant Activity bar set forth in Section 12(b). D.I. 54. The prohibited activity is limited to an "amendment or change" to a patent claim that must occur "in any ***post grant proceeding*** involving the patent-in-suit…." *Id.* § 12(c) (emphasis added). Section 12(b) makes clear that the bar on "Post Grant Activity" extends only to an individual who "reviews, accesses, or learns (directly or indirectly) of Defendants' Highly Confidential Protected Material." *Id.* § 12(b).

Further, this "Court approaches motions to disqualify counsel with cautious scrutiny, mindful of a litigant's right to the counsel of its choice." *Walker Digital, LLC. v. Axis Commc'ns AB*, No.1:11-CV-558-RGA, 2012 WL 5878668, at *8 (D. Del. Nov. 21, 2012) (internal quotes omitted). To prevail, L'Oréal must "clearly show that continued representation would be impermissible," and "vague and unsupported allegations" are insufficient. *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 581 (D. Del. 2001) (internal citations omitted); *see also Regalo Intl'l, LLC v. Munchkin, Inc.* 211 F. Supp. 3d 682, 687 (D. Del. 2016) ("[D]isqualification is disfavored.").

### A. Mr. Blackburn Did Not Violate The Post-Grant Activity Bar

#### 1. The Statutory Disclaimer Was Not Part Of "Post Grant Activity"—It Was Filed Directly With The PTO Outside Of Any PGR Proceedings

On May 18, 2018 Olaplex filed a statutory disclaimer on Claim 17 of U.S. Patent No. 9,668,954 (the "'954 Patent" and the "Statutory Disclaimer"). *See* L'Oréal Aug. 8, 2018 Ltr., Ex. B ("Ltr."). Such a disclaimer, under 35 U.S.C. § 253, has the effect of expunging a claim from a patent on the original issue date of that patent; that is, the patent is treated as if the claim never existed. *In re Yamazaki*, 702 F.3d 1327, 1332 (Fed. Cir. 2012).

The Statutory Disclaimer was not filed in the PGR proceeding, and instead was filed on an "ex parte" basis with the U.S. Patent and Trademark Office ("PTO"). Ltr., Ex. B. That Statutory Disclaimer filing is not an action "in" any PGR proceeding for the '954 patent. A statutory disclaimer does not involve "proceedings," but is a mere administrative "recordation." 37 C.F.R. § 1.321(a)(2). In fact, the PTAB expressly stated that disclaimed Claim 17 is not part of the PGR proceeding. D.I. 366, Ex. A at 3 n.1 ("[I]n view of this disclaimer, the Board will not institute post-grant review based on claim 17").

L'Oréal proffers no evidence that an amendment or change was made to any claim in the PGR proceeding—because there is none. Amendments or changes to the patent claims in the PGR are permitted only after the proceeding has been instituted and the time for such a motion in the only instituted PGR proceeding for the '954 Patent (PGR2018-00025) is November 2, 2018. *See* Ex. B at 6 (PTAB Scheduling Order "amendment" deadline); *see also* 37 C.F.R. § 42.221 (rules for amending patent in PGR proceeding).

L'Oréal accuses Olaplex of elevating "form-over-substance," tacitly conceding what is obvious from reading the Protective Order: filing a disclaimer outside of a PGR proceeding is not prohibited. Ltr. at 3. The Protective Order's terms were negotiated by the parties and there is nothing improper in relying on the plain text and meaning of those terms. *See Washington Hosp. v. White*, 889 F.2d 1294, 1300 (3d Cir. 1989) ("[A stipulation is] construed consistently with

The Honorable Sherry R. Fallon
August 15, 2018
Page 3

fundamental precepts of contract construction.").

### 2. *The Statutory Disclaimer Was Not Filed By Mr. Blackburn—It Was Independently Filed By Outside Patent Counsel Rivka Monheit*

Even if the Statutory Disclaimer had occurred within a "post grant proceeding" (it did not), Mr. Blackburn did not file it. Instead, the disclaimer was filed by Olaplex's patent prosecution counsel, Rivka Monheit, Esq., who L'Oréal concedes "does not have access to Defendant's Highly Confidential Information." Ltr. at 4; *see also* Monheit Dec. ¶ 3. Protective orders in intellectual property cases attempt to reduce the risk that those **with access** to confidential information will use it adversely to the producing party (even inadvertently). No such harm can result from actions by those **without access**, like Ms. Monheit. L'Oréal proffers no evidence that Mr. Blackburn violated the Protective Order—because there is none.[1]

### 3. *The Statutory Disclaimer Is Not An "Amendment Or Change"*

Further, the Statutory Disclaimer was not an "amendment or change" as required to trigger the Post Grant Activity bar. *See* D.I. 54 § 12(c). As Section 1490 of the PTO's Manual of Patent Examining Procedure establishes, a "***statutory disclaimer is not, however, a vehicle for adding or amending claims, because there is no provision for such in the statute (35 U.S.C. 253) nor the rules (37 CFR 1.321)***." MPEP § 1490 (I) (emphases added).

L'Oréal's own cases establish that any risk of harm to L'Oréal is eliminated when patent claims are **disclaimed**, *i.e.*, eliminated from the patent, as with the Statutory Disclaimer. *See Xerox Corp. v. Google, Inc.*, 270 F.R.D. 182, 184–85 (D. Del. 2010) (denying motion to amend protective order, noting "while claims may be broadened during prosecution to support new, tailor made infringement allegations, amendments made during [a post grant proceeding] can only serve to *narrow* the original claims.") (emphasis in original); *Boston Sci. Corp. v. Cook Grp. Inc.*, No. 15-980-LPS-CJB, 2017 WL 547903, at *2 (D. Del. Feb. 10, 2017) (noting risk of prejudice "is surely more circumscribed in an IPR proceeding, where amended claims may be narrowed, not broadened").

And, while L'Oréal points to case quotes stating that "strategic narrowing" of claims is a potential risk underlying the Post Grant Activity bar (Ltr. at 3), it makes no attempt to show how the Statutory Disclaimer, fully eliminating Claim 17, harms L'Oréal at all. *In re Yamazaki*, 702 F.3d at 1332 (effect of statutory disclaimer is that "the patent is treated as though the disclaimed claim never existed") (internal quotes omitted). Having neither identified any harm caused by the Statutory Disclaimer nor any potential future harm when Mr. Blackburn continues as Olaplex's PGR counsel, L'Oréal's request for an extreme remedy (*i.e.*, disqualifying Olaplex's lead PGR counsel, Mr. Blackburn, from any PGR proceeding) cannot be granted.[2]

---

[1]   L'Oréal emphasizes that the Statutory Disclaimer was filed by Ms. Monheit one day before Mr. Blackburn, as lead PGR counsel, argued that the Statutory Disclaimer mooted institution on now disclaimed Claim 17. Ltr. at 3. Nothing about this undisputed chronological fact establishes or even suggests impropriety.

[2]   ***The Statutory Disclaimer Did Not Require Confidential Information***: L'Oréal's claim that the Statutory Disclaimer violated the Post Grant Activity bar is also unsupportable because

(Continued . . .)

The Honorable Sherry R. Fallon
August 15, 2018
Page 4

### B. Disqualification Will Deprive Olaplex Of Its Chosen Counsel And Cause Significant Hardship

A "[p]laintiff clearly has a strong interest in choosing its own counsel—particularly in the complex and technical realm of patent litigation." *Xerox*, 270 F.R.D. at 185. That is especially so where, like Mr. Blackburn, "counsel ha[s] acquired expertise in the patents-in-suit [and] the prior art." *Id.* L'Oréal knew that Mr. Blackburn was Olaplex's lead PGR counsel and would have access to highly confidential information in this litigation at the time L'Oréal negotiated the Protective Order, but Mr. Blackburn has not violated and remains fully aware of his obligations under the Protective Order. Blackburn Dec., ¶¶ 4, 8. *See Elonex*, 142 F. Supp. 2d at 581 (denying request on "vague and unsupported" claims).

L'Oréal vaguely asserts "risk of inadvertent disclosure or competitive use" of its information in the PGRs, citing its forthcoming production of unreacted lab notebooks. Ltr. at 3. This demonstrates L'Oréal's motive—they are not seeking disqualification based on an alleged past violation (*i.e.*, the Statutory Disclaimer), but attempting to deny Olaplex its chosen PGR counsel based on the mere specter of some ***potential future*** violation. In balancing any potential risk of future misuse against Olaplex's right to the counsel of its choice, *see In re Deutsche Bank Trust Co. Am.,* 605 F.3d 1373, 1380 (Fed. Cir. 2010), Olaplex's right to retain Mr. Blackburn surely prevails.

