## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LIQWD, INC. and OLAPLEX LLC,            )
                                        )
          Plaintiffs,                   )
                                        )
     v.                                 )     Civil Action No. 17-14-JFB-SRF
                                        )
L'ORÉAL USA, INC., L'ORÉAL USA          )
PRODUCTS, INC., L'ORÉAL USA S/D,        )
INC., and REDKEN 5TH AVENUE NYC,        )
L.L.C.,                                 )
                                        )
          Defendants.                   )

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this patent infringement action are the following motions: (1) the renewed motion for a preliminary injunction filed by plaintiffs Liqwd, Inc. and Olaplex LLC (together, "Olaplex") (D.I. 239), which was remanded to this court by mandate of the Federal Circuit on April 5, 2018 (D.I. 217), and (2) the motion to strike the declaration of Nisha Mody, Ph.D, filed by defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., L'Oréal USA S/D, Inc., and Redken 5th Avenue NYC, LLC (collectively, "L'Oréal") (D.I. 266). For the following reasons, I recommend that the court grant Olaplex's motion for a preliminary injunction and deny the motion to strike.

### II.   BACKGROUND

#### A.  Patents-In-Suit

On November 22, 2016, the United States Patent and Trademark Office (the "USPTO") issued United States Patent No. 9,498,419 ("the '419 patent"), entitled "Keratin Treatment Formulations and Methods." The '419 patent was filed on March 31, 2016 on a fast track, and

claims priority to United States Provisional Application No. 61/994,709, which was filed on May 16, 2014. The '419 patent is a continuation of parent application 14/713,885, which was filed on May 15, 2015, published on November 19, 2015, and issued as U.S. Patent No. 9,326,926 on May 3, 2016. The '419 patent lists as inventors Eric D. Pressly and Craig J. Hawker ("the inventors"), and identifies Liqwd, Inc. as the assignee. The '419 patent discloses "[f]ormulations, kits, and methods for rebuilding the disulfide bonds in keratin" to be applied in conjunction with a hair coloring treatment. ('419 patent, Abstract)

While the '419 patent was pending before the USPTO as Patent Application No. 15/087,415, a series of anonymous submissions were made on August 25, 2016, August 29, 2016, September 14, 2016, and September 23, 2016 alleging that the pending claims could not be allowed. (D.I. 262 at ¶ 83) Olaplex alleges that L'Oréal made one or more of the third-party submissions to the USPTO to prevent the issuance of the '419 patent. (*Id.* at ¶ 84) The third-party submissions were rejected, and the '419 patent was issued. (*Id.* at ¶ 85) On July 19, 2017, the USPTO's Patent Trial and Appeal Board ("PTAB") instituted post-grant review ("PGR") of claims 1-8 and 10 of the '419 patent. (D.I. 143, Ex. D)

The PTAB issued a final written decision in the PGR proceedings on June 27, 2018, finding claims 1-8 and 10 of the '419 patent unpatentable. (D.I. 339, Ex. A) Specifically, the PTAB rejected L'Oréal's contention that the '419 patent is invalid as anticipated by U.S. Patent No. 7,044,986 to Ogawa *et al.* ("Ogawa"), but concluded that the '419 patent is invalid under 35 U.S.C. § 103 as obvious over the combination of Ogawa, Berkemer, German Patent App. Pub. No. 1,220,969 ("Berkemer"), and Korean Patent App. Pub. No. 10-2006-0059564 ("KR '564"), as well as the combination of Kitabata *et al.*, U.S. 2002/0189034 A1 ("Kitabata"), Berkemer, and KR '564. (D.I. 339, Ex. 1 at 9-40) On July 10, 2018, Olaplex appealed the PTAB's final written

2

decision to the Federal Circuit. (D.I. 337, Ex. A) The appeal of the PTAB's final written decision remains pending before the Federal Circuit.

United States Patent No. 9,668,954 ("the '954 patent") (together with the '419 patent, the "patents-in-suit") was filed on January 25, 2017 and issued on June 6, 2017. The '954 patent is a continuation of United States Patent Application No. 15/290,593, which is a continuation of the '419 patent. The '954 patent has the same title, inventors, and specification as the '419 patent. The active agent element in claim 1 of the '954 patent requires application of a bleaching mixture containing an active agent of maleic acid to the hair. ('954 patent, col. 25:58-67) On August 10, 2018, the PTAB instituted PGR proceedings regarding the '954 patent. (D.I. 366, Ex. A)

## B. Parties

Olaplex LLC is a California start-up that discovered, developed, and sells professional hair care products including Olaplex Bond Multiplier No. 1 ("Bond Multiplier"), which protects hair during bleach treatments. (D.I. 262 at ¶¶ 2, 18) Olaplex LLC is purportedly the exclusive licensee of the patents-in-suit pursuant to a May 20, 2014 licensing agreement. (*Id.* at ¶ 26; D.I. 68, Ex. A at 57:4-58:11 and Ex. 13) Olaplex LLC formally launched in June 2014 via its website. (D.I. 262 at ¶ 32) Liqwd, Inc. is a California company which is the alleged owner of the patents-in-suit. (*Id.* at ¶¶ 6, 26)

L'Oréal USA Products, Inc., L'Oréal USA S.D., Inc., and Redken 5th Avenue NYC L.L.C. are subsidiaries of co-defendant L'Oréal USA, Inc. (D.I. 262 at ¶¶ 9-11) L'Oréal USA, Inc. is a wholly-owned subsidiary of L'Oréal S.A., a French company headquartered in France.[1]

---

[1] L'Oréal S.A. was dismissed from the present action pursuant to the undersigned judicial officer's February 28, 2018 Report and Recommendation recommending dismissal for lack of personal jurisdiction pursuant to Rule 12(b)(2). (D.I. 186 at 51 n.20) The district judge adopted

(D.I. 53 at ¶ 11) L'Oréal develops and manufactures hair care, skin care, cosmetics, and fragrances distributed through over 30 brands. Three of L'Oréal's products are accused of infringement by Olaplex in the present case: Matrix Bond Ultim8 Step 1 Amplifier, Redken pH-Bonder #1 Bond Protecting Additive, and L'Oréal Professionnel Smartbond Step 1 Additive (collectively, the "Accused Products"). (D.I. 262 at ¶¶ 60-61)

## C. Facts

Dean Christal, the CEO of Olaplex LLC and Liqwd, Inc., worked with Drs. Pressly and Hawker to develop a hair product that would protect hair during chemical treatments. (D.I. 262 at ¶¶ 20-21) Olaplex launched its products online in June 2014. (*Id.* at ¶ 32) In November 2014, Olaplex launched in the United States by marketing its products through Salon Centric, a wholesale salon and beauty supply distributor wholly owned by L'Oréal. (*Id.* at ¶ 33)

In January 2015, Christal was contacted by a L'Oréal executive regarding a potential acquisition of Olaplex. (D.I. 262 at ¶ 40) Olaplex and L'Oréal subsequently met five times throughout 2015 to discuss a potential acquisition. After meeting on February 20, March 27, and April 14, Olaplex and L'Oréal executed a nondisclosure agreement ("NDA") effective May 15, 2015. (*Id.* at ¶¶ 41, 43-46; Ex. B) On May 19, 2015, Olaplex provided a copy of unpublished patent application 14/713,885 to L'Oréal pursuant to the terms of the NDA, disclosing the active ingredient and formula used in the Accused Products months before the application was published. (*Id.* at ¶ 47) Christal and Pressly met with L'Oréal representatives on the same day, providing an in-depth explanation of how the formula works and what testing is needed to ensure efficacy. (*Id.* at ¶¶ 50-57) The parties subsequently met on September 1, 2015, and a

---

the Report and Recommendation in its entirety on April 23, 2018. (D.I. 234) In a June 26, 2018 Order, the district judge reaffirmed the court's conclusion that there is no personal jurisdiction over L'Oréal S.A., and L'Oréal S.A. is therefore dismissed with prejudice. (D.I. 317)

4

representative of L'Oréal informed Christal that L'Oréal was no longer interested in the acquisition. (*Id.* at ¶ 59) Following the cessation of negotiations, L'Oréal developed the Accused Products. (*Id.* at ¶ 60)

## D. Procedural History

On November 22, 2016, the '419 patent was issued by the USPTO, and Olaplex filed a complaint against L'Oréal for infringement of the '419 patent and false advertising in the Central District of California (the "California Action"). (D.I. 262 at ¶ 112; C.D. Cal. C.A. No. 16-8708-R-AFM, D.I. 1) Olaplex filed the present action on January 5, 2017 against L'Oréal after dismissing the California Action, asserting causes of action for the alleged infringement of the '419 patent, misappropriation of trade secrets under the Defend Trade Secrets Act, misappropriation of trade secrets under the Delaware Trade Secrets Act, unjust enrichment, breach of contract, and breach of the implied covenant of good faith and fair dealing. (D.I. 2) On January 17, 2017, Olaplex filed a motion for a preliminary injunction, alleging that it had suffered and would continue to suffer irreparable harm unless L'Oréal's infringement was enjoined. (D.I. 14)

Olaplex filed its first amended complaint on March 20, 2017, adding L'Oréal S.A. as a defendant. (D.I. 53) In response, L'Oréal filed its motion to dismiss the first amended complaint on April 17, 2017, alleging that Olaplex did not have standing to maintain the action under Rule 12(b)(1), and arguing that the causes of action failed to state a claim under Rule 12(b)(6). (D.I. 66) L'Oréal S.A. followed suit on June 15, 2017, filing a motion to dismiss for insufficiency of service of process, lack of personal jurisdiction, lack of standing, and failure to state a claim. (D.I. 117) On June 21, 2017, Olaplex moved for leave to file a second amended complaint, seeking to add a cause of action for infringement of the '954 patent, and striking its causes of

5

action for unjust enrichment and breach of the implied covenant of good faith and fair dealing. (D.I. 126, Ex. 2)

On June 8, 2017, Judge Robinson heard argument on the pending motion for preliminary injunction and L'Oréal's pending motion to dismiss. (D.I. 114) Judge Robinson issued a memorandum order on July 6, 2017, denying Olaplex's motion for a preliminary injunction. (D.I. 135) Specifically, Judge Robinson found that Olaplex failed to demonstrate a likelihood of success on the merits, even though it established irreparable harm. (*Id.*) On July 11, 2017, Olaplex appealed the ruling on the preliminary injunction to the Federal Circuit. (D.I. 136) The Federal Circuit issued its opinion on January 16, 2018, vacating the district court's denial of a preliminary injunction and remanding the case to the district court for further proceedings. (D.I. 176, Ex. 1) The Federal Circuit returned the mandate to this court on April 5, 2018, making the judgment of the Federal Circuit final. (D.I. 217)

On February 28, 2018, the court issued its Report and Recommendations, granting Olaplex's motion to amend the complaint, denying L'Oréal's motion to dismiss, and granting-in-part L'Oréal S.A.'s motion to dismiss. (D.I. 186) The district judge adopted the Report and Recommendations on April 23, 2018, and Olaplex filed its second amended complaint on May 14, 2018. (D.I. 234; D.I. 262) In response to the second amended complaint, on June 12, 2018, L'Oréal filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). (D.I. 302) The motion to dismiss remains pending.

