IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIQWD, INC. and OLAPLEX LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. No. 17-14 (JFB) (SRF) |
| | ) | |
| L'ORÉAL USA, INC., L'ORÉAL USA | ) | REDACTED -- PUBLIC VERSION |
| PRODUCTS, INC, L'ORÉAL USA S/D, | ) | |
| INC., and REDKEN 5TH AVENUE NYC, | ) | |
| L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR *DAUBERT* MOTION TO EXCLUDE THE EXPERT OPINION OF DAVID NOLTE**

OF COUNSEL:

Joseph M. Paunovich
Ali Moghaddas
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Adam DiClemente
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Matthew K. Blackburn
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA 94111
(415) 692-5200

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com
araucci@mnat.com

*Attorneys for Plaintiffs*

Original Filing Date: March 14, 2019
Redacted Filing Date: July 8, 2019

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    NATURE AND STAGE OF THE PROCEEDINGS ...........................................................1

II.   SUMMARY OF ARGUMENT .......................................................................................1

III.  STATEMENT OF FACTS .............................................................................................2

IV.  LEGAL STANDARD.....................................................................................................2

V.   ARGUMENT .................................................................................................................3

     A.    Mr. Nolte's Opinions On Disgorgement And Lost Profits Should Be
           Excluded For Failure To Measure Or Otherwise Assess The Impact Of
           Olaplex's Alleged Bad Acts...................................................................................3

          1.    Mr. Nolte's Disgorgement And Los Profits Opinions Fail To
                Quantify Or Otherwise Assess The Impact Of Olaplex's Alleged
                Bad Acts On Olaplex's Or L'Oréal's Sales ...................................................5

          2.    Mr. Nolte's Lost Profits Opinion Failed to Quantify or Otherwise
                Assess the Impact of Olaplex's Alleged Bad Acts on L'Oréal's
                Sales ............................................................................................................7

          3.    Mr. Nolte's Deposition Testimony Confirms That His Opinions
                Must Be Excluded .......................................................................................8

     B.    Mr. Nolte's Opinions On Disgorgement Should Be Excluded............................11

          1.    Mr. Nolte's Opinion That L'Oréal Is Entitled to Disgorgement of
                Revenues, Rather Than Profits, Is Contrary To Law.................................11

          2.    Mr. Nolte Inclusion Of False Patent Marking In His Calculation of
                Disgorgement Damages Is Contrary To Law .............................................12

           3.    Mr. Nolte Should Be Precluded From Providing Any Damages
                Opinions At Trial Based On Domestic-Only Sales ....................................13

     C.    Mr. Nolte's Opinions On Lost Profits Should Be Excluded.................................14

          1.    Mr. Nolte's Reliance On L'Oréal's Aspirational Sales Projections
                For His Lost Profits Opinions Are Speculative and Unreasonable............14

          2.    Mr. Nolte's Arbitrary Effort To Fill Gaps In The Sales Projections
                Is Unreliable And Must Be Excluded .........................................................17

     D.    The Court Should Exclude As Unreliable And Contrary To Law Mr.
           Nolte's Opinions That Olaplex And L'Oréal Do Not Compete In A Two-
            Player Market......................................................................................................17

     E.    Mr. Nolte Should Be Precluded From Offering Testimony Regarding The
           Credibility Of Olaplex Or its Witnesses .............................................................18

VI.  CONCLUSION............................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advanced Med. Optics, Inc. v. Alcon, Inc.*,
No. Civ. A. 03–1095–KAJ, 2005 WL 782809 (D. Del. Apr. 7, 2005).....................................2

*AstraZeneca LP v. Tap Pharm. Products, Inc.*,
444 F. Supp. 2d 278 (D. Del. 2006)........................................................................13

*Banjo Buddies, Inc. v. Renosky*,
399 F.3d 168 (3d Cir. 2005) ................................................................................11

*Bracco Diags., Inc. v. Amersham Health, Inc.*,
627 F. Supp 2d. 384 (D.N.J. 2009) ....................................................................4, 10

*Burno v. Bozzuto's, Inc.*,
311 F.R.D. 124 (M.D. Pa. 2015)...........................................................................16

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003) ..................................................................................3

*Cave v. Saxon Mortg. Servs., Inc.*,
No. 11-4586, 2015 WL 6153754 (E.D. Pa. Oct. 20, 2015) ........................................3

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ...............................................................................4

*Cot'n Wash, Inc. v. Henkel Corp.*,
56 F. Supp. 3d 613 (D. Del. 2014)........................................................................13

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)...................................................................................passim

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000) ..................................................................................3

*Griggs v. BIC Corp.*,
844 F. Supp. 190, 201 (M.D.Pa.1994), *aff'd*, 7 F.3d 1486 (3d Cir.1994) ..............18

*Herbert v. Lisle Corp.*,
99 F.3d 1109 (Fed. Cir. 1996) ...............................................................................3

*Hill v. NSB Niederelbe Schiffahrtsges.mbH & Co.*,
No. Civ.A. 02–2713, 2004 WL 569908 (E.D.Pa. Mar. 5, 2004)...........................18

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    No. CA 05-485-JJF, 2010 WL 8591815 (D. Del. July 28, 2010) ................................ 5

*Intellectual Ventures I LLC v. Xilinx, Inc.*,
    No. CV 10-1065-LPS, 2014 WL 1814384 (D. Del. Apr. 14, 2014) ............................ 3

