IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LIQWD, INC. and OLAPLEX LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. No. 17-14 (JFB) (SRF) |
| | ) | |
| L'ORÉAL USA, INC., L'ORÉAL USA | ) | |
| PRODUCTS, INC, L'ORÉAL USA S/D, | ) | REDACTED -- PUBLIC VERSION |
| INC., and REDKEN 5TH AVENUE NYC, | ) | |
| L.L.C., | ) | Original Filing Date:  September 17, 2019 |
| | ) | Redacted Filing Date:  September 25, 2019 |
| Defendants. | ) | |

## DECLARATION OF JOHN W. SHAW

I, John W. Shaw, declare and state as follows:

1.     I am a member of the bars of the Supreme Court of Delaware, the

Supreme Court of Pennsylvania, the Third Circuit Court of Appeals, the Federal

Circuit Court of Appeals, the United States District Court for the District of

Delaware, the United States District Court for the Eastern District of Pennsylvania,

and the United States Patent & Trademark Office.  I was admitted to the Delaware

Bar in 1995.

2.     I am a 1994 *magna cum laude* graduate of the University of Pittsburgh

School of Law, and a 1989 graduate of The Pennsylvania State University with

Honors and High Distinction.  I served as a law clerk for the Honorable Murray M.

Schwartz, Senior Judge, United States District Court for the District of Delaware, in 1994-95.

3.      I worked at the law firm of Young Conaway Stargatt & Taylor, LLP as an associate from 1995 to 2001 and as a partner from 2002 to 2011.  I was a founding partner of Shaw Keller LLP in 2011.

4.      Through 2009 my practice consisted primarily of commercial and patent litigation.  From 2009 to present, the majority of my practice has consisted of patent litigation.

5.      I have tried cases in the United States District Court for the District of Delaware, the United States District Court for the Northern District of California, the United States International Trade Commission, and the Delaware Court of Chancery.  I also have appeared on behalf of clients in litigations pending in the above-listed courts, along with the United States District Court for the Eastern District of Pennsylvania, the United States District Court for the Western District of Pennsylvania, the United States District Court for the Middle District of Florida, and the United States District Court for the Southern District of Florida.

6.      I received the Caleb R. Layton, III Service Award from the United States District Court for the District of Delaware and the 2005 H. James Conaway Pro Bono Award from Young Conaway Stargatt & Taylor, LLP.  I have received

recognition from various third-party sources, including an AV rating from Martindale and a Band 1 rating in Intellectual Property from Chambers USA.[1]

7.     I am a past Vice President for the Third Circuit, Federal Bar Association, and previously served as the President of the Delaware Chapter of the Federal Bar Association.

8.     In my practice I serve as both lead (or primary) counsel, as co-counsel, and as Delaware counsel.  Through this work, I am familiar with the tasks normally and regularly performed as lead trial counsel and with the tasks normally and regularly performed as Delaware counsel.

9.     I review litigation tasks and client billing as part of my normal and regular practice and have done so for my clients since at least 2002.

10.     My regular and customary hourly rate is $775 per hour.  I have employed the services of a paralegal and a law clerk to locate additional data from the public record to supplement my analysis and opinions.

11.     Based on my experience, I have been requested to evaluate three questions and to provide analysis and opinions in response:

     a.  Whether the hourly rates charged by national counsel Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn") and Diamond McCarthy LLP

---

[1]  https://chambers.com/lawyer/john-shaw-usa-5:194005.

("Diamond McCarthy") in this litigation are reasonable and within the range of rates charged by national counsel for work on intellectual property and/or complex litigation in the District of Delaware from 2017 to 2019?

b. Whether the hourly rates charged by Delaware counsel, Morris Nichols Arsht & Tunnell LLP ("Morris Nichols"), in this litigation are reasonable and consistent with rates for Delaware counsel?

c. Whether the volume of work performed by national and Delaware counsel was reasonable?

**Question 1 – Whether the hourly rates charged by national counsel Quinn Emanuel Urquhart & Sullivan, LLP and Diamond McCarthy LLP in this litigation are reasonable and within the range of rates charged by national counsel for work on intellectual property and/or complex litigation in the District of Delaware from 2017 to 2019?**

12.     I have reviewed the Declaration of Joseph M. Paunovich, which details the billing rates and backgrounds of the Quinn and Diamond McCarthy professionals who worked on this litigation.

13.     I understand that the undiscounted hourly rates charged by Quinn and Diamond McCarthy in this litigation are consistent with the rates paid by other Quinn and Diamond McCarthy clients, regardless of the litigation forum. ███

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

14.     To evaluate the reasonableness of the Quinn and Diamond McCarthy billing rates, I considered data from several sources.  First, I evaluated the American Intellectual Property Law Association's "2019 Report of the Economic Survey" ("2019 Economic Survey").  The 2019 Economic Survey reports various demographic and "economic aspects of intellectual property law practice, including individual billing rates and typical charges for representative IP law services."  2019 Economic Survey at 1.  The survey participants are self-selected in response to an email invitation.  *Id.*  The 2019 Economic Survey reports that AIPLA received 941 responses and that many respondents did not answer all questions.  *Id.*

15.     Most of the Quinn attorneys who participated in this litigation are located within the Los Angeles, New York, Silicon Valley, San Francisco, Washington DC, and Boston reporting regions.  The 2019 Economic Survey (page I-29) reports partner billing rates for these regions as follows:

| | Number of Individuals | Mean (Average) | 10th Percentile 10% | First Quartile 25% | Median (Midpoint) | Third Quartile 75% | 90th Percentile 90% |
|---|---|---|---|---|---|---|---|
| | | * | * | * | | | |
| Boston CMSA | 13 | $747 | $369 | $450 | $800 | $1,015 | $1,080 |
| NYC CMSA | 22 | $559 | $365 | $408 | $475 | $699 | $964 |
| Philadelphia CMSA | 10 | $599 | $433 | $486 | $560 | $729 | $823 |
| Washington, DC CMSA | 43 | $590 | $354 | $430 | $570 | $700 | $850 |
| Other East | 10 | $462 | $314 | $365 | $461 | $513 | $691 |
| Metro Southeast | 12 | $418 | $292 | $343 | $375 | $421 | $746 |
| Other Southeast | 8 | $414 | ISD | $354 | $375 | $463 | ISD |
| Chicago CMSA | 20 | $537 | $351 | $435 | $533 | $644 | $734 |
| Minne.-St. Paul PMSA | 15 | $443 | $290 | $330 | $420 | $545 | $626 |
| Other Central | 62 | $421 | $283 | $342 | $390 | $500 | $646 |
| Texas | 19 | $534 | $400 | $406 | $460 | $650 | $800 |
| Los Angeles CMSA | 13 | $586 | $336 | $440 | $575 | $675 | $978 |
| San Francisco CMSA | 14 | $665 | $385 | $464 | $650 | $826 | $1,023 |
| Other West | 41 | $496 | $300 | $343 | $450 | $623 | $769 |

16.     The 2019 Economic Survey combines billing rates for patent prosecution and patent litigation professionals, treating these different areas of work in the field of patent law as the same for purposes of data aggregation.  As reported for partners on page I-26:

**Percent of time devoted to the following types of work, by Income Level (Q17)**

*Private Firm, Equity Partner*

| Gross Income in 2018 | TOTAL Number of Individuals | IP prosecution work Mean (Average) | Opinions or counseling prior to litigation or formal ADR Mean (Average) | IP licensing Mean (Average) | Non-licensing transactional work Mean (Average) | IP litigation Mean (Average) | Post-grant proceedings Mean (Average) | Other dispute resolution Mean (Average) |
|---|---|---|---|---|---|---|---|---|
| All Individuals | 350 | 42.3% | 8.7% | 3.8% | 2.2% | 15.2% | 3.4% | .7% |
| Less than $126,000 | 9 | 56.0% | 6.2% | .4% | .6% | 3.9% | .2% | .3% |
| $126,000-$150,999 | 5 | 54.0% | 13.6% | 7.0% | 2.0% | 4.0% | .0% | .0% |
| $151,000-$175,999 | 5 | 60.0% | 3.0% | 2.2% | .2% | 7.0% | .0% | .0% |
| $176,000-$200,999 | 19 | 46.3% | 8.7% | 5.6% | 2.9% | 8.4% | .5% | 1.3% |
| $201,000-$250,999 | 31 | 44.8% | 7.2% | 3.8% | 1.3% | 15.8% | 1.8% | .9% |
| $251,000-$300,999 | 37 | 52.3% | 9.2% | 5.0% | 2.8% | 8.4% | 2.3% | .3% |
| $301,000-$350,999 | 28 | 48.0% | 8.7% | 4.7% | 1.5% | 13.0% | 2.0% | .4% |
| $351,000-$400,999 | 31 | 46.1% | 5.9% | 4.3% | 1.8% | 13.6% | 2.9% | .9% |
| $401,000-$450,999 | 31 | 51.6% | 12.2% | 3.5% | 2.2% | 8.7% | 2.4% | .3% |
| $451,000-$500,999 | 24 | 37.9% | 5.7% | 4.0% | 2.4% | 21.8% | 4.1% | .7% |
| $501,000-$600,999 | 23 | 34.2% | 9.6% | 2.5% | .9% | 26.3% | 8.0% | .7% |
| $601,000-$750,999 | 24 | 43.8% | 13.2% | 5.1% | 5.0% | 9.2% | 1.0% | .0% |
| $751,000 or more | 62 | 29.7% | 7.9% | 2.5% | 2.1% | 23.4% | 6.5% | .7% |

17.     This table indicates that the survey respondents skew heavily toward patent prosecution (identified in the table as "IP prosecution work"), which in my experience carries a lower billable rate than patent litigation work. Further, it bears noting that the 2019 Economic Survey, while reporting billable rates by region, does not break out within regions partner experience levels, litigation versus IP prosecution work, types of matters handled, litigation experience, or other factors that impact actual billing rates. Thus, while the survey results provide useful benchmarks for assessing the reasonableness of hourly rates in a complex patent litigation, the survey alone does not answer the question.