Disqualification is further unsupported because Olaplex will suffer extreme hardship if L'Oréal's request is granted. Over more than 16 months as lead PGR counsel, Mr. Blackburn has developed deep knowledge of the patents-in-suit, the related prior art, and the issues in the PGR proceedings. *See* Blackburn Dec. ¶ 7. This Court has recognized the fundamental importance of attorney-knowledge in patent cases: "Forcing plaintiff to rely on less knowledgeable counsel during reexamination would thus ***increase costs and duplicate effort***." *Xerox*, 270 F.R.D. at 185 (emphasis added). This is especially significant here, where a replacement for Mr. Blackburn would need to get up to speed, take discovery, and file the response to L'Oréal's PGR petition in less than ninety days. Walden Dec. ¶ 11; Ex. B at 6.

L'Oréal's suggestion (Ltr. at 4) that Ms. Monheit—back-up counsel—could easily replace Mr. Blackburn is not accurate. Ms. Monheit is not and has never been a litigator, does not have any experience in post-grant proceedings, and her role as back-up counsel in these PGR proceedings has been limited. Monheit Dec. ¶ 4 ("Primarily, I review filings prepared by [Mr. Blackburn] to ensure consistency with the ongoing prosecution portfolio."). If Mr. Blackburn were removed, Olaplex would be forced to spend significant resources retaining new counsel, who would require significant time to become competent. Walden Dec. ¶¶ 11–12. In addition, Ms. Monheit is not involved in ***this*** District Court case. Monheit Dec. ¶ 2. Precluding Mr. Blackburn from acting as PGR counsel would force Olaplex to split its resources between

---

(. . . continued.)

potential grounds for disclaiming Claim 17 of the '954 were evident in the public record. The decision to disclaim Claim 17 could be reached based entirely on ***non-confidential*** filings ***in the PGR proceeding***—***not this case***. *See* Ex. C at 39–40 (L'Oréal USA, Inc. filing in the PGR, dated January 31, 2018, claiming that Claim 17 is invalid and stating alleged legal basis for that position). Olaplex disagrees with L'Oréal's positon as to Claim 17 and its associated arguments.

The Honorable Sherry R. Fallon
August 15, 2018
Page 5

the matters, which this Court has deemed too burdensome. *Xerox*, 270 F.R.D. at 185 ("[P]reventing trial counsel . . . from fully participating in [post-grant] proceedings would force plaintiff to split its resources between two fronts of the same war.").

**II.    THERE IS NO GOOD CAUSE TO MODIFY THE PROTECTIVE ORDER TO EXCLUDE OLAPLEX'S ONLY IN-HOUSE COUNSEL, TIFFANY WALDEN, FROM ACCESS TO HIGHLY CONFIDENTIAL INFORMATION**

"A party seeking a modification to a protective order . . . regarding an attorney's access to otherwise protected information carries the burden of ***demonstrating 'good cause'*** for the modification." *PhishMe, Inc. v. Wombat Security. Techs., Inc.*, No. 16-403-LPS-CJB, 2017 WL 4138961, *2 (D. Del. Sept. 8, 2017) (emphasis added). "Good cause" requires proof that "disclosure will result in a ***clearly defined, specific and serious injury*** [and] broad allegations of harm are not sufficient." *Shingara v. Skiles*, 420 F.3d 301, 306 (3d Cir. 2005) (emphasis added). L'Oréal has not even attempted to meet that standard. Even so, the request must be rejected because none of L'Oréal's justifications support modification. *See infra* Part A. Moreover, the relief requested would cause significant hardship and prevent effective client-management of this litigation, not least because the overwhelming majority of L'Oréal's documents to date are marked Highly Confidential. L'Oréal does not seek to restrict Ms. Walden's access; it seeks to remove her from this case. *See infra* Part B.

**A.    There Is No Basis To Restrict Ms. Walden's Access Under The Protective Order**

The request to restrict Ms. Walden's access to Highly Confidential Information has no relationship to the alleged Protective Order violation related to the Statutory Disclaimer—it is pure gamesmanship. L'Oréal appears to offer three justifications for the requested restriction: (1) an allegedly "shifting role at Olaplex, LLC," (2) alleged "loose treatment" of L'Oréal's Highly Confidential Information, and (3) a belated belief that there are "loopholes" in the Protective Order. Ltr. at 4. Points 2 and 3 are easily dispatched. Olaplex has adhered to the Protective Order at all times and its interpretation of that Order is compelled by its text. *Supra*, Part I. The first point is no stronger: Ms. Walden's business responsibilities at Olaplex have remained the same since she began her employment, and L'Oréal has been aware of them for the ***duration*** of this action.

Even though it was aware of her business responsibilities before this litigation, Ms. Walden's January 17, 2017 declaration made abundantly clear to L'Oréal that she "serve[s] an independent business function [and is] directly or indirectly involved in a variety of business decisions made at Olaplex, including [its] relationships with its distribution partners." D.I. 18, ¶ 1; *see* D.I. 247, ¶ 1 (same). L'Oréal probed this issue in a March 24, 2017 deposition, during which Ms. Walden informed counsel that, in her business role, she is "one of the people that oversee [Olaplex's] distribution accounts." Ex. D at Tr. 22:11–19. L'Oréal has known about Ms. Walden's dual roles for ***more than a year*** without seeking to modify the Protective Order and has waived the right to bar her continued participation on these grounds. *Conley v. Chaffinch*, 431 F. Supp. 2d 494, 499 (D. Del. 2006) (finding movant waived disqualification issue when motion filed nine months after learning of grounds for conflict). Recognizing this, L'Oréal seizes on the new ***title*** granted to Ms. Walden—Chief Administrative Officer—in June 2018. Ltr. at 5. But that title merely reflects the ***administrative*** responsibilities Ms. Walden has

The Honorable Sherry R. Fallon
August 15, 2018
Page 6

performed all along. Walden Dec. ¶ 5. L'Oréal's claim that this title bestows "new responsibilities" (Ltr. at 4) is entirely speculative. Moreover, this title does not imply that Ms. Walden has any particular expertise in patent prosecution or is now responsible for developing Olaplex's intellectual property as L'Oréal asserts. *Cf.* Ltr. at 5. That work is managed internally at Olaplex by inventor Eric Pressly, Walden Dec. ¶ 4, and Ms. Walden's role in patent prosecution is limited to managing the budget, *id.* ¶¶ 4, 11; *see also* Ex. D at Tr. 137:22–23 ("Q. You consider yourself a patent lawyer? A. No.").

Because Ms. Walden's business responsibilities have been constant L'Oréal lacks "good cause" to modify the Protective Order. Further, because her role focuses on ***administration***, and not intellectual property development, there is minimal "risk of inadvertent disclosure or competitive use" under the *Deutsche Bank* balancing test.

### B.   Modifying The Protective Order Would Cause Olaplex Undue Hardship

L'Oréal claims that limiting Ms. Walden's ability to access its Highly Confidential Information is minimally intrusive. Ltr. at 5. That is untrue because the overwhelming majority of L'Oréal's documents have been produced as "Highly Confidential." Walden Dec. ¶ 10.[3] Removing Ms. Walden's access to Highly Confidential Information would effectively remove her from the case.[4] Further, restricting Ms. Walden's access will prevent her from continuing to assist outside counsel in depositions, which frequently include reference to Highly Confidential Information, likely necessitating additional spending for attorneys to take her place. *Id.* ¶ 9.

If Ms. Walden were barred from seeing Highly Confidential discovery, Olaplex would likely be forced to hire additional in-house counsel to fill that role. In addition to the search expenses and salary costs (which will likely run hundreds of thousands of dollars), Olaplex would be required to expend significant time to retain new in-house counsel. *See* Walden Dec. ¶ 10. That is not remotely proportional to the potential risks L'Oréal alleges and L'Oréal's true goal—disrupting Olaplex's advancement of this case—is clear. This Court should not countenance that effort. *See Elonex*, 142 F. Supp. 2d at 584 ("The court will not countenance such tactics [to] depriv[e] [Plaintiff] of its longstanding counsel . . . .").

\*       \*       \*

This Court should deny L'Oréal's request to disqualify Mr. Blackburn from continuing to serve as PGR counsel and should further deny L'Oréal's request to modify Section 12(d) of the Protective Order.

---

[3]   To date L'Oréal has produced 633 documents. Of those, 467 are designated "Highly Confidential," 5 are designated as "Confidential," and the remaining 161 are not designated. In practical terms, 73% of L'Oréal's documents are marked Highly Confidential. The non-designated documents are predominantly prior art references.

[4]   Burdening Ms. Walden's participation—Olaplex's only in-house lawyer—is unjust and would create a fundamental imbalance in the case, where up to three in-house counsel for L'Oréal will maintain the right to access Olaplex's Highly Confidential Information. *See* D.I. 54, ¶6(b).