On April 26, 2018, Olaplex filed its renewed motion for a preliminary injunction in response to the Federal Circuit's mandate, in accordance with the briefing schedule established by the court. (D.I. 239; D.I. 232) On June 21, 2018, the court held oral argument on the

6

renewed motion for a preliminary injunction and the related motion to strike the declaration of

Dr. Nisha Mody.

## III.  DISCUSSION

### A.  Renewed Motion for Preliminary Injunction

#### 1.  Legal Standard

"[A] preliminary injunction[2] is a drastic and extraordinary remedy that is not to be

routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993);

*see also Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991, 996 (Fed. Cir. 1985) ("Only a viable

threat of serious harm which cannot be undone authorizes exercise of a court's equitable power

to enjoin before the merits are fully determined." (internal quotation marks and citations

omitted)).  However, the court may issue a preliminary injunction "in accordance with the

principles of equity" pursuant to 35 U.S.C. § 283 if the movant establishes: (1) a reasonable

likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) that

the balance of equities tips in the movant's favor; and (4) that the injunction is in the public

interest. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375-76 (Fed. Cir. 2009).

---

[2] "The grant, denial, or modification of a preliminary injunction . . . is not unique to patent law, so [the Federal Circuit] applies the law of the regional circuit when reviewing and interpreting such a decision." *Aevoe Corp. v. AE Tech Co.*, 727 F.3d 1375, 1381 (Fed. Cir. 2013).  However, the Federal Circuit applies its own body of precedent "insofar as it reflects considerations specific to patent issues." *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1203 (Fed. Cir. 2017) (quoting *Murata Mach. USA v. Daifuku Co.*, 830 F.3d 1357, 1363 (Fed. Cir. 2016)).  *Cf. Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988) (recognizing the existence of confusion regarding whether Federal Circuit law or regional circuit law provides the standards governing the issuance of a preliminary injunction pursuant to 35 U.S.C. § 283, and concluding that "a preliminary injunction of this type, although a procedural matter, involves substantive matters unique to patent law and, therefore, is governed by the law of [the Federal Circuit.").

Although the court must balance each of these factors before granting a motion for a preliminary

injunction, "a movant cannot be granted a preliminary injunction unless it establishes *both* of the

first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com,*

*Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citing *Vehicular Techs.*

*Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1088 (Fed. Cir. 1998)).

A "patentee's entitlement to such an injunction is a matter largely within the discretion of

the trial court." *Titan Tire*, 566 F.3d at 1375. "[A]ll findings of fact and conclusions of law at

the preliminary injunction stage are subject to change upon the ultimate trial on the merits."

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363 (Fed. Cir. 2001).

## 2. Analysis

### (a) Reasonable likelihood of success on the merits

"With regard to the first factor—establishing a likelihood of success on the merits—the

patentee seeking a preliminary injunction in a patent infringement suit must show that it will

likely prove infringement, and that it will likely withstand challenges, if any, to the validity of

the patent." *Titan Tire*, 566 F.3d at 1376. A plaintiff cannot show a likelihood of success on the

merits if the alleged infringer raises a substantial question regarding either infringement or

validity of the asserted patents. *See Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364

(Fed. Cir. 1997). For the following reasons, I recommend a conclusion that Olaplex is

reasonably likely to succeed on the merits of its infringement case, and the validity of the

patents-in-suit is likely to be upheld on the present record.

8

#### (i)    Infringement

In addressing whether Olaplex established a reasonable likelihood of success on the merits for direct infringement of the '419 patent, the Federal Circuit concluded that "hair coloring agent" should be construed in a manner consistent with the prosecution history as "a customary hair-coloring composition that is present in the mixture in an amount that, when the mixture is applied to hair, results in hair coloring, judged in the usual way—by visual inspection." *Liqwd, Inc. v. L'Oréal USA, Inc.*, 720 F. App'x 623, 626-27 (Fed. Cir. 2018). Applying the correct claim construction, the Federal Circuit determined that the district court "clearly erred in finding no likelihood of success on infringement on that basis." *Id.* at 628. Consequently, the Federal Circuit concluded that "the denial of a preliminary injunction must be vacated at least as to direct infringement." *Id.*

L'Oréal now asserts a new basis for challenging the viability of Olaplex's direct infringement claim based on facts and evidence not available to it at the time of the original motion practice. Specifically, L'Oréal argues that Olaplex identifies "maleic acid" as the active ingredient recited in claim 1 of the '419 patent, despite testimony from Olaplex's expert demonstrating that it is impossible to have the required concentration of maleic acid in the claimed mixture within the pH range to which Olaplex's expert limits the method of claim 1. (D.I. 268 at 12-13) To the extent that the claim language also encompasses salts of maleic acid, L'Oréal points to Olaplex's purported disclaimer of "and salts thereof" during the PGR proceedings before the PTAB. (*Id.*) In reply, Olapex contends that L'Oréal waived this argument by not raising it in the briefing on the original motion for preliminary injunction, and the Federal Circuit's ruling did not open the door to reconsideration of the direct infringement analysis on remand. (D.I. 285 at 2; 6/21/18 Tr. at 11:16-12:12) Moreover, Olaplex alleges that

9

claim 1 is infringed because it expressly encompasses an active agent in the form of maleic acid or salts thereof. (D.I. 285 at 2-3)

As a preliminary matter, the court concludes that further consideration of Olaplex's likelihood of success on the merits of its infringement claims does not exceed the scope of the Federal Circuit's decision vacating and remanding the case for further proceedings. (D.I. 240 at 11) The Federal Circuit vacated the district court's ruling regarding the likelihood of success on infringement based solely on the district court's erroneous construction of "hair coloring agent," and remanded for further proceedings on the issue of infringement. *Liqwd*, 720 F. App'x at 628. The Federal Circuit's reversal was narrowly tailored to the finding of "no likelihood of success on infringement on that basis," referring specifically to the erroneous claim construction. *Id.* Consequently, this court is tasked with reassessing the likelihood of success on the merits of infringement in accordance with the Federal Circuit's claim construction of the disputed term.

Olaplex's reliance on the Federal Circuit's decision in *ArcelorMittal France v. AK Steel Corp.* is inapposite. In *ArcelorMittal*, the Federal Circuit applied the "mandate rule," which "dictates that an inferior court has no power or authority to deviate from the mandate issued by an appellate court." 786 F.3d 885, 888 (Fed. Cir. 2015) (quoting *Banks v. U.S.*, 741 F.3d 1268, 1276 (Fed. Cir. 2014)) (internal citations and quotation marks omitted). Accordingly, the Federal Circuit determined that the district court was prohibited from revisiting the construction of a claim term previously construed by the appellate court. *Id.* at 889 ("Permitting a reissue patent to disturb a previous claim construction of the original claims would turn the validity analysis . . . on its head."). In contrast, the analysis pertaining to the likelihood of success on infringement in the present case requires the court to apply the Federal Circuit's claim construction of "hair coloring agent" to the infringement inquiry.

10

Olaplex's reliance on *Gibbs v. Coupe*, a district court decision denying a *pro se* prisoner's motion to reiterate a motion for default judgment and a motion for summary judgment, is also misplaced. 256 F. Supp. 3d 515, 520 (D. Del. 2017). In *Gibbs*, the plaintiff sought to "reiterate" previously-decided motions without raising new issues or changed facts. *Id.* at 520-21. Unlike the circumstances in *Gibbs*, L'Oréal does not advocate altering the Federal Circuit's claim construction. The Federal Circuit concluded that "the district court, relying on a flawed claim construction, clearly erred in finding no likelihood of success on infringement on that basis." *Liqwd*, 720 F. App'x at 628. The Federal Circuit expressly qualified its ruling and made no findings on the likelihood of success on infringement beyond the erroneous claim construction, instead vacating and remanding the issue for further proceedings. Consequently, the court may reassess the likelihood of success on the merits of infringement in accordance with the Federal Circuit's claim construction of the disputed term.

To the extent that Olaplex contends L'Oréal waived this argument by not raising it in response to the original motion for a preliminary injunction, the court notes that L'Oréal's argument regarding the claimed concentration range is based on Dr. Borish's testimony given during the PGR proceedings before the PTAB on January 5, 2018, after the district court's ruling on the original motion for a preliminary injunction. (D.I. 268 at 13; D.I. 272, Ex. E) For this reason, the facts presently before the court are distinguishable from *Edgewell Personal Care Brands, LLC v. Albaad Massuot Yitzhak, Ltd.*, in which the court declined to consider an issue raised for the first time during oral argument that was not addressed in the briefing. C.A. No. 15-1188-RGA, 2017 WL 1900736, at \*4 (D. Del. May 9, 2017). Moreover, in its briefing on the original motion for a preliminary injunction, L'Oréal expressly reserved its right to challenge other limitations of claim 1. (D.I. 60 at 20 n.22) ("Although L'Oréal USA focuses on certain

11

aspects of claim 1 for purposes of this motion, it does not concede that the Accused Products

meet the limitations of claim 1 for other reasons. L'Oréal USA expressly reserves the right to

demonstrate noninfringement of any limitation of any asserted claim of the '419 Patent for other

reasons in this or other proceedings.")