*Larry Pitt & Associates v. Lundy Law LLP*,
    294 F. Supp. 3d 329 (E.D. Pa. 2018) ..................................................... 4, 10

*Legendary Art, LLC v. Godard*,
    No. CIV.A. 11–0674, 2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) ...................... 16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ....................................................................... 4

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
    971 F.2d 1056 (3d Cir. 1992) ............................................................. 15

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ............................................................... 14

*Rogers v. Conair Corp.*,
    No. CIV.A. 10-1497, 2012 WL 1443905 (E.D. Pa. Apr. 25, 2012) ...................... 8

*U.S. v. Scop*,
    846 F.2d 135 (2d Cir. 1998) .............................................................. 18

*SEC v. Blatt*,
    583 F.2d 1325 (5th Cir. 1978) ........................................................... 11

*Sukumar v. Nautilus, Inc.*,
    785 F.3d 1396 (Fed. Cir. 2015) ........................................................... 12

*SurgiQuest v. Lexion Med.*,
    2018 WL 2247216 (D. Del. May 16, 2018) ............................................... 11

*Suter v. Gen. Accident Ins. Co. of Am.*,
    424 F. Supp. 2d 781 (D.N.J. 2006) ...................................................... 18

*Target Market Publishing, Inc. v. Advo, Inc.*,
    136 F.3d 1139 (7th Cir. 1998) ........................................................... 16

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ........................................................ 14, 15, 16

## Rules / Statutes

35 U.S.C. § 292 ........................................................................ 12, 13

35 U.S.C. § 292(b) ............................................................................................... 4, 12

Fed. R. Civ. P. 26(a)(b)(i) ......................................................................................... 7

Fed. R. Evid. 702 ................................................................................................. 1, 3

Local Rule 7.1.1 ...................................................................................................... 2

### **Other Authorities**

5 McCarthy on Trademarks and Unfair Competition (5th ed.) ..................................... 4

*Black's Law Dictionary* (9th ed. 2009) ...................................................................... 12

## I.    NATURE AND STAGE OF THE PROCEEDINGS

On January 5, 2017, Plaintiffs Liqwd, Inc. and Olaplex LLC (collectively, "Plaintiffs" or "Olaplex") filed a Complaint against L'Oréal USA, Inc., L'Oréal USA Products, Inc., L'Oréal USA S/D, Inc., Redken 5th Avenue NYC, L.L.C.'s (collectively, "Defendants" or "L'Oréal"), alleging patent infringement, breach of contract and trade secret misappropriation.   D.I. 2. Olaplex filed its Third Amended Complaint on January 31, 2019.   D.I. 636.   On February 8, 2019, L'Oréal filed its Answer and Defenses to Plaintiffs' Third Amended Complaint and Amended Counterclaims.   D.I. 650.   Trial is set to commence on July 29, 2019.   D.I. 394.

## II.    SUMMARY OF ARGUMENT

The Court should exclude the opinions of L'Oréal's damages expert, David Nolte, on its counterclaims for false patent marking and false advertising under *Daubert* and Rule 702 because the opinions are speculative, lack any reliable methodology, depend on unreliable and untested data, and are contrary to law.

*First*, Mr. Nolte's disgorgement and lost profits damages opinions should be excluded because he has not conducted any sort of causation analysis linking Olaplex's alleged false advertising and marking misconduct (the "Bad Acts") to any actual diversion of sales and harm to L'Oréal.   Without any supporting methodology or explanation, Mr. Nolte concludes that every additional dollar that Olaplex earned after L'Oréal entered the market was a result of the alleged Bad Acts.   Similarly, Mr. Nolte cherry picks a L'Oréal internal aspirational sales document and concludes that the only reason that L'Oréal did not achieve these sales was due to Olaplex's Bad Acts.   *Second*, Mr. Nolte's disgorgement opinions should be excluded as contrary to law because he has erroneously calculated disgorgement of revenues rather than profits and his only disgorgement opinion seeks recovery for false patent marking, even though that is not permitted as a matter of law.   *Third*, the Court should not permit Mr. Nolte to provide disgorgement

opinions at trial based on Olaplex's domestic sales since such analysis is not in his report. **Fourth**, Mr. Nolte's lost profits opinion should be excluded because his reliance on L'Oréal's sales projection document is wholly speculative and reliable.  Mr. Nolte bases his entire lost profits calculations on these supposed projections, but he has no idea how the projections were prepared, no access to the underlying data, and no basis to say that the projections were reliable. **Fifth**, Mr. Nolte should be precluded at trial from providing opinions that Olaplex and L'Oréal do not compete in a two-player market, because such opinions would be contrary to law of the case, and in any event, Mr. Nolte has not done a proper economic or technical analysis to provide such an independent opinion. And **_finally_**, the portions of Mr. Nolte's opinion that lodge unfounded credibility attacks on Olaplex – including that Olaplex "should not be trusted" – are not proper expert testimony and should be excluded.

## III.    STATEMENT OF FACTS

Mr. Nolte submitted his expert report in this case on January 29, 2019.  Declaration of Joseph M. Paunovich ("Paunovich Decl."), Ex. 5 ("Nolte Report").  He was deposed on March 7, 2019.  Paunovich Decl., Ex. 16 ("Nolte Tr.").  The relevant facts are included in the Argument section as appropriate.  Pursuant to Local Rule 7.1.1, Olaplex has made a reasonable effort to reach agreement with L'Oréal on the matters set forth in the motion but has been unable to do so.