18.     The 2019 Economic Survey (page I-42) reports partner-track (*e.g.*, associate) billing rates as follows:

| | Number of Individuals | Mean (Average) | 10th Percentile 10% | First Quartile 25% | Median (Midpoint) | Third Quartile 75% | 90th Percentile 90% |
|---|---|---|---|---|---|---|---|
| | | | * | * | * | | |
| Boston CMSA | 4 | $671 | ISD | $533 | $675 | $806 | ISD |
| Philadelphia CMSA | 3 | $381 | ISD | ISD | $414 | ISD | ISD |
| Washington, DC CMSA | 16 | $436 | $285 | $315 | $400 | $516 | $669 |
| Other East | 5 | $312 | ISD | $288 | $300 | $343 | ISD |
| Metro Southeast | 6 | $422 | ISD | $324 | $438 | $503 | ISD |
| Other Southeast | 4 | $335 | ISD | $233 | $336 | $438 | ISD |
| Chicago CMSA | 5 | $378 | ISD | $350 | $360 | $415 | ISD |
| Minne.-St. Paul PMSA | 9 | $297 | ISD | $276 | $295 | $313 | ISD |
| Other Central | 24 | $314 | $245 | $251 | $284 | $345 | $428 |
| Texas | 4 | $448 | ISD | $310 | $345 | $688 | ISD |
| Other West | 14 | $413 | $243 | $269 | $427 | $500 | $664 |

19.   The 2019 Economic Survey reports that the partner-track respondents were roughly 50% or more focused on IP prosecution work, as compared to patent litigation work.  The table on page I-38 reports:

**Percent of time devoted to the following types of work, by Income Level (Q17)**

*Private Firm, Partner-Track Attorney*

| Gross Income in 2018 | TOTAL Number of Individuals | IP prosecution work Mean (Average) | Opinions or counseling prior to litigation or formal ADR Mean (Average) | IP licensing Mean (Average) | Non-licensing transactional work Mean (Average) | IP litigation Mean (Average) | Post-grant proceedings Mean (Average) | Other dispute resolution Mean (Average) |
|---|---|---|---|---|---|---|---|---|
| All Individuals | 135 | 54.8% | 6.5% | 2.8% | 1.9% | 16.5% | 3.6% | .2% |
| Less than $126,000 | 10 | 57.1% | 8.0% | 2.6% | 1.5% | 19.5% | .5% | .2% |
| $126,000-$150,999 | 20 | 71.4% | 2.2% | 1.4% | .9% | 8.7% | 1.4% | .0% |
| $151,000-$175,999 | 20 | 56.7% | 12.6% | 2.9% | 2.1% | 10.9% | 1.6% | .6% |
| $176,000-$200,999 | 19 | 59.2% | 6.7% | 7.1% | 3.7% | 11.1% | 1.3% | .0% |
| $201,000-$250,999 | 29 | 55.2% | 6.3% | 1.4% | 2.1% | 14.0% | 7.2% | .2% |
| $251,000-$300,999 | 15 | 51.9% | 6.6% | 2.6% | .5% | 16.9% | 4.1% | .3% |
| $301,000-$350,999 | 6 | 18.3% | 6.2% | 2.5% | 3.3% | 44.5% | 10.0% | .0% |
| $351,000-$400,999 | 4 | 27.5% | 2.5% | 3.8% | 3.8% | 45.0% | 7.5% | .0% |
| $401,000-$450,999 | 4 | 35.5% | 3.8% | 3.0% | 2.3% | 40.0% | .8% | .0% |
| $451,000-$500,999 | 1 | 69.0% | .0% | .0% | .0% | .0% | 20.0% | .0% |
| $501,000-$600,999 | 2 | 46.0% | .5% | .5% | .5% | 44.0% | .0% | .5% |
| $751,000 or more | 1 | 100.0% | .0% | .0% | .0% | .0% | .0% | .0% |

20.   Because the 2019 Economic Survey results, though instructive, do not focus on the form of work at issue in this litigation—complex patent litigation and

trade secret litigation—I reviewed additional data sources to supplement my knowledge of reasonable billing rates for such work.

21.     Specifically, I evaluated fee applications in a United States Bankruptcy Court filed by two national law firms with similarly strong reputations and skill in the industry as Quinn.  I reviewed these filings because I understand that, under the Bankruptcy Code, the reasonableness of fees paid in bankruptcy proceedings is measured in part by whether the rates are comparable to the hourly rates charged by comparably skilled practitioners in analogous non-bankruptcy fields such as intellectual property and complex corporate and commercial litigation matters, among other practice areas.  I reviewed two recent fee applications filed by Paul Hastings, LLP because Paul Hastings represents the L'Oréal defendants in this litigation.  I also reviewed a recent Kirkland & Ellis fee application because Kirkland & Ellis has a similar reputation to Quinn for intellectual property and patent litigation.

22.     My review of the fee applications described in the previous paragraph showed the following:

| Law Firm & Time Period | Blended Non-Bankruptcy Partner Rate | Blended Non-Bankruptcy Associate Rate | Blended Non-Bankruptcy Paralegal Rate |
|---|---|---|---|
| Paul Hastings LLP (February 1, 2018-January 31, 2019)[2] | $1,106 | $667 | not reported |
| Paul Hastings LLP (rates described as "current" as of August 26, 2019)[3] | $1,100 - $1,525 | $605 - $1,040 | $240 - $495 |
| Kirkland & Ellis, LLP (May 1, 2017-April 30, 2018)[4] | $1,107.68 | $710.97 | $361.16[5] |

23.     The data from these bankruptcy petitions is consistent with billable

rates reported from other sources.  For example, the court in *Regeneron*

*Pharmaceuticals, Inc. v. Merus N.V.*, 2018 WL 3425013, at *4-5 (S.D.N.Y. June

---

[2] *The Financial Oversight & Management Board for Puerto*, Case No. 17-03283 (LTS), Doc. 5822, filed 03/18/19 (United States Bankruptcy Court for the District of Puerto Rico), Exhibit A. The blended rates are "for Paul Hastings timekeepers in the New York office who billed to nonbankruptcy matters."  This filing involved the Puerto Rico Oversight, Management and Economic Stability Act of 2016 "PROMESA".  According to the Paul Hastings fee application, under PROMESA the reasonableness of fees is evaluated in part "based on the customary compensation charged by comparably skilled practitioners in comparable nonbankruptcy cases in a competitive national legal market."  *Id.* ¶28.  The partner rates billed in this fee application ranged from $1,050 to $1,500 per hour.  *Id.*, Exh. B.

[3] *In re:  Interlogic Outsourcing, Inc., et al.*, Case No. 19-31445-hcd, Doc. 176, filed 08/26/19 (United States Bankruptcy Court for the Northern District of Indiana), ¶13; *see also id.* ¶15 ("The Debtors submit that Paul Hastings' hourly rates are reasonable, comparable to Paul Hastings' hourly rates for non-bankruptcy engagements, and within the range of rates charged by comparably skilled professionals.").

[4] *In re:  Charming Charlie Holdings Inc.*, Case No. 17-12906-CSS, Doc. 708, filed 06/17/18 (United States Bankruptcy Court for the District of Delaware), Exhibit D.  The blended rates listed for Kirkland & Ellis are "all K&E domestic timekeepers (including both professionals and paraprofessionals) who billed to non-bankruptcy matters."

[5] Exhibit D to the *Charming Charlie* filing also reports a Junior Paralegal Rate of $209.62.

25, 2018), noted hourly rates for multiple national firms based on a billing rate survey of AmLaw 50 law firms with intellectual property practices.  (The decision and supporting survey material found on the public docket are appended as Exhibit 1).  The rates listed for national law firms in the *Regeneron* materials are consistent with the rates for Quinn and Diamond McCarthy at issue in this case.

24.     The most active Quinn attorneys in this litigation, as identified in the Paunovich Declaration according to the number of hours billed, charged rates ranging from ███████████████. Paunovich Declaration, ¶7.  These rates reflect ████████████████████████████████████████████████████████ ████  *Id.*  Further, from a review of Appendix A to the Paunovich Declaration, other Quinn attorneys who worked on the litigation would have ███████████ ████████████████████████████████████████████████████ ███████████

25.     These rates are consistent with, if not lower than, the market rates for comparable attorneys and are reasonable in light of prevailing market rates for comparable work.

26.     The undiscounted Quinn partner and associate rates fall within the same range as the reported blended rates from non-bankruptcy practitioners from Paul Hastings and Kirkland & Ellis.  The discounted Quinn partner and associate

rates from this litigation are lower than the reported rates from the comparable firms.

27.     With regard to the 2019 Economic Survey, the Quinn partner and associate rates fall generally within the third quartile and/or 90th percentile for the relevant regions, to the extent the survey contains sufficient data to report results.  I note that the reported rates from the 2019 Economic Survey are skewed in favor of non-litigation intellectual property practices.  It is my further understanding that Quinn is widely known as a leading patent litigation and trade secret litigation firm.  For example, Quinn's intellectual property group was named "Intellectual Property Group of the Year" for 2018 by Law360, a well-regarded industry publication.[6]  Similarly, BTI Consulting's 2019 analysis of the legal industry recognized as Quinn one of the "Fearsome Foursome" law firms (along with Kirkland & Ellis).[7]

---

[6]  *See* "IP Group of the Year: Quinn Emanuel," Law360.com, *available at* https://www.law360.com/articles/1004210/ip-group-of-the-year-quinn-emanuel; *see also* Quinn Emanuel Press Release, *available at* https://www.quinnemanuel.com/the-firm/news-events/award-may-2018-quinn-emanuel-awarded-law360-s-practice-group-of-the-year-in-six-practice-areas/#page=0&byNewsType=1748.
[7]  *See* "37 Law Firms Most Feared in Litigation," BTI Consulting Group, *available at* https://www.bticonsulting.com/themadclientist/37-law-firms-most-feared-in-litigation.

28.     Co-national counsel, Diamond McCarthy, attorneys charged rates ranging from ███ per hour for partner work[8] and ███ per hour for associates. Paunovich Declaration, ¶15.

29.     These rates are consistent with and lower than the market rates for comparable attorneys and thus are reasonable in light of prevailing market rates for comparable work, whether based on the reported non-bankruptcy rates or the rates described in the 2019 Economic Survey.

30.     Based on the foregoing, it is my opinion that the rates for Quinn and Diamond McCarthy in this litigation are reasonable and within the range of rates charged by national counsel for work on intellectual property or complex litigation from 2017 to 2019, including in Delaware.