The Honorable Sherry R. Fallon
August 15, 2018
Page 7

Respectfully,

Jeremy A. Tigan (#5239)

JAT/dam
Enclosure
cc:      Counsel of Record (by CM/ECF and email)

12132597

# EXHIBIT A

1

```
          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE


LIQWD, INC., and OLAPLEX)
LLC,                    )
                        )
         Plaintiffs,    )   C.A. No. 17-14-JFB-SRF
                        )
v.                      )
                        )
L'OREAL USA, INC.,      )
et al.,                 )
                        )
         Defendants.    )


              Wednesday, August 1, 2018
              11:00 a.m.
              Room 6100

              844 King Street
              Wilmington, Delaware


BEFORE:  THE HONORABLE SHERRY R. FALLON
         United States District Court Judge

APPEARANCES:


     MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
     BY:  MARYELLEN NOREIKA, ESQ.

              -and-

     QUINN, EMANUEL, URQUHART & SULLIVAN, LLP
     BY:  JOSEPH M. PAUNOVICH, ESQ.
     BY:  ALI MOGHADDAS, ESQ.

                    Counsel for the Plaintiff
```

2

1    APPEARANCES CONTINUED:

2

3    RICHARDS, LAYTON & FINGER, P.A.
     BY:  FREDERICK L. COTTRELL, III, ESQ.
     BY:  JASON JAMES RAWNSLEY, ESQ.

4         -and-

5    PAUL HASTINGS

6    BY:  JOSEPH E. PALYS, ESQ.
     BY:  DANIEL ZEILBERGER, ESQ.

7    BY:  NAVEEN MODI, ESQ.

8         Counsel for the Defendant

3

1    MS. NOREIKA:  Good morning.  This

2    is Maryellen Noreika and I have the Judge's 11

3    o'clock call in the Olaplex versus L'Oreal case

4    on the line.

5         THE COURT:  This is Magistrate

6    Judge Sherry Fallon.  Ms. Noreika, is everybody

7    on the line?  Can we go into a a roll call?

8    MR. NOREIKA:  Yes, I believe so.

9         THE COURT:  All right.  Who is on

10   the line for Liqwd and Olaplex?

11   MS. NOREIKA:  I have Joe Paunovich

12   and Ali Moghaddas from Quinn Emanuel.

13        THE COURT:  All right.  Very good.

14   And for the L'Oreal defendants?

15   MR. COTTRELL:  Good morning, Your

16   Honor.  Fred Cottrell at Richards Layton.  Jason

17   Rawnsley from my office is in here with me and

18   from Paul Hastings we have Naveen Modi, Joe

19   Palys and Dan Zeilberger.

20        THE COURT:  All right.  Very good.

21   We've got a number of issues to get through.

22   I'm going to start in the order that they were

23   briefed for me.  Plaintiff's letter brief came

24   to me first, so let's start with the plaintiff's

4

1    issues.  And the first item on the agenda on

2    docket item #346, the plaintiff's moving

3    submission, is the alleged missing lab

4    notebooks.  So let's start with that issue.

5         MR. PAUNOVICH:  Thank you, Your

6    Honor.  This is Joe Paunovich on behalf of the

7    plaintiffs.  This is probably a familiar,

8    potentially familiar issue to Your Honor as it

9    was raised during our last discovery

10   teleconference on June 5th, which, as Your Honor

11   may recall, you had encouraged L'Oreal to

12   produce its lab notebooks in an unredacted

13   non-excerpted fashion.  These are, Your Honor,

14   critical documents to this case that have real

15   relevance on opportunity to resolve claims and

16   defenses.  And in fact, in our view, critical

17   documents to the preliminary injunction motions

18   and despite the passage of 20 months, we still

19   do not have them.

20        THE COURT:  Do you not -- excuse

21   me, Mr. Paunovich, clarify for me.  You have

22   zero, nothing or do you have some, incomplete?

23   What's the status?

24   MR. PAUNOVICH:  Sure.  So we have

**61**

1 believe that the prosecution bar has been
2 triggered by Mr. Blackburn. We believe that he
3 shouldn't be allowed to participate in any
4 further post grant activity as defined in the
5 protective order. Two, we'd like a modification
6 of the protective order to exclude Ms. Walden
7 from having access to such highly sensitive
8 information given what has transpired today.
9 　　　　THE COURT: All right. Thank you.
10 Let me hear from plaintiffs.
11 　　　　MR. PAUNOVICH: Thank you, Your
12 Honor. This is Joe Paunovich again. I want to
13 start by pointing out the very clear fact that
14 all of what Mr. Palys has just said, all of the
15 accusations are pure conjecture and a belief
16 that there's some conspiracy for Olaplex to
17 violate this Court's protective orders, which is
18 simply not true. The disclaimer that they have
19 pointed to was filed by Olaplex's outside
20 prosecution counsel who is not counsel of record
21 to this proceeding and the disclaimer was filed
22 in the ordinary course of prosecution, not in
23 connection with the PGR proceedings. L'Oreal
24 has cast a variety of aspersions attributing

**62**

1 this to Mr. Blackburn and to Ms. Walden that is
2 based on nothing other than conjecture. That
3 event happening is something that in a PGR
4 context, was only pointed out to simply say that
5 the dispute raised by L'Oreal is moot with
6 respect to the claim 17 because it's a claim
7 that doesn't exist. Nothing more. The
8 protective order has a prosecution bar quite
9 clearly like almost every single district it
10 provides for that in certain circumstances might
11 preclude an attorney who receives confidential
12 information from amending or adding or changing
13 the claims to, for example, broaden their scope.
14 Not only do we not have the participation of
15 either individual that they complain of doing
16 those things, but more concretely, the issue
17 that they complain of is a simple cancellation
18 by counsel, prosecution counsel not of record to
19 this case, who is ethically walled and has not
20 received any confidential information of
21 L'Oreal. What we viewed this request as is
22 they're essentially asking for an absolutely
23 extraordinary remedy that from our perspective
24 is to design for no other reason but to

**63**

1 prejudice Olaplex. Olaplex is a small company,
2 about 20 employees, from the very beginning
3 until even now. We have one in house individual
4 with any sort of legal training, Ms. Walden.
5 She's not a registered patent attorney, she has
6 no technical background. She'd be the first to
7 admit if she was on the phone that she doesn't
8 view herself as a patent attorney or somebody
9 skilled in the art. She is the single point of
10 contact for the client to advise and direct the
11 litigation in broader set of proceedings
12 relating to the company. And what L'Oreal is
13 asking for is an absolutely extraordinary remedy
14 to preclude Olaplex from having anyone that can
15 direct and guide this case. And that is
16 essentially what would happen, because what we
17 have seen is that almost every single document,
18 almost every single discovery response is marked
19 highly confidential AEO.
20 　　　　I will point out, with respect to
21 Ms. Walden, that this was a negotiated
22 protective order where not only was Ms. Walden
23 allowed to view these materials, but three
24 L'Oreal in house attorneys are also allowed to

**64**

1 view materials, confidential materials from
2 Olaplex. We have the same concerns that they
3 have, but we don't have any basis any more than
4 they do to come in now and make accusations that
5 they're violating the protective order. That's
6 Ms. Walden's piece.
7 　　　　With respect to Mr. Blackburn,
8 again, I would circle back to the fact that this
9 was not a disclaimer that was filed by him. It
10 is frankly we don't think it's the correct
11 reading of the protective order and I won't
12 belabor it. It is outlined in our papers. What
13 the protective order, negotiated protective
14 order provides is that such a person would be
15 barred if they make a change or amendment to a
16 claim in the PGR proceeding. That's not what
17 happened here. We think that this is another
18 clear attempt to prejudice Olaplex by denying it
19 having its chosen counsel for the PGR
20 proceedings, which, as Your Honor I'm sure can
21 appreciate, and even more so for a small
22 company, is an absolutely extraordinary remedy
23 and it has to be based on something more
24 concrete than the conjecture that's been put

65

1  forward by L'Oreal.
2          THE COURT:  All right.  Mr. Palys,
3  is this a conjecture?
4          MR. PALYS:  If I may respond
5  briefly.
6          THE COURT:  Go ahead.
7          MR. PALYS:  Thank you.  I just
8  want to clarify some things.  One I just want to
9  be clear we're not accusing anyone, you know, of
10  wrongdoing here.  It's that we think if you look
11  at the letter, what the protective order says
12  and what has transpired, the prosecution bar has
13  triggered.  And two, with respect to Ms. Walden,
14  Mr. Paunovich says that she by no means has any
15  experience with patents.  Just -- I just looked
16  at her Linkedin, she called herself skilled in
17  litigation, trademark and patents and the
18  College of William & Mary actually has her
19  listed under their alumni for intellectual
20  property and technology law at William & Mary.
21  So in fact she is a direct line to the
22  prosecution.  Mr. Paunovich may just of
23  forgotten our conversations a couple years ago
24  understandably how that was one of the reasons