Turning to the substantive issue before the court, I recommend a finding that Olaplex has

established a reasonable likelihood of success on the merits of its cause of action for direct

infringement of the '419 patent. Claim 1 of the '419 patent requires, in pertinent part, an "active

agent in the mixture . . . at a concentration ranging from about 0.1% by weight to about 50% by

weight." ('419 patent, col. 26:1-3) Claim 1 defines the "active agent" as "          or

salts thereof."[3]  (*Id.*, col. 25:45-60)

Lab testing results and instructional product videos contained in the record reflect that the

Accused Products contain maleic acid in concentrations falling within the range recited in claim

1 of the '419 patent. (D.I. 242, App'x 1 at 6-9; App'x 2 at 17-20; App'x 3 at 29-32; D.I. 287,

Exs. A-E) L'Oréal's expert, Dr. Robert John Warwick Hefford, testified that the Accused

Products satisfy the disputed limitation, and its other expert, Dr. Benny Dean Freeman, offered

no opinion regarding whether the Accused Products infringe the '419 patent. (D.I. 307, Tab B at

134:13-135:17; D.I. 288, Ex. C at 98:24-99:19) The declaration of Dr. Edward T. Borish

establishes that the active agent is present in the mixture at the requisite concentration in each of

the Accused Products. (D.I. 16 at ¶¶ 74-76, 78-79, 82-83) L'Oréal does not challenge Olaplex's

infringement allegations regarding the remaining limitations of claim 1, and the record supports

---

[3] The parties do not dispute that the chemical formula in claim 1 represents maleic acid. (D.I. 288 at ¶ 72; D.I. 268 at 12)

12

Olaplex's infringement contentions with respect to those limitations.[4] Consequently, Olaplex

has met its burden to show a reasonable likelihood of success on the merits of its direct

infringement claim by demonstrating that the Accused Products satisfy each limitation of claim 1

of the '419 patent.

L'Oréal alleges that Olaplex fails to establish infringement of the disputed limitation

regarding the concentration levels of the active agent because both parties' expert opinions

suggest that maleic acid in the claimed concentrations would have a pH level not conducive to

bleaching hair. (D.I. 268 at 13-14) In his January 2018 testimony, Dr. Borish testified that claim

1 of the '419 patent implies a pH of 9 to 11 because it requires a bleaching formulation to lighten

hair, and a person of ordinary skill would understand that a pH of 9 to 11 is necessary to achieve

bleaching. (D.I. 272, Ex. E at 119:20-121:12) At these pH levels, Dr. Borish indicates that

"virtually all of the maleic acid in the mixture would be in the salt form." (D.I. 288 at ¶ 78; D.I.

272, Ex. E at 122:13-23, Errata Sheet; 194:8-14) Likewise, Dr. Freeman explains that the

concentration of maleic acid present in the Accused Products at the preferred pH range cited by

Dr. Borish would be "virtually undetectable" and would fall "well outside the concentration

range recited in claim 1 of the '419 patent." (D.I. 270 at ¶¶ 89-91) According to L'Oréal, this

---

[4] Specifically, Olaplex sets forth unrefuted evidence demonstrating that the Accused Products
satisfy the remaining limitations of claim 1, including: (1) "[a] method for bleaching hair," (D.I.
16 at ¶¶ 35, 42-47; D.I. 242, App'x 1 at 1-3; App'x 2 at 12-14; App'x 3 at 24-26; D.I. 241, Ex. B
at 68:11-69:17; Ex. C at 11:20-13:4; Ex. D at 23:10-24:8); (2) "mixing a formulation," (D.I. 16
at ¶¶ 48-57; D.I. 242, App'x 1 at 3-5; App'x 2 at 14-16; App'x 3 at 26-28); and (3) "applying the
mixture to the hair," (D.I. 16 at ¶¶ 58-66; D.I. 242, App'x 1 at 5-6; App'x 2 at 16-17; App'x 3 at
28-29; D.I. 241, Ex. B at 68:11-69:17; Ex. C at 11:20-13:4; Ex. D at 23:10-24:8). The Federal
Circuit previously determined that Olaplex has established a reasonable likelihood of success on
the merits based on the limitation requiring that "the mixture does not contain a hair coloring
agent." *Liqwd, Inc. v. L'Oréal USA, Inc.*, 720 F. App'x 623, 627-28 (Fed. Cir. 2018).

testimony demonstrates that maleic acid cannot be present in formulations at the claimed concentration ranges. (D.I. 268 at 13-14)

L'Oréal's contentions regarding the impossibility of achieving the requisite concentration levels of the active agent at the preferred pH levels are not supported by the evidence on the record. The record reflects that the requisite concentration levels of maleic acid are satisfied in the '419 patent when using a standard calculation of the weight of the active agent added into the active agent formulation divided by the total weight of the final mixture. (D.I. 288 at ¶¶ 70, 72-74) Example 3 of the '419 patent describes an active agent formulation containing "maleic acid at concentrations of 2.0 g in 10 g total solution (water)," for a 20 wt% of maleic acid. ('419 patent, col. 22:28-30) Nine milliliters of the active agent formulation is added to one ounce of developer and one ounce of powder bleach for a total weight of 65 grams. (*Id.*, col. 22:37-42) The two grams of maleic acid solution in the 65 gram mixture amounts to 3 wt% of maleic acid concentration, well within the claimed concentration range. (D.I. 288 at ¶¶ 68-69) For these reasons, Olaplex has met its burden to show a reasonable likelihood of success on the merits of its direct infringement claim.

Even if the court were to conclude that the requisite concentration levels of maleic acid are not achievable at the appropriate pH levels in a bleaching formulation, the record establishes that the formulation would contain the claimed salts of maleic acid. (D.I. 288 at ¶ 78; D.I. 272, Ex. E at 122:13-23, Errata Sheet; 194:8-14) L'Oréal alleges that Olaplex disclaimed salts of maleic acid from the scope of the '419 patent by asserting that Olaplex's products are not covered by the '419 patent during proceedings before the PTAB. (D.I. 268 at 14; D.I. 273, Ex. J at 15:21-25, 44:6-15) According to L'Oréal, Olaplex's expert in proceedings before the United Kingdom disclosed that the active ingredient in Olaplex's product is bis-amino dipropyl diglycol

14

dimaleate, which was characterized as a salt of maleic acid. (D.I. 272, Ex. D at 397:12-398:5) On the present record, the court concludes that this evidence is insufficient to establish a clear and unmistakable disavowal of claim scope. The law is well-established that, "for prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing actions and statements made during prosecution be both clear and unmistakable." *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003)).

    The evidence before the court in the instant litigation and related PTAB proceedings does not affirmatively support L'Oréal's assertion that Olaplex's product is not covered by the '419 patent specifically because the active ingredient in Olaplex's product is bis-amino dipropyl diglycol dimaleate, which L'Oréal characterizes as a salt of maleic acid. To the contrary, Dr. Borish refutes L'Oréal's characterization of bis-amino dipropyl diglycol dimaleate as a salt of maleic acid. (D.I. 272, Ex. B at 79:3-18) This court's consideration of evidence from proceedings in the United Kingdom must be balanced against Federal Circuit precedent "caution[ing] against indiscriminate reliance on the prosecution of corresponding foreign applications in the claim construction analysis." *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1279 (Fed. Cir. 2011) (internal quotation marks and citations omitted); *see also Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of intrinsic evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained."). For these reasons, I recommend that the court conclude that Olaplex is likely to prevail on the merits of its cause of action for direct infringement.

15

Olaplex has also demonstrated a reasonable likelihood of success on the merits of its cause of action for induced infringement. L'Oréal presents no arguments in its renewed briefing regarding Olaplex's cause of action for induced infringement. (D.I. 268 at 12-14) The Federal Circuit held that Olaplex was not required to demonstrate pre-suit knowledge relating to its claim for induced infringement, and observed that its claim construction of "hair coloring agent" "makes it likely that the knowledge element for inducement of infringement may be satisfied" on remand. *Liqwd*, 720 F. App'x at 628-29. Olaplex presents unrefuted evidence demonstrating that L'Oréal instructs its customers to use the Accused Products in an infringing manner. (D.I. 241, Ex. B at 68:11-69:17; Ex. C at 11:20-13:4; Ex. D at 23:10-24:8) (covering the Redken pH-Bonder #1 Bond Protecting Additive, L'Oréal Professionnel Smartbond Step 1 Additive, and Matrix Bond Ultim8 Step 1 Amplifier products, respectively). Olaplex's evidence in support of its claims for direct and induced infringement, combined with L'Oréal's post-suit knowledge that its instructions for use of the Accused Products would induce infringement, are therefore sufficient to establish Olaplex's likelihood of success on the merits of its induced infringement claim. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 60 (Fed. Cir. 2012).

## (ii) Invalidity

### a. Inventorship

Without citation to authority or discussion of the record before the court in its renewed briefing, L'Oréal suggests that serious questions regarding inventorship and standing counsel against the entry of an injunction. (D.I. 268 at 4 n.2) The district court previously rejected L'Oréal's argument that the '419 patent is invalid for failure to name an Olaplex employee, Joe Santy, as a co-inventor, concluding that L'Oréal failed to show that Olaplex "could not correct inventorship if a trier of fact were to determine that Santy is an inventor of claim 1 of the '419

16

patent." *Liqwd, Inc. v. L'Oréal USA, Inc.*, 2017 WL 2881351, at *6 (D. Del. July 6, 2017). The Federal Circuit acknowledged L'Oréal's inventorship argument, but declined to further discuss the issue, determining that it "may be further explored on remand." *Liqwd, Inc. v. L'Oréal USA, Inc.*, 720 F. App'x 623, 631 n.2 (Fed. Cir. 2018). In the absence of further support for L'Oréal's position in the renewed briefing, and L'Oréal's resultant failure to show a substantial question of invalidity on this point, I recommend that the court adopt the district court's prior ruling on inventorship. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001).

## b. Indefiniteness

L'Oréal suggests that certain terms in claim 1 of the '419 patent, particularly "about" and "hair coloring agent," render the '419 patent invalid for indefiniteness. (D.I. 268 at 11-12) According to Olaplex, L'Oréal waived any challenge to the indefiniteness of the word "about" by failing to raise it in the original briefing and, regardless, the word "about" is not inherently indefinite. (D.I. 285 at 6) Olaplex further contends that the Federal Circuit's construction of the term "hair coloring agent" shows that the term is amenable to construction, and is therefore not indefinite.[5] (*Id.*)

L'Oréal fails to raise a substantial question of invalidity with respect to its indefiniteness arguments. The law is well-established that the word "about" does not automatically render a patent claim indefinite. In *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, the Federal Circuit

---

[5] In *Nautilus, Inc. v. Biosig Instruments, Inc.*, the Supreme Court rejected an indefiniteness analysis based on whether a patent's claims are "amenable to construction" or "insolubly ambiguous," observing that such "formulations can breed lower court confusion, for they lack the precision § 112, ¶ 2 demands." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 (2014). Instead, the Supreme Court held that "we read § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.*

17

concluded that an "imprecise claim limitation, such as the phrase 'about 100% per second,'" does not render the claim invalid. 842 F.2d 1275, 1280 (Fed. Cir. 1988); *see also Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991) (cautioning that the indefiniteness ruling "should not be understood as ruling out any and all uses of ['about'] in patent claims."); *Chem. Separation Tech., Inc. v. U.S.*, 51 Fed. Cl. 771, 782 n.4 (Fed. Cl. 2002) (citing cases holding claims employing "about" to be definite). Other phrases of approximation commonly used in patent claims, such as "close to," "substantially equal," and "closely approximate," have been accepted during prosecution and upheld by the courts "when serving reasonably to describe the claimed subject matter to those of skill in the field of invention, and to distinguish the claimed subject matter from the prior art." *Andrew Corp. v. Gabriel Elecs., Inc.*, 847 F.2d 819, 821 (Fed. Cir. 1988).