## IV.    LEGAL STANDARD

A party offering expert testimony has the burden of proving that the testimony is admissible under Federal Rule of Evidence 702.  *Advanced Med. Optics, Inc. v. Alcon, Inc.*, No. Civ. A. 03–1095–KAJ, 2005 WL 782809, at *1 (D. Del. Apr. 7, 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993)).  Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise **_if_**:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

F. R. Evid. 702 (emphasis added). The Third Circuit has explained that this rule "embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *see also Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003).

An expert's opinion does not "fit" the case when it is contrary to law. Opinions that conflict with existing law are "*per se* unreliable and inadmissible under *Daubert*." *Cave v. Saxon Mortg. Servs., Inc.*, No. 11-4586, 2015 WL 6153754, at *9 (E.D. Pa. Oct. 20, 2015) (emphasis added). When an expert witness's "understanding of the law is incorrect," it effectively "renders his opinion unreliable." *Intellectual Ventures I LLC v. Xilinx, Inc.*, No. CV 10-1065-LPS, 2014 WL 1814384, at *3 (D. Del. Apr. 14, 2014). In *Intellectual Ventures,* Chief Judge Stark excluded an expert witness's damages opinion where the witness substituted his own "sense of fairness" for settled principles of damages calculation in patent infringement matters. *Id.; see also Herbert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("[The] exercise of the trial court's gatekeeper authority [is encouraged] when parties proffer, through purported experts, not only unproven science . . . but markedly incorrect law. Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories.").

## V.    ARGUMENT

### A.    Mr. Nolte's Opinions On Disgorgement And Lost Profits Should Be Excluded For Failure To Measure Or Otherwise Assess The Impact Of Olaplex's Alleged Bad Acts

It is black letter law that a damages expert must take into account, and disaggregate, the allegedly unlawful conduct for which the claimant is entitled to recover damages, from lawful conduct which, naturally, cannot yield recoverable damages. *Bracco Diags., Inc. v. Amersham Health, Inc.*, 627 F. Supp 2d. 384, 443 (D.N.J. 2009) (expert must "take into account the effect of non-tortious activity" in his or her calculations); *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1055-57 (8th Cir. 2000) (holding that expert testimony should not be admitted when it fails to separate lawful from unlawful conduct).

This requirement applies to false advertising and false patent marking cases. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014) ("[A] plaintiff suing under [the Lanham Act] must show economic or reputational injury *flowing directly from* the deception wrought by the defendant's advertising; and that that occurs when deception of consumers *causes them to withhold trade from the plaintiff*.") (emphases added); 35 U.S.C. § 292(b) (false marking statute: "A person who has suffered a competitive injury *as a result of* a violation of this section may file a civil action . . . for recovery of damages adequate to compensate for the injury.") (emphasis added); *Larry Pitt & Associates v. Lundy Law LLP*, 294 F. Supp. 3d 329, 341 (E.D. Pa. 2018) ("[Lanham Act plaintiff] must *establish a causal link between its alleged injury and [the defendant's] specific misrepresentations* by showing that [the defendant's] statements actually deceived and influenced consumers.") (emphasis added); *Bracco Diagnostics*, 627 F. Supp. 2d at 480–81 ("In Lanham Act cases, the causation standard for an award of damages is higher than the general standard for injunctive relief. . . . [A] plaintiff seeking monetary rather than injunctive relief *must show actual damages rather than a mere tendency to be damaged*. Moreover, a plaintiff seeking monetary damages must show more than a mere presumption of actual customer confusion based on a finding of literal falsity. The

plaintiff must **link the deception with actual harm to its business**. Actual **damages cannot exist without a nexus between a false advertisement and an adverse purchasing decision**.") (emphases added); 5 McCarthy on Trademarks and Unfair Competition § 27:41 (5th ed.) ("As in any field of law, to recover damages, the plaintiff in a false advertising case must prove that the damages were caused by the illegally false statements of defendant. Plaintiff must prove a causal relation between the deceptive advertising and some damage to plaintiff.").

Mr. Nolte, L'Oréal's purported expert for damages on its Counterclaims, has submitted a Rule 26 expert report with only a single sentence even addressing the causal link between Olaplex's alleged false advertising and false patent marking misconduct (the "Bad Acts") and damages owed to L'Oréal.  Mr. Nolte states:

> "Olaplex's alleged false patent marking and related communications on this topic would predictably benefit Olaplex's sales, and would harm L'Oréal USA's sales."

Nolte Report, p.3.  Other than this one sentence, Mr. Nolte has failed to do any sort of causation or apportionment analysis in providing his disgorgement and lost profits damages opinions. Accordingly, these opinions must be excluded under *Daubert* as unreliable.  *See In re Intel Corp. Microprocessor Antitrust Litig.*, No. CA 05-485-JJF, 2010 WL 8591815, at *27 (D. Del. July 28, 2010) (excluding opinion of damages expert who failed to control for other factors in calculating damages).

        **1.**      **Mr. Nolte's Disgorgement And Lost Profits Opinions Fail To Quantify Or Otherwise Assess The Impact Of Olaplex's Alleged Bad Acts On Olaplex's Or L'Oréal's Sales**

In calculating damages for disgorgement, Mr. Nolte assumes, without analysis, that literally every additional dollar that Olaplex has earned since L'Oréal's products entered the market is a result of the alleged Bad Acts identified by L'Oréal in its false advertising and false patent marking counterclaims.  Nolte Report, p.1 (listed alleged Bad Acts), p.5 ("In light of the

increased competition described in Section A above and the entrance of the three L'Oréal USA brands relevant to this dispute, one would expect Olaplex's sales to not increase.").[1] This unsupported assumption creates significant reliability issues with the ensuing damages analysis.