**Question 2 – Whether the hourly rates charged by Delaware counsel, Morris Nichols Arsht & Tunnell LLP, in this litigation are reasonable and consistent with rates for Delaware counsel?**

31.     As stated, I have reviewed the Declaration of Joseph M. Paunovich in preparing this analysis. That declaration details the billing rates and backgrounds of the Morris Nichols professionals who worked on this litigation.

---

[8]  I understand that one Diamond McCarthy partner worked on this matter and that his primary role was as lead counsel in concurrent PTAB proceedings.  I further note that Diamond McCarthy's intellectual property practice group is smaller than Quinn's intellectual property practice group.  *Compare* https://www.diamondmccarthy.com/our_practice/11-intellectual-property *with* https://www.quinnemanuel.com/practice-areas/intellectual-property-litigation/.  It is not unusual in my experience for a client to retain more than one national counsel firm as the client necessary and appropriate to address the needs of any particular case.

32.     I understand that the hourly rates charged by Morris Nichols in this litigation are consistent with the rates paid by Morris Nichols clients in lead and Delaware counsel matters, regardless of the forum of the litigation.  I further understand that Morris Nichols charges the same rates regardless of whether it is working on a litigation as primary (or lead) counsel, as Delaware counsel, or as co-counsel (*e.g.*, performing litigation tasks beyond those required by the roles of Delaware counsel as specified by the District of Delaware Local Rules).

33.     To evaluate the reasonableness of the Morris Nichols billing rates, I considered data from several sources.  First, as with the Quinn and Diamond McCarthy rates, I evaluated the 2019 Economic Survey.  Delaware falls within the study location "Other East", which includes practitioners from Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Maryland, Virginia, and West Virginia, in addition to Delaware.  Because the patent litigation practice in many of these states bears little semblance to practice in this district, as a practitioner I also look to comparable data from Philadelphia.  The rates reported for these regions are reproduced above.

34.     Second, I evaluated fee applications filed by Morris Nichols and other Delaware law firms in the United States Bankruptcy Court for the District of Delaware.  These fee petitions showed the following:

| Law Firm & Time Period | Blended Non-Bankruptcy Partner Rate | Blended Non-Bankruptcy Associate Rate | Blended Non-Bankruptcy Paralegal Rate |
|---|---|---|---|
| Richards Layton & Finger LLP (calendar year 2018)[9] | $757.76 | $401.67 | $239.81 |
| Richards Layton & Finger LLP (calendar year 2016)[10] | $699.22 | $370.99 | $222.16 |
| Young Conaway Stargatt & Taylor LLP (calendar year 2017)[11] | $807 | $406 | $212 |
| Morris Nichols Arsht & Tunnel LLP (May 1, 2018 to May 1, 2019)[12] | $804.86 | $478.61 | $279.61 |

---

[9] *In re: Imerys Talc America, Inc.*, Case 19-10289 (LSS), Doc. 821, filed 07/15/19, Exhibit E. The identified 2019 rates for bankruptcy partners (identified as "Directors") in this fee application ranged from $975 to $700 per hour.  Exh. B.

[10] *In re: Gulfmark Offshore, Inc.*, Case 17-11125 (KG), Doc. 287, filed 09/14/17, Exhibit D.  The identified rates for bankruptcy partners (identified as "Directors") in this fee application were $900 and $875 per hour.

[11] *In re: Mach Gen GP, LLC*, Case 18-11369-MFW, Doc. 13, filed 10/15/18, Exhibit D.  This fee application states that it views the services performed by its bankruptcy and intellectual property litigation attorneys as being comparable:

> Young Conaway's blended hourly rates for attorneys and paraprofessionals in the Corporate Counseling and Litigation, Business Planning and Tax, and Intellectual Property Litigation sections of the Firm for the prior calendar year were as set forth below.  Young Conaway believes that the services performed by those three sections of the Firm are comparable to the services performed in the Bankruptcy and Corporate Restructuring section.

[12] *In re: Orexigen Therapeutics, Inc.*, Case No. 18-10518 (JTD), Doc. 1151, filed 07/19/19, Exhibit C.  The rates for bankruptcy partners in this fee application were $1,100 and $700 per hour.  Doc. 1151 at 3.  The blended non-bankruptcy rates were determined from a ratio of the total dollar amount billed divided by the total hours billed.  Exh. C, n.2.

| Law Firm & Time Period | Blended Non-Bankruptcy Partner Rate | Blended Non-Bankruptcy Associate Rate | Blended Non-Bankruptcy Paralegal Rate |
|---|---|---|---|
| Morris Nichols Arsht & Tunnel LLP (October 1, 2017 to October 31, 2018)[13] | $779.69 | $464.63 | $272.22 |

35.     I understand that these average hourly rates are "blended" rates for all timekeepers with a particular title, regardless of experience.

36.     These billing rates are consistent with the market rates for comparable attorneys and are reasonable in light of prevailing market rates for comparable work.

37.     With regard to the reported blended rates from non-bankruptcy Delaware-based practitioners, the blended highest Morris Nichols partner rates, as reported in the Paunovich Declaration, ¶10, fall within the reported ranges.  The blended highest Morris Nichols partner rates also fall within the upper quartile of Philadelphia practitioners.  The rates are above the reported ranges for the "Other East" category.  I would expect this to be the case based on the geographic regions included in the "Other East" category, the low number of responding practitioners for that category, and the general mix of litigation to non-litigation practice for all

---

[13] *In re: Veneco, LLC*, Case No. 17-10828-KG, Doc. 1048, filed 10/26/18, Exhibit A.  The rates for bankruptcy partners in this fee application ranged from $1,050 to $650 per hour.  Doc. 1048 at 3.  The blended non-bankruptcy rates were determined from a ratio of the total dollar amount billed divided by the total hours billed.  Exh. A, n.2.

reported compensation levels.  The highest Morris Nichols partner rate falls within the range of the highest comparable practice rates reported to the bankruptcy court, commensurate with that partner's experience as lead trial counsel and national reputation.

38.     The highest reported Morris Nichols associate rate modestly exceeded the blended average associate rates reported for non-bankruptcy Delaware-based practitioners and in the 2019 Economic Survey.  I note that the particular Morris Nichols associate is more senior than an average of all associates and is expected, therefore, to bill at a higher rate than the blended average.  This associate rate is also lower than the associate rates reported from the national firms as described above.  I also noted this associate's rate is within ████ of the 2019 calendar year billing rate of one of defendants' Delaware counsel associate attorneys of record.[14]

39.     Based on the foregoing, it is my opinion that the rates for Morris Nichols in this litigation are reasonable and within the range of rates charged by Delaware counsel for work on intellectual property and complex litigation from 2017 to 2019.

---

[14] *In re: Imerys Talc America, Inc.*, Case 19-10289 (LSS), Doc. 821, filed 07/15/19, Exhibit B. This associate has one year more experience than the Morris Nichols associate.

## Question 3 – Whether the volume of work performed by national and Delaware counsel was reasonable?

40.     To evaluate this question I took several steps.  First, I noted that the litigation is between competitors, which is often more contentious and harder fought than other types of litigation.

41.     Next, I reviewed the docket.  As of September 13, 2019, there were 1,088 entries on the docket, along with a separate miscellaneous action.  I counted approximately 20 separate substantive motions, along with six motions for summary judgment and nine motions to exclude expert testimony.  I also am aware from the docket that this case involved an interlocutory appeal to the Federal Circuit following the Court's order on plaintiffs' original motion for preliminary injunction, that this appeal resulted in remand to this Court for further proceedings, and that the Court ultimately entered an Order granting a preliminary injunction. My observations are consistent with the description of the litigation found in the Paunovich Declaration, ¶4.

42.     I understand that counsel for defendants took 20 and defended 33 depositions of fact witnesses and took 12 and defended 10 depositions of expert witnesses.  I also understand that the parties collectively produced approximately 187,000 pages of documents.  *See* Paunovich Declaration ¶4.  I further identified on the docket approximately seven discovery disputes, one substantive redaction

dispute, and multiple separate objections to Reports and Recommendations issued by Magistrate Judge Fallon. *See generally* Paunovich Declaration ¶4.

43.    According to the docket and the trial transcripts, the trial lasted one week (6 days, including jury deliberations), with each side receiving approximately 11 hours to present its case.  In closing arguments the plaintiff asked for $33 million in compensatory damages for trade secret theft, plus a finding of willfulness, and up to $24.96 million in damages for patent infringement, plus a finding of willfulness.  This is in addition to plaintiffs' request for injunctive relief, which was renewed after the jury's verdict.  I further understand from my review of the docket that defendants filed a set of counterclaims in January 2019 that were the subject of a motion to dismiss, a motion to bifurcate, expert discovery, and ultimately summary judgment.  Defendants' counterclaims were not tried to the jury.

44.    The volume of activity reported on the docket and in the Paunovich Declaration exceeds the norm in the District of Delaware for matters in which I have been involved, whether measured by the number of docket entries or the number of motions and other disputes.  Although every litigation is different, I note that matters brought to trial, with more at stake, often have one-half this number of docket entries.

45.     I also reviewed the 2019 Economic Survey for national information
on patent and trade secret litigation expenses.  When $25 million or more is at
issue, page I-145[15] reports a national average total cost through appeal of $9
million in both the third quartile and the 90th percentile for infringement actions.
Insufficient data ("ISD") is reported for the "Other East" region, including
Delaware.  The report does not identify or differentiate the reported fees based on
the work location of trial counsel.  For the Los Angeles region, the 2019 Economic
Survey reports a third quartile cost of $9 million and a 90th percentile cost of $11.4
million.  The 2019 Economic Survey at page I-177 further reports that 67.6% of
respondents believed there was a "strong correlation between the amount at risk in
a patent infringement action and the overall attorney hours required to litigate the
action."

46.     For trade secret litigation where greater than $25 million is at stake,
the 2019 Economic Survey reports on page I-220 a median, third quartile, and 90th
percentile cost of $7.5 million to bring a matter to trial and through the appellate
process.  The 2019 Economic Survey at page I-222 further reports that 80% of
respondents believed there was a "strong correlation between the amount at risk in

---

[15] These materials cited in this paragraph and in paragraph 46 are appended as Exhibit 2 to this
declaration because the tables are too large to reproduce within the text.

a trade secret misappropriation action and the overall attorney hours required to litigate the action."