66

1  why that she had to have access to some of the
2  information, one, to allow they are to have,
3  make business decisions or strategic decisions
4  but also she's the only link to prosecution, to
5  their outside counsel.  Having said that, I
6  think Mr. Paunovich's response really highlights
7  the alleged loophole that can be taken advantage
8  of in the way the protective is currently
9  drafted.  And again, I'll point out that at that
10  time we were privy to Ms. Walden's role,
11  business role.  She's wearing multiple hats for
12  the company.  And so we think that it would
13  prejudice L'Oreal to have this individual have
14  access to such highly sensitive information.
15          Now, if the Court wants to
16  consider different levels, we can certainly
17  appreciate that -- Mr. Paunovich's argument
18  about the size of their company and they only
19  have one individual who is trained in the law.
20  That's fine, but I think we need to -- there has
21  to be a way of finding a middle ground here that
22  can address L'Oreal's concerns with respect to
23  having this individual who can't really unring
24  the bell if she's getting access to highly

67

1  technical sensitive stuff and then also
2  assisting in the prosecution of Olaplex's
3  patents that are being asserted against L'Oreal.
4          MR. PAUNOVICH:  Your Honor, may I
5  respond briefly to those points?
6          THE COURT:  Yes.
7          MR. PAUNOVICH:  I have not
8  forgotten any conversations.  Your Honor, this
9  was an expressly discussed issue between
10  L'Oreal's counsel and Olaplex's counsel.
11  They've have a long-term business relationship
12  through their wholly owned subsidiary and solely
13  understand the business role that Ms. Walden
14  plays.  We raised these specific issues with
15  L'Oreal and negotiated a protective order
16  providing exactly for what her allowed access is
17  to confidential material.  And there's a
18  specific trigger for her.  If she is directing
19  the amendment of claims or disclaimers, then in
20  that instance she would no longer have access.
21  This is, again, this is basically an attempt to
22  redo a negotiated protective order from our
23  perspective to highly prejudice our client.
24  It's an extraordinary remedy, there's absolutely

68

1  no basis to ask for this now other than for the
2  express purpose to try and prejudice our client.
3  The disclaimer in question was made by outside
4  prosecution counsel, Rifka Monet.  She is not
5  counsel to this case.  She is ethically walled,
6  she has no access to confidential information.
7  We understand all our obligations, all of us,
8  including Ms. Walden and Mr. Blackburn, not to
9  provide her any confidential information.  And
10  she is independent counsel that can assess and
11  evaluate based on public records on how and when
12  to manage Olaplex's prosecution in the ordinary
13  course.  The disclaimer that she made was not in
14  connection with the PGR.  This is -- this is not
15  an issue that should result in the prejudice of
16  selection of counsel or direction of litigation
17  to Olaplex.
18          THE COURT:  All right.
19          MR. PALYS:  May I just --
20          THE COURT:  Very brief, but then
21  I'm going to give counsel my position on this.
22  Go ahead.
23          MR. PALYS:  I'm sorry.  Okay.  I
24  appreciate it.  One, I just want to make sure

69

1  that the issues with Mr. Blackburn are still in
2  play here too.  Presumably -- as you can see
3  from what has happened in the preliminary
4  response that has triggered the post grant
5  activity.  And as to Ms. Walden, I think an
6  example might help the court appreciate what
7  could happen here.  Mr. Paunovich just pointed
8  out that the prosecution counsel for Olaplex,
9  who is PGR counsel, is walled off, can't see
10 confidential information.  But Ms. Walden can.
11 So there's nothing to stop Ms. Walden from
12 directing prosecution counsel, say, hey, make
13 these changes based on what she's seeing in the
14 highly sensitive information and outside
15 counsel, prosecution counsel following through.
16 She may not have seen the information that Ms.
17 Walden has, so I think even this that example it
18 shows the type of things L'Oreal has concerns
19 about when they're giving up their highly
20 sensitive information to Olaplex's business
21 personnel.
22         THE COURT:  All right.  Couple of
23 things.  Just a gentle reminder to both sides
24 that when you're doing your rebuttals on the

70

1  back and forth, back and forth, be aware that
2  both my law clerk and I have very thoroughly
3  prepared for these discovery dispute hearings
4  and that when you get into repetitive territory,
5  it just unnecessarily lengthens the duration of
6  these calls and I think both sides are, on their
7  rebuttals, getting a bit too repetitive.  I can
8  assure you that I've thoroughly read the
9  materials and I'm prepared to go forward with
10 all of you and resolve as much of this in bench
11 rulings as I can.  In this particular instance,
12 given the nature of the relief requested by
13 L'Oreal, I am going to order supplemental
14 briefing.  And that's through no fault of
15 counsel.  I understand the constraints of my
16 discovery dispute resolution practice and the
17 four-page limit.  But given the nature of the
18 relief and how it could, if granted, potentially
19 significantly effect the plaintiff's litigation
20 management and strategy with having Mr.
21 Blackburn precluded from further participation
22 of PGR proceedings and having Ms. Walden
23 potentially walled off from review of highly
24 confidential materials, I'm going to ask that

71

1  the moving party, L'Oreal, submit an opening
2  submission within one week of today to further
3  flush this out and also provide the Court with
4  some case authority.  I mean, I think I have in
5  mind and my law clerk and I have in mind the
6  cases that are potentially being relied upon,
7  but it would be nice to see those in the brief
8  and have this issue flushed out in a little bit
9  more detail with respect to both individuals,
10 Mr. Blackburn and Ms. Walden.  I was thinking of
11 a six-page limitation on the supplemental
12 submission.  Do the defendants have any concerns
13 about that limitation or can you do it in six
14 pages?  And I would give the same page
15 limitation to the plaintiffs to respond.
16         MR. PALYS:  This is Joseph Palys
17 for defendants.  I think six pages is fine, Your
18 Honor.
19         THE COURT:  All right.  So six
20 pages for that.  Give it to me within a week of
21 today's hearing.  And then within a week of
22 service of that opening submission on the
23 plaintiffs, plaintiffs respond in six pages
24 within a week of that.  And then I will give the

72

1  defendants an opportunity for a reply.  Normally
2  I don't have opening, answering and reply in
3  these types of hearings, but I think this issue
4  probably warrants it.  So a three-page reply a
5  week after getting the plaintiff's opposing
6  submission.  That will conclude the briefing on
7  it.  I don't think I need another argument.  The
8  transcript will sufficiently serve as background
9  information in conjunction with the supplemental
10 briefing and I will get a written order out
11 after the supplemental briefing is closed.
12 Also, defendants, if you can do one other thing.
13 I think you've spelled it out on the transcript,
14 but it will be helpful nonetheless to have a
15 proposed form of order with the relief that
16 you're seeking with your opening submission as
17 an exhibit to it.
18         MR. PALYS:  We can do that, Your
19 Honor.
20         THE COURT:  All right.  So that
21 concludes at least the protective order issue
22 with respect to L'Oreal's submission.  Are we
23 ready to move on to the next item, item #2,
24 which is the PGR documents?

EXHIBIT B

Trials@uspto.gov                                    Paper 13
571.272.7822                              Entered:  Aug. 10, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

L'ORÉAL USA, INC,
Petitioner,

v.

LIQWD, INC.,
Patent Owner.

_____

PGR2018-00025
Patent 9,668,954 B2
_____

Before TONI R. SCHEINER, CHRISTOPHER M. KAISER, and
TIMOTHY G. MAJORS, *Administrative Patent Judges*.

MAJORS, *Administrative Patent Judge*.

SCHEDULING ORDER

PGR2018-00025
Patent 9,668,954 B2

A.  DUE DATES

This order sets due dates for the parties to take action after institution of the proceeding.  The parties may stipulate to different dates for DUE DATES 1 through 5 (earlier or later, but no later than DUE DATE 6).  A notice of the stipulation, specifically identifying the changed due dates, must be promptly filed.  The parties may not stipulate to an extension of DUE DATES 6 and 7.

In stipulating to different times, the parties should consider the effect of the stipulation on times to object to evidence (37 C.F.R. § 42.64(b)(1)), to supplement evidence (37 C.F.R. § 42.64(b)(2)), to conduct cross-examination (37 C.F.R. § 42.53(d)(2)), and to draft papers depending on the evidence and cross-examination testimony (see section B, below).  In addition, any request for oral argument should be filed by original DUE DATE 4 as set forth in the DUE DATE APPENDIX.

The parties are reminded that the Testimony Guidelines appended to the Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,772 (Aug. 14, 2012) ("Trial Practice Guide") (Appendix D), apply to this proceeding.  The Board may impose an appropriate sanction for failure to adhere to the Testimony Guidelines.  37 C.F.R. § 42.12.  For example, reasonable expenses and attorneys' fees incurred by any party may be levied on a person who impedes, delays, or frustrates the fair examination of a witness.