In the present case, the record reflects that a person of ordinary skill in the art would understand the scope of "about" as used in claim 1 of the '419 patent. ('419 patent, col. 16:30-39; D.I. 288 at ¶¶ 53-59) Moreover, L'Oréal offers no compelling reason explaining why it did not raise its indefiniteness challenge to the word "about" in claim 1 of the '419 patent at the time the original motion for a preliminary injunction was briefed. *See Melchior v. Hilite Int'l, Inc.*, 665 F. App'x 894, 899 n.4 (Fed. Cir. 2016) (concluding that claim construction argument presented for the first time at oral argument and raised on appeal was waived). Unlike L'Oréal's infringement challenge, which was based in large part on expert testimony proffered in a PGR proceeding well after the conclusion of briefing on the original motion for a preliminary injunction, L'Oréal's indefiniteness challenge based on the word "about" is not based on new evidence. For these reasons, Olaplex has demonstrated a reasonable likelihood of success on the

18

merits that the '419 patent is not invalid for indefiniteness due to the use of the word "about" in claim 1.

The Federal Circuit's construction of "hair coloring agent" does not render claim 1 indefinite, and the specification contains adequate written description to support the construction. According to L'Oréal, the '419 patent does not adequately describe the visual inspection process. (D.I. 268 at 12) However, the Federal Circuit specifically held that "[i]ndefiniteness does not necessarily follow from a claim's reliance on visual inspection with the human eye," concluding that "there is ample evidence in the record that the identified persons of ordinary skill in the art of hair-care products know how to use visual inspection to determine with reasonable certainty whether a certain ingredient in a product would actually alter the color of hair." *Liqwd*, 720 F. App'x at 630. The Federal Circuit went on to cite to the numerous examples in the '419 patent specification calling for visual inspection. *Id.* The evidence presently before the court confirms the Federal Circuit's conclusion that a person of ordinary skill in the art would evaluate a hair coloring agent by way of visual inspection. (D.I. 288 at ¶ 47)

L'Oréal also contends that the written description does not delineate between "customary" and "non-customary" hair-coloring compositions. (D.I. 268 at 12) However, the record reflects that a person of ordinary skill in the art would know how to determine whether a hair-coloring composition is customary or non-customary. (D.I. 288 at ¶¶ 50-51; D.I. 287, Ex. F at 96:20-25) Specifically, a person of ordinary skill in the art would look to literature, including the Cosmetic, Toiletry and Fragrance Association, Inc.'s Cosmetic Ingredient Dictionary, to identify colorants or pigments customarily used in hair care products. (D.I. 288 at ¶¶ 50-51)

In view of the foregoing analysis, Olaplex has met its burden of showing a reasonable likelihood of success on the merits in response to L'Oréal's invalidity challenge based on the

19

purported indefiniteness and/or lack of written description of certain claim terms in the '419

patent.

### c. Anticipation

L'Oréal contends that the '419 patent is anticipated by U.S. Patent No. 7,044,986 to

Ogawa ("Ogawa") because Ogawa discloses a method of using maleic acid with a bleaching

formulation, a point confirmed by Olaplex's expert, Dr. Borish. (D.I. 268 at 6-7; D.I. 60 at 18)

According to Olaplex, Ogawa does not anticipate claim 1 because it includes maleic acid in a

laundry-list of chelating agents without disclosing a bleaching treatment or concentration range

for maleic acid. (D.I. 285 at 4) Olaplex reiterates that both the patent examiner and the PTAB

considered and rejected L'Oréal's anticipation argument during prosecution of the '419 patent

and in declining to institute PGR proceedings, respectively. (Id.)

Olaplex has shown a reasonable likelihood of success on the merits in overcoming

L'Oréal's anticipation defense. L'Oréal has not demonstrated on the present record that Ogawa

discloses maleic acid in the context of a hair bleaching method at the claimed concentration

ranges of the '419 patent. The disclosed concentration ranges of maleic acid appear in claims 1

and 8 of Ogawa, which expressly relate to a "method of dyeing the hair." (D.I. 62, Ex. N at col.

7:44; 8:34-39) In contrast to the '419 patent, which discloses maleic acid's property of repairing

damaged disulfide bonds during or after hair bleaching treatments, Ogawa includes maleic acid

among a list of ten chelating agents, whose purpose is to interact with metal ions left by the

claimed hair dyeing treatments. (D.I. 62, Ex. N at 1:34-40; 2:64-3:1) Specifically, Ogawa

explains that the chelating agent is necessary because the use of transition metals to accelerate a

reaction with an oxidizing agent "require[s] further treatment with a hair dye after hair is left

over with a metal-ion-containing preparation applied thereon beforehand." (Id. at 1:34-40)

20

L'Oréal emphasizes Ogawa's disclosure of both hair bleaching and hair dyeing methods in support of its argument that Ogawa teaches each limitation of the '419 patent. (D.I. 268 at 6-7) L'Oréal cites a portion of the specification describing potential chelating agents in support of its contention that Ogawa discloses using maleic acid with a bleaching formulation. (*Id.* at 7) However, the portion of the Ogawa specification relied upon by L'Oréal is consistent with the language of claim 1 of the Ogawa reference, and refers to a "hair dye composition comprising the following ingredients (A) to (D)." (D.I. 62, Ex. N at col. 2:1-3) The Ogawa specification defines ingredient (D) as a chelating agent, which may be maleic acid and salts thereof, and must have the "ability to chelate metal ions in the ingredient (C) [a transition metal salt]." (*Id.* at col. 2:61-3:3) L'Oréal does not refer to any portion of the Ogawa reference identifying maleic acid in the context of a bleaching formulation, as opposed to a hair dyeing composition. Therefore, Ogawa does not read on the claimed concentration range of maleic acid in a bleaching formulation as set forth in the '419 patent.

Further bolstering Olaplex's position, the present record establishes that the USPTO rejected third party arguments based on Ogawa during prosecution of the '419 patent. (D.I. 16 at ¶¶ 110-11, Exs. Z, AA) L'Oréal attempts to distinguish the examiner's analysis of Ogawa, which was performed in the context of an obviousness analysis with another reference. (D.I. 62 at ¶ 28; D.I. 61, Ex. N) However, the law is well-established that "anticipation is the epitome of obviousness." *Ziarno v. Am. Nat'l Red Cross*, 55 F. App'x 553, 557-58 (Fed. Cir. 2003) (concluding that a verdict of nonobviousness and anticipation for the same patent claim was inconsistent with the principle that anticipation is the "epitome of obviousness" (quoting *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984)). Considering the examiner's conclusion that Ogawa, combined with another reference, was

21

insufficient to invalidate the '419 patent, it is not logical to conclude that the examiner would

have invalidated the '419 patent based on Ogawa alone. Having failed to identify persuasive

evidence of invalidity under § 102, "the very existence of the ['419] patent satisfies [Olaplex's]

burden on validity" under the presumption that every issued patent is valid. *Purdue Pharma L.P.

v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001).

Moreover, in its PGR petition regarding the '419 patent, L'Oréal asserted that claim 1

was invalid as anticipated by Ogawa. (D.I. 272, Ex. H at 26-37) The PTAB declined to institute

proceedings based on L'Oréal's argument that claim 1 of the '419 patent was anticipated by

Ogawa. (D.I. 143, Ex. D at 8-11) Specifically, the PTAB was "not persuaded that Petitioner has

shown sufficiently that Ogawa discloses all the limitations of any of the claims of the '419

patent" because a person of ordinary skill in the art would have to combine multiple distinct

teachings in the prior art reference to achieve the claimed invention. (*Id.* at 10)

Following the Supreme Court's decision in *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348

(2018), the PTAB proceeded to institute "on the remaining grounds presented in the Petition,"

and issued a final written decision on June 27, 2018, which rejected the petitioner's anticipation

arguments based on Ogawa. (D.I. 339, Ex. A at 1, 9-11) Specifically, the PTAB concluded that

Ogawa did not disclose "all the limitations of any of the claims of the '419 patent, arranged as in

the claims of the '419 patent." (*Id.* at 10) The PTAB explained:

> [W]e agree with Patent Owner that finding this disclosure requires combining one
> portion of Ogawa that discloses applying to hair mixtures of formulations
> containing chelating agents and hydrogen peroxide with another portion of Ogawa
> disclosing maleic acid and its salts among a list of chelating agents, and then
> combining those disclosures with another portion of Ogawa that discloses that an
> unspecified chelating agent may be present in a particular range of concentrations.

(*Id.* at 11) Consequently, the PTAB concluded that a person of ordinary skill in the art would not

necessarily think to combine the multiple, distinct teachings of the Ogawa reference. (*Id.*)

22

Consistent with this court's previous conclusion that "[d]efendants have not explained

how Ogawa applies in light of either of plaintiffs' claim constructions," and the repeated findings

of the USPTO rejecting L'Oréal's anticipation defense, I recommend a conclusion that L'Oréal

is not likely to succeed on the merits of its claim that the '419 patent is invalid for anticipation in

view of Ogawa. (D.I. 135 at 11)

### d. Obviousness

The Federal Circuit explained that the PTAB's July 19, 2017 institution of PGR

proceedings on the '419 patent "necessit[ates] more analysis in this case than we now have" with

respect to obviousness.[6] *Liqwd*, 720 F. App'x at 632. As a result, L'Oréal presents obviousness

arguments pertaining to Ogawa and Korean Pat. Appl. No. 2003-0003970 to Kim, et al. ("Kim")

to satisfy its "enhanced burden." *See Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1367

(Fed. Cir. 2011) (stating that "a party challenging validity shoulders an enhanced burden if the

invalidity argument relies on the same prior art considered during examination by the

[USPTO]."). For the following reasons, Olaplex has shown that L'Oréal is not likely to prevail

on its obviousness defense.