Specifically, with respect to his disgorgement analysis, Mr. Nolte arrived at his quantum of damages by averaging Olaplex revenues in the year before what he deemed to be L'Oréal's market entrance (August 2015 to July 2016), and compared that to Olaplex's revenues in the approximately two years after that (August 2016 to October 2018) to calculate a "Monthly average increase" in Olaplex sales for the period after L'Oréal's products launched. Nolte Report, p. 5. Mr. Nolte then attributed every additional dollar that Olaplex earned, or will earn through the date of trial (measured by his "monthly average increase"), to the alleged Bad Acts. As Mr. Nolte presents it, no other factor in the world is possibly responsible (in whole or part) for this increase in Olaplex's revenue after L'Oréal entered the market.

Mr. Nolte's arbitrary calculation lacks any supported or explained methodology, and must be excluded under *Daubert*. Mr. Nolte's terse report does not provide any basis for this extreme opinion, nor does he attempt to investigate any other facts or circumstances that could have contributed to Olaplex's revenue growth, such as better or different products or labeling; growth in the overall market (*i.e.,* the total population of prospective Olaplex customers); introduction of new, related products for sale by Olaplex; changes in the rate of repeat purchases from existing customers; changes in pricing and other purchase incentives instituted by Olaplex; geographical expansion to new sales territories; or a myriad other potential factors.

---

[1]    Mr. Nolte's report neither provides explanation of why this would be "expected" nor offers citations to any analysis or authorities supporting this contention.

Worse still, Mr. Nolte's opinion also does not even account for the impact that the conduct alleged in L'Oréal's other counterclaims, such as for fraud, breach of contract, and inequitable conduct in obtaining patents, would have had on Olaplex's sales. Nolte Tr. at 83:5-86:9 (admitting that he did not account for L'Oréal's other counterclaims). In other words, by allocating 100% of any increase in Olaplex's revenue after L'Oréal's market entry to the false patent marking and advertising Bad Acts, Mr. Nolte has assumed zero damages result from L'Oréal's other causes of action. Even if Olaplex agrees with Mr. Nolte's assumption of zero monetary damages for those other causes of action, that does not excuse Mr. Nolte from explaining that assumption and explaining how he methodologically arrived at the conclusion that 100% of revenue changes were a result of the charged false advertising and false marking misconduct—something he utterly failed to do.

Nor does Mr. Nolte make any effort to specifically quantify or measure, much less approximate, the impact of each of the alleged Olaplex Bad Acts, whether alone or together. For example, how much did the allegedly misleading social media postings increase Olaplex's sales? Would Olaplex's sales have increased anyway since the overall market was expanding? Mr. Nolte's report leaves these and other basic questions wholly unanswered. *See infra* Section IV(B)(3).

At bottom, Mr. Nolte's report fails to identify a single additional sale earned by Olaplex as a result of the alleged Bad Acts and reliably quantify how much those Bad Acts actually increased Olaplex sales. *See* Fed. R. Civ. P. 26(a)(b)(i) (requiring expert reports to include "a complete statement of all opinions the witness will express and the basis and reasons for them"). Mr. Nolte's disgorgement opinions should be excluded.

    **2.**    **Mr. Nolte's Lost Profits Opinion Failed to Quantify or Otherwise Assess the Impact of Olaplex's Alleged Bad Acts on L'Oréal's Sales**

Mr. Nolte's lost profits opinion, like his disgorgement opinion, makes no attempt to tie Olaplex's alleged Bad Acts to the purported profits lost by L'Oréal.

In calculating lost profits, Mr. Nolte first chose to rely on one-off sales projections prepared by L'Oréal in 2016 for the Matrix and Redken Accused Products. Because L'Oréal did not achieve these sales projections in the real world, Mr. Nolte assumed, without any analysis or explanation whatsoever, that any shortfall is 100% attributable to Olaplex's Bad Acts, and is therefore recoverable by L'Oréal as lost profits damages.

As with disgorgement—and notwithstanding clear law requiring damages to result from the alleged misconduct—Mr. Nolte does not account for any other potential reason for why L'Oréal would not have met its own sales projections, as companies routinely do even in the *absence* of alleged activity such as false advertising or false patent marking. Mr. Nolte's report makes no effort to tie the Bad Acts to any injury that L'Oréal actually suffered. *Rogers v. Conair Corp.*, No. CIV.A. 10-1497, 2012 WL 1443905, at *4 (E.D. Pa. Apr. 25, 2012) ("While Plaintiff sets forth the legal conclusion that Conair's false marking practices led to limited shelf space for his products and loss of sales, he alleges no facts from which the Court can find a plausible causal connection between any difficulty Plaintiff experienced in obtaining retail shelf space or selling his product and Conair's marking practices.").

Like his disgorgement opinion, Mr. Nolte's lost profits opinion should be excluded under *Daubert* as unreliable and contrary to law.