47.     In the aggregate, the cost to litigate a combined patent litigation and trade secret litigation matter to trial and through the appellate process may exceed $16.5 - $18.9 million according to the 2019 Economic Survey, assuming no overlap in the two subjects.  Given that this litigation also involved a breach of contract claim brought by plaintiffs and seven other claims brought by defendants, I would also expect the cost to litigate this matter could exceed this combined aggregate cost.

48.     I understand the total requested attorneys' fees and expenses and expenses for this litigation (including expert costs that I understand are compensable pursuant to a clause in a Non-Disclosure Agreement at issue in the case) was ███████████  Paunovich Declaration ¶24.  I understand that those fees and expenses do not include a significant portion of the work performed by plaintiffs' counsel related to the litigation, including for example work related to PTAB proceedings and related appeals, an earlier action filed against L'Oréal USA and later (now pending) action filed against L'Oréal SA in the United States District Court for the Central District of California, the dismissal of L'Oréal S.A., alternative dispute resolution, ongoing efforts related to yet-to-concluded appeals,

and other ministerial tasks.  *Id*., ¶8.  This further demonstrates the reasonableness of plaintiffs' attorneys' fees request in my opinion.

49.     I further understand that plaintiffs paid the invoices from the three law firms as presented, including the fees for which plaintiffs are not seeking reimbursement.  Paunovich Declaration, ¶8.

50.     In light of the quantity of activity in the litigation, the amounts at stake, the nature of competitor disputes, and the client's willingness to pay, the requested attorneys' fees and expenses are reasonable.  As a rough measure, the requested attorneys' fees and expenses are roughly equivalent to the national average for large scale patent litigation plus approximately ███ of the average fees for large scale trade secret litigation, as reported in the 2019 Economic Survey for the third quartile.  Further, the numbers reported in the 2019 Economic Survey are based on average litigation levels, while it appears that in this case the amount of litigation activity exceeded average levels.

I declare under penalty of perjury under the laws of the United States of America that foregoing is true and correct.

_____
John W. Shaw, Esquire (No. 3362)


Executed on September 17, 2019

# EXHIBIT 1

Regeneron Pharmaceuticals, Inc. v. Merus N.V., Not Reported in Fed. Supp. (2018)

KeyCite Blue Flag – Appeal Notification

Appeal Filed by REGENERON PHARMACEUTICALS v. MERUS N.V., Fed.Cir., July 25, 2018

2018 WL 3425013
Only the Westlaw citation
is currently available.
United States District
Court, S.D. New York.

REGENERON PHARMACEUTICALS,
INC., Plaintiff,
v.
MERUS N.V., Defendant.

14-cv-1650 (KBF)
|
Signed 06/25/2018

**Attorneys and Law Firms**

Brendan Mathew O'Malley, Christopher P. Borello, Donald Joseph Curry, Joshua Daniel Calabro, Michael Enzo Furrow, Robert Louis Baechtold, Robert Seth Schwartz, Scott Kenneth Reed, Susanne Lynn Flanders, Fitzpatrick, Cella, Harper & Scinto, Charles Anthony Michael, Susan E. Brune, Brune Law P.C., New York, NY, Nathan Nobu Lowenstein, Goldberg, Lowenstein & Weatherwax LLP, Los Angeles, CA, for Plaintiff.

Patricia Ann Carson, Aaron Dennis Resetarits, David Nelson Draper, Jeanna Marie Wacker, Leora Ben-Ami, Peter Brian Silverman, Saunak Kirti Desai, James Henry McConnell, Kirkland & Ellis LLP, Charles Anthony Michael, Brune Law P.C., Thomas Francis

Fleming, United States Attorney's Office, New York, NY, for Defendant.

## OPINION & ORDER

KATHERINE B. FORREST, United States District Judge

**\*1** Pending before the Court is defendant Merus, N.V.'s ("Merus") motion for an award of attorneys' fees and costs from plaintiff Regeneron Pharmaceuticals, Inc. ("Regeneron"). (ECF No. 471.) By a previous Opinion & Order, this Court has already determined that this case is "exceptional" under Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct. 1749, 1756 (2014); accordingly, it granted Merus's motion for attorney fees, expert fees, and costs. (ECF No. 468.)

This Opinion takes up the narrower question of the amount Merus should be awarded. For the reasons stated below, Merus's motion for $8,332,453.46 in attorneys' fees, $465,390.34 in expert fees, and $1,717,100.69 in litigation expenses and costs, along with interest, is GRANTED. [1]

## I. BACKGROUND & PROCEDURAL HISTORY

The Court incorporates by reference its Opinion & Order of March 25, 2018. (ECF No. 468.) Herein, the Court describes only a general procedural history and any additional facts that are particularly relevant to the instant motion.

On March 11, 2015, Regeneron filed twin patent infringement actions: one against Merus B.V. [2] ("Merus"), a company based in the Netherlands, and another against Ablexis LLC ("Ablexis"), accusing both of infringing 🚩 U.S. Patent No. 8,502,018 ("'018 Patent"). Merus answered and counterclaimed, arguing that the 🚩 '018 Patent was unenforceable due to Regeneron's conduct during patent prosecution. Following issuance of this Court's opinion on claim construction, Regeneron stipulated that its infringement claim as to Merus must fail if the Court's constructions withstand challenge on appeal. Thereafter, Ablexis settled with Regeneron prior to claim construction; all that remained was Merus's counterclaim for inequitable conduct.

On June 9-15, 2015, this Court held a bench trial on that claim. Noting that the litigation should never have commenced, this Court found that Regeneron engaged in inequitable conduct both during patent prosecution and continued its misconduct throughout litigation. "Troubling litigation tactics were on display soon after this case was filed and continued into the trial." Regeneron Pharms., Inc. v. Merus B.V. (Regeneron I), 144 F. Supp. 3d 530, 537 (S.D.N.Y. 2015). These tactics are described in greater detail in Regeneron I as well as in this Court's Opinion of March 26, 2018. (ECF Nos. 423, 468.)

**\*2** The Federal Circuit affirmed the Court's judgment on July 27, 2017. 🔵 Regeneron Pharms., Inc. v. Merus B.V. (Regeneron II),

864 F.3d 1343 (Fed. Cir. 2017). On January 11, 2018, Merus renewed its motion for attorneys' fees (which this Court had previously stayed in light of Regeneron's appeal). (ECF No. 449.) Regeneron opposed a lift of the stay because it intended to file an appeal to the Supreme Court (and, indeed, it has done so). (ECF No. 453.) Nonetheless, the Court lifted the stay and directed the parties to confer on a briefing schedule for the motion. (ECF No. 455.) That motion—which focused only on whether Merus would be awarded fees, and not on the specific amount of such fees—became fully briefed on March 12, 2018. (See ECF No. 467.)

Based on Regeneron's inequitable conduct during patent prosecution and its litigation misconduct that spanned over months,[3] this Court found that this case qualified as "exceptional" under 🔵 Octane Fitness, 134 S. Ct. 1749, and granted Merus's motion for attorneys' fees, expert fees, and costs on March 26, 2018. (ECF No. 468.) It then directed Merus to file a detailed explanation of those costs; Merus did so on April 20, 2018. (See ECF Nos. 471, 472, 473, 474.) Regeneron's opposition, filed on May 9, 2018, largely focused on an argument that Merus's attorneys charged "well-above average hourly rates" and suffered from "duplication of efforts due to too many timekeepers, block billing, and ... top-heav[y] ... staffing." (ECF No. 476, Regeneron's Resp. in Opp. to Merus's Mot. & Documentation for Att'ys' Fees, Expert Fees, Expenses & Costs ("Regeneron Opp.") at 1.) The Court thus directed Regeneron to submit its own attorneys' hourly rates and billed hours

for this case. (ECF No. 479.) Regeneron did so on May 25, 2018. (ECF No. 483.)

As an overview, starting in April 2014, Merus's attorneys ("Kirkland") worked under a fixed fee agreement that set payment for attorneys' fees at $273,214.28 per month.[4] (ECF No. 473, Decl. of Patricia A. Carson, Esq. in Supp. of Merus' Mot. & Documentation for Att'ys' Fees, Expert Fees, Expenses & Costs ("Carson Decl.") ¶ 6.) The fee agreement was terminated in November 2014 and starting in December 2014, Merus was billed at Kirkland's standard hourly billing rates with a 12% discount. (Id.) The write-offs and write-downs amounted to $959,372.50 over the course of litigation. (Carson Decl., Ex. A at 11.) In addition, Merus paid Kirkland a flat success fee of $500,000 in May 2015. (Carson Decl. ¶ 6.)

## II. LEGAL PRINCIPLES

In determining an attorneys' fees award, courts must use the "lodestar" number—or, the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Healey v. Leavitt, 485 F.3d 63, 71 (2d Cir. 2007); see also Large Audience Display Sys., LLC v. Tennman Prods., LLC, 660 Fed.Appx. 966, 972 (Fed. Cir. 2016) (noting that "typically, attorney's fee awards are calculated using the lodestar method" and requiring the district court to use the lodestar method if the case qualified as "exceptional"); Bywaters v. United States, 670 F.3d 1221, 1229 (Fed. Cir. 2012) (noting the "strong presumption that the lodestar figure represents a reasonable attorney fee" (internal quotations

omitted) ). "[T]he court may enhance the lodestar only when it 'fails to take into account a relevant consideration,' " such as the prevailing party's attorney's performance or conduct. Lumen View Tech. LLC v. Findthebest.com, Inc., 811 F.3d 479, 485 (Fed. Cir. 2016) (quoting Bywaters, 670 F.3d at 1229).

**\*3** To determine what constitutes a "reasonable" hourly rate, courts are to consider the "prevailing market rates in the relevant community." Bywaters, 670 F.3d at 1232 (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984) ); see also Large Audience Display Sys., 660 Fed.Appx. at 972 ("A reasonable hourly rate should reflect the prevailing market rate."). The "relevant community," as defined by the Federal Circuit, is generally "based upon 'the prevailing market rate of the forum court ... or the prevailing market rate of the geographic location where the attorney is based.' " Bywaters, 670 F.3d at 1233 (quoting Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008) ). Courts should also examine "the attorneys' comparable skill, experience, and reputation." Large Audience Display Sys., 660 Fed.Appx. at 972. Whether the number of hours used to calculate the lodestar is "reasonable" is determined by examining, inter alia: (1) whether a case was "overstaffed"; (2) the "skill and experience" of the lawyers; and (3) whether any hours were "excessive, redundant, or otherwise unnecessary." Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).