1.  INITIAL CONFERENCE CALL

If either party wishes to have an initial conference call, the parties will confer and contact the Board within ten days of this order requesting such a conference, and proposing dates and times when counsel for the parties are

PGR2018-00025
Patent 9,668,954 B2

available.  *See* Trial Practice Guide, 77 Fed. Reg. at 48,765–66 (providing guidance in preparing for an initial conference call).

    2.  DUE DATE 1

The patent owner may file—

    a.      A response to the petition (37 C.F.R. § 42.120), and

    b.      A motion to amend the patent (37 C.F.R. § 42.121).

The patent owner must file any such response or motion to amend by DUE DATE 1.  The patent owner is reminded that it must confer with the Board before filing a motion to amend.  37 C.F.R. § 42.121(a).  The patent owner should confer with the Board to request this conference in sufficient time to ensure that the conference is conducted at least one week before DUE DATE 1.  If the patent owner elects not to file anything, the patent owner must arrange a conference call with the parties and the Board.  The patent owner is cautioned that any arguments for patentability not raised in the response will be deemed waived.

    3.  DUE DATE 2

The petitioner must file any reply to the patent owner's response and opposition to the motion to amend by DUE DATE 2.

    4.  DUE DATE 3

The patent owner must file any reply to the petitioner's opposition to the patent owner's motion to amend by DUE DATE 3.

    5.  DUE DATE 4

    a.      Each party must file any observation on the cross-examination testimony of a reply witness (*see* section C, below) by DUE DATE 4.

    b.      Each party must file any motion to exclude evidence (37 C.F.R § 42.64(c)) by DUE DATE 4.

PGR2018-00025
Patent 9,668,954 B2

c.      Each party must file any request for oral argument (37 C.F.R.
§ 42.70(a)) by DUE DATE 4.

6.  DUE DATE 5

a.      Each party must file any response to an observation on cross-
examination testimony by DUE DATE 5.

b.      Each party must file any opposition to a motion to exclude
evidence by DUE DATE 5.

7.  DUE DATE 6

Each party must file any reply for a motion to exclude evidence by
DUE DATE 6.

8.  DUE DATE 7

The oral argument (if requested by either party) is set for DUE
DATE 7.  The Board tentatively plans to hold oral argument (if requested) at
the Patent Office's Denver Regional Office: 1961 Stout Street, 14th floor,
Denver,  CO 80294.

B.  CROSS-EXAMINATION

Except as the parties might otherwise agree, for each due date:

1.      Cross-examination begins after any supplemental evidence is
due.  37 C.F.R. § 42.53(d)(2).

2.      Cross-examination ends no later than a week before the filing
date for any paper in which the cross-examination testimony is expected to
be used.  *Id.*

C.  OBSERVATION ON CROSS-EXAMINATION

An observation on cross-examination provides the parties with a
mechanism to draw the Board's attention to relevant cross-examination
testimony of a reply witness because no further substantive paper is

4

PGR2018-00025
Patent 9,668,954 B2

permitted after the reply.  *See* Trial Practice Guide, 77 Fed. Reg. at 48,768.
The observation must be a concise statement of the relevance of precisely
identified testimony to a precisely identified argument or portion of an
exhibit.  Each observation should not exceed a single, short paragraph.  The
opposing party may respond to the observation.  Any response must be
equally concise and specific.

 D.   COMMUNICATIONS WITH THE BOARD

Except as otherwise provided in the Rules, Board authorization is
required before filing a motion.  37 C.F.R. § 42.20(b).  A party seeking to
file a non-preauthorized motion should request a conference to obtain
authorization to file the motion.  Parties may request a conference with us by
contacting the Board staff by e-mail at Trials@uspto.gov or by telephone at
571-272-7822.

Finally, we refer the parties to the instructions on the Board's website
at http://www.uspto.gov/ip/boards/bpai/prps.jsp regarding the proper use of
email communication to the Board.  Specifically, an email requesting a
conference call should copy the other party, indicate generally the relief
being requested or the subject matter of the conference call, state whether
the opposing party opposes the request, and include multiple times when all
parties are available.  The email may not contain substantive argument.  The
parties also are reminded that they should discuss and attempt to resolve
issues with each other first before requesting conference calls with the
Board.

PGR2018-00025
Patent 9,668,954 B2

## DUE DATE APPENDIX

DUE DATE 1 ................................................................... November 2, 2018

    Patent owner's response to the petition

    Patent owner's motion to amend the patent

DUE DATE 2 ..................................................................... January 25, 2019

    Petitioner's reply to patent owner's response to petition

    Petitioner's opposition to motion to amend

DUE DATE 3 .................................................................. February 22, 2019

    Patent owner's reply to petitioner's opposition to motion to amend

DUE DATE 4 ...................................................................... March 15, 2019

    Observation regarding cross-examination of reply witness

    Motion to exclude evidence

    Request for oral argument

DUE DATE 5 ...................................................................... March 29, 2019

    Response to observation

    Opposition to motion to exclude

DUE DATE 6 .......................................................................... April 5, 2019

    Reply to opposition to motion to exclude

DUE DATE 7 ........................................................................ April 23, 2019

    Oral argument (if requested); Denver Regional Office (tentative)

PGR2018-00025
Patent 9,668,954 B2

PETITIONER:

Michelle E. O'Brien
Timothy J. Murphy
THE MARBURY LAW GROUP, PLLC
mobrien@marburylaw.com
tjmurphy@marburylaw.com


PATENT OWNER:

Matthew K. Blackburn
DIAMOND MCCARTHY LLP
mblackburn@diamondmccarthy.com

Rivka Monheit
PABST PATENT GROUP LLP
rivka@pabstpatent.com

EXHIBIT C

Filed on behalf of L'Oréal USA, Inc.

By: Michelle E. O'Brien
Timothy J. Murphy

THE MARBURY LAW GROUP, PLLC
11800 Sunrise Valley Drive
15th Floor
Reston, VA  20191

Tel: (703) 391-2900
Fax: (703) 391-2901

# UNITED STATES PATENT AND TRADEMARK OFFICE

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

# PETITION FOR POST-GRANT REVIEW

# OF U.S. PATENT 9,668,954

**Mail Stop PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

# TABLE OF CONTENTS

I.    Mandatory Notices (37 C.F.R. §42.8(a)(1)) ......................................................11

II.   Grounds for Standing (37 C.F.R. §42.204(a)) ..................................................14

III.  Identification of Challenge (37 C.F.R. §42.204(b)) .........................................14

   A. Citation of Prior Art....................................................................................14

   B. Statutory Grounds for Challenge and Non-Redundancy...............................16

IV.   The '954 Patent..................................................................................................18

   A.   Overview ....................................................................................................18

   B.   Background of Hair Bleaching/Highlighting .............................................19

   C.   Maleic Acid and Salts Known in Hair Bleaching Prior to 2014................21

      1. Maleic acid and salts were known to repair/reduce damage to ...... bleached
      hair                                                                                    21

      2. Maleic acid and salts were a common ingredient in bleaching    formulations
                                                                                              22

   D.   Prosecution of the '954 Patent ...................................................................23

      1. Pressly was not considered by the Examiner ...............................................23

      2. PO's inaccurate statements regarding Ogawa misled the ........... Examiner
                                                                                              23

V.    Level of Ordinary Skill in the Art ....................................................................26

VI.   Claim Interpretation..........................................................................................27

VII.  Claims 1-30 of the '954 Patent Not Entitled to Any Priority Claim.............28

   A. Legal Standard for Establishing the Priority Date of a Claim ......................29

   B. '954 Patent Claims 1-30 Are Not Entitled to May 2014 Priority    Date.......30

      1. Claims 1, 5, 6, 17:  "about" not supported ..................................................30

VIII. Grounds ...............................................................................................................41

   A. GROUND 1: Claims 1-30 are Unpatentable Under 35 U.S.C. §102(a)(1)
   Over Pressly ..........................................................................................45

B.   GROUND 2: Claims 1–11 and 24-30 are Unpatentable Under 35 U.S.C. §103 over the Ogawa/Berkemer/KR'564 Combination .......................................58

  1.   Claim 1 .................................................................................................60

  2.   Claims 2-4 ............................................................................................73

  3.   Claims 5-6 ............................................................................................73

  4.   Claim 7 .................................................................................................74

  5.   Claim 8 .................................................................................................76

  6.   Claim 9 .................................................................................................77

  7.   Claim 10 ...............................................................................................78

  8.   Claim 11 ...............................................................................................79

  9.   Claims 24-28 ........................................................................................80

  10.   Claim 29 .............................................................................................82

  11.   Claim 30 .............................................................................................83

  12.   Secondary Considerations ................................................................84

  7.   Secondary Considerations ...................................................................94

D.   GROUND 4: Claims 20 and 22 are Unpatentable Under 35 U.S.C. §103 over Ogawa, KR'564, Berkemer, Tanabe, and Stone.................................................95

E.   GROUND 5: Claims 1-30 are Unpatentable Under 35 U.S.C. §112(a) ......100

F.   GROUND 6: Claim 22 is Unpatentable Under 35 U.S.C. §112(a).............102

IX.   Conclusion .................................................................................................105

is not modified by the term "approximately;" (2) the use of two different adverbs to modify different "small amounts" evidences that the second amount of "preferably at least 0.1%" is not modified by the term "approximately," which would include amounts below the minimum amount; and (3) the ranges recited in claims 5-6 are recited in a separate sentence from the recitation of "approximately," demonstrating that those ranges were clearly not intended to be modified by "approximately."