As discussed at § III.A.2(a)(ii)(c), *supra*, Ogawa does not disclose maleic acid used in a

bleaching formulation in the claimed concentration ranges, as required by claim 1 of the '419

---

[6] The PTAB's review of the obviousness challenge to the '419 patent in the PGR proceedings
was based on two prior art combinations: (1) Ogawa with Berkemer, German Patent App. Pub.
No. 1,220,969 ("Berkemer") and Korean Patent App. Pub. No. 10-2006-0059564 ("KR '564");
and (2) Kitabata *et al.*, U.S. 2002/0189034 A1 ("Kitabata") with Berkemer and KR '564. (D.I.
339, Ex. A at 11-40) The combination of Ogawa and Kim at issue in the present litigation was
not before the PTAB. The PTAB determined that the '419 patent was invalid as obvious over
both combinations of prior art. (D.I. 339, Ex. A) Unlike Kim, Berkemer and KR '564 relate to
maleic acid hair treatments for improving the condition of hair damaged by bleaching treatments.
(*Id.* at 12) The PTAB concluded that Berkemer and KR '564 "provide an additional reason why
a person of ordinary skill in the art would have chosen Ogawa's maleic acid over Ogawa's other
chelating agents." (*Id.* at 14)

23

patent. Combining Ogawa with Kim does not resolve this deficiency because Kim does not disclose a hair bleaching method. (6/21/18 Tr. at 86:3-6) ("Kim is presented in this combination. It teaches every limitation of the claim except the method of bleaching because it's an oxidative dye process.") Kim "relates to a . . . composition that has a hair protective effect that is superior to the hair dyes of the prior art, characterized in that a hair dye containing an oxidation dye precursor contains a maleic acid derivative." (D.I. 62, Ex. O at 2) The hair dye composition claimed in Kim contains one or more oxidation dye precursors which also contain maleic acid and salts thereof. (*Id.* at 2-3) Maleic acid derivatives in Kim include "maleic acid anhydride, maleamic acid, maleimide, and metal salts thereof." (*Id.* at 7)

The parties do not dispute that the hair dyeing method disclosed in Kim includes a hair coloring agent, which is expressly excluded from claim 1 of the '419 patent. (D.I. 288 at ¶¶ 109-110, 120-126; D.I. 62 at ¶ 159) Moreover, Ogawa does not teach that hair dyeing methods can be converted into hair bleaching methods simply by omitting the hair coloring agent. (*Id.*) Neither reference provides motivation to adapt Kim's hair dyeing methods to a method of hair bleaching, and the testimony of L'Oréal's expert, Dr. Benny D. Freeman, establishes that converting a method of hair dyeing to a method of bleaching is a complicated endeavor.[7] (*Id.*; D.I. 288, Ex. C at 163:10-164:5) Despite Dr. Freeman's claim that a person of ordinary skill in the art would have modified Kim for use in a method of bleaching hair because Kim discloses adding maleic acid or a salt thereof to a hair formulation in an oxidative dyeing process to reduce hair damage, (D.I. 270 at ¶¶ 40-41), neither Ogawa nor Kim teaches a method of converting a

---

[7] Specifically, Dr. Freeman testified that, in addition to removing the dye precursors and couplers, a person of ordinary skill would also remove the antioxidant, alter the composition to achieve a compatible pH, and rebalance other components such as the ammonia water and excipients. (D.I. 288, Ex. C at 163:10-164:5)

hair dyeing method to a hair bleaching method by omitting oxidative dye intermediates, which would result in changes to the pH of the formulation, (D.I. 98 at ¶ 207; D.I. 288 at ¶¶ 129-132).

L'Oréal also challenges the veracity of a declaration by Dean Christal that was submitted to the USPTO and was relied upon by the examiner during prosecution of the '419 patent. (D.I. 268 at 8) In the declaration, dated August 22, 2016, Mr. Christal represented it was commonly understood prior to the '419 patent that reducing agents used in hair dyeing processes break disulfide bonds in the hair and form thiols, which damage the hair. (D.I. 61, Ex. L at ¶ 3) In contrast, Mr. Christal observed that hair bleaching methods involve an oxidation step and do not include the application of a reducing agent. (*Id.* at ¶ 4) For this reason, Mr. Christal stated that it was commonly believed that thiols are not formed during a hair bleaching method. (*Id.* at ¶ 5) The examiner relied on Mr. Christal's declaration, allowing the '419 patent over Kim because, "as attested by Dean Christal on August 23, 2016, prior to applicants [sic] invention it was not taught that free-thiols were formed during the bleaching process as it is a [sic] oxidation process not a reducing process (like the process in Kim et al. which is a reducing process)." (D.I. 16, Exs. Z & AA)

According to L'Oréal, Mr. Christal's explanation of hair dyeing in the declaration is inaccurate because Kim teaches oxidative hair dyeing where no reducing agent is applied. (D.I. 60 at 17; D.I. 268 at 8) L'Oréal contends that oxidative dyeing processes and bleaching are both oxidation processes pursuant to the evidence on the record and, therefore, a person of ordinary skill in the art would have known to use maleic acid in an oxidative dyeing process based on Kim. (*Id.*; D.I. 270 at ¶ 41)

L'Oréal has failed to establish that Mr. Christal's declaration is erroneous. The record before the court establishes that Kim is directed to hair dyeing compositions, and maleic acid

derivatives in the compositions protect the hair from damage caused by thiol groups present in the hair after dyeing in this context. (D.I. 99, Ex. R at 8)  In contrast to hair dyeing methods, free thiols were not known to form in hair bleaching processes prior to the teachings of the '419 patent.  (*Id.*, Ex. C at 48:4-15; D.I. 61, Ex. L at ¶¶ 3-5)  The thiol-disulfide bond exchange in Kim is a consequence of having used a reducing agent on the hair. (D.I. 99, Ex. C at 174:25-175:18)  Olaplex's expert, Dr. Borish, explains that "[a] POSITA would have understood that 'thiol-disulfide bond exchange' refers to the effect that a thiol reducing agent can have on the disulfide bonds present in hair." (D.I. 288 at ¶ 118; D.I. 98 at ¶¶ 90, 182, 211, 232-33)

L'Oréal's expert, Dr. Robert John Warwick Hefford, affirms that reducing agents are not used in hair bleaching formulations because they would cause the mixture to be less effective at lightening hair.  (D.I. 99, Ex. C at 46:24-47:14; D.I. 98 at ¶ 211; D.I. 288 at ¶ 116)  Instead, the record suggests that reducing agents are used as antioxidants in hair coloring formulations to help the dye precursors have their intended effect.  (D.I. 288 at ¶ 115)  Because hair bleaching compositions need no protection from oxidation and, consequently, do not require the application of a reducing agent, it was not commonly known that thiols could be formed during a hair bleaching method.  (D.I. 61, Ex. L at ¶¶ 4-5; D.I. 288 at ¶¶ 112, 118, 123, 163)  For these reasons, the evidence supports the accuracy of Mr. Christal's declaration.

Olaplex contends that secondary considerations of non-obviousness support its position that the '419 patent is valid and enforceable.  (D.I. 285 at 5)  First, Olaplex indicates that the Kim and Ogawa references issued ten years prior to the effective filing date of the '419 patent, but products using maleic acid in a bleaching context did not appear on the market until recently,

indicating a failure of others to address this issue prior to the March 31, 2016 filing date[8] of the
'419 patent. (6/21/18 Tr. at 38:3-13) The record before the court supports Olaplex's contentions
on this point. During the June 15, 2018 deposition of Leslie Warner, Mr. Warner testified that
L'Oréal first considered including maleic acid as an active ingredient in August 2014, and began
working on a formula containing maleic acid in April 2015. (D.I. 314, Ex. G at 18:12-19:2;
23:12-24:21; 25:17-21; 39:11-15) However, further deposition testimony by Mr. Warner
suggests that he was not involved in the development of the Accused Products and was not
acquainted with their formulations. (D.I. 311, Ex. B at 10:16-11:8, 58:23-59:13, 78:18-79:20,
92:14-94:1) The passage of time between the Kim and Ogawa references and the '419 patent
filing date therefore supports Olaplex's allegation that this secondary consideration weighs in
favor of a conclusion of non-obviousness.

Second, Olaplex cites the testimony of Dr. Hefford, who opined that free thiols were not
taught to be formed during the bleaching process at the time of the '419 patent, and record
evidence suggesting that maleic acid combined with a bleaching formulation presents a potential
dangerous incompatibility. (6/21/18 Tr. at 38:14-39:17) The evidence before the court supports
Olaplex's contention that the state of the art prior to the '419 patent taught away from using
maleic acid in a bleaching formulation. Specifically, a safety data sheet from 2011 advises
against using maleic acid together with oxidative bleaching agents because such combinations
could result in skin sensitization. (D.I. 99, Ex. Z; D.I. 98 at ¶ 239) Consequently, this secondary
consideration bolsters Olaplex's assertion of non-obviousness.

---

[8] The parties did not present arguments regarding the priority date of the '419 patent in
connection with their discussion of secondary indicia of non-obviousness in the present
litigation. The PTAB addressed the applicability of the March 31, 2016 filing date in its final
written decision in the PGR proceedings. (D.I. 339, Ex. A at 26-27; *see also* D.I. 135 at ¶ 2)

27

Third, Olaplex points to the broader timeline relating to the development of the '419 patent, which shows that L'Oréal obtained the unpublished patent application leading to the '419 patent pursuant to the terms of a nondisclosure agreement ("NDA") shortly before launching the Accused Products. (6/21/18 Tr. at 41:12-42:20) However, Olaplex's allegations of copying do not find adequate support on the present record because Olaplex does not affirmatively allege that its products are covered by the '419 patent.[9] In *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, the Federal Circuit held that "copying requires the replication of a specific product" because "[o]therwise every infringement suit would automatically confirm the nonobviousness of the patent" if the analysis turned on whether a competing product arguably fell within the scope of a patent. 392 F.3d 1317, 1325 (Fed. Cir. 2004). Olaplex's allegation of copying regarding the timing of the entry of the Accused Products onto the market does not advance the merits of its case in the absence of evidence establishing that it has a product which embodies the claims of the '419 patent.