### 3. Mr. Nolte's Deposition Testimony Confirms That His Opinions Must Be Excluded

Mr. Nolte's deposition testimony also revealed the truly unreliable nature of his lost profits and disgorgement opinions. Although Mr. Nolte perfunctorily assumes that every additional dollar that Olaplex earned, or every dollar L'Oréal aspired to earn but did not earn, is

a function of the alleged Bad Acts, Mr. Nolte was unaware, and did not consider in his opinion, key facts or figures related to those Bad Acts that would necessarily inform an appropriate damages opinion.  Mr. Nolte does not know or have an opinion on:

- the number of consumers L'Oréal lost to Olaplex as a result of Olaplex's wrongful acts.  Nolte Tr. at 4:4-17;

- when Olaplex allegedly started, and whether and when it stopped, making the statement that Olaplex would allow stylists to "never break a client's hair."  *Id.* at 147:13-150:24.

- any sales that Olaplex obtained as a result of the claim that stylists would "never break a client's hair."  *Id.* at 152:12-20;

- when Olaplex allegedly started misidentifying the ingredients in the Olaplex Step 1 and Step 2 product, and whether such alleged conduct had stopped.  *Id.* at 152:22-153:3; 155:2-4.

- the last time someone with an undisclosed financial interest in Olaplex made a promotional statement about Olaplex.  *Id.* at 158:1-7.

- any sale that Olaplex obtained as a result of a promotional statement made by someone with a financial interest in Olaplex.  *Id.* at 158:8-11, 17-18.

- the last time that an allegedly "fake" social media posting was made by Olaplex.  *Id.* at 163:24-163:8.

- any sales that Olaplex obtained as a result of an allegedly "fake" social media posting by Olaplex.  *Id.* at 163:9-14.

- any sales that Olaplex obtained as a result of the claim by Olaplex that L'Oréal was infringing upon Olaplex's patents.  *Id.* at 168:15-21.

Moreover, Mr. Nolte's report intentionally ignores the fact that many of the alleged Bad Acts **precede** when either Olaplex or L'Oréal, or both, entered the market, Nolte Report p.1 (identifying certain activities beginning in 2014 and certain others in 2015), and some are alleged to have occurred **after** L'Oréal was already selling the Accused Products, *see* D.I. 650 ¶¶ 106-11. Instead of assessing sales based on what was in the market relative to the Bad Acts, Mr. Nolte simply lumps all the alleged Bad Acts into a black box, with no consideration of how often each

of the alleged Bad Acts occurred, their relative or absolute impact, or when the alleged activity started and stopped. At his deposition, Mr. Nolte had to admit that "in [his] own mind, some things might be less important than others," Nolte Tr. at 173:25-174:3, but his report did nothing to account for such differences in importance, rendering his opinion unreliable and unhelpful to the jury. Indeed, Mr. Nolte further asserted that the date when Olaplex started or stopped its alleged Bad Acts "doesn't matter," Nolte Tr. at 151:11, 152:55-6, as if the frequency and duration of alleged Bad Acts is somehow irrelevant to a damages expert, who is tasked to reasonably measure the damages caused by those bad acts. *Cf. Bracco Diagnostics*, 627 F. Supp. 2d at 480–81; *Larry Pitt & Assocs.*, 294 F. Supp. 3d at 341.

Despite the glaring deficiencies in Mr. Nolte's report, at deposition he repeatedly insisted that he did in fact consider "causation," claiming that he "made adjustments" in his calculations, Nolte Tr. at 49:7-8, and that somehow the "totality of the calculations do not ignore causation," *id.* at 50:2-3. But, when offered the opportunity to explain, he could not identify a single sentence or paragraph where he measured, or relied on someone else who measured, the extent to which Olaplex's allegedly false advertising or false patent marking enriched Olaplex or caused L'Oréal to lose profits. Nolte Tr. at 48:14-50:9.

L'Oréal has proffered another expert, Rhonda Harper, who purports to assess the impact of some of the alleged Bad Acts by Olaplex.[2] But Mr. Nolte did not speak to Ms. Harper or review her report before providing his own opinions. *See* Nolte Tr. at 42:6-8 ("Q. The Harper report is not among [the materials listed in your report]; is that right? A. It was not available as of January 29."). Indeed, Mr. Nolte admitted during his deposition that—even if he had reviewed Ms. Harper's report in forming his opinions in this case—he cannot rely on Ms. Harper

---

[2] Ms. Harper's report is also subject to a Rule 702 motion, filed concurrently herewith.

for measuring the quantum of harm *caused* by consumers who were allegedly victim of Olaplex's false advertising or marking, since Mr. Harper did not perform such an analysis either. Nolte Tr. at 74-77.

### B. Mr. Nolte's Opinions On Disgorgement Should Be Excluded

#### 1. Mr. Nolte's Opinion That L'Oréal Is Entitled to Disgorgement of Revenues, Rather Than Profits, Is Contrary To Law

The law limits recovery under the Lanham Act to a defendant's *profits*, not *revenues*. *SurgiQuest v. Lexion Med.*, 2018 WL 2247216, at *9 (D. Del. May 16, 2018) ("The Third Circuit has outlined three independent rationales pursuant to which the court may award disgorgement of profits.") (citing factors outlined in *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 177-78 (3d Cir. 2005); *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978) ("Disgorgement is remedial and not punitive. The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment.").