The Supreme Court has established a "strong presumption that the lodestar represents the reasonable fee." City of Burlington v. Dague, 505 U.S. 557, 562 (1992) (internal quotations omitted). "The presumptively reasonable fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes 'to spend the minimum necessary to litigate the case effectively.' " Simmons v. N.Y.C. Transit Auth., 575 F.3d 170, 174 (2d Cir. 2009) (internal quotations omitted). [5]

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437. "In order to calculate the reasonable hours expended, the prevailing party's fee application must be supported by contemporaneous time records, affidavits, and other materials." McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Tr. Fund, 450 F.3d 91, 96 (2d Cir. 2006). "[I]n cases in which substantial numbers of voluminous fee petitions are filed, the district court has the authority to make across-the-board percentage cuts in hours 'as a practical means of trimming fat from a fee application.' " In re Agent Orange Prod. Liab. Litig., 818 F.2d 226, 237 (2d Cir. 1987) (quoting N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1146 (2d Cir. 1983) ).

III. DISCUSSION

Section 285 of the Patent Act provides that "[t]he court in exceptional cases may award reasonable attorneys' fees to the prevailing party." 35 U.S.C. § 285. Additionally, while the Patent Act does not include a provision for the award of expert fees or costs, the Court may award these as sanctions. See MarcTec, LLC v. Johnson & Johnson, 664 F.3d 907, 921 (Fed. Cir. 2012) ("A district court has inherent authority 'to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute.' ") (quoting Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc., 549 F.3d 1381, 1391 (Fed. Cir. 2008) ). By separate Opinion & Order, this Court has already determined that this case is "exceptional" under the Patent Act and thus eligible for fee-shifting, (see ECF No. 468); accordingly, the sole remaining issue is the determination of the amount.

A. Attorneys' Fees

**\*4** Merus requests $8,332,453.46 in attorneys' fees based on 14,338 hours of recorded time by sixty-two timekeepers. (See Carson Decl., Ex. A; Merus Reply at 1 n.1.) Generally, the Court finds that the number of hours spent and the rates charged by Kirkland were both reasonable. This case was time-intensive from the beginning; its complexity was only enhanced by Regeneron's repeated litigation misconduct. Merus required highly skilled counsel, especially as a small entity defending itself in baseless litigation initiated by a much larger entity.

Regeneron attacks Merus's requested sum by arguing the following: (1) Kirkland's hourly fees are unreasonable; (2) Kirkland's staffing of the case was unreasonably top-heavy and unnecessarily duplicative; and (3) Kirkland inappropriately engaged in block billing. Rather than attacking specific billing entries, Regeneron argues for a 20% reduction in fees across the board, as permitted by In re Agent Orange Product Liability Litigation, 818 F.2d 226. However, the Court is not persuaded that Merus's requested fees should be reduced.

Regeneron first argues that Kirkland's hourly fees are unreasonable. They point to several junior and senior associates who worked on the case, noting that their hourly rates are significantly higher than the rates in the Valeo 2018 Intellectual Property Litigation Hourly Rate Report for the corresponding year. (See ECF No. 473-41 ("Valeo Report"); Regeneron Opp. at 3-4.) They also note that the two "primary partners" on the case billed "well above normal rates." (Regeneron Opp. at 5.) Regeneron relies on its own calculation of various timekeepers' "blended" hourly rates: as this litigation lasted over several years, specific timekeepers' hourly rates naturally changed, and thus Regeneron calculated an average rate weighted by number of hours. (See ECF No. 477, Decl. of Josh Calabro in Supp. of Regeneron Opp. ("Calabro Decl.").)

However, Kirkland's blended rates, as calculated by Regeneron—which Regeneron argues are unreasonably high—fail to account for the 12% deduction across the board that Kirkland provided to Merus. (Carson Decl. ¶ 6.) Once that 12% deduction is factored in, Kirkland's rates are within ranges found reasonable in this District, and some timekeepers' rates are lower than those in the Valeo Report. Kirkland's partners charged between $775-$1355 per hour over the course of the litigation; its overall "blended" partner rate in 2015 was $799 an hour, when one accounts for the 12% discount. This is, of course, below the 2015 Valeo Report's average of $886 for a senior partner and $822 for a partner. (Valeo Report at 4.)

Moreover, the rates charged by Regeneron's various law firms are similar to, and in many cases lower than, those charged by Kirkland in this litigation. For example, Neal Katyal, a partner at Hogan Lovells (Regeneron's appellate counsel), charged between $1,350 and $1,750 per hour for 589.8 hours. (ECF No. 483-1, Regeneron's Resp. to the Court's May 18, 2018 Order, Ex. A ("Regeneron Rate Sheet") at 3.) Even the lower rate ($1,350) is 48% higher than the highest blended rate charged by any individual Kirkland partner who spent substantial time on this case ($908 per hour).

Aside from this example, though, there are a number of partners that charged about the same rate as Kirkland's two lead partners on the case. As noted earlier, Kirkland's "blended" partner rate in 2015 was $799 an hour when one accounts for the 12% discount. Accounting only for partners who spent one hundred or more hours on the case, Regeneron's various law firms charged between $463 and $1,750 an hour for partners: Irell & Manella's partners

charged between $975-$1,750 an hour; Foley Hoag's partners charged between $800-$1,050 an hour; Hogan Lovells's partners charged between $1,350-$1,750 an hour (Katyal is the only partner who spent more than one hundred hours on the case); and Fitzpatrick, Cella, Harper & Scinto's ("Fitzpatrick, Cella") partners charged between $463-$663 an hour. [6] (Regeneron Rate Sheet.) Clearly, Carson and Silverman's blended $799 per hour effective rate is reasonable when compared with the partners at Regeneron's law firms.

**\*5** The same goes for Kirkland's associate rates, which ran between $450-$965 per hour; the blended rates for senior associates and associates in 2015 were $699 and $422-$664, respectively. While this is higher than the Valeo Report's averages, it is in line with the charges incurred by Regeneron with respect to this litigation. Counting only associates[7] who spent one hundred or more hours on the case, Irell & Manella's associates charged between $475-$920 an hour; Foley Hoag's associates charged between $410-$565 an hour; Hogan Lovells's associates charged between $620-$690 an hour; and Fitzpatrick, Cella's associates charged between $264-$480 an hour. (Regeneron Rate Sheet.) Clearly, Kirkland's associate rates, like its partner rates, were comparable to those of Regeneron's various law firms. Presuming that Regeneron is a comparable "reasonable, paying client" that "wishes to spend the minimum necessary to litigate the case effectively," the fact that it was willing to pay these rates for this litigation indicates that Merus was reasonable to pay

similar rates to defend itself. Simmons, 575 F.3d at 174 (internal quotations omitted).

Regeneron next contends that Kirkland staffed this case unreasonably—specifically, that the staff was "top heavy." (Regeneron Opp. at 5.) It argues that it was inappropriate that partners outbilled associates by a ratio of 1.31 to 1. First, the Court notes that this ratio is not accurate, as it does not account for Kirkland's delegation of certain tasks to contract attorneys. Additionally, Regeneron does not support its argument that any "top-heaviness," if it existed, was inappropriate. It fails to point to any tasks that should have been performed by associates but were performed by partners.

Moreover, Kirkland staffed the case quite leanly; Merus sent fewer attorneys to hearings and depositions, for example. (See e.g., Resetartis Decl., Ex. 2 (B. Jones deposition, one Merus attorney taking, four Regeneron attorneys defending); id., Ex. 3 (S. Stevens deposition, one Merus attorney taking, three Regeneron attorneys defending); id., Ex. 4 (V. Gregg deposition, one Merus attorney taking, two Regeneron attorneys defending); id., Ex. 5 (A. Murphy deposition, one Merus attorney taking, two Regeneron attorneys defending); id., at Ex. 6, (T. Smeland deposition, two Merus attorneys taking, three Regeneron attorneys defending); ECF No. 52, May 5, 2014 Hr'g Tr. (two Merus attorneys appearing, four Regeneron attorneys appearing); ECF No. 92, July 24, 2014 Hr'g Tr. (three Merus attorneys appearing, four Regeneron attorneys appearing); ECF No. 161, Sept. 12, 2014

Hr'g Tr. (three Merus attorneys appearing, six Regeneron attorneys appearing).)

Regeneron also argues that Kirkland's use of sixty-two individual timekeepers, including twenty-four attorneys, was unreasonable and led to duplication of efforts, especially as fourteen attorneys billed about one hundred hours or less. (Regeneron Opp. at 6; see also Carson Decl. at 4-6.) But Regeneron used seven law firms and 120 timekeepers, including eighty-four attorneys, over the course of this litigation. (Regeneron Rate Sheet.) Fifty-two of Regeneron's attorneys—more than Merus's entire team—billed fewer than one hundred hours on the case. And of course, engaging seven law firms over the course of a lawsuit inherently leads to duplication of efforts.

The Court would not purport to suggest how best attorneys should manage a case or run a law firm. However, it is not persuaded that Kirkland handled its staffing unreasonably when Regeneron employed many more attorneys for the exact same litigation. Likewise, if a large number of attorneys who bill a relatively low number of hours indicates that there was duplication of efforts—and the Court is not persuaded that it does—Regeneron suffered from the same staffing issue. It is perhaps the case that some duplication of efforts is inherent in litigation this complex and prolonged or that this litigation required many discrete tasks that could be completed by an attorney not staffed on this case full-time. Whatever the reason, both parties in this case had a significant proportion of attorneys who spent fewer than one hundred hours on

the case—it cannot be the case that Merus acted unreasonably in engaging this type of staffing while Regeneron did not. And while, of course, Regeneron's seven law firms are not a substitute for the market as a whole, they are a helpful benchmark for what was required in this litigation specifically. [8]

**\*6** Regeneron also argues that it is entitled to a 20% reduction in fees because Kirkland engaged in block billing. However, Regeneron has not identified any specific entries as too general, and the Court's review of the records finds them to be sufficiently detailed. While some entries are redacted to protect privileged information, there is more than enough in the thousands of pages submitted by Merus to persuade the Court that Kirkland kept detailed records that reflect reasonable hours spent defending Merus in this litigation. [9]

All told, the Court is not persuaded that Merus's request for attorneys' fees is unreasonable. Kirkland staffed this case more leanly than Regeneron's law firms did, and its attorneys charged comparable rates. Accordingly, a 20% reduction is not warranted.