Finally, as noted above, the *Eiselstein* court previously rejected a position that the single use of the term "about" before a series of ranges should be applied to every number in the series. *Eiselstein,* 52 F.3d at 1039. In particular, the court rejected the applicant's argument that the single instance of the term "about" before a series of numbers should be read on every number recited in the series under a plain meaning interpretation, and also rejected the notion that it should be interpreted that way because otherwise requiring an applicant to recite the term "about" before every number "would be both cumbersome and redundant." *Id.* Rather, as in the present case, the court focused on the applicant's choice of language when precision was or was not intended, and confirmed that the applicant clearly knew how to distinguish between when a precise number was, or was not, intended. *Id.*

38

*Petition for Post-Grant Review of*
*U.S. Patent 9,668,954*

Accordingly, the presence of the term of approximation "about" *before each number* in a series of ranges throughout the '954 specification would have led a POSITA to understand that those numbers indicate an approximation, while omission of such a term for numbers in other ranges, such as the disclosure in the '954 specification correlating to the amount of active agent in the bleaching mixture in claims 1, 5, and 6, would have led a POSITA to understand that those numbers indicate precision.

As such, the use of the term "about" in claims 1, 5, and 6 for the amount of active agent in the bleaching mixture expands the scope of the claims beyond that which is supported in any application to which the '954 patent claims priority.  For example, in PGR2017-00012, PO's expert confirmed that the term "about" would be understood by a POSITA to expand the scope of the endpoints of a range by 10%. (Ex. 1026, 80:16-81:19.)  However, an amount of active agent in the mixture *up to 55%* is not supported under 35 U.S.C. §112(a) in any application to which the '954 patent claims priority.

Accordingly, none of claims 1, 5, or 6 of the '954 patent are entitled to any claim of priority, and instead are only entitled to the filing date of the application leading to the '954 patent, *i.e*. January 25, 2017.

### b.  Claim 17: "about" not supported for hair breakage amount

Claim 17, which ultimately depends from claim 1, recites that hair breakage

from the bleaching method is "decreased by at least ***about 40%*** compared to hair

bleached with the bleaching formulation in the absence of the active agent."  (Ex.

1001, claim 17.)  Although the '954 patent specification does not provide specific

disclosure regarding an amount of decrease in hair breakage for a hair ***bleaching***

process, with respect to hair breakage in a hair ***coloring*** process, the '954 patent

specification recites that:

> In some embodiments, hair breakage decreases ***by 5, 10, 15, 20,***
>
> ***25, 30, 35, 40, 45, or 50% or higher*** after treatment with the active
>
> agent compared to untreated hair from the same individual.

(Ex. 1001, 18:27-30; Ex. 1020, 24:27-29; Ex. 1030, 29:18-20; Ex. 1031, 29:18-20;

Ex. 1032, 29:18-20; Ex. 1033, 29:21-23.)  This disclosure notably omits the term

"about," as recited in claim 17.  Therefore, for the same reasons as discussed above

regarding claims 1, 5, and 6, the full scope of claim 17 is not supported by any

application to which the '954 patent claims priority.

In sum, PO's insertion of the term "about" into claims 1, 5, 6, and 17

improperly broadened the claims to extend beyond the disclosed endpoints, and

therefore constitutes new matter.  *See, e.g., Quantum Corp., supra*; *Eiselstein,*

*supra*; *see also Ex parte MARTIN D. BLOOMBERG and MARKS. HOUSTON-*

*MCMILLAN*, 2015 Pat. App. LEXIS 11128 (Comm'r Pat. & Trademarks Nov. 12, 2015.)  As such, none of these claims are entitled to any claim of priority. Further, since claims 2-30 all ultimately depend from claim 1 directly or indirectly, all of claims 2-30 are likewise not entitled to a claim of priority earlier than the filing date of the '954 patent for this reason alone, and therefore should only be given priority as of the filing date of the '954 patent, *i.e.* January 25, 2017.

## VIII.  Grounds

For at least the reasons set forth below in Grounds 1-6, there is a reasonable likelihood that at least one claim of the '954 patent is unpatentable, and as such, the Petition should be granted and Trial instituted.

Regarding Ground 1, a prior art reference anticipates a patent's claim under 35 U.S.C. §102 "when the four corners of [that] . . . document describe every element of the claimed invention, either expressly or inherently, such that a [PHOSITA] could practice the invention without undue experimentation." *Spansion, Inc. v. ITC*, 629 F.3d 1331, 1356 (Fed. Cir. 2010).  For the reasons set forth in Ground 1 below, Pressly anticipates claims 1-30 of the '954 patent.

Regarding Grounds 2-4, Petitioner evaluates the scope and content of the prior art, any differences between the art and the claim, and the knowledge of person of ordinary skill in the art in accordance with *Graham v. John Deere Co.,*

EXHIBIT D



## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF DELAWARE
 3
 4   LIQWD, INC., and OLAPLEX
     LLC,
 5         Plaintiffs,     Case No.: 17-cv-00014-
                                        SLR
 6   vs.
 7   L'OREAL USA, INC., L'OREAL
     USA PRODUCTS, INC., L'OREAL
 8   USA S/D, INC., and REDKEN
     5th AVENUE NYC, L.L.C.,
 9
             Defendants.
10   _____
11
12
13
14
15        VIDEOTAPED DEPOSITION OF TIFFANY WALDEN
16              Los Angeles, California
17              Friday, March 24, 2017
18
19
20
21   Reported by:
22   Mary K. Medley
23   CSR No. 9557
24   Job No.: 10031370
25
```

## Page 2

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF DELAWARE
 3
 4   LIQWD, INC., and OLAPLEX
     LLC,
 5         Plaintiffs,     Case No.: 17-cv-00014-
                                        SLR
 6   vs.
 7   L'OREAL USA, INC., L'OREAL
     USA PRODUCTS, INC., L'OREAL
 8   USA S/D, INC., and REDKEN
     5th AVENUE NYC, L.L.C.,
 9
             Defendants.
10   _____
11
12
13
14
15
16
17
18
19
20        VIDEOTAPED DEPOSITION OF TIFFANY WALDEN, taken
21   on behalf of the Defendants, at 515 South Flower Street,
22   Los Angeles, California, beginning at 9:31 a.m. and
23   ending at 1:12 p.m., on Friday, March 24, 2017, before
24   Mary K. Medley, CSR No. 9557.
25
```

## Page 3

```
 1   APPEARANCES:
 2
 3   For Plaintiffs:
 4      QUINN EMANUEL URQUHART & SULLIVAN, LLP
        BY:  JOSEPH M. PAUNOVICH, ESQ.
 5      856 South Figueroa Street, Tenth Floor
        Los Angeles, California 90017
 6      (213) 443-3000
        joepaunovich@quinnemanuel.com
 7
 8   For Defendants:
 9      PAUL HASTINGS
        BY:  DENNIS S. ELLIS, ESQ.
10      515 South Flower Street, Twenty-Fifth Floor
        Los Angeles, California 90071
11      (213) 683-6273
        dennisellis@paulhastings.com
12
        -and-
13
        PAUL HASTINGS
14      BY:  JOSEPH E. PALYS, ESQ.
        875 15th Street, N.W.
15      Washington, D.C. 20005
        (202) 551-1700
16      josephpalys@paulhastings.com
17
18   Also Present:  Misha Tsirtsan, Videographer
19
20
21
22
23
24
25
```