Olaplex has adequately established that the '419 patent satisfies a long-felt but unmet need, and that scientific data prior to the '419 patent teaches away from the invention. Although the record does not sufficiently support Olaplex's contentions of copying, the record as a whole

---

[9] Since the filing of the original motion for a preliminary injunction, Olaplex has consistently represented that, while "Olaplex's '419 patent covers the Step 1 bond builder additive for each system," its three-component bond building system does not practice the '419 patent. (D.I. 17 at ¶ 4 n.1; D.I. 61, Ex. C at 93:12-14; Ex. B at 60:17-21) Instead Olaplex's bond builder system "embodies the technology in other patents exclusively licensed by Olaplex LLC from Liqwd, Inc." (D.I. 17 at ¶ 6) During PGR proceedings before the PTAB on April 11, 2018, Olaplex's counsel reaffirmed that Olaplex's product is not covered by the '419 patent. (D.I. 273, Ex. J at 44:6-15) ("If you take a look at the Olaplex product . . . we don't believe it's covered by the '419 patent.") The final written decision addressing Olaplex's copying allegation in the PGR proceeding reiterates that "Patent Owner does not even argue, much less show, that [redacted] a product that embodied the claims of the '419 patent." (D.I. 339, Ex. A at 31)

28

demonstrates that Olaplex is likely to succeed on the merits regarding the non-obviousness of the '419 patent in view of Ogawa and Kim for the reasons previously stated.

### (b) Irreparable harm

Olaplex has shown that it will suffer irreparable harm in the absence of a preliminary injunction. On appeal, the Federal Circuit concluded that "the district court did not err when it determined that the bond-builder market is a 'two-player national market' and that Olaplex would likely suffer irreparable harm from L'Oréal's 'direct competition in [its] primary market.'" *Liqwd*, 720 F. App'x at 633. However, the Federal Circuit did not "preclude reconsideration of the issue when the case returns to the district court, by which time the market will have changed since July 2017 in ways of potential relevance to the irreparable-harm question." *Id.* at 632 (citing *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1384 (Fed. Cir. 2017)). L'Oréal now alleges that the court's prior determination on irreparable harm was based on incorrect data provided by Olaplex, and the market has changed since the court's previous ruling. (D.I. 268 at 14-15)

As a preliminary matter, the record does not support L'Oréal's assertion that the court's July 6, 2017 ruling on irreparable harm was based on erroneous sales data underlying the declaration of Olaplex's expert, Dr. Nisha Mody.[10] Although Dr. Mody admitted during her deposition that her supplemental declaration included incorrect representations regarding distributors (D.I. 273, Ex. L at 36:17-37:6), Dr. Mody's use of allegedly incorrect sales data has no bearing on the irreparable harm analysis because she does not offer a financials-based damages opinion.

---

[10] A more detailed analysis regarding the ramifications of perceived inaccuracies in the declarations of Dr. Mody is found at § III.B.3, *infra*.

29

At oral argument, counsel for L'Oréal alleged that "the Mody Declarations that rely on sales data are not for the limited purpose of identifying who is a competitor and who is a national distributor," but also extend to show price erosion and a decline in market share. (6/21/18 Tr. at 116:8-117:4) Nonetheless, the court did not rely on the disputed paragraphs of Dr. Mody's declarations pertaining to Olaplex's sales data in reaching its conclusion on irreparable harm in the July 6, 2017 Memorandum Order. (D.I. 135 at ¶ 22) Although the court cited Dr. Mody's January 2017 Declaration in support of the proposition that Olaplex faced "price pressures and declining revenues based upon competition by the accused products," the court referred only to undisputed data regarding the competitive pricing and bundling of the Accused Products. (*Id.*) (citing D.I. 17 at ¶¶ 11-17) L'Oréal's challenge to the accuracy of the data relied upon in Dr. Mody's declarations does not extend to retail pricing and bundling discounts for Olaplex and the Accused Products. Consequently, L'Oréal has failed to show that the court's prior finding of irreparable harm was based on erroneous data included in the declarations of Dr. Mody.

With respect to identifying changes in the relevant market since the court's July 6, 2017 Memorandum Order, L'Oréal first argues that evidence since the launch of the Accused Products in August and November 2016[11] shows that Olaplex has suffered no negative impact on its pricing, revenue, or goodwill. (D.I. 268 at 16-17) In reply, Olaplex cites evidence showing that it was forced to give away products with its kit sales, decreasing prices and revenue opportunities. (D.I. 285 at 7) Olaplex contends that L'Oréal's analysis fails to consider the fact that every sale of the Accused Products represents a revenue loss for Olaplex, and downward price pressure from the Accused Products has resulted in harm to Olaplex's reputation. (*Id.* at 8)

---

[11] L'Oréal's Redken pH Bonder #1 product launched in August 2016, and its Smartbond Step 1 Additive and Matrix Bond Ultim8 Step 1 Amplifier products launched in October 2016. (D.I. 271 at ¶ 22)

30

Olaplex has adequately demonstrated irreparable harm to its revenues following the launch of the Accused Products. (D.I. 289 at ¶¶ 34-35; Ex. F) The deposition testimony of L'Oréal's expert, W. Todd Schoettelkotte, illustrates that revenue was "holding" for Olaplex in a growing product market. (D.I. 287, Ex. I at 56:22-57:10, 58:11-59:10) However, "in a new or relatively new product market, one expects revenue growth, and for total revenue to increase and eventually level out once the product market matures with late-adopters embracing the product and its benefits." (D.I. 289 at ¶ 29) For these reasons, a court may find irreparable injury even if a patentee "manages to maintain a profit in the face of infringing competition," or experiences an increase in market share following the launch of an infringing product. *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013). Mr. Schoettelkotte concedes that Olaplex's largest sales were made in 2015, before the Accused Products entered the market. (D.I. 271 at ¶ 23) Although the data reflects that Olaplex's revenues are on an upward trajectory, they have not approached the peak levels achieved in 2015 prior to the launch of the Accused Products. (*Id.* at ¶ 22; D.I. 289 at ¶ 31)

The record also reflects that Olaplex suffered irreparable harm as a result of price pressure from the Accused Products. The parties do not dispute that the Accused Products are priced lower than Olaplex's competing products. (D.I. 241, Ex. F at LO_USA0003099, Ex. H; D.I. 285 at 7 n.10) Beginning in July 2016,[12] Olaplex began to give away its "Back-Bar Bond Perfector No. 2" product as a free add-on to its Salon Intro Kit. (D.I. 314, Ex. K) Although the price of Olaplex's competing product kit has not changed (D.I. 273, Ex. N at 39:2-14; Ex. M at

---

[12] Olaplex cites the declaration of Ms. Walden in support of its contention that Olaplex did not initiate its product giveaway until the launch of the Accused Products. (D.I. 247 at ¶ 11) However, correspondence from July 2016 establishes that the promotion began prior to the launch of the Accused Products. (D.I. 314, Ex. K)

43:2-11), inclusion of a giveaway product valued at $140 with the kit has substantially reduced
Olaplex's profit margins and, in this regard, has effectively lowered the price of the kits, (D.I.
289 at ¶¶ 26-28). Olaplex is compelled to continue its product giveaway as a result of the price
pressure resulting from competition by the Accused Products. (*Id.*) Olaplex presents evidence
suggesting that "a customer that has purchased one or more of the Accused Products at a lower
price than that offered by Olaplex is less likely to purchase higher-priced Olaplex products now
or in the future." (D.I. 289 at ¶ 38) For this reason, the harm suffered by Olaplex cannot be
reduced to monetary damages alone. *See Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922,
930 (Fed. Cir. 2012) (upholding the district court's conclusion that "[t]here is no effective way to
measure the loss of sales or potential growth—to ascertain the people who do not knock on the
door or to identify the specific persons who do not reorder because of the existence of the
infringer.").

In addition, Olaplex presents evidence establishing that it suffered reputational harm
linked to the Accused Products. Olaplex cites the testimony of Steven Orzel, who described the
advantages of having market exclusivity in a distribution channel to obtain more customers and
capture a larger market share. (D.I. 287, Ex. H at 171:9-172:20, 173:7-175:23, 177:13-179:18)
Online product reviews demonstrate that a number of Olaplex customers subsequently switched
to the Accused Products due to the lower price of the Accused Products, diminishing the benefits
gained from Olaplex's brief window of market exclusivity. (D.I. 247 at ¶ 13; D.I. 289 at ¶¶ 56-
57)

L'Oréal contends that the bond builder market has changed since the court's July 6, 2017
decision due to the market entry of Wellaplex as a new bond builder product, and the role of
Amazon.com as a new distributor of bond building products. (D.I. 268 at 17-18) These

purported changes in the market are insufficient to overcome the Federal Circuit's prior findings. Specifically, Dr. Borish conducted an analysis of allegedly alternative products sold by Cosmoprof, including Wellaplex, and concluded that Wellaplex "do[es]not provide the same or equivalent functionality as Olaplex and the '419 patent Accused Products." (D.I. 242 at ¶ 33) Specifically, Dr. Borish opined that Wellaplex does not "contain[] an ingredient known to repair disulfide bonds," and "shares other conventional hair conditioning agents . . . which rather than repair damage, only treat undesirable superficial hair damage." (*Id.*)

Aside from technical distinctions in the composition of new products such as Wellaplex, the record is replete with evidence establishing that L'Oréal specifically targeted Olaplex by introducing the Accused Products into the market. (D.I. 241, Exs. F-H; D.I. 96, Ex. C at 44:1-8) The entry of other competitors into the market with infringing products does not alter the fact that L'Oréal and Olaplex are in direct competition. *See Butamax Advanced Biofuels LLC v. Gevo, Inc.*, 868 F. Supp. 2d 359, 374 (D. Del. 2012). Under such circumstances, the Federal Circuit has cautioned against "effectively establish[ing] a presumption against irreparable harm whenever the market contains a plurality of players." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151 (Fed. Cir. 2011).

L'Oréal presents data demonstrating Amazon.com's role as a distributor of Olaplex's products in support of its argument that the relevant market has changed since the court's July 6, 2017 Memorandum Order. (D.I. 271 at ¶ 37; D.I. 243, Ex. G) This evidence reveals that sales on Amazon.com represent a small percentage of Olaplex's total sales from 2015 to the present. (D.I. 243, Ex. G) (representing that sales of Olaplex's salon kit and travel kit on Amazon.com accounted for 0.62% of Olaplex's total sales between 2015 and 2018). Although sales of Olaplex through Amazon.com increased to account for 11.3% of Olaplex sales in 2018 thus far,

L'Oréal has not shown how this small percentage would substantially alter the analysis of Olaplex's revenues.