Mr. Nolte's disgorgement opinion that L'Oréal is entitled to recover $48 million from Olaplex is contrary to law and must be excluded because it is a figure for disgorgement of Olaplex's revenues, not its profits. Nolte Report, p. 5; Nolte Tr. at 181:7-10. Mr. Nolte claims that he intentionally calculated disgorgement of revenues only, since he believes that the cost information from the discovery record (provided to him by L'Oréal's counsel) is deficient. Nolte Report, pp. 6-7. However, Olaplex is not aware of any authority that would allow a damages expert to provide an opinion on disgorgement of revenues merely because that expert harbors a subjective view that cost information is unreliable. Indeed, Mr. Nolte did not endeavor to make any assumptions that would help him gain comfort with the cost data, or even some of it, but simply chose to offer an opinion that all *revenues* should be disgorged. That is contrary to the

law, and Mr. Nolte should not be allowed to present his $48 million disgorgement of revenue opinion at trial.

### 2. Mr. Nolte Inclusion Of False Patent Marking In His Calculation of Disgorgement Damages Is Contrary To Law

In his report, Mr. Nolte asserts that disgorgement is one of the "appropriate monetary remedies" for Olaplex's alleged "false advertising ***and*** false marking claims." Nolte Report, p. 3 (emphasis added). However, disgorgement is not available for false patent marking, which under 35 U.S.C. § 292(b) only allows recovery for the amounts "adequate to compensate for" the "competitive injury" suffered. Because Mr. Nolte has failed to calculate disgorgement sought from Olaplex for false advertising only (the claim where that could possibly be permitted), his disgorgement opinions are contrary to law and must be excluded.

Review of available cases indicates that no court has ever allowed a plaintiff to seek disgorgement for false patent marking and, as of this date, nothing in L'Oréal's submissions to the Court suggest otherwise. There is affirmative support for this conclusion as well. The false marking statute (35 U.S.C. § 292) was amended by the 2011 American Invents Act to include a statutory requirement for "competitive injury." Cases interpreting this amendment indicate that disgorgement would not be an appropriate measure of "damages adequate to compensate for the" competitive injury as required by Section 292(b), as amended. For example, in *Sukumar v. Nautilus*, the Federal Circuit for the first time addressed "the meaning of 'competitive injury.'" It referred to a common legal definition of: "[a] wrongful economic loss caused by a commercial rival, such as the loss of sales due to unfair competition; a disadvantage in a plaintiff's ability to compete with a defendant, caused by the defendant's unfair competition." *Sukumar v. Nautilus, Inc.*, 785 F.3d 1396, 1400 (Fed. Cir. 2015) (citing Black's Law Dictionary (9th ed. 2009)). This strongly suggests that "lost profits" or "lost sales" is the appropriate measure of damages for

false patent marking—not disgorgement of the wrongdoer's profits (or in the case of Mr. Nolte's excludable opinion, disgorgement of revenues).  Similarly, the District of Delaware has found that the "competitive injury" prong of Section 292 requires the non-patentee, here L'Oréal, "to plausibly establish that, as a result of [patentee's] mismarking [non-patentee's] ability to compete against [patentee] in the market for purchasers of such products was impaired, resulting in tangible economic *loss to [non-patentee]*."  *Cot'n Wash, Inc. v. Henkel Corp.*, 56 F. Supp. 3d 613, 624 (D. Del. 2014) (emphasis added).  And, in contrast to compensatory damages such as lost profits, disgorgement is an equitable remedy.  *AstraZeneca LP v. Tap Pharm. Products, Inc.*, 444 F. Supp. 2d 278, 288 (D. Del. 2006) (describing disgorgement as "a remedy which is equitable in nature").

### 3.     Mr. Nolte Should Be Precluded From Providing Any Damages Opinions At Trial Based On Domestic-Only Sales

The sales data relied upon by Mr. Nolte for his disgorgement damages calculation pertain to Olapelx's *worldwide* corporate sales: they are inclusive of both United States and international revenues.  During deposition, Mr. Nolte admitted that his disgorgement calculation pertains to Olaplex's worldwide sales only and that he has not done a domestic-only calculation of disgorgement damages.  Nolte Tr. at 36:22-37:11, 40:15-25 ("Q.  And can you tell me what the number, your disgorgement number would be if the Court were to find that sales outside of the United States have to be excluded from the disgorgement analysis? A.  Those calculations have not been finished yet. So as of this instant, I cannot tell you that.") (objections omitted).  It is too late for Mr. Nolte to attempt to supplement his opinion and to do a separate domestic-only calculation.  Thus, to the extent that Mr. Nolte's disgorgement opinions are not wholly excluded on the grounds identified in Sections IV(B) and IV(C)(1)-(2) above, he should be prohibited

from providing any opinions at trial related to the disgorgement of Olaplex's domestic sales only.

### C.    Mr. Nolte's Opinions On Lost Profits Should Be Excluded

#### 1.    Mr. Nolte's Reliance On L'Oréal's Aspirational Sales Projections For His Lost Profits Opinions Are Speculative and Unreasonable

Otherwise qualified and reliable expert testimony is inadmissible if it is based on unreliable, untested, or untestable underlying data.  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291–94 (3d Cir. 2012); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748, n.18 (3d Cir. 1994).  Mr. Nolte should not be permitted to provide an opinion on lost profits because he has no knowledge of, and has not adequately tested, any of the unreliable sales projections or underlying sales data that form the sole basis for his opinions.