## B. Expert Fees

Merus also requests $465,390.34 in expert fees. The only aspect of this request challenged by Regeneron is the amount spent on two retired judges who consulted with Merus during the appellate phase of litigation. [10] Mock appellate arguments are typical exercises,

especially in complex and substantial litigation like this; conducting two such exercises is reasonable. See Bayer Cropscience AG v. Dow Agrosciences LLC, No. 12-cv-256, 2015 WL 5772219, at *5 (D. Del. June 18, 2015) (finding that "conducting a mock oral argument and a follow-up one to address feedback from the first argument is entirely reasonable in a case of this complexity" but refusing to award fees for a third mock argument). In addition, the Court notes that Merus's other experts were vital in its defense, as they were necessary to expose Regeneron's misconduct during patent prosecution. The Court thus awards Merus the full $465,390.34 in expert fees.

### C. Costs

Merus seeks $1,717,100.69 in litigation expenses and costs. Regeneron argues for a reduction of 20% and claims that many of Kirkland's costs were unreasonable.

Regeneron first challenges costs incurred for legal services related to the litigation in the United States by non-United States outside counsel, JP Wave. It contends that the foreign counsel was not admitted in the United States and never appeared in this litigation. However, an attorney from JP Wave was present at hearings and a deposition in this case—this cost is properly billed.

Regeneron also challenges $18,302 spent translating materials from Dutch to English as unrelated to the U.S. proceedings, but this was necessary for a tutorial on the technology at issue in this case. Indeed, the technology at issue here was highly complicated and technical; it is not unreasonable that Merus, a Dutch company, needed to translate some of its materials into English to assist its counsel in defending it in the U.S. courts.

**\*7** Regeneron also challenges overhead and copying costs, including travel fare and copying. [11] Kirkland did not include these costs in its hourly rates; they are properly charged as expenses. See Mathis v. Spears, 857 F.2d 749, 759 (Fed. Cir. 1988). Additionally, costs for business-class international travel are regularly approved by courts in fee awards. Inter-Am. Dev. Bank v. Venti S.A., No. 15-cv-4063, 2016 WL 642381, at *9 (S.D.N.Y. Feb. 17, 2016) (approving costs that included first-class and business-class airfare); Norwest Fin., Inc. v. Fernandez, 121 F. Supp. 2d 258, 263 (S.D.N.Y. 2000) (approving costs for business-class airfare and "first class" but not "luxurious" hotels); Ply Gem Indus., Inc. v. Argonaut Ins. Co., No. 87-cv-7327, 1988 WL 132911, at *2 (S.D.N.Y. Dec. 6, 1988) ("Air fare may be business class or equivalent...."). Regeneron challenges specific flights taken by Merus's counsel, but the Court is persuaded that each was necessary in the course of this litigation. Finally, Regeneron argues that Merus inappropriately included various charges for overtime meals and transportation. However, the examples pointed out by Regeneron all appear to be within the normal course of business; employee meal charges, for example, were incurred while employees were working outside normal business hours.

Accordingly, the Court awards Merus $1,717,100.69 in litigation expenses and costs.

### D. Prejudgment Interest

"[A] district court [has] authority, in cases of bad faith or other exceptional circumstances to award prejudgment interest on the unliquidated sum of an award made under Section 285." Mathis, 857 F.2d at 761 (internal quotation omitted). Merus seeks prejudgment interest of 9%, under N.Y. C.L.P.R. § 5004. Regeneron argues that the Court should use the one-year Treasury bill ("T-bill") rate of return However, 9% is the amount often awarded by courts in this District. See, e.g., Gust, Inc. v. Alphacap Ventures, LLC, No. 15-cv-6192, 2017 WL 2875642, at *7 (S.D.N.Y. July 6, 2017); Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc., No. 14-cv-6911, 2016 WL 658310, at *12 (S.D.N.Y. Feb. 17, 2016), report and recommendation adopted, No. 14-cv-6911, 2016 WL 1717215 (S.D.N.Y. Apr. 27, 2016). It is, in fact, lower than necessary to make Merus whole, as Merus lost capital in defense of this litigation and its cost of capital to fund its operations is higher than 9%. (See Resetartis Decl., Ex. OO at 6; id., Ex. PP at 5.)

Accordingly, the Court awards prejudgment interest of 9% from the date fees, costs, and expenses were invoiced by Merus's attorneys, experts, and vendors.

### E. Postjudgment Interest

Merus also seeks post-judgment interest pursuant to 28 U.S.C. § 1961 and this District's fee schedule issued in accordance with 28 U.S.C. 6 1914(b):

> The post-judgment interest rate is the weekly average one-year constant maturity Treasury yield for the calendar week preceding the date of entry of the judgment. Effective December 21, 2000, the rate of interest that may be added to a judgment, subject to the provisions of 28 U.S.C. § 1961, 18 U.S.C. § 3612 and 40 U.S.C. § 258(e)(1) shall be equal to the weekly average 1-year constant maturity Treasury yield.

District Court Fee Schedule and Related Information, http://nysd.uscourts.gov/fees? judgment. Regeneron does not challenge this request. Accordingly, it is granted in full.

### IV. CONCLUSION

For the foregoing reasons, Merus's motion for $8,332,453.46 in attorneys' fees, $465,390.34 in expert fees, and $1,717,100.69 in litigation

expenses and costs, along with interest, is GRANTED.

The Clerk of Court is directed to close the open motion at ECF No. 471.

**\*8** SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3425013

## Footnotes

1   The Court notes that Merus's original motion requested for $7,905,124.78 in attorneys' fees, $465,390.34 in expert fees, and $1,793,366.44 in litigation expenses and costs. However, its reply brief correct these totals due to inadvertent inclusions and an inadvertent exclusion of a "catch-up" payment (based on a deferral of payment by Merus in 2014). (ECF No. 483, Merus Reply Mem. of Law in Supp. Of Its Mot. & Documentation for Attorneys' Fees, Expert Fees, Expenses, and Costs ("Merus Reply") at 1.)

2   In May 2016, Merus changed its name from Merus B.V. to Merus N.V.; on January 18, 2018, the Court granted Merus's motion to amend the case caption accordingly. (ECF No. 456.)

3   "Throughout litigation, Regeneron, inter alia: (1) failed to abide by this Court's Individual Rules, even after being instructed to do so; (2) failed to produce discovery and withheld evidence; (3) misrepresented facts to the Court and to Merus; and (4) used privilege as a sword and a shield. As to the [second] item, Regeneron specifically withheld: (1) non-privileged documents; (2) previously privileged documents as to which Regeneron affirmatively waived the privilege and which this Court ordered be produced pursuant to its February 25, 2015 Order; and (3) documents on the privilege log relating to precisely those topics waived by Regeneron on May 29, 2015 when it filed its trial declarations." Regeneron Pharms., Inc. v. Merus B.V. (Regeneron III), 14-cv-1650, 2018 WL 1472507 at *13 (S.D.N.Y. Mar. 26, 2018).

4   However, for the initial six months from April 2014 through September 2014, Kirkland agreed to an accommodation period that deferred $73,214.28 per month. (Carson Decl. ¶ 6.) As of October 2014, the full fixed fee payment of $273,214.28 per month was paid by Merus, along with a "catchup" payment of $439,285.68.

5   Merus refers to twelve factors that are to be consulted in determining the reasonableness of a fee award. However, while the Supreme Court has mentioned these factors, it was in the context of describing a House of Representatives Report in connection with the Civil Rights Attorney's Fees Awards Act of 1976. That report, as described by the Supreme Court in Hensley, cites a Fifth Circuit case from 1974 that outlines twelve factors to be considered when determining the amount of a fee award. See Hensley, 461 U.S. at 429-30 & nn.3-4. These factors are useful, but neither exclusive nor dispositive, in guiding the Court's determination of whether Merus's requested fees are reasonable.

6   This is a discounted rate; the document does not specify what Fitzpatrick Cella's attorneys typically charge before a discount.

7   The Regeneron Rate Sheet does not distinguish between associates and senior associates.

8   Similarly, Regeneron argues that Kirkland incurred unnecessary expenses by conducting two mock appellate exercises, but fails to persuade the Court that these were, in fact, unnecessarily extravagant in some way. Regeneron's own appellate counsel charged similar rates to those of Merus's counsel during the appellate phase.

9   Even assuming that Kirkland's records were too general, the mere fact of block billing does not entitle Regeneron to a 20% reduction across the board. The cases Regeneron points to suggest this proposition in situations where vague entries or other timekeeping problems already existed. See, e.g., Source Vagabond Sys., Ltd. v. Hydrapak, Inc., No. 11-cv-5379, 2013 WL 136180, at *13 (S.D.N.Y. Jan. 11, 2013), report and recommendation adopted in part, rejected in part, No. 11-cv-5379, 2013 WL 634510 (S.D.N.Y. Feb. 21, 2013), aff'd, 753 F.3d 1291 (Fed. Cir. 2014); Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic, No. 10-cv-05256, 2012 WL 5816878, at *10

Regeneron Pharmaceuticals, Inc. v. Merus N.V., Not Reported in Fed. Supp. (2018)

(S.D.N.Y. Nov. 14, 2012); 📒 Spalluto v. Trump Int'l Hotel & Tower, No. 04-cv-7497, 2008 WL 4525372, at *8 (S.D.N.Y. Oct. 2, 2008). That is not the case here.

10    While Regeneron challenges this as an aspect of the attorneys' fees award, it is more properly included as an award of expert fees.

11    Regeneron argues that it asked for more detailed accounting of Merus's payment information, which Merus refused to provide. However, Regeneron admits that it is "impractical" to review the voluminous records already submitted by Merus, (Regeneron Opp. at 3); Regeneron should not be permitted to ask for additional records to engage in a fishing expedition when it has not reviewed the records it already has.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.