## Page 4

```
 1                      INDEX
 2   WITNESS                        EXAMINATION
 3   TIFFANY WALDEN
 4        BY MR. ELLIS                7, 140
 5        BY MR. PAUNOVICH            138
 6
 7
 8                    EXHIBITS
 9   Defendant's                          PAGE
10   Exhibit 9    Document headed "3/23/2017,    24
                  (4) santy olaplex - Facebook
11                Search"
12   Exhibit 9A   Document headed "3/24/2017,    48
                  Olaplex - We would like you to
13                meet Joe Santy from...| Facebook
14   Exhibit 10   E-mails dated 8-13-16 re       30
                  "Monday's launch email"
15
                  Exhibit 11   E-mails dated 12-3-12 and     52
16                12-6-12 re "Working Agreement
                  11-30-12/5% Updated"
17
                  Exhibit 12   First Amended Complaint       55
18
                  Exhibit 13   LiQWD Inc. License Agreement  57
19                to Olaplex, LLC
20   Exhibit 14   Declaration Of Tiffany Walden  63
                  In Support Of Olaplex's Motion
21                For A Preliminary Injunction
22   Exhibit 15   Document headed "3/21/2017,    86
                  Tiffany Walden - Olaplex -
23                Vanguard Law Magazine"
24
25
```

1       THE WITNESS:  So I do know what I did in that -- I
2   do know how to respond to that question, but I was
3   responding to these requests working as an attorney for
4   Olaplex, so I'm not sure if I can answer that question.
5       MR. PAUNOVICH:  Given that, I would instruct you not
6   to answer.
7       MR. ELLIS:  Somebody's gotta answer the question
8   about what the company did to produce the documents.  So
9   I don't know if it's her or somebody, but somebody's
10  gotta do it.
11      So maybe you guys want to go outside and talk
12  about it, but somebody's gotta tell me if the document's
13  complete.
14      MR. PAUNOVICH:  You have your instruction to --
15      THE WITNESS:  Okay.
16      MR. PAUNOVICH:  Proceed, Counsel.
17      MR. ELLIS:  Let's mark the transcript.
18      THE WITNESS:  Okay.
19      MR. ELLIS:  Just keep it open.
20      THE WITNESS:  That's fine.
21      MR. PAUNOVICH:  We're going to disagree with that,
22  but go ahead, you can proceed.
23      MR. ELLIS:  You can't instruct her not to answer and
24  put up a witness who was responsible for collecting the
25  documents and not tell me how you did it.

1       Is that your position?
2       MR. PAUNOVICH:  Yes.  She gave you the answer, we've
3   laid the foundation for privilege.  Move on.
4       MR. ELLIS:  What did you say?
5       MR. PAUNOVICH:  I said please move on.
6       MR. ELLIS:  No, you don't tell me to move on, and
7   you don't provide any instructions here, all right.
8   This is my deposition, I'll ask whatever questions I
9   want.
10      MR. PAUNOVICH:  Okay.
11      MR. ELLIS:  And if you want to instruct her not to
12  answer wrongfully 15, 20 times, I'll get it on the
13  record --
14      MR. PAUNOVICH:  Okay.
15      MR. ELLIS:  -- but you don't tell me to move on.
16      MR. PAUNOVICH:  It's on the record.
17      MR. ELLIS:  Do you understand?
18      Q.  Now, at some level, did you ever take any
19  steps, other than plugging your computers into this USB
20  that you got from the vendor, who you don't know the
21  name of, to actually make sure that you retrieved all
22  hard copy documents from the custodians who were on the
23  hold notice?
24      MR. PAUNOVICH:  I'll give you the same caution.
25      THE WITNESS:  Okay.

1       Yes.
2       MR. ELLIS:
3       Q.  What did you do in that regard, to make sure
4   that you collected all physical hard copy documents from
5   employees of the company?
6       A.  I think we're going to run into the same issue
7   that my attorney had two questions ago where I did
8   things, but I don't know -- but I was acting as an
9   attorney on instruction of counsel to do such things.
10  So I'm not sure how I can answer to this question.
11      Q.  Do you understand the difference between
12  communications which are protected by the
13  attorney-client privilege and what you actually did?
14      Like if you went and got a box of documents,
15  that's not protected by any privilege.
16      A.  Okay.
17      Q.  And if you talked to somebody, I think he's
18  wrongfully instructing you not to answer in that regard,
19  but we'll let him do that.
20      But what did you do?
21      A.  Okay.  I under- --
22      Q.  Did you tell people to put it in a conference
23  room, or did you go collect them out of a conference
24  room?
25      What did you physically do to make sure that

1   the hard copy documents were turned over to counsel so
2   they could be produced to us?
3       A.  Okay.  Thank you.  I under- -- I understand
4   what you're asking for now.
5       I had conversations.
6       Q.  And did you physically ever, at any point in
7   time, give a collection of hard copy documents over to
8   your counsel?
9       A.  I -- I don't believe so.
10      Q.  Was there any point in time where you took
11  physical hard copy documents and either imaged them, put
12  them in -- reduced them to .pdf or other electronic
13  format and then sent those over to counsel?
14      A.  I think that that's -- that for me personally
15  is how I operate in my day-to-day life.  I -- Olaplex
16  doesn't have a headquarters, we don't have a physical
17  office, so everyone works from home.  So that's how I
18  personally operate, where if I have a -- if someone --
19  if I get a letter, I scan it immediately and put it on
20  to the computer.
21      Q.  Ms. Walden, at any point in time when you were
22  producing documents in this case, did you ever touch,
23  hold physically a hard copy document and give those to
24  counsel, either electronically or in its hard copy
25  format?

Page 21

1    A.  I would have given them electronic documents.
2    Q.  So you didn't produce, to your knowledge, at
3  any point in time, any physical paper documents to
4  counsel?
5    A.  Not that I'm aware of.
6    Q.  Do you believe you're generally familiar with
7  the documents that have been provided to counsel for
8  production in this case?
9    A.  I mean, there's been a lot of documents, so I
10  have a general familiarity with the categories.  I can't
11  say I know every single thing that was turned over.
12    Q.  Did you review all the documents that were
13  turned over to counsel?
14    A.  I did not.
15    Q.  At some level, you didn't quality assure that
16  what would have been taken off the computers from the
17  vendor were actually responsive documents that went over
18  to counsel?
19    A.  I did some of them, but I think there were --
20  there were so many, I just -- like I put in a good
21  effort on it, I think, but I couldn't do it all.
22    Q.  Your declaration mentions that you perform some
23  business functions for the company.
24        You recall that?
25    A.  I do.

Page 22

1    Q.  In relationship to those business functions
2  versus your function as a lawyer, can you give me a
3  percentage of how much relates to the business versus
4  how much relates to your work as a lawyer?
5    A.  Sure.
6        It depends on day, week, month of what's going
7  on.  Right now, obviously, this week, heavy lawyer week.
8  It's probably 60-40, 60 percent attorney work,
9  40 percent business, could be 30-70 or some version of
10  that.
11    Q.  And what specific issues do you perform in the
12  business function capacity?
13    A.  Olaplex is a really small company, so I feel
14  like a lot of people do a lot of different things that
15  wouldn't -- wouldn't happen at a bigger company.
16        One of the big things I do is, I oversee --
17  many -- one of the people that oversee our distribution
18  accounts, specifically a lot of our international
19  accounts.
20    Q.  Are you or anybody at Olaplex -- or is anybody
21  at Olaplex responsible for the content on Olaplex's
22  social media pages?
23    MR. PAUNOVICH:  Objection.  Form.
24    THE WITNESS:  Can you go through -- so --
25    MR. ELLIS:

Page 23

1    Q.  Facebook?
2    A.  So, for Facebook, I -- so on the Facebook page,
3  yes, someone at Olaplex would upload content onto the
4  Facebook -- Olaplex's Facebook page.
5    Q.  Do you play any role in making sure that the
6  information on that page is accurate?
7    A.  I can sometimes.
8    Q.  Is there any protocols or procedures in place
9  about how something can get uploaded to your Facebook
10  social media page?
11    A.  There is not.
12    Q.  You guys rely heavily on social media to market
13  your products; correct?
14    A.  We do.
15    Q.  And you rely heavily on social media to market
16  the company; correct?
17    A.  The company versus the product, sure.
18    Q.  And, in part, some of the goodwill that you
19  believe you've generated for the company is through its
20  social media; right?
21    A.  Right.  We think we have a very engaged social
22  media following.
23    Q.  And you believe, don't you, that you must be
24  truthful and accurate on your social media pages; right?
25    A.  Yes.

Page 24

1    Q.  And so if something is on your social media,
2  you would hope that it would be a truthful statement and
3  be accurate and truthful with respect to the facts
4  described therein; right?
5    A.  I would hope so.
6    Q.  Yeah.
7        You know who Joe Santy is; right?
8    A.  I do.
9    MR. ELLIS:  I'll mark as 8 what I believe is a
10  comment or portion of the Olaplex Facebook page.
11    THE REPORTER:  It's going to be 9.
12    MR. ELLIS:  9.
13        (Whereupon the document referred to is marked
14  by the reporter as Defense Exhibit 9 for
15  identification.)
16    MR. ELLIS:
17    Q.  I handed you what purports to be a page from
18  the Olaplex Facebook page.
19        Do you recognize that as such?
20    A.  No.
21    Q.  You don't believe this is off the Olaplex
22  Facebook page?
23    A.  I -- I can't tell based on how this is printed.
24  It looks like it might be -- it's a shared photo, but it
25  says "Randy Darden Hair, Makeup and Henna shared

1   A.  I do know that.

2      Q.  It was an application, or was it an actual

3   granted U.S. patent?