Because L'Oréal has not established a substantial change in the market since the court's July 6, 2017 Memorandum Order, I recommend that the court affirm the prior rulings of this court and the Federal Circuit concluding that Olaplex has suffered irreparable harm since the launch of the Accused Products. "[B]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Hybritech*, 849 F.2d at 1456-57. "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008).

### (c) Balance of equities and public interest

Olaplex has shown a reasonable likelihood of success on the merits, and has met its burden of demonstrating irreparable harm. The remaining factors also weigh in favor of Olaplex. Specifically, Olaplex points to evidence demonstrating that the Accused Products constitute an insignificant portion of L'Oréal's overarching business. (D.I. 314, Ex. H at 48:4-18; Ex. J at 35:25-36:13)[13] In contrast, undisputed evidence on the record establishes that Olaplex's bond builder products constitute the entirety of its business. (D.I. 17 at ¶ 5; D.I. 135 at ¶ 22) For these reasons, the balance of equities and public interest weigh in favor of granting Olaplex's renewed motion for a preliminary injunction.

---

[13] The cited pages were not attached to the declaration of Scott F. Peachman at D.I. 314. Excerpts from these depositions were presented to the court at Slide 47 of Olaplex's June 21, 2018 PowerPoint presentation.

34

## B. Motion to Strike Declarations of Nisha Mody, Ph.D

### 1. Legal standard

Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994). The admissibility of expert testimony is a question of law governed by Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court explained that Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." The rule requires that expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Expert testimony is admissible only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d); *see Elcock v. Kmart Corp.*, 233 F.3d 734, 741-46 (3d Cir. 2000). "[A]ny step that renders the [expert's] analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli*, 35 F.3d at 745.

The Third Circuit has explained that Rule 702 restricts testimony based on qualification, reliability, and fit. *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The issues raised in the present matter primarily implicate the reliability of Dr. Mody's declarations. To prove reliability, the party must show that the expert's testimony is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590). The expert's testimony must also be relevant for the

35

purposes of the case and must assist the trier of fact. *Schneider*, 320 F.3d at 404. In *Daubert*,
the Supreme Court explained that "Rule 702's 'helpfulness' standard requires a valid scientific
connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-
92. Neither expert testimony on the legal standards applicable to the case, nor testimony on
factual matters involving common sense, assists the trier of fact. *See Int'l Market Brands v.
Martin Int'l Corp.*, 882 F. Supp. 2d 809, 814-15 (W.D. Pa. 2012).

## 2. Background

Dr. Nisha Mody is a partner at OSKR, LLC, a consulting firm specializing in litigation
damages and financial valuation. (D.I. 17 at ¶ 1) Dr. Mody's work focuses on economic and
financial issues that arise from complex litigation, and she has worked as an adjunct professor at
Santa Clara University School of Law, teaching a course on the economics and finance of
intellectual property. (*Id.*) Dr. Mody has more than fifteen years of experience analyzing and
calculating economic damages in a variety of cases, offering opinions regarding patent and trade
secret damages, economic interference, irreparable harm, price erosion, and market share. (*Id.* at
¶ 3)

Dr. Mody filed her declaration in support of the original motion for a preliminary
injunction in the present litigation on January 17, 2017 (the "January 2017 Declaration"). (D.I.
17) The January 2017 Declaration, which is directed to establishing irreparable harm to Olaplex
caused by L'Oréal's purported infringement, contains a chart purporting to show total monthly
sales of Olaplex's products through Salon Centric and Cosmoprof,[14] Olaplex's two primary
distributors. (*Id.* at ¶ 7) In the same paragraph, Dr. Mody represents that about 85% of
Olaplex's United States sales are made through Salon Centric and Cosmoprof ("the National

---

[14] Cosmoprof is also known as Beauty Systems Group LLC ("BSG"). (D.I. 243 at ¶ 15)

36

Market"). (*Id.*) Olaplex produced the financial records relied upon by Dr. Mody on March 17, 2017.[15] (D.I. 299, Ex. A) Dr. Mody was deposed on March 31, 2017, and presented a notebook at that time containing the documents she had relied on in her January 2017 Declaration. (D.I. 267, Ex. C at 69:19-70:18, 148:3-14; D.I. 299, Ex. B at 147:10-11)

Dr. Mody submitted her rebuttal declaration in support of Olaplex's reply brief on May 25, 2017 (the "May 2017 Declaration"). (D.I. 97) In the May 2017 Declaration, Dr. Mody analyzed the direct competition between Olaplex and L'Oréal, the nature of the primary market, and the financial records of both parties. (*Id.* at ¶¶ 18, 23-27) Dr. Mody also indicated that she had spoken with Olaplex's technical expert, Dr. Borish, and reviewed his declaration in forming her opinion. (*Id.* at ¶ 2) L'Oréal alleges that Olaplex refused to offer Dr. Mody for deposition to discuss the May 2017 Declaration. (D.I. 266 at 4; D.I. 267, Ex. D at 1)

On April 26, 2018, Dr. Mody submitted her supplemental declaration in support of Olaplex's renewed motion for a preliminary injunction (the "April 2018 Declaration"). (D.I. 243) In the April 2018 Declaration, Dr. Mody analyzed additional sales data provided by Olaplex through the first quarter of 2018, and concluded that a majority of Olaplex's sales were made through the National Market. (*Id.* at ¶¶ 15-16) The underlying financial data was attached to Dr. Mody's April 2018 Declaration. (D.I. 243, Ex. G) However, some of the financial data reproduced in Figure A of the April 2018 Declaration contained mathematical errors that were absent from the original underlying data. (D.I. 243 at ¶ 15) L'Oréal alleges that certain source

---

[15] On February 13, 2017, the court entered an order setting a briefing schedule for the motion for preliminary injunction. (D.I. 39) The order provided that "[t]he parties agree to serve all materials its declarants relied upon at the time that the declarations are filed with the Court (or at the time this paper is filed with the Court for all declarations already filed)." (*Id.* at 2)

materials underlying the data contained in Exhibit G were not attached to the April 2018
Declaration. (D.I. 266 at 5)

Also on April 26, 2018, Olaplex served its response to L'Oréal's Interrogatory No. 5,
directing L'Oréal to Exhibit G of the April 2018 Declaration and Exhibit 43 to Dr. Mody's
March 31, 2017 deposition in response to L'Oréal's request for "all sales of Olaplex Bond
Multiplier No. 1, by unit and revenue, from inception to present, broken down on a monthly
basis and by distributor or distribution channel." (D.I. 267, Ex. B at 6) On April 30, 2018,
Olaplex supplemented its response to remove data from sales ultimately exported for
international distribution so that the data would reflect only domestic sales. (D.I. 251; D.I. 267,
Ex. B at 7; D.I. 286 at ¶ 19) The supplemental response removed the reference to Exhibit 43 and
provided new charts identifying relevant sales information for "Top 5 Distributors" and "Other
Distributors." (D.I. 267, Ex. B)

Dr. Mody appeared for her deposition on May 1, 2018. During the deposition, Dr. Mody
testified that the April 2018 Declaration included inaccurate representations. (D.I. 267, Ex. A at
26:14-27:18, 32:12-33:14, 34:6-37:6, 53:11-55:2) Dr. Mody also testified that if there were a
mistake in ten percent of Olaplex's data addressed in the April 2018 Declaration, Dr. Mody
would have to revisit her analysis. (*Id.* at 75:15-76:2)

On May 13, 2018, Olaplex served a second supplemental response to L'Oréal's
Interrogatory No. 5, which withdrew the unit sales and revenue data provided in Olaplex's
previous response to Interrogatory No. 5 and replaced the data with new charts to correct certain
distributor names and include aggregate sales from Olaplex.com. (D.I. 286 at ¶¶ 19-20) Olaplex
declined to produce backup data in support of the charts. (D.I. 267 at ¶ 7) Dr. Mody filed a

38

subsequent declaration on June 4, 2018 (the "June 2018 Declaration"), following the filing of the
instant motion to strike. (D.I. 289)

### 3. Analysis

In support of its motion to strike, L'Oréal contends that Dr. Mody's declarations are
unreliable because they are based on errors and inconsistencies in the underlying data, and
Olaplex has failed to produce the underlying documents relied upon by Dr. Mody in forming her
opinions. (D.I. 266 at 11-15) In response, Olaplex contends that L'Oréal's challenge does not
call into question Dr. Mody's qualifications, methodology, or the economic and legal framework
for her analysis. (D.I. 298 at 1) According to Olaplex, Dr. Mody relied on the disputed data for
only a small portion of her opinion, and subsequent modifications were not material and did not
alter Dr. Mody's ultimate opinions. (*Id.* at 9-10)

I recommend that the court deny L'Oréal's motion to strike Dr. Mody's declarations.[16]
Dr. Mody based her opinions regarding the definition of the National Market on sales data from
both Olaplex and L'Oréal, as well as data from The Kline Group, an independent global
marketing intelligence firm. (D.I. 17 at ¶¶ 8-9, Ex. B; D.I. 243 at ¶ 15; D.I. 97 at ¶¶ 24, 26-27)
This data consistently shows that Salon Centric and Cosmoprof are the dominant suppliers in the
industry. (*Id.*) The parties agree that more than 80% of Olaplex's products are sold in the
National Market. (D.I. 17 at ¶ 7; D.I. 289 at ¶ 34; D.I. 287, Ex. I at 77:7-79:24) L'Oréal's
expert did not refute the accuracy of the data upon which Dr. Mody based her definition of the

---

[16] During oral argument on the motion to strike, counsel for L'Oréal emphasized that the
requested relief encompassed striking all of Dr. Mody's declarations in their entirety: "It's
simply not enough in this case for the Court to ignore only those paragraphs of the Mody
Declarations that are based on admittedly false sales data. It should definitely do that at a
minimum. But the sales data are not the only problem. They just highlighted the problem."
(6/21/18 Tr. at 112:13-19)

National Market. (D.I. 287, Ex. I at 77:7-79:24; D.I. 299, Ex. D at 50:22-51:7) Consequently,

the record reflects that Dr. Mody's definition of the National Market in this case is based on

relevant, reliable data.