In *ZF Meritor*, 696 F.3d 254, the Third Circuit affirmed the district court's exclusion of expert testimony because the data underlying his opinion was not sufficiently reliable.  In that case, a qualified damages expert applied reliable methodology, but his opinion was based on an unreliable business forecast.  Although the expert was "generally aware of the circumstances under which the [forecast] was created and the purposes for which it was used" he was "unaware of the qualifications of the individuals who prepared the document" and the assumptions on which its contents were based.  *Id.* at 292-93.  The Third Circuit affirmed the district court, holding that the expert "lacked critical information that would be necessary for [the opposing party] to effectively cross-examine him."  *Id.* at 293.  The expert knew that experienced professionals presented the forecast to the board, but he did not know who initially calculated the figures, the methodology used to create the forecast or the assumptions on which the forecast's estimates were based.  *Id.*

This case falls squarely within the facts and analysis of *ZF Meritor*.  In his report, Mr. Nolte relied on sales estimates included in a PowerPoint presentation (Matrix) and an email (Redken).  The data in this presentation and email are the purported foundation of his lost profits opinion.  Nolte Report, p.3 (bullet point 7); Paunovich Decl., Exs. 35, 45 (documents referred to in Nolte Report).  Mr. Nolte has done nothing to confirm the reliability of these "sales projection" documents.  This is a fundamental flaw in his approach.  *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992) ("Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance.").

As in *ZF Meritor*, Mr. Nolte knows the name of who prepared the document, but did not conduct any investigation with the authors.  Indeed, the identities of the authors is the full extent of his knowledge, which he admitted during deposition.  Nolte Tr. at 216:13-16.  Mr. Nolte did not consider, and L'Oréal has not produced, any of the underlying data that form the basis of these limited sales projections, the methodology used to calculate the sales numbers, the source of the data, or information on how the data was compiled.  Mr. Nolte's lack of knowledge of these critical issues has prevented Olaplex from effectively cross-examining Mr. Nolte about the contents of the sales projection and how they factored into his lost profits opinion.  *ZF Meritor*, 696 F.3d 293 ("An expert's lack of familiarity with the methods and the reasons underlying someone else's projections virtually precludes any assessment of the validity of the projections through cross-examination.") (quotations and alterations omitted).  Mr. Nolte's opinions that rely on this sales projection are thus unreliable and should be excluded.

Moreover, the projection documents appear on their face to be aspirational sales documents, rather than reliable sales projections—another reason why Mr. Nolte's opinions

relying on those projections should be excluded as unreliable under *Daubert*. Paunovich Decl., Ex. 45, at 2 ("Nathalie is reviewing during the next Mancom in Paris the main countries' strategy and ***ambition*** for bond protectors launches") (emphasis added); Paunovich Decl., Ex. 35, at 1 ("Launch Assumptions. . . 12M ***ambition***") (emphasis added). Mr. Nolte cannot reasonably rely on sales "projections" that are, on their face, a measure of L'Oréal's "ambitions," rather than a calculated assessment of actual future sales targets. *Burno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 139 (M.D. Pa. 2015) (excluding expert opinion that relied on projections that "were 'identifying a target profit, not making a projection of actual profits' and . . . 'sought to demonstrate what the product's profits might be given certain assumptions.") (citing *Target Market Publishing, Inc. v. Advo, Inc.*, 136 F.3d 1139 (7th Cir. 1998)). Further still, the sales documents themselves include foundational assumptions, such as that "Matrix is 5th Entrant to Market," Paunovich Decl., Ex. 35, at 2, that did not even occur in real life.

As the Third Circuit explained in *ZF Meritor*, while an expert might sometimes rely on the estimates of others, to do so in a reliable (admissible) manner, that "expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable." *Id.* (emphasis added). Mr. Nolte cannot meet that standard and his reliance on the aspirational "projection" documents and any opinions that flow from it must be excluded. *Legendary Art, LLC v. Godard*, No. CIV.A. 11–0674, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012) ("There is no evidence that [the claimant's expert] did anything to verify [the claimant's own] profit and loss projections. Indeed, his report states several times that his analysis assumed the validity of the projections. Moreover, there is no evidence that [the expert] had any familiarity with the methods or reasoning used by [the claimant] to arrive at the projections. [Expert's]

reliance on projections supplied by [the claimant], without independent verification, renders his analysis unreliable.") (internal quotation marks and citations omitted).

### 2. Mr. Nolte's Arbitrary Effort To Fill Gaps In The Sales Projections Is Unreliable And Must Be Excluded

Mr. Nolte's report did not stop with using existing sales projections—aspirational as they were—as the foundation of his lost profits opinion. Further, arbitrarily, and without explanation, Mr. Nolte manufactured additional sales projections to "complete" the record given that L'Oréal did not produce any "projection" documents for the L'Oréal Professionnel Smartbond Accused Products (only the Matrix and Redken brands). To fill this "gap," Mr. Nolte simply applied the ratio of Matrix Bond Ultim8 "projected" sales versus its "actual" sales to the L'Oréal Professionnel Smartbond products—without any further adjustments of assumptions. *See* Nolte Report, p. 8 n.19. There is no explanation or analysis in Mr. Nolte's report to support his faulty assumption that these two distinct product lines would have identical performance (or even projections), and Mr. Nolte does not reference any quantitative or qualitative evidence justifying this logical leap. Nothing in Mr. Nolte's report or his deposition testimony permits Olaplex, the Court, or the jury to assess whether Mr. Nolte's lost profits assumptions for 1/3 of the Accused Products bear any relationship to reality. Such an opinion cannot stand under the gatekeeping function mandated by *Daubert*.