Valeo 2018 Intellectual Property Litigation Hourly Rate Report

2018

An exclusive report by

VALEO PARTNERS

# Executive Summary

The Valeo 2018 Intellectual Property Litigation Rate Report analyzes the hourly rates of Attorneys specializing in Copyright, Patent and Trademark Litigation from over 200 Law Firms. The Report has 6 Sections: 1) Overall Rates by Firm Revenue Groups 2) Overall Rates by Individual Firms 3) Practice Area (Copyright, Patent and Trademark) Rates by Individual Firms 4) Companies Represented and Overall Rates Billed by Their Outside Counsel.

IP matters especially Patent litigation, representing two-thirds of all IP litigation, continue to grow annually and will continue to do so in 2018 by an estimated 5% over 2017 matters.  Rates will also increase overall but with some discounting (10% or more).

A word on Valeo's research and compilation methodology. Valeo has a Research Team that identifies hourly rates that are publicly disclosed. About 2,000 hourly rates per week of Attorneys and Support Staff for over 1,200 Law Firms globally are added to the database. Further research is required to "connect the dots" by adding detailed Attorney Profile information and linking the legal work performed to specific Clients and Client Industries. Through this process we are able to provide actionable data to users – Law Firms and Corporate Counsel - of the Valeo Attorney Hourly Rates and our Analytical Reports, including this one, to make important monetary decisions in terms of legal services offered and purchased. In terms of the Report, not all timekeepers will appear in every year so sometimes average rates may vary; in this case the trend line and averages over the 2012 – 2018 period are the best indicators.  In the event that Valeo has no rates for a given field (Year or Position), an algorithm is used to estimate a rate or rates.  In Sections 5 and 6, Engagement Summaries by Client and Law Firm, respectively, those averages are Blended (Total Fees divided by Total Hours for all Timekeepers). Valeo considers Senior Partners to be ones with 25+ years of experience from law school graduation, Partners with 24 years or less experience and Senior Associates with 5 years or more experience. Of course, those experience levels may vary by Firm but seem to work for both Large Law Firms and Middle-Market ones.

Valeo takes no responsibility for the information obtained from public or private sources in compiling this Report or for the errors and omissions of its Research staff. This Report is for internal purposes only. Any other use by the purchaser of this Report, for example use in any Court or Mediation or in the Media, is prohibited except with the prior written consent of Valeo Partners. All comments, feedback and questions are welcomed and should be directed to Chuck Chandler, Partner of the Legal Consulting Practice Group of Valeo Partners, at cchandler@valeopartners.com.



## AMLAW (1-50)

| Overall | 2012 Rate | 2103 Rate | % | 2014 Rate | % | 2015 Rate | % | 2016 Rate | % | 2017 Rate | % | 2018e Rate | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AMLAW (1-50) | | | | | | | | | | | | | |
| Senior Partner | $811 | $834 | 3% | $857 | 3% | $886 | 3% | $994 | 12% | $1,120 | 13% | $1,145 | 2% |
| Partner | $652 | $740 | 13% | $761 | 3% | $822 | 8% | $925 | 13% | $960 | 4% | $979 | 2% |
| Counsel | $706 | $715 | 1% | $755 | 6% | $761 | 1% | $772 | 1% | $874 | 13% | $905 | 3% |
| Senior Associate | $541 | $553 | 2% | $563 | 2% | $574 | 2% | $660 | 15% | $704 | 7% | $729 | 3% |
| Associate | $445 | $454 | 2% | $466 | 3% | $483 | 4% | $542 | 12% | $618 | 14% | $642 | 4% |
| Supporting Staff | $284 | $293 | 3% | $308 | 5% | $322 | 5% | $332 | 3% | $348 | 5% | $359 | 3% |
| Overall | $573 | $598 | 4% | $618 | 3% | $641 | 4% | $704 | 10% | $771 | 9% | $793 | 3% |



AMLAW (1-50)

| | 2012 | 2103 | 2014 | 2015 | 2016 | 2017 | 2018e |
|---|---|---|---|---|---|---|---|
| Senior Partner | $811 | $834 | $857 | $886 | $994 | $1,120 | $1,145 |
| Partner | $652 | $740 | $761 | $822 | $925 | $960 | $979 |
| Counsel | $706 | $715 | $755 | $761 | $772 | $874 | $905 |
| Senior Associate | $541 | $553 | $563 | $574 | $660 | $704 | $729 |
| Associate | $445 | $454 | $466 | $483 | $542 | $618 | $642 |
| Supporting Staff | $284 | $293 | $308 | $322 | $332 | $348 | $359 |

VALEO PARTNERS

# EXHIBIT 2

# AIPLA

# 2019

## Report of the Economic Survey

Prepared Under Direction of
Law Practice Management Committee

**American Intellectual Property Law Association**
1400 Crystal Drive, Suite 600
Arlington, VA 22202

www.aipla.org



# Report of the Economic Survey 2019

**Prepared Under Direction of the
American Intellectual Property Law Association
Law Practice Management Committee**

**Frank L. Gerratana, Chair**

**September 2019**

**Prepared by:**



**910 Clopper Road, Suite 210N ∎ Gaithersburg, Maryland 20878
TEL: (240) 268-1262 ∎ ARI@associationresearch.com**

## AIPLA Law Practice Management 2019 Economic Survey Participants

**We would like to thank those who helped put together and review
this year's AIPLA Economic Survey:**

**Frank Gerratana**: Fish & Richardson, PC – Chair of LPM Committee

**Arlene Neal**: Neal Bilbo, LLC – Vice Chair of LPM Committee

**Stephanie Sanders:** Kilpatrick Townsend & Stockton, LLP – Co-Chair of the Economic Survey Subcommittee

**Ariana Fleishman**: PiVerse, Inc. – Co-Chair of the Economic Survey Subcommittee

**DeAnn Smith**: Foley Hoag – Board Liaison

---

### Economic Survey Subcommittee Members:

| | |
|---|---|
| **Ashraf Abdul-Mohsen**: ARI | **John Gorecki**: Anderson Gorecki, LLP |
| **Iasha Chaudhry:** Smart & Biggar | **Megan Kirkegaard**: ARI |
| **Ryan Dean:** Umberg Zipser, LLP | **Joshua Kresh:** DLA Piper LLP, US |
| **Meghan Donohoe**: AIPLA | |

---

©2019 AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION

ALL RIGHTS RESERVED. NO PART OF THIS BOOK MAY BE REPRODUCED OR TRANSMITTED IN ANY FORM OR BY ANY MEANS, ELECTRONIC OR MECHANICAL, INCLUDING PHOTOCOPYING, RECORDING, OR BY AN INFORMATION STORAGE AND RETRIEVAL SYSTEM, WITHOUT PERMISSION IN WRITING FROM THE PUBLISHER.

Printed Copies OF THIS REPORT ARE AVAILABLE FROM AIPLA AT A COST OF $75 PER COPY FOR MEMBERS AND $495 PER COPY FOR NON-MEMBERS.

AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION
1400 CRYSTAL DRIVE, SUITE 600
ARLINGTON VA 22202
(703) 415-0780
WWW.AIPLA.ORG

## INTRODUCTION

The AIPLA Economic Survey, developed and directed by the Law Practice Management Committee of the American Intellectual Property Law Association (AIPLA), reports the annual incomes and related professional and demographic characteristics of intellectual property (IP) law attorneys and associated patent agents. Conducted every other year by AIPLA, this survey also examines the economic aspects of intellectual property law practice, including individual billing rates and typical charges for representative IP law services. All U.S. AIPLA members, with the exception of student members were invited to participate.

The Law Practice Management Committee took an active role in reviewing the Economic Survey with a goal of improving the usefulness and value of the data that are collected and analyzed.

## DATA COLLECTION

An e-mail invitation to participate in the 2019 AIPLA Economic Survey was sent to a list of 9,439 AIPLA members; accounting for bounces and requests to be removed from the database, the actual sample surveyed was 8,619. The e-mail included an individualized direct link to the Web-based questionnaire along with an attached letter requesting additional participation in the Firm portion of the Economic Survey. The initial e-mail was followed up by several e-mail reminders. Additionally, AIPLA and committee members sent out promotional emails with survey links as well. Similar to 2015 and 2017, additional efforts were made to collect the Firm Survey data. Contact information was collected directly from the Individual Survey respondents that was then used for distributing Firm Survey links directly to the appropriate people identified at each firm by the Individual Survey respondents.

A total of 961 individuals responded by completing some or all of the Individual questionnaire, yielding an 11.1% response rate, nearly the same as the response rate in 2017. This is the seventh time the survey has been conducted online. Additional efforts to gather data for the Firm portion of the survey garnered 160 responses – lower than the 205 received in 2017.

All data submitted by respondents were reviewed and evaluated for reasonableness and consistency; data anomalies and outliers were analyzed and corrected or deleted.

In many cases, respondents did not answer every question, so the total counts for each table may vary.

## CHANGES TO THE SURVEY

A number of enhancements were made to the 2019 Individual Survey instrument. The committee worked to update the survey and included new questions that covered important areas of interest to the profession. In Part I, the primary practice categories were updated, and questions about remote work and work status were added. Previously, the survey asked for years of IP law attorney experience and this year non-attorney years of IP law experience was added. A number of questions were reordered in this section.