4   A.  It was a granted patent.

5      Q.  And what happened?

6   A.  I believe the company was like -- I don't know

7   if they're even still in business.  I think they were

8   sued and delisted from NASDAQ.

9       So we sent them a letter, and they kind of

10  imploded.  And we hadn't seen the product for sale

11  anymore, so we considered it a resolution.

12     Q.  Are you familiar with a company named Henkel?

13  A.  I am.

14     Q.  Did you ever accuse them of infringing on any

15  of Olaplex's patents or intellectual property?

16  A.  In the United States?  Anywhere in the world?

17     Q.  Sure.

18  A.  In the United States, I do not believe Henkel

19  is infringing on any of Olaplex's intellectual property.

20  Internationally, I'm not sure.

21     Q.  My question was, did you accuse them --

22  A.  Oh, did I accuse them of it?  I don't believe I

23  have, no.

24     Q.  Did you -- not you personally, but Olaplex

25  write them?

1   A.  I believe that Olaplex informed Henkel of a

2   patent -- right of a patent that was filed but not yet

3   published, and informed them that if they did launch

4   with this product and the patent granted, they would be

5   infringing.

6      Q.  With respect to the DS Laboratories and Henkel

7   or any of these other companies that you have believed

8   may be infringing on any intellectual property of

9   Olaplex, does that intellectual property relate to the

10  same bond builder market that the Olaplex products are

11  distributed in?

12  A.  I don't believe the Henkel product is for sale

13  in the United States at all, so the answer is no.  And

14  continuum, no, I don't even know if that product -- like

15  it's not sold at any of our -- at Salon Centric or

16  CosmoProf or any of our stores.

17     Q.  You're familiar with this Lab Muffin article?

18  A.  I know there's an article from someone called

19  Lab Muffin because I -- it's a funny name, but I don't

20  know anything other than that it exists.

21     Q.  Let me show it to you.

22  A.  Okay.

23     Q.  Exhibit Number 24.

24      (Whereupon the document referred to is marked

25  by the reporter as Defense Exhibit 24 for

1   identification.)

2   MR. ELLIS:

3      Q.  Turn to page 98, and if you look at the bottom

4   right corner, they say, like, "85 of 114" and stuff like

5   that.

6   A.  98?

7      Q.  Yeah.

8   A.  Okay.  Yes.

9      Q.  Or 99.  Actually, it's 99 of 114.

10  A.  Okay, I see it.

11     Q.  There's a reference that somebody had spoke to

12  Dean, I believe it means Dean Christal, and he had

13  provided some information regarding chemistry of the

14  product and how it operated.

15      Is there any procedures in place at Olaplex

16  whereby Mr. Christal can offer, either in blogs or on

17  social media, his opinions regarding the chemistry of

18  the products?

19  A.  What do you mean, is there a procedure?

20     Q.  Policies.

21  A.  Is Mr. Christal allowed to do it?

22     Q.  Yeah.

23  A.  Yeah.  He would -- Yes, he would be allowed to.

24     Q.  Would there be any policy or procedures in

25  place about how anything he says is vetted before it's

1   sent out, or can he just send it out without any review

2   by yourself or anybody else?

3   A.  There is not a written policy or procedure.  I

4   think, practically, he would review it with Dr. Pressly,

5   if it was scientific.

6       And I believe he would speak to me if he

7   thought it was legally significant or significant in

8   another way that he thought would be appropriate for me

9   to see it as well.

10     Q.  Certainly, there are some times that he posts

11  things without anybody's review; right?

12  A.  That is probably true.

13     Q.  Uh-huh.

14      Can I get a second here to talk to my

15  counsel -- co-counsel here.

16  A.  Should we fix the one thing with the

17  declaration?

18  MR. PAUNOVICH:  Just let him finish and when he's

19  done.

20  MR. ELLIS:  If he wants to, yeah.

21  THE WITNESS:  Okay.

22  MR. ELLIS:  Can I maybe get, like, five minutes.

23  MR. PAUNOVICH:  Yeah, of course.

24  THE VIDEOGRAPHER:  Going off the record.  The time

25  is 1:02 p.m.

1     (Interruption in proceedings.)
2     THE VIDEOGRAPHER:  Back on the record.  Time is
3  1:07 p.m.
4     MR. ELLIS:  Going to mark as Exhibit Number 27
5  Intellectual Property Theft Investigation Conference
6  sheet for district attorney.
7     MR. PALYS:  22.
8     MR. ELLIS:  22.  Mark as Exhibit 22.
9     (Whereupon the document referred to is marked
10  by the reporter as Defense Exhibit 22 for
11  identification.)
12     MR. ELLIS:
13  **Q.  Earlier this year, you spoke at a conference**
14  **regarding a -- successful patent prosecutions?**
15     A.  No, I did not.
16  **Q.  What did you speak on?**
17     A.  I didn't speak at this at all.
18  **Q.  You were listed to speak.**
19     A.  They invited me to speak, but I couldn't do it.
20  **Q.  You didn't do it?**
21     A.  Huh-uh.
22  **Q.  You consider yourself a patent lawyer?**
23     A.  No.
24  **Q.  Other than your work at Olaplex, have you been**
25  **involved in any patent prosecutions?**

1     A.  Prosecutions?  Design patents, so a little bit,
2  but not really.
3     MR. ELLIS:  All right.  All right.  That's all I
4  have.
5     THE WITNESS:  All right.
6     MR. PAUNOVICH:  Real quick.
7
8     EXAMINATION
9  BY MR. PAUNOVICH:
10  **Q.  So Exhibit 14, if you can pull it out,**
11  **Ms. Walden.  Exhibit 14 is a copy of your declaration.**
12     **Do you see that?**
13     A.  I do.
14  **Q.  Did you review that in preparation for your**
15  **deposition?**
16     A.  I did.
17  **Q.  Is there anything in it that you would like to**
18  **correct?**
19     A.  Yeah, I found two things.  One is, I reference
20  in Exhibit A to a Salon Centric survey twice and only
21  one is attached.  There should be a second survey.
22  **Q.  Let's just turn to page 3 of Exhibit 14.**
23     A.  Sorry.
24  **Q.  Is the -- What Exhibit A are you referring to,**
25  **or what portion is it that you'd like to correct?**

1     A.  I think that the survey was not attached here,
2  and we need -- and I think we've turned it over, but I
3  don't think we've attached it.
4  **Q.  And is that -- You're saying the survey that is**
5  **not attached is the one referred to as Exhibit A at the**
6  **end of paragraph 7?**
7     A.  I believe so.  I know we reference two surveys,
8  I know we only attached one.
9  **Q.  And that's the survey that you're relying on,**
10  **the one that's been produced that provides for the**
11  **68 percent of hair colorists that use Olaplex also offer**
12  **their clients No. 3?**
13     A.  Yes.
14     MR. ELLIS:  Objection.  Leading.
15     THE WITNESS:  I believe so.
16     MR. PAUNOVICH:
17  **Q.  Are there any other corrections that you'd like**
18  **to make to your declaration?**
19     A.  Yeah, here (indicating), for some -- I wrote --
20  I don't have any idea why the "At-Home" for the No. 3 is
21  $14.  It's actually $28.
22  **Q.  When you say "here," what are you referring to?**
23     A.  Oh, actually, no, that's accurate.  I know why
24  I did that.
25     I believe that here (indicating) -- sorry, I

1  was thinking about on page 3, but that -- that price
2  actually does -- that does stand.  I'm sorry.
3  **Q.  Okay.  So the only correction you have is**
4  **the -- to the attached survey which is not attached, but**
5  **referred to at the end of paragraph 7?**
6     A.  Exactly.
7     MR. PAUNOVICH:  Thank you.
8
9     EXAMINATION
10  BY MR. ELLIS:
11  **Q.  Why did you do that?**
12     A.  Why did I make a mistake?
13  **Q.  No, why did you use that price in your**
14  **declaration that was $14 as opposed to 28?**
15     A.  Oh, so the No. 3's retail product.  So the
16  $14 is what the stylists buy it for.  They retail at 28.
17  So when I was thinking the price, I was thinking of the
18  end-user price, not the price of apples to apples on
19  what the salons are buying it for and -- yeah, I just
20  mis- --
21  **Q.  ██████████████████████████  Sandy, do**
22  **you remember how to spell her last name?**
23     A.  I don't.  I don't.  I don't know.
24  **Q.  Do you have documents --**
25     A.  She's Tracey Cunningham's sister.