L'Oréal contends that Dr. Mody's declarations should be stricken in their entirety based

on inconsistencies between the Olaplex sales numbers contained in Dr. Mody's January 2017

Declaration and Olaplex's second supplemental response to Interrogatory No. 5. (D.I. 266 at 11-

12) Specifically, the January 2017 Declaration identifies less than $500,000 in sales of Olaplex

products to Cosmoprof in June 2015, whereas Olaplex's second supplemental response to

Interrogatory No. 5 states that Olaplex sold $3,685,284 worth of merchandise to Cosmoprof in

June 2015. (D.I. 17 at ¶ 7; D.I. 267, Ex. B at 19) Likewise, Dr. Mody contends that Olaplex

sold more than $3 million of products to Cosmoprof and Salon Centric in September 2015, while

Olaplex's second supplemental response to Interrogatory No. 5 identifies $0 in sales to

Cosmoprof and Salon Centric during the same time period. (*Id.*)

The alleged discrepancies in Olaplex's sales data[17] have no bearing on Dr. Mody's

ultimate conclusion that the majority of Olaplex's sales occur through the National Market. (D.I.

243 at ¶¶ 15-21) L'Oréal has not shown that Dr. Mody relied on the disputed Olaplex sales

numbers for any purpose other than defining the National Market. Moreover, this court did not

---

[17] Olaplex contends that the data is not inconsistent, because the January 2017 Declaration shows
aggregated monthly sales of all three Olaplex products, whereas the second supplemental
response to Interrogatory No. 5 only includes sales of Bond Multiplier No. 1. (D.I. 298 at 13)
Moreover, Olaplex alleges that the chart in the January 2017 Declaration shows retail sales
"through . . . SalonCentric and Cosmoprof," whereas the second supplemental response to
Interrogatory No. 5 reflects Olaplex's wholesale sales to SalonCentric and Cosmoprof. (*Id.*) It is
not clear to the court that these explanations fully reconcile the discrepancies in the sales
numbers presented. Nevertheless, the inconsistencies in Olaplex's sales data do not warrant
striking Dr. Mody's declarations in their entirety where, as here, the purported errors have no
bearing on Dr. Mody's ultimate conclusion, and were not relied upon by this court or the Federal
Circuit in ruling on the original motion for a preliminary injunction.

rely on the challenged data in reaching its conclusion on irreparable harm in the July 6, 2017 Memorandum Order. (D.I. 135 at ¶ 22) On appeal, the Federal Circuit found no error in the district court's determination "that the bond-builder market is a 'two-player national market' and that Olaplex would likely suffer irreparable harm from L'Oréal's 'direct competition in [its] primary market.'" *Liqwd*, 720 F. App'x at 633. Striking Dr. Mody's declarations in their entirety based on perceived inaccuracies in Olaplex's sales data is therefore unwarranted under the present circumstances. Disputes regarding the accuracy of Olaplex's sales data go to the weight of the opinion, and not its admissibility. *See Plastic Omnium Advanced Innovation & Research v. Donghee Am., Inc.*, C.A. No. 16-187-LPS, 2018 WL 2316637, at \*3 (D. Del. May 22, 2018) (citing *i4i Ltd. P'Ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012)). Deficiencies in the accuracy of the underlying data "can be adequately addressed through cross-examination and the presentation of competing evidence." *Id.*

L'Oréal further contends that Dr. Mody's May 2017 Declaration is unreliable because it is inconsistent with the declaration and testimony of Tiffany Walden regarding Olaplex's efforts to increase spending and expand its marketing operations in response to competition from the Accused Products. (D.I. 266 at 12) (citing D.I. 243, Ex. C at 38) Specifically, Ms. Walden testified that Olaplex did not expand its social media marketing strategy to encompass traditional forms of advertising as a consequence of the entry of the Accused Products onto the market. (D.I. 267, Ex. F at 201:4-15, 202:4-11) Dr. Mody's opinion in her May 2017 Declaration that Olaplex "believes it will have to . . . branch[] out into other forms of more expensive marketing" is not supported by Ms. Walden's subsequent statements in her May 2018 deposition. (D.I. 97 at ¶ 51; D.I. 299, Ex. F) However, Ms. Walden's testimony supports Dr. Mody's broader opinion

41

on the subject that Olaplex increased spending on its social media marketing operations in

response to the entry of the Accused Products into the market. (D.I. 299, Ex. F at 199:13-

200:22) ("About maybe even more than half of Olaplex's employees are devoted full-time to

social media-related tasks . . . .") Whether the increase in marketing expenses derives from

social media spending or expansion into traditional advertising channels is irrelevant to the

broader question of harm caused by the entry of the Accused Products into the market.

L'Oréal also challenges Dr. Mody's representation in the May 2017 Declaration that

Olaplex faced diminished revenues following the launch of the Accused Products, which was

based on Ms. Walden's representation that sales of Olaplex to Salon Centric decreased following

the launch of the Accused Products. (D.I. 266 at 13) The record reflects that calculations made

by Ms. Walden during her deposition supported an increase in sales of Olaplex to Salon Centric

following the launch of the Accused Products. (D.I. 267, Ex. F at 181:18-182:5) However, other

evidence of record supports Dr. Mody's opinion by showing that Salon Centric's sales of

Olaplex to customers decreased immediately after the launch of the Accused Products. (D.I. 289

at ¶ 35; Ex. F; D.I. 299, Ex. F at 183:10-13) Consequently, questions surrounding the increase or

decrease in sales of Olaplex following the launch of the Accused Products go to the weight of the

evidence, and not its admissibility. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 855-56

(Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).[18]

---

[18] In *i4i Ltd. Partnership v. Microsoft Corp.*, the Federal Circuit held that the focus of the inquiry
under Rule 702 is "whether the expert relied on facts sufficiently related to the disputed issue,"
and not whether better or more accurate facts exist. 598 F.3d 831, 855-56 (Fed. Cir. 2010), *aff'd*,
564 U.S. 91 (2011). "While the data were certainly imperfect, and more (or different) data might
have resulted in a 'better' or more 'accurate' estimate in the absolute sense, it is not the district
court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony."
*Id.* at 856 (citing *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003)
("Defendants confuse the requirement for sufficient facts and data with the necessity for a
reliable foundation in principles and method . . . . When, as here, the parties' experts rely on

In addition, L'Oréal challenges Dr. Mody's representation in the May 2017 Declaration that she spoke to Dr. Borish in preparing her opinion, despite subsequent testimony indicating that she had not spoken to him. (D.I. 266 at 13-14) L'Oréal does not challenge Dr. Mody's representation that she relied on the opinions of Dr. Borish, and does not challenge the substance of any statements made by Dr. Mody in reliance on Dr. Borish's opinions. The record reflects that Dr. Mody did speak with Dr. Borish in preparing the May 2017 Declaration, but did not consider further conversations necessary in preparing the April 2018 Declaration. (D.I. 97 at ¶ 2; D.I. 243 at ¶ 6; D.I. 267, Ex. A at 12:18-13:2) Dr. Mody's reliance on Dr. Borish's opinions and/or conversations does not warrant striking her declarations.

Next, L'Oréal seeks to strike Dr. Mody's April 2018 Declaration, which contains irrelevant data regarding international sales. (D.I. 266 at 14) The record demonstrates that Dr. Mody admitted the international sales data should be removed. (D.I. 299, Ex. E at 27:9-13) Upon removing international sales, the percentage of sales to Salon Centric and Cosmoprof increased to 93% from the previous 83%, further bolstering Dr. Mody's expert opinion regarding the definition of the National Market. (*Id.* at 27:13-14; Ex. D at 85:12-89:14; D.I. 289 at ¶ 47) Inaccuracies in Dr. Mody's April 2018 relating to the inclusion of international sales therefore go to the weight of the evidence, and not its admissibility. *See i4i Ltd.*, 598 F.3d at 856.

According to L'Oréal, the April 2018 Declaration should also be stricken because the Olaplex sales figures fail to account for Olaplex.com, which is the third largest distributor of Olaplex Bond Multiplier No. 1. (D.I. 266 at 14) L'Oréal contends that this error is fatal to Dr. Mody's opinion because the distributor is responsible for 10% of sales, and Dr. Mody

---

conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.")).

acknowledged that a mistake in 10% of Olaplex's sales data would require her to revisit her analysis. (*Id.*) In response, Olaplex clarifies that the data supporting Exhibit G of the April 2018 Declaration included Olaplex.com sales, but not in an aggregated form. (D.I. 298 at 14) The record establishes that Olaplex provided Olaplex.com sales data in aggregated form in its second supplemental responses to Interrogatory No. 5. (D.I. 286 at ¶¶ 19-20) Moreover, Exhibit C to Dr. Mody's June 2018 Declaration compares data from Exhibit G to the April 2018 Declaration with data from the second supplemental response to Interrogatory No. 5, which shows a difference of less than one half of one percent. (D.I. 289 at ¶¶ 49-50, Ex. C) The insubstantial nature of the discrepancy counsels against granting L'Oréal's motion to strike on this basis.

Finally, L'Oréal alleges that Dr. Mody should be foreclosed from filing the June 4, 2018 Declaration[19] because Olaplex failed to produce its underlying financial data in support of Dr. Mody's declarations. (D.I. 266 at 14-15) The record reflects that Dr. Mody included with each declaration the data she relied upon in forming her opinions. (D.I. 17 at ¶ 7; D.I. 97 at ¶¶ 18, 24; D.I. 243 at ¶¶ 15-16, Ex. G; 6/21/18 Tr. at 120:12-121:2, 121:16-122:6) To the extent that L'Oréal believed Olaplex's production was incomplete, L'Oréal failed to pursue a motion to compel the production of additional financial documents. In view of the foregoing record, I recommend that the court deny L'Oréal's motion to strike the declarations of Dr. Mody.

## IV. CONCLUSION

For the foregoing reasons, I recommend that the court: (1) grant Olaplex's renewed motion for a preliminary injunction (D.I. 239), and (2) deny L'Oréal's motion to strike the declaration of Nisha Mody, Ph.D (D.I. 266).

---

[19] The pending motion to strike was filed on May 17, 2018, prior to Olaplex's submission of Dr. Mody's June 2018 Declaration. (D.I. 266; D.I. 289)

Given that the court has relied upon material that technically remains under seal, the

court is releasing this Report and Recommendation under seal, pending review by the parties. In

the unlikely event that the parties believe that certain material in this Report and

Recommendation should be redacted, the parties should jointly submit a proposed redacted

version by no later than **October 25, 2018**. The court will subsequently issue a publicly

available version of its Report and Recommendation.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10)

pages each. The failure of a party to object to legal conclusions may result in the loss of the right

to de novo review in the District Court. *See Sincavage v. Barnhart,* 171 F. App'x 924, 925 n.1

(3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.

Dated: October 15, 2018

Sherry R. Fallon
United States Magistrate Judge

45