### D. The Court Should Exclude As Unreliable And Contrary To Law Mr. Nolte's Opinions That Olaplex And L'Oréal Do Not Compete In A Two-Player Market

Mr. Nolte's disgorgement and lost profits calculations necessarily accept this Court's and the Federal Circuit's repeated findings that Olaplex and L'Oréal compete in a two-player market. D.I. 135, 217-1, 430. For example, Mr. Nolte's opinion that the sole cause of L'Oréal's failure to meet its revenue projections was Olaplex, and literally no other possible factor or

circumstance in the world, necessarily mandates that L'Oréal had no other competitors vying for a share of the market. *See, e.g.*, Nolte Report, p. 3. However, Section III of Mr. Nolte's report—a series of standalone opinions with no evident connection to the rest of his opinions—asserts, contrary to the prior sections of his report, that Olaplex and L'Oréal do ***not*** compete in a two-player market. Nolte Report, pp. 9-10. Mr. Nolte has no expertise and performed no analysis—or even cited to any analysis—demonstrating that the other bonder products are true technical substitutes for Olaplex's products or L'Oréal's Accused Products. The barebones section purporting to offer this opinion is not only wrong, but does not even claim to represent the results of a proper economic analysis of the market in which the Olaplex and Accused Products compete. As such, the opinion is unhelpful, unreliable on its face and must be precluded under *Daubert* principles.

### E. Mr. Nolte Should Be Precluded From Offering Testimony Regarding The Credibility Of Olaplex Or its Witnesses

Rule 702 generally prohibits expert witnesses from offering opinions on the credibility of fact witnesses. *See, e.g., Suter v. Gen. Accident Ins. Co. of Am.,* 424 F. Supp. 2d 781, 793 (D.N.J. 2006) ("[E]xpert witnesses may not offer opinions ... based on their personal assessment of the credibility of another witness's testimony. The credibility of witnesses is exclusively for the determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial.") (quoting *U.S. v. Scop*, 846 F.2d 135, 142 (2d Cir. 1998)); *Hill v. NSB Niederelbe Schiffahrtsges.mbH & Co.,* No. Civ.A. 02–2713, 2004 WL 569908, at *1 (E.D.Pa. Mar. 5, 2004) ("To the extent that these experts' reports state opinions on the credibility of fact witnesses, such testimony will not be allowed."); *Griggs v. BIC Corp.,* 844 F.Supp. 190, 201 (M.D.Pa. 1994), *aff'd* 7 F.3d 1486 (3d Cir. 1994) ("[I]t is generally inappropriate for a

witness to judge the credibility of another witness").   Nevertheless, Mr. Nolte's report lodges two direct and unsupported credibility attacks on Olaplex:

> "1.   Any calculation that references or otherwise relies on Olaplex's claims regarding its prospects or value is unreliable, as the starting point for all such commentary is incorrect; and
>
> 2.   Based on its past history of providing incorrect information, ***Olaplex*** demonstrated that its views of Olaplex's value and success ***should not be trusted***."

Nolte Report, p. 9 (emphasis added).  This is not proper expert opinion, and it should be excluded.

The only basis for Mr. Nolte's attacks on Olaplex's trustworthiness appears to be a perceived inconsistency between informal sales projections Olaplex provided to L'Oréal by text message during 2015 business negotiations leading up to a potential acquisition by L'Oréal and Olaplex's ultimate, actual, sales figures produced three years later in this litigation.  Whatever the reason for these alleged discrepancies (and there are many valid reasons, including reconciliation, adopting more sophisticated sales-tracking software, and a host of other points Mr. Nolte does not even consider in passing), Mr. Nolte cannot be permitted to make credibility attacks on Olaplex and/or its employees at trial.  It is wholly improper for Mr. Nolte to offer opinions to the jury that statements by Olaplex's witnesses about Olaplex's "value and success should not be trusted." This section of his report must also be stricken under Rule 702 and *Daubert* principles.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Olaplex respectfully requests that the Court exclude Mr. Nolte's opinions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Anthony D. Raucci

OF COUNSEL:

Joseph M. Paunovich
Ali Moghaddas
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000

Adam DiClemente
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Matthew K. Blackburn
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA  94111
(415) 692-5200

March 14, 2019

Jack B. Blumenfeld (#1014)
Jeremy A. Tigan (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jtigan@mnat.com
araucci@mnat.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 14, 2019 upon the following in the manner indicated:

Frederick L. Cottrell, Esquire                    *VIA ELECTRONIC MAIL*
Jeffrey L. Moyer, Esquire
Jason J. Rawnsley, Esquire
Katharine Lester Mowery, Esquire
RICHARDS, LAYTON & FINGER, PA
One Rodney Square
920 North King Street
Wilmington, DE  19801
*Attorneys for Defendants*

Dennis S. Ellis, Esquire                          *VIA ELECTRONIC MAIL*
Katherine Murray, Esquire
Adam M. Reich, Esquire
Serli Polatoglu, Esquire
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
*Attorneys for Defendants*

Naveen Modi, Esquire                              *VIA ELECTRONIC MAIL*
Joseph E. Palys, Esquire
Daniel Zeilberger, Esquire
Michael A. Wolfe, Esquire
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C.  20005
*Attorneys for Defendants*

Scott F. Peachman, Esquire                    *VIA ELECTRONIC MAIL*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY  10166
*Attorneys for Defendants*

/s/ Anthony D. Raucci
Anthony D. Raucci (#5948)