In Part II (Corporate Practitioners), a question was added to ask about the IP budget as it related to US prosecution and non-US prosecution. Part III (Private Practitioners) included new questions about discounted hourly billing rates. In Part IV (Typical Charges), one new charge was added to the section covering Trademarks (preparing and filing assignments or other formal documents). Eight new charges were added to the US Utility Patent section along with a top-level clarifying statement about US Utility Patents that indicates that the category includes foreign-origin patents where no substantive direction is received from foreign attorneys. These new items covered preparation and filing of Information Disclosure Statement (IDS), reference management, Patent Term Adjustment (PTA) calculation, formalities, preparing and filing formal drawings,

**Litigation-Patent Infringement, All Varieties >$25M Initial case management (000s) by Location (Q47Am)**

| | Total | Boston CMSA | NYC CMSA | Phila CMSA | Wash, DC CMSA | Other East | Metro South-east | Other South-east | Chicago CMSA | Minne.-St. Paul PMSA | Other Central | Texas | L.A. CMSA | S.F. CMSA | Other West |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Respondents | 69 | 5 | 4 | 2 | 5 | 1 | 4 | 1 | 4 | 4 | 8 | 6 | 11 | 3 | 11 |
| Mean (Average) | $378 | $260 | $90 | ISD | $220 | ISD | $994 | ISD | $605 | $419 | $84 | $382 | $636 | $450 | $299 |
| 10th Percentile 10% | $50 | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | $500 | ISD | $28 |
| First Quartile 25% | $123 | $150 | $14 | ISD | $175 | ISD | $94 | ISD | $105 | $169 | $50 | $123 | $500 | ISD | $75 |
| Median (Midpoint) | $250 | $250 | $75 | ISD | $250 | ISD | $450 | ISD | $160 | $263 | $63 | $300 | $500 | $500 | $250 |
| Third Quartile 75% | $500 | $375 | $181 | ISD | $250 | ISD | $2,438 | ISD | $1,550 | $825 | $119 | $625 | $500 | $500 | $500 |
| 90th Percentile 90% | $750 | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | $1,700 | ISD | $500 |

**Litigation-Patent Infringement, All Varieties >$25M Inclusive of discovery, motions, and claim construction (000s) by Location (Q47An)**

| | Total | Boston CMSA | NYC CMSA | Phila CMSA | Wash, DC CMSA | Other East | Metro South-east | Other South-east | Chicago CMSA | Minne.-St. Paul PMSA | Other Central | Texas | L.A. CMSA | S.F. CMSA | Other West |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Respondents | 70 | 5 | 4 | 2 | 5 | 1 | 4 | 1 | 4 | 4 | 8 | 6 | 11 | 4 | 11 |
| Mean (Average) | $3,043 | $2,860 | $1,213 | ISD | $2,930 | ISD | $1,850 | ISD | $3,750 | $3,000 | $1,394 | $1,798 | $5,909 | $4,000 | $3,335 |
| 10th Percentile 10% | $500 | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | $5,200 | ISD | $172 |
| First Quartile 25% | $1,000 | $725 | $513 | ISD | $825 | ISD | $800 | ISD | $1,750 | $1,500 | $625 | $760 | $6,000 | $2,000 | $600 |
| Median (Midpoint) | $2,375 | $1,500 | $675 | ISD | $1,500 | ISD | $2,000 | ISD | $2,750 | $3,250 | $1,375 | $1,375 | $6,000 | $4,250 | $2,500 |
| Third Quartile 75% | $6,000 | $5,675 | $2,450 | ISD | $5,750 | ISD | $2,750 | ISD | $6,750 | $4,250 | $2,238 | $2,750 | $6,000 | $5,750 | $6,000 |
| 90th Percentile 90% | $6,000 | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | $6,000 | ISD | $6,000 |

**Litigation-Patent Infringement, All Varieties >$25M Inclusive of pre-trial, trial, post-trial, and appeal (when applicable) (000s) by Location (Q47Ao)**

| | Total | Boston CMSA | NYC CMSA | Phila CMSA | Wash, DC CMSA | Other East | Metro South-east | Other South-east | Chicago CMSA | Minne.-St. Paul PMSA | Other Central | Texas | L.A. CMSA | S.F. CMSA | Other West |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Respondents | 72 | 5 | 4 | 2 | 4 | 1 | 4 | 1 | 4 | 5 | 8 | 6 | 11 | 4 | 12 |
| Mean (Average) | $5,184 | $5,500 | $2,463 | ISD | $4,830 | ISD | $5,000 | ISD | $7,250 | $3,740 | $1,919 | $3,508 | $9,182 | $4,750 | $5,979 |
| 10th Percentile 10% | $930 | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | $8,200 | ISD | $525 |
| First Quartile 25% | $2,000 | $2,750 | $638 | ISD | $1,475 | ISD | $3,000 | ISD | $1,750 | $1,475 | $875 | $1,138 | $9,000 | $1,250 | $3,125 |
| Median (Midpoint) | $4,000 | $3,500 | $1,750 | ISD | $4,200 | ISD | $3,500 | ISD | $4,000 | $4,750 | $1,750 | $3,250 | $9,000 | $4,500 | $7,100 |
| Third Quartile 75% | $9,000 | $9,250 | $5,000 | ISD | $8,500 | ISD | $8,500 | ISD | $16,000 | $5,500 | $3,175 | $5,625 | $9,000 | $8,500 | $9,000 |
| 90th Percentile 90% | $9,000 | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | ISD | $11,400 | ISD | $9,700 |

**A strong correlation between the amount at risk in a patent infringement action and the overall attorney hours required to litigate the action (Q47E)**

|  |  | Yes | No | Total Count |
|---|---|---|---|---|
| All Individuals |  | 67.6% | 32.4% | 216 |
| Location | Boston CMSA | 53.3% | 46.7% | 15 |
|  | NYC CMSA | 46.2% | 53.8% | 13 |
|  | Phila CMSA | 44.4% | 55.6% | 9 |
|  | Wash, DC CMSA | 56.0% | 44.0% | 25 |
|  | Other East | 60.0% | 40.0% | 10 |
|  | Metro South- east | 81.8% | 18.2% | 11 |
|  | Other South- east | 71.4% | 28.6% | 7 |
|  | Chicago CMSA | 58.3% | 41.7% | 12 |
|  | Minne.- St. Paul PMSA | 87.5% | 12.5% | 8 |
|  | Other Central | 69.2% | 30.8% | 39 |
|  | Texas | 61.9% | 38.1% | 21 |
|  | L.A. CMSA | 100.0% | .0% | 13 |
|  | S.F. CMSA | 62.5% | 37.5% | 8 |
|  | Other West | 88.0% | 12.0% | 25 |

**Litigation-Trade Secret Misappropriation >$25M Initial case management (000s) by Type of Practice (Q52Am)**

|  | Total | 1-3 Attorneys | 4-15 Attorneys | 16-59 Attorneys | 60 or more Attorneys | All Corporate |
|---|---|---|---|---|---|---|
| Number of Respondents | 26 | 2 | 0 | 5 | 16 | 2 |
| Mean (Average) | $306 | ISD | ISD | $86 | $355 | ISD |
| 10th Percentile 10% | $45 | ISD | ISD | ISD | $68 | ISD |
| First Quartile 25% | $94 | ISD | ISD | $65 | $400 | ISD |
| Median (Midpoint) | $400 | ISD | ISD | $100 | $400 | ISD |
| Third Quartile 75% | $400 | ISD | ISD | $100 | $400 | ISD |
| 90th Percentile 90% | $430 | ISD | ISD | ISD | $430 | ISD |

**Litigation-Trade Secret Misappropriation >$25M Inclusive of discovery, motions, and claim construction (000s) by Type of Practice (Q52An)**

|  | Total | 1-3 Attorneys | 4-15 Attorneys | 16-59 Attorneys | 60 or more Attorneys | All Corporate |
|---|---|---|---|---|---|---|
| Number of Respondents | 26 | 2 | 0 | 5 | 16 | 2 |
| Mean (Average) | $2,425 | ISD | ISD | $1,490 | $2,672 | ISD |
| 10th Percentile 10% | $500 | ISD | ISD | ISD | $1,025 | ISD |
| First Quartile 25% | $1,438 | ISD | ISD | $625 | $2,625 | ISD |
| Median (Midpoint) | $3,000 | ISD | ISD | $1,000 | $3,000 | ISD |
| Third Quartile 75% | $3,000 | ISD | ISD | $2,600 | $3,000 | ISD |
| 90th Percentile 90% | $3,210 | ISD | ISD | $3,000 | $3,000 | ISD |

**Litigation-Trade Secret Misappropriation >$25M Inclusive of pre-trial, trial, post-trial, and appeal (when applicable) (000s) by Type of Practice (Q52Ao)**

|  | Total | 1-3 Attorneys | 4-15 Attorneys | 16-59 Attorneys | 60 or more Attorneys | All Corporate |
|---|---|---|---|---|---|---|
| Number of Respondents | 28 | 2 | 0 | 5 | 17 | 3 |
| Mean (Average) | $5,830 | ISD | ISD | $2,260 | $6,521 | $9,167 |
| 10th Percentile 10% | $710 | ISD | ISD | ISD | $670 | ISD |
| First Quartile 25% | $2,688 | ISD | ISD | $1,000 | $6,250 | ISD |
| Median (Midpoint) | $7,500 | ISD | ISD | $1,500 | $7,500 | $7,500 |
| Third Quartile 75% | $7,500 | ISD | ISD | $3,900 | $7,500 | ISD |
| 90th Percentile 90% | $7,750 | ISD | ISD | ISD | $8,000 | ISD |

**A strong correlation between the amount at risk in a trade secret misappropriation action and the overall attorney hours required to litigate the action (Q52B)**

| | | | | Total |
|---|---|---|---|---|
| | | Yes | No | Count |
| All Individuals | | 80.0% | 20.0% | 70 |
| Location | Phila CMSA | 100.0% | .0% | 4 |
| | Wash, DC CMSA | 60.0% | 40.0% | 5 |
| | Chicago CMSA | 66.7% | 33.3% | 3 |
| | Minne.- St. Paul PMSA | 100.0% | .0% | 3 |
| | Other Central | 76.5% | 23.5% | 17 |
| | Texas | 60.0% | 40.0% | 5 |
| | L.A. CMSA | 100.0% | .0% | 8 |
| | S.F. CMSA | 66.7% | 33.3% | 3 |
| | Other West | 91.7% | 8.3% | 12 |

**The total cost of asserting a trade secret misappropriation action in comparison to the total cost of defending such an action (52C)**

| | | | | Total |
|---|---|---|---|---|
| | | About the same | Cost of asserting is a percent of the cost of defending | Count |
| All Individuals | | 76.6% | 23.4% | 64 |
| Location | Phila CMSA | 100.0% | .0% | 4 |
| | Wash, DC CMSA | 60.0% | 40.0% | 5 |
| | Chicago CMSA | 66.7% | 33.3% | 3 |
| | Minne.- St. Paul PMSA | 33.3% | 66.7% | 3 |
| | Other Central | 80.0% | 20.0% | 15 |
| | Texas | 80.0% | 20.0% | 5 |
| | L.A. CMSA | 100.0% | .0% | 7 |
| | S.F. CMSA | 66.7% | 33.3% | 3 |
| | Other West | 90.9% | 9.1% | 11 |