IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


LIQWD, INC., et al.,          :
                              :
          Plaintiffs,         : No. 1:17-cv-0014-JFB-SRF
                              :
     v.                       :
                              :
L'OREAL USA, INC., et al.,    :
                              :
          Defendants.         :


               Thursday, November 1, 2018
               11:00 a.m.

               Teleconference
               Chambers of Judge Sherry R. Fallon

               844 King Street
               Wilmington, Delaware


     BEFORE:    THE HONORABLE Sherry R. Fallon,
                United States District Court Magistrate



     APPEARANCES:


               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
               BY:  JEREMY TIGAN, ESQ.

                         -and-

               QUINN EMANUEL
               BY:  JOSEPH PAUNOVICH, ESQ.
               BY:  MATTHEW BLACKBURN, ESQ.

                    On behalf of Plaintiffs

```
 1    APPEARANCES CONTINUED:

 2
                     RICHARDS, LAYTON & FINGER, P.A.
 3                   BY:  KATHARINE MOWERY, ESQ.

 4                              -and-

 5                   PAUL HASTINGS
                     BY:  JOSEPH PALYS, ESQ.
 6                   BY:  DANIEL ZEILBERGER, ESQ.
                     BY:  NAVEEN MODI, ESQ.
 7                   BY:  SCOTT PEACHMAN, ESQ.

 8                        On behalf of Defendants

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1              THE COURT:  Good afternoon.
 2    Please be seated.  Let's start with the
 3    introductions of counsel for the record.  For
 4    Liqwd and Olaplex?
 5                   MR. TIGAN:  Good morning, Your
 6    Honor.  Jeremy Tigan with Morris Nichols on
 7    behalf of the Plaintiffs.  I'm joined by my
 8    co-counsel today Joe Paunovich and Matthew
 9    Blackburn.
10                   MR. PAUNOVICH:  Good morning, Your
11    Honor.
12                   MR. BLACKBURN:  Good morning, Your
13    Honor.
14                   MR. TIGAN:  And we also have our
15    client representative here Tiffany Walden.
16              THE COURT:  Very good.  Welcome.
17    And for L'Oreal?
18                   MS. MOWERY:  Good morning, Your
19    Honor.
20              THE COURT:  Good morning,
21    Ms. Mowery.
22                   MS. MOWERY:  Kate Mowery on behalf
23    of the Defendants from Richards, Layton &
24    Finger.  And I have my colleagues from Paul
```

```
 1      Hastings here, Joe Palys, Naveen Modi, Daniel
 2      Zeilberger and Scott Peachman.
 3                      MR. PALYS:  Good morning, Your
 4      Honor.
 5                      MR. MODI:  Good morning, Your
 6      Honor.
 7                      MR. ZEILBERGER:  Good morning,
 8      Your Honor.
 9                      THE COURT:  Good morning.
10                      MS. MOWERY:  And at this time if
11      Your Honor would like, I can pass up the slides
12      that we're going to use so you have them.
13                      THE COURT:  That will be
14      appropriate.  Thank you.  And while Ms. Mowery
15      is doing that, if the Plaintiffs would like to
16      do it as well.  Just a note for both sides, if
17      you also have available to you a copy of the
18      Federal Circuit's decision on the appeal of the
19      denial of the preliminary injunction, that may
20      be handy as we go along on some terms.
21                      And then if different counsel from
22      each side are going to handle the arguments,
23      then I would ask that you reintroduce yourself
24      for the record so that we have a clear record of
```

```
 1      who is arguing on the transcript.  Thank you for

 2      the letter of November 2 analyzing how we're

 3      going to divide the time and who will begin with

 4      each term.

 5                   I'm ready to get started and I

 6      believe the Plaintiffs are presenting arguments

 7      first.

 8                   MR. PAUNOVICH:  Thank you, Your

 9      Honor.  Good morning.  Joe Paunovich on behalf

10      of the Plaintiffs.  Today with me as well will

11      be my colleague Mr. Blackburn.  He will be

12      presenting for a portion of the hearing as well.

13                   THE COURT:  Very well.

14                   MR. PAUNOVICH:  Your Honor, today

15      we want to start with a very brief technology

16      tutorial that will provide some context and

17      relevancy for the claims that are in dispute.  I

18      know that Your Honor is very familiar with the

19      case so it's not our intention to deep-dive into

20      this but to give some context for the terms.

21                   THE COURT:  Very well.

22                   MR. PAUNOVICH:  As Your Honor

23      knows, the asserted patents, the '419 and the

24      '954 patents are directed to a method for
```

1    bleaching, not a product.  And the science

2    behind hair bleaching is very different.  As

3    Your Honor I'm sure is no doubt aware from the

4    Federal Circuit's ruling in the initial P.I.

5    proceedings, whereas a coloring process actually

6    deposits pigment within the hair shaft.

7                    A bleaching process actually

8    removes the color that's in hair.  That's the

9    melanin.  It's like the color that's given to

10   all of our skin.  It's the same thing that's in

11   a hair shaft.  And what happens with bleaching

12   is that melanin is dissolved and oxidized

13   effectively rendering it colorless in hair.  So

14   that's generally speaking how bleaching works,

15   and the process is called oxidation.

16                    The issue with bleaching and

17   what's important for us to understand here today

18   with respect to the disputed terms is that in

19   order to have a bleaching effect, you have to

20   get by a protective coating, a surface if you

21   will, that's on the hair shaft called a cuticle.

22   So this is that outerset of cells on the hair

23   shaft that if you look at it from a microscopic

24   level, it looks almost like scales on a fish.

```
 1                    And what it does is when the hair
 2        is not damaged or it hasn't been bleached, it
 3        lays down flat and it acts as a shield
 4        protecting and strengthening the hair shaft.  So
 5        in order to bleach, what a person of ordinary
 6        skill in the art understands, and we'll see this
 7        is well supported by the literature, is you have
 8        to have a composition that's capable of lifting
 9        up those scales on the outside of the hair shaft
10        so it can get inside to the melanin and
11        ultimately dissolve and render it colorless.
12                    If we look at bleaching like it's
13        claimed, and we'll talk about the ingredients of
14        a bleaching mixture shortly, and I'm now on
15        Slide 6 of Plaintiffs' demonstratives, what we
16        see in bleaching and we'll talk about with
17        respect to those bleaching terms is that it
18        requires most importantly a high alkaline pH.
19                    Now, pH refers to -- you can have
20        a neutral pH, water is around 7 and anything
21        below that is acidic and anything above it would
22        be basic or alkaline.  And what we find and what
23        the literature tells us and a person of ordinary
24        skill in the art understands is in order to have
```

```
 1         an actual bleaching effect, you have to be way

 2         up at around a 9 to 11 pH because it's at that

 3         pH where the ingredients that are in a bleaching

 4         formulation are capable of lifting that cuticle

 5         and getting inside the hair.

 6                   Although this is a somewhat

 7         cartoonish animation, we tried to illustrate

 8         that.  That's the alkaline lifting the cuticle.

 9         The bleach can get inside the cortex of the hair

10         shaft where it can act to ultimately render that

11         melanin, the color in the hair, colorless.

12                   Now, the other thing about high

13         alkaline pH and the need for an alkaline agent

14         in bleach is that it activates the oxidation and

15         accelerates the oxidation that occurs as it's

16         illustrated here.  So you've got peroxide and

17         you've also got persulfates.  The high alkaline

18         pH peroxide is activated.

19                   It's able to dissociate and

20         ultimately further trigger the formation of

21         radicals in the persulfates, and it's these

22         powerful free radicals, those are the things

23         that are able to affect this oxidation in the

24         hair shaft and accomplish the bleaching.
```

1          The parties, we have a plain

2     meaning proposal on one side and we're proposing

3     constructions of it.  It's important for

4     construction here today so we don't end up with

5     what effectively is a self-claim construction

6     dispute before our jury where the one side is

7     saying, look, here is this prior art, it's a

8     bleaching piece of prior art, but in reality

9     it's actually an acidic composition so it's not

10    actually capable of doing the things, the

11    function that's required to accomplish

12    bleaching.

13          And just to hammer that point

14    home, what we find and what the literature tells

15    us is, and this is Slide 7 of our

16    demonstratives, when you have an insufficiently

17    high alkaline pH or something below 9, you don't

18    get that bleaching effect.  The composition

19    might try to get into the hair, you can apply

20    it, you might leave it there for a very long

21    time but it's not going to be able to lift that

22    cuticle and render the melanin colorless, and

23    the literature spells this out as we look at

24    this later today.

1               Let's turn back to our

2      Demonstrative 4.  So what's in a bleaching

3      formulation that provides this function.

4      There's two components.  One component is a

5      bleach powder and the second component is a

6      developer.  The bleach powder requires as we'll

7      explain later today an alkalizing agent for that

8      high pH that we just looked at that provides the

9      required function and the persulfate, one of the

10     other ingredients that's required as part of the

11     bleach powder is one of the substance in

12     addition to the peroxide that forms these

13     powerful free radicals that accomplishes the

14     oxidation.

15               THE COURT:  Is there any dispute

16     with regard to the respective claim

17     constructions where you said it requires an

18     alkalizing agent, that's one of the issues we

19     will be addressing in the claim construction?

20               MR. PAUNOVICH:  That's correct,

21     Your Honor.  In the tutorial, we're just trying

22     to give some preview of the technology and why

23     that from our perspective is a required

24     component of the bleach powder.

```
 1                    THE COURT:  Understood.  I'm just
 2       trying to keep the moving parts clear.
 3                    MR. PAUNOVICH:  Understood.  The
 4       second part of the bleaching formulation is the
 5       developer.  This is peroxide or hydrogen
 6       peroxide, H2O2.  We'll hear more about this
 7       later today as well.  You probably as kids when
 8       you injured your knee when you were younger, the
 9       brown bottle, you pour the liquid substance on
10       your knee, that's our product --
11                    THE COURT:  I've got a lot of
12       personal experience with hair products too.
13                    MR. PAUNOVICH:  That product is
14       not stable unless it's stored at an acidic pH 3
15       or 4.  And as I explained earlier, the reason we
16       require alkalizing agent is to activate that
17       peroxide to get into form, dissociate and become
18       a powerful free radical which in turn will help
19       dissociate persulfates.  You need the alkalizing
20       agent.
21                    Now, what that means is that when
22       you combine the developer with the bleach
23       powder, it becomes an unstable mixture.  It has
24       a limited shelf, a very limited shelf life.  In
```

```
 1        fact, as we'll see from the evidence, if you mix

 2        these ingredients, the peroxide forms these free

 3        radicals along with persulfate free radicals and

 4        it begins constantly changing.

 5                    Persons of ordinary skill in the

 6        art in the context of this invention and

 7        certainly just an ordinary practitioner,

 8        stylist, understands when you mix these

 9        ingredients, you use them and discard them when

10        you're done.  It's not something you put on the

11        shelf.  Together this combination which forms

12        the bleaching formulation that creates the high

13        alkaline pH condition that can lift that cuticle

14        and ultimately affect the oxidation for this.

15                    Now, we saw earlier just in the

16        cartoon animation of how that ultimately results

17        in bleaching, so what's the result.  What we

18        know is that bleaching, and this has long been

19        known, for many, many years, decades, bleaching

20        causes damage to the hair.  It's just a

21        practical reality.  If you go to a stylist and

22        you try to bleach your hair too far in one visit

23        or after multiple repeated visits for bleaching

24        or coloring for that matter, which would include
```

```
 1      a bleaching step, you're going to end up with
 2      damage to the hair.
 3                    Now, on a molecular level there's
 4      all sorts of damage that might occur.  Maybe
 5      it's broken bonds, maybe it's surface damage, et
 6      cetera, but you can't see those visibly with the
 7      human eye.  What you see and how this presents
 8      is frizz, course hair, the hair becomes brittle,
 9      it becomes dull, it loses some of that sheen and
10      most importantly, the most problematic of them
11      is it leads to breakage of hair, almost like a
12      piece of straw.
13                    If you look at hair that's been
14      bleached way beyond the normal of what you will
15      see in a salon, you can literally take it in
16      your hand, it's going to stand straight and snap
17      it.  It's just a problem that exists with this.
18      So when we're talking about breakage in the
19      context of this patent, that's what's being
20      referred to, and we see that identification in
21      examples that we'll talk about later.  It's not
22      at a molecular level, generic damage that you
23      can't see, but rather the actual breakage of the
24      hair fibers.  That's what this invention was
```

1     attempting to solve.

2                    So what is our invention?  The

3     invention, as we said earlier, is a method for

4     bleaching.  And what it does is it uses an

5     active agent.  In the case of this particular

6     patent family, that's our maleic acid or its

7     salts so that it helps protect, strengthen and

8     prevent that break.  And what we're talking

9     about when we're referring to the activation,

10    we're talking about the starting ingredient, the

11    thing before you do anything else with it,

12    before you combine it, put it in aqueous

13    solution of water, before you're combining it

14    with the bleaching formulation.

15                    So in the case of active agents as

16    maleic acid, it can start as pure nonionic

17    pre-acid, just pure maleic acid.  In the case of

18    a salt, it can start as any powderized form of

19    the maleic acid salt.  And these ingredients

20    added to water is what creates that active agent

21    formulation.

22                    Now, as it's applied, as it's

23    claimed, what you do at that point is you take

24    that bleaching formulation that's a high pH and

```
 1        provides that high pH of 9 to 11 and you combine

 2        it with the active agent formulation.  You mix

 3        those together.  You can do it either before you

 4        apply it to the hair, shortly before or you

 5        could conceivably apply one of the mixtures, one

 6        of the formulations to the hair and apply the

 7        other formulations to the hair and in effect

 8        they will be mixed once on the hair.  You're

 9        using a brush, you're moving all of these

10        ingredients around on the hair.

11                  Just briefly, the claims talk

12        about a concentration of what's the

13        concentration of the active agent in that

14        mixture.  And L'Oreal focuses very closely on

15        the in the mixture language of the claims.  What

16        we have to keep in mind, and we'll talk about it

17        here again shortly, is these claims are viewed

18        through the eyes of a person of ordinary skill

19        in the art, the context of the spec and the

20        general knowledge in the art.

21                  And what folks understand in this

22        industry and chemistry generally is that when

23        you're talking about concentrations, for

24        example, you're talking about the initial
```

```
 1          ingredients.  So for example, Thanksgiving
 2          gravy.  We all know Grandma has a recipe for
 3          Thanksgiving gravy.  It's two cups of chicken
 4          stock, a cup of flour, a sprinkle of salt, a
 5          sprinkle of pepper, maybe some drippings.  The
 6          list goes on.
 7                    When you're eating at
 8          Thanksgiving, you say this is great gravy.  I
 9          would love to have the recipe.  How much chicken
10          stock do you put it in.  Grandma doesn't put a
11          probe down in there at the table side to assess
12          let me tell you exactly how much chicken stock
13          is in here.
14                    Now, what she says is there's two
15          cups of chicken stock in it, a cup of flour and
16          so forth.  But everyone realizes in that gravy
17          that it may be that you don't actually have
18          chicken stock anymore in that final combined
19          mixture.  It's been mixed with a bunch of other
20          things.  It's reacted with the drippings, with
21          the flour and subjected to heat, et cetera.  So
22          this is a commonplace understanding that I don't
23          want it to be too kitschy analogy, but I think
24          it's applicable here today and it's certainly
```

```
 1        applicable in the chemistry context where we see

 2        the great way to the evidence is this is exactly

 3        how analytic chemists look at concentration as

 4        well.

 5                      So when you're using the

 6        invention, you add this active agent to a

 7        bleaching formulation, you apply it in exactly

 8        the same way as you would a normal bleaching

 9        formulation.  It's the same procedure, same

10        times, et cetera.  And what's no better

11        illustrative of that are some of L'Oreal's own

12        tutorial videos that they published on the

13        Internet.

14                      We were able to go on YouTube and

15        find three different videos that L'Oreal has

16        made and published talking about how, for

17        example, their accused products are used in a

18        bleaching treatment or how bleaching treatments

19        are used in particular -- how you combine the

20        peroxide and the bleach powder or bleach cream,

21        if you will, and apply them quickly thereafter.

22                      And for the sake of time in this

23        hearing without boring everyone sitting through

24        a video, we spliced a couple portions of them
```

```
 1        just so that you could see the relevant parts of

 2        the technology at issue, but we have included

 3        the cites in the next slide in the event that

 4        the Court would like to view those videos in

 5        their entirety.

 6                    (Video playing.)

 7                    MR. PAUNOVICH:  This is a tutorial

 8        on bleaching and just demonstrates how even just

 9        a person at home would go about combining the

10        required ingredients to bleach and applies them

11        shortly thereafter.  And as I mentioned, the

12        full videos are in the demonstratives that we

13        provided.  That's Demonstrative Slide 12.

14                    So turning to the disputed claim

15        terms and as the parties have proposed,

16        Plaintiffs would go first on the initial set of

17        proceedings or are you --

18                    MR. PALYS:  Yes.  Sorry to

19        interrupt.  I thought we had agreed to split the

20        intro and then --

21                    MR. PAUNOVICH:  Okay.

22                    THE COURT:  I will hear from

23        Defendants.

24                    MR. PALYS:  Sorry to interrupt,
```

```
 1    Your Honor.
 2                  THE COURT:  That's all right.
 3                  MR. PALYS:  Good morning, Your
 4    Honor.  May it please the Court.  My name is
 5    Joseph Palys with Paul Hastings for the
 6    Defendants.  So we can start with Slide 2.  As
 7    Mr. Paunovich mentioned, Your Honor, it's not
 8    lost on us that you're familiar with the case.
 9    You have been involved with it for a while and
10    the patents, so I'm going to keep our
11    introduction and background on the technology
12    somewhat at a very high level.
13                  Obviously, we're going to be
14    talking about a lot of technical issues and
15    technical terms and I plan on addressing them
16    then when we get to the disputed terms where
17    it's relevant.  With that in mind, I'll go to
18    Slide 3.  We'll start with a very brief
19    understanding.  Obviously, we're here to talk
20    about the asserted patents.  That's the '419
21    patent and the '954 patent.
22                  A couple of points here regarding
23    the patents.  You heard Olaplex's counsel talk
24    about what their invention is and what it's
```

```
1       related to bleaching, and these patents describe
2       formulations and processes for treating what
3       they call keratin in hair, in nails and skin
4       relating to coloring and permanent wave
5       treatments.
6               The specifications provide
7       examples.  They provide discussions of different
8       compounds, things like active agents.  We'll
9       talk about that today.  The one point I want to
10      make and just make sure it's not lost, I'm sure
11      you're aware the '954 is a continuation of the
12      '419, meaning it shares the specification.  It
13      comes from the same subject matter.  When it
14      uses terms, it all relates.
15              So Slide 4.  Now, while the
16      specifications describe many things, what is
17      clear, what is in the claims, they're directed
18      to a method of bleaching hair.  On the left you
19      see the '419 patent.  This is on Slide 4, and on
20      the right you see claim 1 of the '954 patent.
21      Both are directed to a method of bleaching hair
22      that is very related.  There are some slight
23      differences that I'll point out just for the
24      Court for purposes of today.
```

```
 1                 But in general, the '419 patent is
 2       a two-step method.  The first method, you're
 3       mixing a formulation comprising an active agent.
 4       You're mixing that with a bleaching formulation
 5       to create a mixture.  You heard Olaplex's
 6       counsel kind of give you a graphic about that,
 7       so there should be no dispute.  There's a
 8       mixture formed.
 9                 The claim clearly shows what that
10       active agent formula is.  It's the maleic acid.
11       That's the structure you see in claim 1.
12       Alternatively, that can be salts for that.  Then
13       the second step, that's all part of the first
14       step, is just mixing that together to create the
15       mixture.  And then obviously Step B is apply to
16       the hair.
17                 The rest of these characteristics
18       like the active agent that I mentioned and the
19       concentration clearly says what the active agent
20       and the mixture has to have.  Those are
21       characteristics.  In the end, it's a two-step
22       method.  The '954 patent claim 1 is a similar
23       method.  It's just three steps here.
24                 One Of the differences it adds is
```

1     first Step A where you're creating the bleaching

2     formulation, so now this is where this term

3     comes in, mixing a bleach powder and a developer

4     to the bleaching formulation.  But

5     realistically, when you look at the claims

6     collectively, Your Honor, Step A and Step B,

7     Step A of the '419 and Step B in the '954,

8     they're tracking.  Slight difference in the '954

9     patent.  It even calls out to form a mixture.

10              Step C of the '954 patent tracks

11     with Step B of the '419 applying that mixture to

12     the hair, and then the characteristics about the

13     activation in that mixture, that tracks in both

14     claims.  So slight differences, but we're really

15     talking about a very similar method of bleaching

16     here.

17              It's also important to note, Your

18     Honor, what these claims do not recite.  They

19     don't recite any level of bleaching.  Nothing in

20     these claims that say you have to have a certain

21     lift, a certain effect that's caused.  It

22     doesn't say anything about building bonds or

23     breaking bonds.  You heard that in the previous

24     discussion and set forth in the specification.

```
 1                    It certainly doesn't say anything
 2        about a pH level in these claims.  We're looking
 3        at the plain language of the claims in its
 4        entirety.  It doesn't talk about a solution.
 5        You heard Olaplex's counsel raise this and show
 6        you a graphic in their introduction.  Now, this
 7        is our invention, I believe, he said.  And it
 8        showed maleic acid, which I don't know if there
 9        is even a dispute that was the nonionic form.
10        That is obviously Defendants' position.  Plus
11        water to create the active agent formulation.
12        There's nothing in that claim, in either one of
13        those claims that require an aqueous solution.
14        In fact, we will explain why that is the case
15        when you look at the full scope of the claims.
16                    So what their invention is what
17        you see in the claim language and obviously
18        there are some dependent claims.  So what are we
19        here today to do.  Again, I'm going to focus my
20        tech tutorial or I should say pass it off when
21        we talk about the disputed terms.
22                    But what we're not here to do
23        today is really try to discuss Olaplex's
24        infringement, how they're trying to map the
```

```
 1     claims.  You saw some theatrics a little bit ago
 2     about the video which is not even
 3     contemporaneous.  When we're talking about claim
 4     construction, we're talking about the time frame
 5     of 2014 and 2015.
 6               We're here to talk about the
 7     intrinsic record.  And Defendants believe their
 8     constructions will stay true to that intrinsic
 9     record, and we agree it should be in the context
10     of what one of ordinary skill in the art should
11     understand.
12               Defendants provided expert
13     testimony to support that for purposes of this
14     claim construction, and Olaplex did not.  So
15     before we dig into the disputed terms, there's
16     another important aspect that we want to make
17     sure that is not lost, and that is the '419 and
18     '954 patent family.
19               We want to make sure that the
20     evidence that we provided, that the Court
21     appreciates where do the '419 patent and '954
22     patent come from.  You can see on Slide 5
23     they're highlighted in yellow, and this is a
24     rudimentary graphic, if you will.  We're trying
```

```
 1          to explain what Olaplex's patent family is.

 2                    It starts off at the top, and

 3          that's the U.S. Provisional 61/994,709, and it's

 4          a copy of that in the record at D.I. 462-1

 5          Exhibit AP.  That's the provisional application.

 6          Provisional application is submitted to the

 7          Patent Office and you can claim priority on that

 8          to continue what would turn into a normal

 9          application, and that's what you see in gray on

10          the right.

11                    So from there, on May 15, 2015

12          about a year later from when they submitted its

13          U.S. provisional, they submitted the application

14          for the '926 patent.  That's U.S. 9,326,926 on

15          the top right.  The '926 patent is D.I. 462-1

16          Exhibit AO.  So that's a parent application when

17          we're talking about a parent and a child's

18          continuation like we talked about.

19                    So underneath on the right you can

20          see how the stem of applications that came from

21          that specification from the '926 application and

22          from the '709 provisional.  The '419 patent came

23          from that.  Later on they filed a continuation.

24          We got the '954 patent from that.  And recently
```

```
 1          they obtained another patent, the '478.  And all
 2          of this is part of the same family.
 3                      Importantly, we also want to point
 4          out, that's why we highlighted in gray, on the
 5          left side you can see that Olaplex also pursued
 6          many applications overseas.  You can see these
 7          national stage applications that stem from PCT
 8          application that they filed on the exact same
 9          day as that '926 application.  And that PCT
10          application published as WO 2015/175986.  In our
11          papers we refer to that as the WO986
12          application, and that was the recent exhibit
13          that we --
14                      THE COURT:  That you fixed.
15                      MR. PALYS:  Yes, and we apologize
16          for that, and that is the D.I. 476, that's the
17          WO986.  What is important here is that
18          application tracks almost virtually identical to
19          what you see in the 926 application.  In fact,
20          if you turn to Slide 6, Defendants submitted an
21          Exhibit, D.I. 462-1 Exhibit L to make this
22          point.  And it was a red line between the WO986
23          application and the 926 application.
24                      You can see the exhibit speaks for
```

1    itself.  We just gave some excerpts.  Most of

2    them are minor word changes.  Most of the

3    changes you can see here on the slide were two

4    general paragraphs that were added at the end of

5    the application.

6              So Slide 5.  So why is this

7    important?  What happened from that PCT

8    application, and I'll just refer it as WO986 but

9    just understand that that's just the published

10   version of the PCT application.  What happened

11   was Olaplex pursued a number of national

12   applications.  Again, this isn't the full list.

13   This is just an excerpt.  But those national

14   stage applications all stem from the same

15   application that shares virtually the same

16   specification that's in the '926 which gets you

17   to the '419 and '926.

18             Why is that important, Your Honor?

19   Because there's been positions taken from

20   Olaplex, you can see in the briefing that

21   they're trying to run away from what they said

22   in these national stage applications because

23   they were different or they were directed to a

24   different invention.  But as you can see if you

```
 1         go to Slide 7, not only were the specifications
 2         similar, they pursued claims that were very
 3         similar.
 4                        At the top, you see a claim from
 5         Canada, claim 10, you can see the same active
 6         agent, maleic acid, alternatively salts, has the
 7         same type of concentration language.  Down below
 8         it, Australia, claim 11, a very similar claim.
 9         In fact, if you go to Slide 8 in Israel, they
10         pursued a claim that was word for word the same
11         claim as claim 1 of the '954 patent.  So any
12         suggestion to say that these inventions or their
13         discussions on applications that stem from these
14         national stage applications have no bearing on
15         the representations that they made with respect
16         to the '419 patent and '954 patent, we believe
17         the evidence is clear that it is.
18                        So I'll wrap this up.  I will
19         discuss today why these facts are relevant.
20         I'll discuss and touch on the technical issues
21         that we're going to talk about what maleic acid
22         is and bleaching and all of that.  At this time
23         unless the Court has any questions, I'll yield
24         the podium to my friend to my left and we'll get
```

```
 1        started on the disputed terms.

 2                    THE COURT:  Let's get started on

 3        the disputed terms.

 4                    MR. PALYS:  Thank you, Your Honor.

 5                    THE COURT:  Thank you.

 6        Mr. Paunovich?

 7                    MR. PAUNOVICH:  Joe Paunovich on

 8        behalf of Plaintiffs, Your Honor.  For the

 9        disputed terms, the parties have agreed to

10        address a series of three terms that are related

11        together, that being the active agent terms, the

12        salts thereof terms and the added concentration

13        terms.

14                    As Your Honor may know from the

15        briefing, that we have a PTAB ruling that gives

16        us a road map for consideration of these.  We're

17        going to look at some excerpts of it more

18        specifically, but that key document which is

19        very helpful to resolving these disputes is

20        available at D.I. 426 Exhibit 20.  It is the

21        PGR2018-00072737.

22                    This was one of the petitions that

23        L'Oreal had filed against the '954 patent in

24        particular which was ultimately denied
```

1    institution by the PTAB.  So let's look at a

2    quick exemplary claim.  This was the '419 patent

3    claim 1 which includes at least a version of

4    these disputed claim terms that requires a

5    formulation comprising an active agent where the

6    active agent has the formula that's illustrated

7    in the claim or salts thereof and it also

8    requires the active agent in the mixture at a

9    particular concentration range spelled out in

10   the claims.

11          The '954 patent, I don't have an

12   additional slide on it, is very similar.

13   Essentially, the main difference is instead of

14   displaying the illustrated structure formula,

15   that is, it recites maleic acid and does not

16   include the or salts thereof language.

17          Now, the parties' dispute with

18   respect to all three of these terms is very

19   simple.  The question that the Court needs to

20   answer for each of these terms is whether when

21   we're talking about the agent, its salts and the

22   concentration, what a person of ordinary skill

23   in the art as in Olaplex's view look at the

24   ingredient before it's being added to the

```
1        formulation and the mixture to determine whether

2        or not you actually have used the claimed agent

3        and look at its concentration relative to the

4        final mixture like our gravy recipe or would a

5        person of ordinary skill in the art, as L'Oreal

6        contends, look at the mixture at some

7        indeterminate time in the future after

8        everything is combined, you've cooked your

9        gravy, and maybe it's before you apply it to the

10       hair, maybe it's after, determine whether or not

11       you have a continued presence of that active

12       agent and whether at that indeterminate time as

13       a concentration that is within the range

14       required, so this is our probe in the gravy.

15                  For these three terms, we're going

16       to start with the last of them, the added

17       concentration term.  Because when we go through

18       this evidence, it's instructive like our gravy

19       example of how a person of ordinary skill in the

20       art reads these claims in the context of the

21       specification and the art generally.  And from

22       that, the waterfall flows very easily to the

23       construction of the other terms.

24                  Now, very briefly, Your Honor may
```

1    recall this dispute about concentration.  This

2    was a dispute that was raised for the first time

3    after our first PI proceeding and after our

4    argument in the Federal Circuit.  So prior to

5    that time, and we'll see some of this evidence,

6    L'Oreal's experts and submissions to the Patent

7    Office, they had no question, no confusion about

8    how you interpret this claim.  You look at it as

9    Olaplex proposes.

10            You look at the starting

11   ingredient, do you have it or not, and you

12   assess its concentration relative to the mixture

13   but not at some time later after it's combined.

14   And it was only after our early January 2017

15   argument at the Federal Circuit where everybody

16   walked out knowing exactly what was going to

17   happen with the hair coloring term, that we saw

18   L'Oreal articulate this newfound interpretation

19   of the claim for the first time.  That happened

20   in the PGR2018-00023 that I mentioned, again

21   available at D.I. 426, Exhibit 20.  So that's

22   the context for it.

23            I won't spend any time on our

24   Demonstrative Slide 17.  The Court, I'm sure, is

```
 1        aware of what the parties' proposed
 2        constructions are.  I'll turn to Demonstrative
 3        Slide 18 which is our road map from the PTAB.
 4        What this is, D.I. 426, Exhibit 20, is a
 5        decision denying institution of review over the
 6        '954 patent.
 7                    And what we see in that decision
 8        is that the PTAB expressly rejected L'Oreal's
 9        construction.  They found that their proposed
10        construction would be highly unusual examination
11        of the changing mixture, that probe in the
12        gravy.  And they weren't able to offer examples
13        then and they can't today offer any examples
14        within the specification as to how you would
15        conduct that analysis or frankly how it would
16        read on any embodiment in the specification.
17                    And by contrast, the PTAB said the
18        patent owner's proposal is consistent with the
19        '954 patent.  This has a common specification
20        with the '419 so we are on all fours there, and
21        it's also consistent with the manner that
22        L'Oreal's experts used to calculate the active
23        agent concentrations in an earlier post-grant
24        proceeding.  That's referring to the 2017 PGR
```

1      against the '419 patent where their expert

2      looking at this claim, attempting to apply the

3      prior art to it, calculated the concentration in

4      the exact same way that we're proposing here.

5                  This is just not how you do it.

6      You don't dip a probe into the gravy.  If we

7      look at the specification that the PTAB said was

8      consistent with this proposed construction, it

9      follows exactly this methodology that chemists

10     and common people know of how you assess an

11     ingredient within a composition.  This is not

12     attorney argument.  It's plain and simple math,

13     so an expert is not needed.

14                 This is Example 3, an excerpt of

15     it, tells us a few simple things.  You have an

16     active agent formulation that has maleic acid,

17     add concentration of 2 grams in a total 10 gram

18     solution.  With respect to the bleaching

19     formulation, it says you have 1 ounce of

20     developer and 1 ounce of powder bleach and that

21     forms your bleaching formulation or highlighting

22     formulation as it's sometimes referred to in the

23     specification.

24                 And what you do then is it says

```
1        you take 9 ml of that active agent formulation
2        that it just described and you add it to that
3        bleaching formulation.  So we've explained this
4        in our brief, simple math that no expert is
5        needed for.  You have your starting ingredient,
6        your chicken stock, your flour, 2 grams of
7        maleic acid.  That's what Example 3 tells us.
8        It says that's in a total of a 10 gram solution
9        of water.
10                    If we do the simple math, 2
11       divided by 10 is a 20 percent by weight maleic
12       acid in the active agent formulation.  We look
13       at the next step that Example 3 talks about, 1
14       ounce of developer and 1 ounce of bleach powder.
15       It doesn't matter what those things are
16       constituted of because 1 ounce is always about
17       28 grams.  That's just a simple metric.  It
18       doesn't matter what it is.  An ounce translates
19       directly to grams.
20                    So we have about 28 grams of
21       developer, 28 grams of bleach powder for a total
22       of 56 grams of a bleaching formulation.  Just to
23       step back for a moment here, for our active
24       agent formulations, you're starting with that
```

```
 1          initial ingredient, a maleic acid.  It's

 2          nonionic free acid at that point, pure acid, or

 3          a salt in the case of the '419.  Once you add it

 4          to the solution, it's nonionic from that point

 5          forward.  That's just a reality of practical

 6          chemistry reality, and that's what our spec

 7          describes.

 8                    So Step 3, you combine the active

 9          agent formulation with the bleaching

10          formulation.  This again is simple math, doesn't

11          require an expert.  We know that there were 10

12          grams total of active agent formulation and it's

13          primarily water, about 80 percent is what

14          Example 3 tells us.  Simple, water is generally

15          about 1 ml per 1 gram.  Attempting to illustrate

16          it, if it's off by a small amount, it doesn't

17          affect this analysis here.

18                    At the 20 weight percent maleic

19          acid in an active agent solution, that

20          translates to about 1.8 grams maleic acid.  In

21          our brief, we said 2 grams just to make the

22          numbers nice and round but it doesn't affect the

23          ultimate analysis.

24                    So we have 9 grams of active agent
```

```
1        formulation combined with 56 grams of bleaching
2        formulation for a total of 65 grams in the
3        mixture of Example 3.  So what's the
4        concentration in that ultimate mixture.  Well,
5        again simple math.  We've got 1.8 grams of
6        maleic acid divided by 65 grams of the total
7        mixture.  It's about 3 percent by weight
8        relative to the overall mixture, exactly within
9        the claimed range of the claims in both the '419
10       patent as well as the '954 patent.
11                   And at this point just to step
12       back as well here, when you combine the active
13       agent formulation which is already going to have
14       an ionic species of the active agent with the
15       bleaching formulation, this is like we talked
16       about in the tutorial.  Now, you have a reactive
17       mixture.  It's a high alkaline pH.  Things are
18       changing and they're changing quickly.
19                   It's going to also begin reacting
20       with the active agent formation and converting
21       it to salt forms.  So this is a constantly
22       changing mixture at that point.  Now, L'Oreal
23       has focused exclusively almost on the language
24       in the claims in the mixture and they say, well,
```

1    concentration has to be in the mixture because

2    that's what the claims say.  But what we know

3    from Phillips, you don't read the claim language

4    divorced from the patent.  You read it in the

5    context of the specification.

6              A person of ordinary skill in the

7    art also reads it in light of the general

8    knowledge in the art.  So it's not sufficient to

9    just read the claim language and stop there and

10   say, well, it says in the mixture so it's got to

11   be in the mixture.  And if we look at how a

12   person of ordinary skill in the art actually

13   does interpret this, what we see is we have

14   expert testimony of Dr. Borish.

15             This is D.I. 288 at Paragraphs 66

16   and 67, and he explains that this is what

17   chemists do, what a person of ordinary skill in

18   the art does.  They assess it like Olaplex's

19   view of Thanksgiving gravy.  You look at the

20   concentration of the active agent, the weight of

21   the active agent that is, add it into the active

22   agent formulation relative to the total weight

23   of the final mixture.

24             And his opinion on this issue is

```
 1        not surprising because it's consistent with all
 2        of the other evidence other than L'Oreal's
 3        recently hatched interpretation of this claim
 4        term of how people go about interpreting the
 5        concentration terms in these claims.
 6                     I'm not going to go over them each
 7        individually.  Your Honor has the evidence in
 8        the record.  We've summarized it here including
 9        the cites on our Demonstrative Slide 24.  You
10        have the patent examiner at D.I. 99-1, Exhibit
11        R, Page 7 interpreting in relation to the prior
12        art.  The analysis of this concentration term,
13        very much the same way.  When you're analyzing
14        prior art or infringement, you have to interpret
15        the claims the same way so we are all on fours
16        with that.
17                     We have L'Oreal's PGR expert from
18        the 2017 419 PGR petition; D.I. 425, Exhibit A
19        at the paragraphs that are noted on this
20        demonstrative, 153 through 154, 156, 159, 237
21        and 239 interpreting it in exactly the same way.
22        Now, we have a variety of third-party
23        submissions which we still strongly believe are
24        submitted by L'Oreal.  They're all available at
```

1    D.I. 425, Exhibits 5, 6 and 7 where when L'Oreal

2    or whichever the anonymous third party was, was

3    telling the Patent Office, look, here is the

4    prior art.  I want to explain how it maps onto

5    the claims.  They interpreted this concentration

6    term in exactly the same way.

7                    THE COURT:  Let me ask you to stop

8    there for a moment.  What you haven't indicated

9    on this slide and maybe it's coming, reconcile

10   that with how the Fed Circuit interpreted hair

11   coloring agent.  Didn't the Federal Circuit

12   determine that the mixture recited in claim 1

13   referred to the combination of the active agent

14   formulation and the bleaching formulation that's

15   applied to the hair and doesn't that lend more

16   support for L'Oreal's argument and not for

17   Olaplex's argument that you measure the active

18   agent concentration prior to mixing with the

19   bleaching formulation?

20                    MR. PAUNOVICH:  Sure, that's a

21   great question.  Number one, they're certainly

22   different claim terms.  We're talking about

23   apples and oranges here.  One is an affirmative

24   requirement of the claim that you have to have

1          this active agent formulation, active agent in

2          the -- ultimately you're going to add it at some

3          point into the mixture.  Whereas the limitation

4          that we were dealing with before and at the

5          Federal Circuit was a negative claim limitation.

6                         So in other words, it said you

7          cannot have a hair coloring agent.  And as it

8          was defined, that provides a guidepost for why

9          we look at the ultimate mixture as applied to

10         the hair with respect to hair coloring agent as

11         opposed to assessing the presence of the active

12         agent and its concentration relative to the

13         mixture before.

14                         And that's compelled by the fact

15         that the patentee with respect to hair coloring

16         agent acted as their own lexicographer and said,

17         hair coloring agent means -- and I don't have

18         the exact quote in front of me so I don't want

19         to paraphrase it or misquote it, but they

20         described it's an ingredient that when it's in

21         this mixture, it would cause a change to the

22         color of the hair after it's applied.

23                         So in other words, the patentee

24         specifically spelled out how you interpret that

```
 1      particular claim term and moored it to a later

 2      time when it's actually applied to the hair as

 3      opposed to some earlier time as L'Oreal argued

 4      and was ultimately rejected, that you could add

 5      a pin drop of color to the composition and

 6      somehow avoid the lexicography definition.

 7                  THE COURT:  Give me a moment.  I

 8      may have another question.  You haven't

 9      mentioned the Borish Affidavit at D.I. 288.

10      There's also one that the Defendants attached at

11      Document Item No. 422, Exhibit AE at Paragraph

12      57.

13                  Doesn't that declaration from

14      Dr. Borish unequivocally state that the mixture

15      is the combined active agent and bleaching

16      formulations?

17                  MR. PAUNOVICH:  So I will pull

18      that up.  I don't have that particular paragraph

19      at my fingers.  I believe it read in context and

20      in all Dr. Borish's Declarations, in which there

21      are many, four, and multiple depositions both in

22      this matter as well as the PGRs, he made clear

23      at all times and Olaplex has never taken the

24      contrary position that concentration of the
```

```
 1        active agent is assessed relative to the

 2        ultimate mixture.

 3                        And our PTAB road map tells us

 4        exactly why you do this.  This is from D.I. 426,

 5        Exhibit 20 at 10.  The PTAB under petitioner's

 6        rationale, L'Oreal's construction, the preferred

 7        embodiments would be excluded from claim 1's

 8        scope, a result that is rarely justified as our

 9        Federal Circuit tells us.  There's no

10        embodiment.  If we interpreted the claims in the

11        way that L'Oreal proposes, there would literally

12        be not a single embodiment in the specification

13        that was covered by claim 1.

14                        And we will look at this next on

15        maleic acid terms.  The PTAB also expressly

16        found that none of the related patents that

17        L'Oreal's counsel has referred to or any of the

18        foreign prosecution histories that have been

19        cited to them required a construction that was

20        any different than the one compelled and well

21        supported by the patent specification.

22                        So if we understand how

23        concentration is calculated in the view of a

24        person of ordinary skill in the art reading
```

1      these claims in the context of the spec and the

2      construction of the active agent terms and salts

3      thereof flow very easily from that point.

4                    As we talked about earlier, we're

5      talking about the starting material.  The reason

6      that Olaplex proposed no construction is if we

7      understand and interpret the active

8      concentration terms in the way that they're

9      proposing, then it's just a simple look at,

10     well, what's your starting ingredient.  And in

11     this case, there's no dispute whatsoever about

12     what the starting ingredients are.  L'Oreal uses

13     maleic acid.  We see it on their labels.  We see

14     it in their marketing.  We see it in their

15     tutorial videos like we looked at earlier.

16                    L'Oreal by contrast for these

17     terms wants to imply or import the dipstick

18     method where you put the probe into the

19     Thanksgiving gravy and you're hoping to assess

20     it at some point in the future to see if there

21     is an active agent still there, and we think

22     that that construction simply should not be

23     applied.

24                    And our PTAB in the same PGR

1    denial explained exactly that.  L'Oreal's

2    suggestion is that the active agent phrase

3    includes only the free acid to the exclusion of

4    any salt, particularly after the free acid is

5    added to a bleaching mixture.  That's the exact

6    same argument we're seeing here today and they

7    rejected it expressly.

8              And what they found was, and this

9    is in the context of the '954 patent, that in

10   the '954 when it says the active agent is maleic

11   acid, it refers to that active ingredient as

12   added to the active agent formulation in order

13   to form the mixture.  And they were clear, this

14   interpretation does not as L'Oreal suggests

15   exclude the formation of maleic acid salts after

16   the free acid is mixed with a bleaching

17   formulation.

18             In fact, they found that to be

19   consistent with the specification and pointed

20   out, they said, well, when we look at the

21   specification it defines carboxylic acids of

22   which maleic acid is the type, and this

23   definition includes both the free acid and the

24   salts.  And that fact undercuts L'Oreal's

1        proposed construction there as well as today

2        because their construction would exclude the

3        formation of these ionic compositions or the

4        salts which is exactly how Example 3 occurs.

5                      If we look at that portion of the

6        spec, it's very clear.  "Carboxylic acid" as

7        used in here -- this is in the '419

8        specification, a slightly different column and

9        line numbers.  It's at Column 4, Lines 26

10       through 28.  "Carboxylic acid" in here refers to

11       the group COOH.  Unless specified otherwise, the

12       term carboxylic acid embraces both the free acid

13       and the carboxylate salt.

14                      Now, L'Oreal goes through a lot of

15       linguistic gymnastics in their responsive brief

16       and we see it in their demonstratives here today

17       about, well, what about this qualifier unless

18       specified otherwise.  That argument frankly

19       falls flat.  And here is why: If we look at the

20       '954 patent, it talks about wherein the active

21       agent is maleic acid.  Our specification makes

22       clear for that patent since it's referring to a

23       carboxylic acid that it embraces both the free

24       acid and the salt.

1           With respect to the '419 patent,

2    it's different.  It doesn't recite maleic acid.

3    It illustrates a structure.  So in that

4    instance, the patentee Olaplex re -- it

5    illustrated the structure and then it said or

6    salts.  They claim that this is some sort of

7    exception and it's created indefiniteness

8    problems, but it's a simple application directly

9    from how the patentee described how it was going

10   to use these terms.

11          And with respect to the '419

12   patent and its use of an illustrated structure,

13   we know that that's also not limiting to the

14   claim in any way, to an ionic substance or

15   otherwise.  The Sumitomo and the Pfizer v.

16   Ranbaxy cases which we cited in our responsive

17   brief tell us that when you have an illustrated

18   structure unless there's something specific in

19   the specification that says you're going to

20   limit it to this, it covers more than that.  It

21   would embrace multiple things.

22          We don't have to take either the

23   PTAB's word for it or Olaplex's word for it or

24   proposal here.  We asked Dr. Freeman.  This is

```
 1        L'Oreal's expert in this case.  He's the one who

 2        offered the contrary declarations for these

 3        proceedings.  We asked him about that disclosure

 4        in the specification and he was clear, a person

 5        of ordinary skill in the art would understand

 6        carboxylic acid as it was used to include both

 7        the protonated form, that is, the nonionic free

 8        acid form as well as the charged carboxylate

 9        salt with an appropriate counter ion.

10                  This is at D.I. 460, Exhibit 1,

11        Page 170, Line 4 through Page 171, Line 5.  Just

12        to be sure, we asked him, well, isn't this --

13        continuing on 171, Lines 6 through 11.  Isn't

14        maleic acid a carboxylic acid?  And he waffles

15        at first and then he says it expressly, maleic

16        acid is a specific carboxylic acid.  The

17        specification of the patent tells us that when

18        you use those words, it embraces both the acid

19        and the salt.

20                  Now that we say how the

21        specification has applied the carboxylic acids

22        and how that would apply to maleic acid and how

23        a person of skill in the art would interpret

24        that not to be limited as L'Oreal suggested, the
```

```
 1        only other arguments that L'Oreal raises, and

 2        I'm going to reserve some of this for rebuttal,

 3        is a prosecution disclaimer.

 4                    And what we know from our Federal

 5        Circuit law is that you have to have a clear and

 6        unmistakable disclaimer in the view of a person

 7        of ordinary skill in the art, and you have to

 8        show it by clear and convincing evidence.  It's

 9        not a preponderance.  If you have multiple

10        reasonable interpretations of the claim language

11        that would not result in the disclaimer that a

12        Defendant is advancing, then no disclaimer can

13        be found.

14                    But L'Oreal has a second problem.

15        All of the evidence that they're pointing to are

16        in these foreign applications.  And we'll look

17        at them.  We're not concerned about them or

18        trying to run and hide.  But the reality is our

19        courts are universal in saying that if you're

20        going to look at this evidence from foreign

21        prosecution, you look at it very cautiously,

22        because for a very important reason, the laws

23        and procedures in other jurisdictions are

24        different.
```

```
 1                 So whereas in one jurisdiction

 2     when you're applying for a patent, it may be

 3     that you have to narrow the claims or claim it a

 4     different way or use different language, you may

 5     not have to do that in another.  And generally

 6     speaking, as our Federal Circuit has told us,

 7     this type of evidence, this foreign prosecution

 8     evidence, is irrelevant to claim construction as

 9     a result of those differences in foreign laws.

10                 For example, if we look at it in

11     the U.S., if a patentee gets a one-year grace

12     period for a prior publication of its own art or

13     prior use and it won't be treated as prior art

14     under 102(a) or 102(b) post-EIA, so in this case

15     we have and everything that L'Oreal has pointed

16     to is a different patent family that is not

17     prior art here in the U.S. because of these

18     exceptions in the U.S.  Whereas when we look at

19     most other, if not all other jurisdictions,

20     these exceptions don't apply.

21                 You don't get the one-year grace

22     period.  So it's commonplace not just in this

23     case but to have a situation where patentees

24     when they're patenteeing domestically and
```

```
 1         abroad, that they have to contend with their own
 2         art.  And what that often means is sometimes
 3         they use different claim language.  Sometimes
 4         they narrow their claims in different
 5         jurisdictions.  Sometimes maybe they seek the
 6         narrower invention first and file a continuation
 7         and continue to seek the broader limitations or
 8         claims later.
 9                   None of these strategies result in
10         a disclaimer.  You would have to find a clear
11         and unmistakable disclaimer by clear and
12         convincing evidence.  In fact, in the U.S. a
13         disclaimer typically only happens when you're
14         dealing with an unmistakable narrowing of the
15         exact same claim language into directly related
16         applications, like a parent or child situation.
17                   And so it is here, the PTAB again
18         provides us with our road map.  We're going back
19         to D.I. 426, Exhibit 20 at 11.  And what the
20         PTAB considered is some of the very same
21         evidence that L'Oreal is bringing before this
22         Court here today.  And it looked closely at
23         those disclosures.  They pressed these arguments
24         there as well.  They said, well, we've looked at
```

```
 1        it.  And to the extent that these claims or
 2        statements indicated a distinction between a
 3        free acid and its salt, we can reconcile it,
 4        simply meaning that the maleic acid is the form
 5        of the agent when added in the mixture.  Just
 6        like we talked about earlier with the
 7        concentration term.  And that interpretation in
 8        their view is more consistent with the
 9        disclosure in the patent.
10                    Briefly and I will reserve the
11        rest on this particular foreign prosecution
12        piece for rebuttal, when we look at every one of
13        those pieces of evidence that L'Oreal has cited
14        to, it's all this commonplace situation that
15        patentees face all the time.
16                    Olaplex had an earlier patent
17        family.  It's not familially related to the
18        asserted patents here.  They're different
19        families.  That's the WO/768 patent.  When we
20        look at that, it has a very different claim
21        scope and coverage.
22                    We can look, for example, at claim
23        1.  This is Demonstrative Slide 38, D.I. 421,
24        Exhibit T at 50.  This is claim 1 of WO/768.
```

```
 1        What it's talking about is nothing for treating
 2        hair.  It's got a binding agent with four
 3        reactive moieties, A, B, C and D.  It also has
 4        an R linker.  All of these items with specific
 5        charges that are opposing one another, it must
 6        be able to covalently bind free thiol groups.
 7        This invention that Olaplex had to contend with
 8        abroad is a far cry from the invention that
 9        we're talking about in the asserted patents.
10                    We can see this when we take a
11        look at one of the examples.  This is D.I. 421,
12        Exhibit X.  It was an Israeli patent
13        application.  This is one of the pieces of a
14        foreign filing evidence that L'Oreal brought to
15        the PTAB's attention and raised these exact same
16        arguments.  And D1 in the context of this
17        prosecution was that WO/768.  And if we look at
18        it closely, what's actually being said by
19        Olaplex, the first paragraph they're simply
20        describing what WO/768 is.
21                    They say, well, it's ionic
22        compounds.  You got A, B, C and D reactive
23        moieties capable of reacting with free thiol
24        groups, containing one or more charges.  You've
```

1    got this R linker that contains two or more

2    charges.  The charges are opposite one another.

3    It says, a person of ordinary skill in the art

4    reading D1 would have selected agents which

5    contain at least two ionic reactive moieties

6    that are bound to an ionic linker R.

7                    In other words, somebody who reads

8    that when they're analyzing inventive step,

9    which is not the same thing as obviousness, it's

10   a different standard in all of these countries

11   but it's similar, they're not going to be

12   motivated and not taught to do anything other

13   than select one of these complex compounds that

14   have multiple moieties, an R linker, et cetera.

15                   And they go on to say in the

16   second paragraph, nothing in D1 however would

17   have taught, suggested or otherwise motivated

18   that skilled person to select or modify D1's

19   binding agents to be nonionic compounds such as

20   maleic acid.

21                   Now, the PTAB looked at this and

22   they said, here is this Israeli application,

23   D.I. 426, Exhibit 20 at 11 and 12.  He said,

24   well, the statement that L'Oreal is referring to

1      again here in the prosecution of that Israeli

2      application appears to indicate that a

3      disclosure in the prior art of salts does not

4      suggest substituting for the free acid itself.

5      We're not persuaded on this record.  But this

6      statement disclaims an interpretation where

7      maleic acid dissociates to form a salt

8      especially when mixed with an alkaline bleaching

9      formulation.  And we saw earlier I highlighted

10     how they reconciled that distinction.

11            The important point here is when

12     we look at this closely, what's being said,

13     nowhere does Olaplex invoke specific claim

14     language within the foreign patent claim or even

15     a particular claim for that matter.  Nowhere

16     does Olaplex say nonionic maleic acid must be

17     present in the mixture that's applied to the

18     hair to the exclusion of salts.

19            Nowhere does Olaplex say our

20     claims don't cover salts.  Nowhere does Olaplex

21     say anything about its product.  They're simply

22     talking about D1, describing it and saying, a

23     person of skill in the art is going to choose

24     D1.  And just as a reminder in the PTAB, and I'm

```
 1      sure this will be raised by L'Oreal, we fully
 2      acknowledge that there are different standards
 3      that are used in the PTAB.  They're not
 4      necessarily binding, but they can be highly
 5      persuasive.
 6                  And what's important here in
 7      denying institution of review of the '954, the
 8      PTAB was considering a much lower standard than
 9      we have to deal with here today.  They had to
10      find simply that it's more likely than not that
11      there would be this disclaimer to compel this
12      interpretation.  They rejected that.
13                  L'Oreal has a burden of clear and
14      convincing evidence before you here today, and
15      we respectfully submit that the disclosures that
16      they're pointing to simply cannot, do not rise
17      to the clear and unmistakable disclaimer that's
18      required to be showed by clear and convincing
19      evidence.
20                  Brief summary, all the other
21      excerpts that they cite to, there's many, many
22      exhibits.  We've identified them and I won't
23      read them into the record here.  I think it
24      would be duplicative of what we just talked
```

```
 1        about.  Our Demonstrative 41, they cite to all

 2        sorts of other prosecution filings, and they

 3        say, well, these also compel that conclusion.

 4        With minor differences, they essentially are the

 5        exact same thing.  They're contending with

 6        WO/768 and they describe WO/768 in exactly the

 7        same way.  There's no statements that would rise

 8        to the level of a disclaimer.

 9                    Some of the evidence that they

10        recite in their brief aren't even statements by

11        Olaplex.  They're office actions.  They are

12        foreign Patent Offices saying something.  We

13        don't adopt it.  We don't say anything about it.

14        That's never sufficient to rise to the level of

15        disclaimer.  For example, Exhibit BA and BB of

16        D.I. 421.

17                    Other evidence like Exhibit W of

18        that same D.I. is in the foreign language, so we

19        don't even know what is said there.  But we're

20        pretty confident since we've been consistent

21        about this, that there's no there there.

22        There's no difference from what we've dealt with

23        before.

24                    Very last point on salts because
```

1    we don't have any additional slides on it, as we

2    explained earlier, the active agent can be a

3    salt of maleic acid before being added to the

4    formulation or mixture, so it can be like a

5    powderized form of maleic acid.  But this term

6    importantly, it's not even in dispute in this

7    case for infringement or validity.

8              We know what's in the accused

9    products.  There's no prior art dispute that

10   we're aware of from the invalidity contentions

11   about where something may or may not be a salt.

12   Everybody is looking at this in the context of

13   do you or don't you have maleic acid.  And once

14   the Court resolves the question of is it

15   assessed relative to the mixture versus at some

16   indeterminate time, the rest follows.

17             In any event, the '419 patent, if

18   we look at all of the evidence and lots of

19   slides that L'Oreal presents on this issue, it's

20   all focused on the words simple salts, simple

21   salts.  When we look in every one of these

22   foreign filed prosecutions, it's referring to

23   simple salts.

24             Whatever problems L'Oreal

1        perceives in the definition of simple salts in

2        our specification or in the claims of a foreign

3        filing, that's a problem for another day and

4        another patent, because our claims talk about

5        salts period.  And L'Oreal understands full well

6        what a salt is.

7                    So here is D.I. 460, Exhibit 1 at

8        Column 167, Lines 19 through 25.  So we deposed

9        Dr. Freeman a couple of weeks ago after we saw

10       the declaration.  They understand what salts

11       mean.  Everybody understands what salts mean.

12       It's simply a compound that's formed from the

13       reaction of an acid and a base.  So he says

14       that's his definition, and we actually find a

15       definition of that in his declaration as well.

16                   The point of contention from

17       L'Oreal's perspective seems to be on this simple

18       salts, but that's not what is in the claim.  And

19       the last point on that I would simply make is

20       the fact that all of these other foreign filings

21       with maybe the exception of one include the

22       simple salts language and then contending that

23       there's some statement about it, we think that

24       further demonstrates why there's no disclaimer

```
 1    with relation to these foreign prosecutions.

 2    They're talking about different claim language.

 3              To the extent that there's any

 4    ambiguity between simple salts and what a salt

 5    is, that's a problem for those patents, not for

 6    these.  With that unless Your Honor has any

 7    questions, I will turn it over to our opposing

 8    counsel.  Thank you.

 9              MR. PALYS:  Your Honor, I will be

10    talking through these three terms for a bit.  I

11    don't know if you want to have a break or it's

12    up to --

13              THE COURT:  Unless our court

14    reporter -- Ms. Carroll, do you need a break?

15              COURT REPORTER:  No, I'm fine.

16              THE COURT:  All right.  I'm ready

17    to go.

18              MR. PALYS:  Okay.  So Slide 12, as

19    Her Honor realizes, we're going to be talking

20    about three terms collectively.  From our

21    perspective, we think it makes sense to start

22    off with the maleic acid term and then I'll turn

23    to the indefiniteness of the salts thereof and

24    maleic acid or salts thereof language and then
```

```
 1        finish with the mixture concentration language.

 2                    Before I dive in, I just want to

 3        make a couple of points to make sure that I

 4        don't mix this when I get to my arguments about

 5        Olaplex's presentation.  I think I heard him say

 6        that the maleic acid in claim 1 is different

 7        than the maleic acid that's recited in the '954

 8        patent, claim 1.  If I'm wrong, I'd like to have

 9        clarification.

10                    I understand his argument was

11        saying that in claim 11 in the '954 patent that

12        includes salts, but in the '419 it doesn't.  If

13        that's the case, I'm looking at their

14        constructions right here which all have the same

15        construction.  Now, I'm confused.  So maybe that

16        can be a sense of clarification we can have

17        later or I just wanted to point that out.  And

18        if that's the case, we have serious 112 issues

19        that we have to go to.

20                    The other point was, Mr. Paunovich

21        was referring to WO/768.  That's not WO/986.

22        Slide 5, they maybe were unintentionally

23        misleading in their papers.  They were saying,

24        if you read the brief, they were referring to
```

```
1        '768.  That's a prior art reference that they

2        were trying to distinguish from the

3        specifications.  I see you nodding your head so

4        I think the Court's got it.

5                    I just want to make sure that's

6        absolutely clear, the '768 is not in this patent

7        family because it's the prior art that's being

8        applied against that.  So any notion that that

9        '768 is different from what we have in the '419

10       or '954 doesn't go to the question of whether we

11       consider the foreign prior art.

12                    THE COURT:  Okay.

13                    MR. PALYS:  So Page 12.  The other

14       point, I keep hearing this gravy analogy.  We're

15       not talking about gravy here.  In fact, Olaplex

16       made a really big deal about the uniqueness of

17       their invention, that no one really thought

18       about maleic acid and using it in bleaching

19       formulations, and certainly making an analogy to

20       gravy just doesn't seem to fit.

21                    So as I mentioned, here on the

22       Slide 12 are the constructions.  Let me just

23       start right off, the point of Defendants'

24       construction.  There's arguments that Olaplex
```

1        raised here and they raised it in their papers

2        that Defendants are trying to add limitations to

3        these claims.  Frankly from the discussion I

4        even heard today and as I march through the

5        claim language and the intrinsic record and what

6        one of ordinary skill knows, the import of our

7        construction is simply we are making explicit

8        what is implicit.

9                    In fact, I don't think I've seen

10       anything where Olaplex has ever denied that that

11       structure you see in claim 1 of the '419 and you

12       see it here on Slide 12, that is a free acid,

13       that is the nonionic and science says so.  And

14       we're going to walk through that.  We've got

15       evidence on that literature in expert testimony,

16       so there should be no dispute.

17                   So this notion that if Her Honor

18       is leaning against the language that we're

19       trying to put in the claim, the only thing that

20       we're trying to have the Court understand and we

21       think it needs to be expressed in her order or

22       recommendation at least, is that that's nonionic

23       if you lean for us.  If you disagree with us,

24       we're asking that that's expressed as well.

1          We can't walk out of here with a

2     plain meaning and just say it's plain meaning.

3     As Mr. Paunovich noted earlier for other terms,

4     we will be having this discussion in front of a

5     jury which we do not want to do, so there is a

6     dispute here.  And by Olaplex not agreeing that

7     that's the nonionic structure, they are

8     implicitly telling the Court, the public, that

9     that includes the ionic forms and I'm going to

10    walk through and explain why that just doesn't

11    hold for the intrinsic record and the science.

12          So let's move on to Slide 13.  So

13    we start with the language of the claims.  We've

14    heard a lot of references to L'Oreal's products.

15    And again, they're trying to bring in

16    infringement into this proceeding, but we all

17    know and I know the Court considers this, we're

18    doing claim construction and we stick to what

19    the patent is about and we start with the

20    language of the claims.

21          And here we are, the claim could

22    not be much more clearer.  There's the

23    structure.  It says the active agent that has

24    this formula, and from Olaplex's submissions in

1          its joint claim construction statement, you've

2          seen the papers, I don't think there's a dispute

3          because they used this same structure for all of

4          the uses of the definition of maleic acid.

5                    Make no mistake about it, Your

6          Honor, that's nonionic.  That's the free acid.

7          That's maleic acid.  When we move from the claim

8          language -- and by the way, just to make a point

9          in the claim language, nowhere in the claims

10         does it say anything about an ion or an ionic

11         species or an ionic compound maleic acid.  You

12         don't see that there.

13                   When you go to the specification,

14         Slide 14, you can see that's entirely consistent

15         with the claim language.  This is Column 9,

16         Lines 6 through 20 of the '419 patent and you

17         will see this cite a lot today.  Here is the

18         only place you see that structure.  And in

19         particular, this is where the specification

20         itself is calling out the active agent.

21                   It says it has the following

22         structures and it has the same maleic acid in

23         it.  Just like the claim, it has alternatively a

24         salt, in this case a simple salt and we will

```
 1          talk about that in a little bit.  So Slide 15,
 2          you can see if you put that description from
 3          Column 9, Lines 6 through 20 next to claim 1 of
 4          the '419 patent, they nearly track each other.
 5          We couldn't be much more clearer when we're
 6          talking about the active agent, there's maleic
 7          acid and there's a distinction just like in the
 8          claims separating out from a salt or salts
 9          thereof in terms of the description, a type of
10          salt, a simple salt.
11                    So Slide 16, let's talk about what
12          one of ordinary skill in the art would
13          understand when you see that structure.  It is a
14          neutral charge.  It's a nonionic structure.  We
15          have literature on this.  We have expert
16          testimony on this.  In fact, we have citations
17          to their experts in saying this is maleic acid,
18          so there should be no dispute, what you see in
19          claim 1 and what you see in the party's
20          construction when you see that structure, it's
21          not ionic.
22                    So Slide 17.  So what is an ion?
23          This ionic compound, we're talking about ions.
24          What is that?  An ion is simply an atom or a
```

1    molecule that has an electrical charge.  As I

2    mentioned before, the maleic acid that was in

3    claim 1 is neutral.  It's not an ion.  And what

4    happens when a molecule goes through an

5    ionization, it splits up into ions.

6              We try to illustrate this here on

7    Slide 17.  We have cites to Dr. Freeman's

8    discussion about this.  In this case with $H2O$,

9    it splits up into two ions.  You can see the

10   positive charge cation and the negative charge

11   anion.  Those are not the same thing as the

12   molecule that wasn't ionized.  Those are ionic

13   compounds there.

14             So the next slide, when we're

15   talking about maleic acid and we talk about

16   ionic compounds, they have different structures,

17   and we show this on Slide 18.  They have

18   different properties.  They're different

19   compounds, and you don't have to take my word

20   for it.  We implore the Court to look through

21   the record.

22             In fact, we asked Dr. Borish

23   painstakingly to go through this earlier this

24   year not even for claim construction on what

```
1        hydro maleate was and maleate is.  We have
2        literature.  We have Dr. Freeman.  There should
3        be no dispute that these are different
4        compounds.  And scientifically at a very high
5        level if you want to even contemplate the
6        differences between these two compounds, maleic
7        acid is known as a protonated compound.
8                        And what that means is that if you
9        look on the left it has these two hydrogens that
10       are covalently bonded to oxygen.  We tried to
11       circle it for Her Honor there in red and blue.
12       Was there a difference?  When you go to hydrogen
13       maleate, that's sometimes referred to as mono
14       deprotonated or single deprotonated.  It means
15       the molecule doesn't have one of those hydrogens
16       and we circled that in red.  And also, you can
17       see the charge there, the negative charge.
18                        And when you go to a maleate,
19       that's a double deprotonated.  Meaning, two
20       hydrogen atoms are gone.  So if you hear the
21       words protonated, deprotonated, hopefully that
22       gives you some insight of what we're talking
23       about.  These compounds look similar.  When you
24       look at them from afar, they kind of look the
```

```
 1        same but they're not, absolutely not.

 2        Scientifically, they're not.  And one of

 3        ordinary skill in the art would certainly know

 4        that.  Let me make a point here, that even

 5        Dr. Borish confirmed this, Dr. Freeman has

 6        confirmed this and the literature confirmed it.

 7                   If you go to Slide 19, now Olaplex

 8        brought up this -- and I'm glad they did.  They

 9        brought up this section, Column 4, Lines 26

10        through 28 in the patent and I would like to

11        spend some time talking about that.  Here the

12        specification couldn't be more clear.  The point

13        of this slide is there was some discussion and I

14        guess some argument that the use of the word

15        free acid, why are we using free acid, no one

16        knows what free acid is, which we find kind of

17        interesting because their own patent uses the

18        word free acid.  One of ordinary skill in the

19        art would understand that.

20                   In the context of this patent,

21        this citation here is making absolutely clear a

22        free acid is different from a salt.  It's saying

23        that right there.  Now, in the context of the

24        full sentence when it says unless specified
```

```
 1          otherwise, the term carboxylic acid embraces
 2          both the free acid and the salt, the point here
 3          is there's your free acid.  It is different from
 4          anything that would be a salt.
 5                      When you look at the claim again,
 6          it says here is maleic acid or salts thereof,
 7          that's the free acid.  That's why we're
 8          referring to it as a free acid.  If Her Honor
 9          wants to ditch the term free acid to make it
10          clear, I think at the very least -- so go back
11          to Slide 21 for a second -- is nonionic.  That's
12          the key term.
13                      So back to Slide 20, now I want to
14          touch on another point that Mr. Paunovich raised
15          and he was trying to make a big deal about this
16          Column 4.  And he's saying, this specified
17          otherwise really doesn't mean anything.  It
18          means a lot because what that Column 4 language
19          was saying is unless specified otherwise, it
20          covers xylic acid and embraces both the free
21          acid and the salt.
22                      Well, here in Column 9, Lines 6
23          through 20, the specification is absolutely
24          specifying otherwise.  It's saying exactly what
```

1    the claim is saying, you have a free maleic acid

2    here or a salt.  So when it says acid in this

3    context with maleic acid, they're not the same.

4    It's specifying otherwise.  It is different.

5                    THE COURT:  Would L'Oreal's

6    proposal to add free acid and nonionic

7    limitations to the disputed term effectively

8    read the subsequent or salts thereof limitations

9    out of claim 1?

10                    MR. PALYS:  Out of claim 1 of the

11   '419 patent?

12                    THE COURT:  Yes.

13                    MR. PALYS:  No, we think it is

14   what it is.  You have free acid just like you

15   see in the specification.  It's actually very

16   consistent with what the claim language says.

17   It says you can have maleic acid.  And again, I

18   know you had to use the word adds.  We're just

19   trying to say what it is.  But if it's

20   interpreted as it should be, the nonionic form

21   of free acid, it's entirely consistent with the

22   claim.

23                    The claim says you have in our

24   view the free nonionic acid or a salt.  That's

```
 1        completely different, and it's actually
 2        consistent with the language of the
 3        specification and it's entirely consistent with
 4        the language of the other portions of the
 5        specification, and that's what's claimed.
 6                      So Slide 21, I'll just bring up
 7        this nonionic point.  Hopefully, the Court is
 8        understanding our position.  Just to be clear,
 9        when you see that structure in claim 1 and it's
10        in the parties' construction, that is not hydro
11        maleate.  That's an ion, as I showed you in the
12        previous slide, and that's not maleate.
13                      And again, they're not formally
14        saying -- they're trying to hide behind a plain
15        meaning.  They will just leave us with a plain
16        meaning term.  If you disagree or even if you
17        agree with us because we think it's consistent
18        with the plain meaning, but it is the nonionic
19        form and has to be expressly shown so we're not
20        fighting over it later.  It's not the ionic
21        compounds.  And by them disagreeing with that
22        it's not limited to ionic, they're essentially
23        saying that it includes these ionic forms.
24                      THE COURT:  Some time was spent by
```

1     Mr. Paunovich pointing out how these

2     constructions were rejected in the PTAB.  It

3     appears that the PTAB rejected L'Oreal's

4     position, and they said it was a decision not to

5     institute it at D.I. 420.  It seems that the

6     PTAB -- and you may disagree with the way I'm

7     phrasing this -- concluded that the disputed

8     term that we're talking about should not be

9     limited to include only free acid to the

10    exclusion of the salt because this would

11    improperly exclude preferred embodiments.

12                 Could you address that and you can

13    address the other issues that were raised with

14    respect to how the PTAB's constructions differ

15    with the construction that you're proposing?

16                 MR. PALYS:  I will, Your Honor.

17    I'll touch on it for this term and I will touch

18    on it when we get to the mixture claim.  At a

19    high level, first off, this raises my confusion

20    to what I heard earlier today.  That decision,

21    first of all, they represented it as an

22    established ruling.  It's an institution --

23                 THE COURT:  Understood.

24                 MR. PALYS:  Okay.  As long as you

 1    understand that.

 2                    THE COURT:  But it's still out

 3    there and it's in the exhibits.  It's something

 4    that I've looked at and it's something among all

 5    the things that I will look at.

 6                    MR. PALYS:  And we want you to.

 7    That's our point.  It is part of the intrinsic

 8    record and it should be considered and we're not

 9    saying not to.  Having said that, they're saying

10    that maleic acid itself in the '954 patent would

11    include a salt.  Now, I'm baffled.  I think we

12    have serious 112 issues.  That brings me back to

13    that point, well, they're pursuing the same

14    construction for across the board.  Then we look

15    at the '419 which has the alternative salt form.

16    This is something that on the fly I can say,

17    it's just confusing.

18                    But to get to the PTAB point, I

19    think the Court can understand the PTAB record

20    before was different than we have here.  We have

21    more evidence.  We have more arguments and more

22    exhibits and things we're going to point out.

23    The standard is different and I know the Court

24    appreciates that.

```
 1              I think what the Board was getting

 2      at was talking about specifically to the maleic

 3      acid or its salt.  Our construction here for the

 4      maleic acid term is saying that term on its own

 5      when we see that structure, and I think the

 6      parties agree from their JCC submissions, is

 7      that structure and that means the free acid.

 8              In fact, I think if you look at

 9      the PTAB's position, they called it free acid

10      too.  So while they refer to maleic acid and

11      maybe in that context of the '954, not that we

12      would agree with it which we don't, we think the

13      intrinsic evidence and the understanding of one

14      of ordinary skill in the art that we've

15      presented in this case as before Her Honor

16      should take that into account.  Yes, take in

17      account the PTAB, but we think it causes more

18      confusion, but in some sense it supports our

19      position.

20              So let's go to Slide 22.  So I

21      mentioned that obviously the intrinsic record in

22      our view, the claims, specification and the

23      knowledge of one of ordinary skill in the art of

24      what maleic acid is in that structure, it cannot
```

```
1       be confused with an ionic structure.  That would

2       be scientifically wrong.  It's not there.

3                      We know this was coming because

4       the four office actions were being highlighted

5       earlier, but Olaplex's representations abroad

6       are so relevant here, Your Honor.  And there's

7       nothing wrong with this Court addressing it.

8       Olaplex is trying to have this Court turn their

9       head, they don't want to look at the foreign

10      files for procedural issues.  Oh, don't look at

11      what we said because it happened overseas.

12                     Well, those representations as we

13      pointed out, and we'll get into them ad nauseam

14      today, had nothing to do with foreign laws.  I

15      know Mr. Paunovich tried to raise this issue

16      that, oh, the strategies involved when there's

17      an absolute bar.  That has nothing to do with

18      the representation when you're distinguishing

19      the reference for any reason.

20                     Strategy does not come into play

21      when foreign laws are being applied when like

22      Olaplex says, our maleic acid in our application

23      means X; that's a straight admission, if you

24      will, representation about the very same
```

1          technical terms at issue.  But the Federal

2          Circuit was pretty clear here.  And on Page 22,

3          we have a Gillette case, and again this is all

4          in our papers, that a blatant admission like

5          this from a Defendant, in this case would be the

6          EPO, that clearly supports the court's holding

7          construing the term.

8                    So if you go to claim 21, we have

9          other cases that have been cited.  So here in

10         the Starhome case, again we asked the court,

11         view these representations with caution,

12         absolutely.  There's nothing wrong with Her

13         Honor doing that.  But when you do that, you'll

14         see that it's entirely relevant and it's

15         entirely consistent with positions that

16         Defendants are putting forth with respect to

17         maleic acid and entirely inconsistent with what

18         Olaplex is doing.

19                    I will make a mention about the

20         Caterpillar case that they cite.  If you go to

21         their slides, we won't put it up here, the quote

22         that you saw on their slide was actually the

23         quote from Caterpillar and it was really

24         reframed in three different ways.  It won't read

```
 1        that way, and they left out some important

 2        points on that case's cite.

 3                    I believe it was Page 1116 of the

 4        Caterpillar case where the actual quote comes

 5        from.  So I will bring it up.  It's on the slide

 6        for Her Honor.  You can see there's the actual

 7        statement where it says, no authority is cited

 8        for the proposition that instructions, the

 9        foreign counsel in this case -- there was a

10        letter between U.S. counsel and foreign counsel

11        that was in play but also representations to the

12        German Patent Office.

13                    They should be considered in the

14        very legal procedure requirements for obtaining

15        a protection in a foreign country might render

16        consideration of certain types of

17        representations inappropriate, but that's fine.

18        But the court said, there's ample such authority

19        decisions of other courts in one such matter

20        comprised relative, as we see here, must be

21        considered.  So the point here with the case

22        law, Your Honor, is there's nothing wrong with

23        Her Honor considering this.

24                    Another final point on this, they
```

```
 1    raised --
 2                    THE COURT:  Doesn't that also tie
 3    into the claims are the same or virtually the
 4    same?
 5                    MR. PALYS:  That's a very
 6    important point because what the Federal Circuit
 7    is saying is if it's relevant -- if we are
 8    talking about different -- we have to show a
 9    link between what's there, and the '419 patent.
10    And I think there was more than enough evidence.
11    We have the same claims, the same terms.  It has
12    nothing to do with a foreign law or legal issue.
13                    And the last point I want to make
14    is we're not talking about disclaimer.  They're
15    misunderstanding the position.  We never said
16    that what they say in Israel is a disclaimer
17    here.  It's relevant evidence that should be
18    applied.  The point here is that the intrinsic
19    record alone, the evidence that we put forth is
20    very clear and very strong.  They haven't even
21    disputed that that structure is the nonionic
22    form.  That supports it.
23                    These foreign representations,
24    that absolutely shows what their representations
```

```
 1          to the public, mind you, that should be taken

 2          into account when we're looking at what they

 3          said.  And I would like to walk through this and

 4          show you what they said.

 5                      So on Slide 25, we'll start in

 6          Singapore.  Again, you see the '768 in this case

 7          was a prior art reference, D7.  That's not

 8          WO/986.  That's an Olaplex document that was

 9          applied as prior art.  Olaplex is saying down

10          below, again this is at D.I. 461 at 4, that's

11          our brief citing to this exhibit.

12                      What Olaplex is saying here is

13          that nothing in that reference that would have

14          taught a motivated skilled person to modify the

15          bonding agents in that reference so they're

16          comparing the bonding agent, which by the way

17          they refer to them as ionic compounds, to be

18          nonionic compounds such as maleic acid.  Just

19          take a step back.  I kind of know that there's a

20          lot there, but the last part is pretty clear.

21          They're calling maleic acid nonionic, and this

22          wasn't before the PTAB, Your Honor.

23                      So the next slide, to be clear

24          this is the claim that they had pursued in
```

1    Singapore.  Very similar.  There's the active

2    agent.  There's the maleic acid they're

3    referring to.  They call it nonionic.  We

4    shouldn't let Olaplex have the Court turn its

5    head or even the public for that matter from

6    this blatant admission.  It's there.  But it

7    doesn't stop there.

8            So Slide 27, now we have New

9    Zealand.  Here's the claim, very similar.  You

10   can see on Slide 26 where we're citing in the

11   New Zealand Patent Office where it explains what

12   they had amended.  And there's the claim that

13   you can see, active agent is the same maleic

14   acid we have here.

15           So the next slide, Slide 28.  You

16   can see they're applying the '768 patent and

17   then Slide 29.  This is what they say, very

18   similar.  The binding agents disclosed in '768

19   are ionic compounds.  Well, if they weren't

20   distinguishing that by calling the maleic acid

21   that's in the claims nonionic, are they going to

22   tell the New Zealand Patent Office that what

23   they said wasn't true?  I'm not sure.  But the

24   point here is this also wasn't before the Patent

```
 1        Office and the PTAB.

 2                    If you go to Slide 30, again I

 3        mentioned earlier the Israeli Patent Office.  So

 4        the claims that were identical, they said the

 5        same thing.  The presently claimed agent, maleic

 6        acid, they're talking about that and

 7        distinguishing that between ionic compounds.

 8                    Here they're calling again the

 9        nonionic compounds such as maleic acid.  And

10        just to be clear, Slide 31 shows that claim

11        that's identical to the '954 patent.  One more,

12        Slide 32.  In Canada, over and over and over

13        Olaplex is making representations that their

14        active agents are nonionic compounds, and it's

15        the same maleic acid.

16                    And keep in mind, all of these

17        national stage applications stem from the same

18        application that tracks the '926 virtually and

19        all come from the same '709 patent.  To say that

20        these are not relevant should not be considered.

21        We think it's leading the Court to error.

22                    Let's go to Slide 33.  So I'll

23        wrap up on this maleic acid term and address

24        some of Olaplex's positions that they put in
```

1    their papers.  Now, I've already touched on the

2    PTAB's established ruling.  We know that they're

3    not -- they're accusing Defendants of adding

4    limitations of the claims.  I think I addressed

5    that.  We're not.  In fact, if you look, there's

6    silence on the position.  They're trying to add

7    ionic compounds to what maleic acid is.

8                    As to foreign prosecution involves

9    different specification, that's wrong.

10   Different claims, that's wrong; and laws,

11   irrelevant, because they're not.  The

12   representations have nothing to do with foreign

13   patent law.  And their argument that we

14   were trying -- they didn't disclaim maleic acid

15   in this foreign Patent Office representations,

16   again it's not a disclaimer.  They're relevant

17   representations that this Court should consider.

18                    So in the end we think, again when

19   you just look at the claim, maleic acid should

20   be interpreted and we ask the Court in her

21   decision to make it very clear that that is the

22   nonionic free acid form of maleic acid.  So I

23   would like to turn to indefiniteness next or

24   salts thereof.

```
 1                    So we're on Slide 35.  They didn't
 2        talk about much about salts in their
 3        presentation, and they certainly didn't write
 4        about it in their papers.  And this is a topic
 5        that the Defendants have been chasing for a long
 6        time now.  We still have not heard what they
 7        understand their own patent to be, what is a
 8        salt to maleic acid, how that applies to many
 9        things, like it's relationship to its own
10        construction here on maleic acid which we're
11        going to touch on; its representation that its
12        product isn't covered by the '419 patent.
13                    A lot of these issues all come to
14        a head and the time is now.  We're finally here
15        with claim construction and it's the right venue
16        to talk about this.  They just don't want to, so
17        we ask the Court let's have this discussion,
18        let's get this out.  But when you look at what's
19        there in the claims and you look at the
20        positions, what the intrinsic record shows, the
21        claims of the '419 patent, they're indefinite,
22        at least because we have two points here.
23                    The salts thereof in claim 1, it
24        has to encompass simple salts, and I'm going to
```

1    explain what that means.  We are not defining

2    salts thereof to be simple salts.  That's

3    confusion that they're trying to introduce here.

4    When you see the intrinsic record and you see

5    the specification, the proper understanding of

6    whatever a salt is in that claim is broad, has

7    to include the simple salts.  And when you have

8    that, you'll see there's no known meaning of

9    simple salts.  There's plenty of evidence

10   establishing that.  It renders that claim

11   indefinite.

12              In Olaplex's position on its

13   maleic acid, this idea that it can include

14   nonionic forms, also introduces indefiniteness

15   on both the salts thereof and maleic acid term,

16   and I'll explain that.  And even if you want to

17   look to the extent that maleic acid isn't

18   indefinite, we think that there's clear

19   disclaimer here about what they said about the

20   salts in the claims.

21              And to the extent maleic acid in

22   the '954 patent includes salts, like we said we

23   think it would render the claims indefinite.  So

24   let me walk through these with Her Honor.  So

1       the next slide.  I think the Court is quite

2       aware of the standard under Nautilus.  I won't

3       belabor the point, but here it is on Slide 36;

4       but the key point here is a person of ordinary

5       skill in the art has to be informed of

6       reasonable certainty about the scope of the

7       invention and its claims.

8                    When you read Defendants' briefing

9       and you look at the evidence, you'll see that

10      that's just not the case here when it comes to

11      the maleic acid or salts thereof language.  So

12      Slide 37, again with the claims, what does the

13      claims say.  It says the active agent has the

14      formula, maleic acid, free form, nonionic form

15      or salts thereof.  That's pretty clear.  Active

16      agent can be either one of those.

17                   If you go to Slide 38, you'll see

18      what does the specification say about salt.

19      What is a salt?  Olaplex keeps pointing to

20      L'Oreal, look what we can do to find

21      infringement against L'Oreal.  What they're not

22      telling you is -- it's their patent.  What is a

23      salt?  What do they understand a salt to be?

24      It's not how that applies and how you find

1    something for infringement.  We're talking about

2    claim construction here, and we still haven't

3    had that answer.

4              When you go to the specification,

5    you follow the proper process for claim

6    construction.  You'll see they only use the word

7    salt five times.  Here's four of them.  It does

8    so generally.  We talked about the one in Column

9    4.  The other ones are talking about

10   thioglycolic acid, excipients, viscosity

11   modifying agents.  All of these citations are on

12   Slide 38 for Her Honor.

13             So Slide 39, the fifth place where

14   it mentions the word salt is the exact same

15   place in Column 9, Lines 6 through 20 that track

16   the language of the claim.  You can see it

17   again.  The active agent has one of these

18   structures.  There's maleic acid.  And what does

19   it say, or is a simple salt.  This is where

20   simple salt comes in.  It's the only time simple

21   salt comes into the specification.

22             If you go to Slide 40, again

23   compare them next to each other.  We saw this

24   earlier.  Tracking that language in Column 9, 6

```
 1        through 20 tracks the language in claim 1, very

 2        closely, what's the difference.  Yes, the claim

 3        only says salts.  Yes, the disclosure says

 4        simple salts.  The point here is that the salt

 5        has to be interpreted just by the intrinsic

 6        record alone, has to encompass at least the

 7        simple salt.

 8                    If you can picture a circle and

 9        have salts there, simple salts has to be within

10        that circle.  There's no other way for it

11        because simple salt is a type of salt and it's

12        through their words in their own disclosure in

13        the specification.  The language of the claim

14        shows that.

15                    And this argument that they're

16        raising like, hey, look, don't -- just take the

17        word simple salts, they don't want to touch

18        this.  They haven't touched it in their papers.

19        They never asked our expert about it.  They want

20        you to ignore it.  But when you really look at

21        it, it's like -- so they pursued simple salt in

22        the foreign applications.  That proves our

23        point, that they were going after a certain type

24        of salt.  And when they say salt, it means
```

1      something broader.

2                  In fact, simple salt I believe

3      shows up in some of the intrinsic record, the

4      prosecution file history and some of the claim

5      language.  So I want to make sure the Court

6      understands that position.  It's not that we're

7      saying, oh, you got to look at simple salts

8      being a simple salt.  See the claim language.

9      It has to at least encompass it because that's

10     the only way that disclosure can be read.

11                 And you don't even have to take my

12     word for it even though I think the intrinsic

13     record is pretty clear.  If we go to Slide 41,

14     we asked the inventor, this was before we even

15     wrote a claim construction, this was way back

16     early on in the case, we asked him and he said,

17     in the context of the '419, the salt is a simple

18     salt.  It's clear evidence showing that even the

19     inventor knows when we're talking about salt in

20     the context of the patent, it has to at least

21     include simple salt.

22                 So Slide 42, why is this

23     important, because there is no known meaning of

24     simple salt.  There's ample evidence that we

```
 1          have put forth in expert testimony from our side

 2          and Olaplex's side and the literature no one

 3          knows what a simple salt is.  The foreign Patent

 4          Offices don't know what a simple salt is when

 5          that term was being pursued.

 6                      Here we have on Slide 42 referring

 7          to D.I. 424 Paragraph 32 which is Dr. Freeman

 8          explaining which is the only -- by the way, the

 9          only expert testimony that's in this record

10          right now on this issue is from the Defendants.

11          Olaplex has submitted no rebuttal expert

12          testimony on this issue.

13                      And you can see, Dr. Freeman is

14          making the point saying a person of ordinary

15          skill in the art would have no idea, would not

16          understand what a simple salt means, even as

17          it's disclosed in the '419 patent.  He hasn't

18          seen any evidence of it that it has an

19          established definition.

20                      If you go to Slide 43, Dr. Borish

21          was asked this as well, was it a simple salt?

22          He said, well, look, I haven't done any

23          research, so he kind of dodged the question.  So

24          we had to ask him, have you ever used the word?
```

1        I don't recall ever using the term.  Honestly,

2        no.  He didn't know what a simple salt was, at

3        least at that time when he was being deposed.

4                    So Slide 44, Olaplex's other

5        expert in the U.K. was asked the same thing or

6        at least testified to this under oath.  And he

7        was saying, well, look, you'll see that there's

8        no such definition of a simple salt because he

9        went to this IUPAC Gold Book, and this is D.I.

10       422, Exhibit AG at 336-8 through 337-7.

11                   So he couldn't find a definition

12       in the book so what did he do?  Unlike what

13       Dr. Borish did, he said, well, I did some

14       research.  I couldn't find the definition.  And

15       he didn't stop there.  He said, well, I asked my

16       colleagues and they couldn't figure it out.  At

17       the end of the day, there is no one definition.

18       No one knows what this simple salt is.  These

19       are Olaplex's representations to its expert.

20                   If we go to Slide 45, again very

21       consistent with this lack of understanding, if

22       you will.  These Patent Offices around the world

23       had to address this term and they found no known

24       meaning.  Here on Slide 45, you see excerpts

1      from the Australian Patent Office, the Chinese

2      Patent Office, the Korean Patent Office all

3      addressing this simple salt term that Olaplex

4      was pursuing.  Again, very relevant and very

5      related applications.

6                    You can see the Australian Patent

7      Office had some very good insight here.  I think

8      that is applicable here.  And they even pointed

9      out that, look, given that a skilled artisans

10     apply different definitions, then it is

11     important for the phrase to be specified, so the

12     third parties will know, like L'Oreal USA, with

13     confidence that they're working within or

14     outside the scope of the claims, do we infringe

15     or not.

16                    Simple salt has no accepted

17     meaning, China.  Simple salt again is not

18     recognizable, Korea.  So Slide 46, again in

19     Japan they're saying it's a relative term but

20     it's a term without a clear definition.  So

21     Slide 46, that's D.I. 462-1, Exhibit K at 5.

22     And, Your Honor, if it isn't apparent, our

23     slides try to guide you through the record for

24     the cites.

```
 1              So Slide 48, in conclusion the
 2     claims are indefinite because a person of
 3     ordinary skill in the art would not have been
 4     able to reasonably ascertain the scope of salts
 5     thereof; because that salts thereof as we
 6     mentioned, you have to follow the intrinsic
 7     record, what the claims say and what the
 8     specification says and it has to accomplish a
 9     simple salt, but nobody knows what that is.  And
10     they have no rebuttal expert testimony on this,
11     none.  And we do.  So that evidence even tips in
12     Defendants' favor here.
13              They had a chance to ask
14     Dr. Freeman about this at his deposition and
15     they didn't.  They chose not to.  They had a
16     chance to address it in their papers.  They
17     didn't.  They just want to say, don't look at it
18     because it's not claimed.  And we're saying it
19     should be and I think it's pretty obvious from
20     our positions why it should be.
21              So in the end, we think the salts
22     thereof language renders the claims indefinite
23     as you see in the asserted patents.  So there's
24     another reason why there's indefiniteness here.
```

```
 1        You have to take this from the perspective of
 2        their positions on maleic acid.  I think we
 3        start touching on these other issues that Her
 4        Honor has raised.
 5                    If you consider that they're
 6        saying maleic acid includes the ionic compounds
 7        like change that structure into the mono
 8        deprotonated and the double d hydro maleate
 9        like you see here on Slide 49, that introduces
10        more indefiniteness, especially when we're
11        talking about where the claims say maleic acid
12        or a salt thereof, and let me explain.
13                    So Slide 50.  I heard
14        Mr. Paunovich just bring this up, well, look,
15        Dr. Freeman said he knows what a salt is.  Well,
16        yeah, there's a general understanding about what
17        a salt is, and they don't seem to dispute that
18        it can be a reaction between an acid and a base.
19                    But the point here is that to have
20        a salt of acid, you need an ion.  You need an
21        ionic compound to form a salt bond with another
22        counter ion.  So if you recall, Your Honor, we
23        had that H2O image there and how they split up
24        those ions.  Well, those ions if they're going
```

1    to form a salt they have to form a salt with

2    another ion, but you need an ionic compound to

3    form that salt with that acid.

4              And here with respect to the

5    maleic acid and hydro maleate and maleate,

6    that's hydro maleate and maleate.  If you go to

7    Slide 51, when you take that into account, you

8    look at their constructions and then apply it to

9    the claims.

10              We have indefiniteness.  There's

11   this redundancy here that cannot be reconciled.

12   So if you follow what their construction is and

13   you apply it to what maleic acid is, you say,

14   well, that includes hydro maleate and maleate,

15   change the claim and make it look like this.

16   Well, that also falls into the other category

17   that's alternative which is a salt because you

18   need those to form a salt.

19              Thus, a person of ordinary skill

20   in the art looking at this would not be able to

21   reasonably ascertain what's the scope of the

22   claim.  And again, we have expert testimony on

23   this.  They do not.  Now, let's go to Slide 52.

24   There's more issues here and we want to make

1    sure it doesn't get lost in this court because

2    this issue has come up over and over in previous

3    discussions and we think it's very relevant for

4    claim construction here; and that's Olaplex's

5    representation about its product.  It's finally

6    coming to a head.

7                    They've said over and over, and I

8    don't think this Court even disputes that they

9    have said that their product is not covered by

10   the '419 patent and we have a slew of citations

11   for Her Honor to show in the record where they

12   said this, Slide 52.

13                   It's also undisputed that their

14   product includes this active agent.  It's a long

15   word.  I will say it once, bis-aminopropyl

16   diglycol di-maleate.  We're going to shorten it

17   to di-maleate active agent, if you don't mind.

18                   THE COURT:  That's fine.

19                   MR. PALYS:  And you can see some

20   record cites where that's true and we provided

21   an image of that and you can see it there at the

22   bottom of Slide 52.  So Slide 53, we will start

23   off with what is that di-maleate active agent.

24   Well, their expert in the U.K. admitted it's a

```
 1        salt of maleic acid, and it makes sense when you

 2        see the structure there, but it's a salt.

 3                    If you go to Slide 54, so

 4        Dr. Borish, now this is an important slide here

 5        because we're citing D.I. 422, Exhibit AL at 81,

 6        Lines 15 to Page 82, Line 11 and also D.I. 422,

 7        Exhibit A at 82, Lines 20 through 23.  These are

 8        all Dr. Borish's testimony.  We understand from

 9        papers and submissions with the Court that Her

10        Honor has considered some of Dr. Borish's

11        opinions on this point.

12                    He testified and said, hey, look,

13        that di-maleate active agent is not a salt in

14        the context of the '419 patent.  While he said

15        that in the context of that question, if you go

16        back to that language where he said this, I

17        think it's D.I. 422, Exhibit AL 78, 9 through

18        81, 14, you'll see in the context he couldn't

19        explain why, nor would he.

20                    We asked him why.  Oh, it's the

21        structure, he said.  Well, what about the

22        structure?  No answer.  Can you draw the

23        structure for us for a salt maleic acid?

24        Counsel stopped us.  He's not drawing.  Over an
```

```
 1          objection, he's not going to answer that
 2          question, he's not going to draw.  So he didn't
 3          really explain.  He just said, oh, it's not.
 4                        But when it came to other things,
 5          he said, oh, that is a salt within the context
 6          of the claim, so you have to take that into
 7          account.  But when you get to this language that
 8          you see on Slide 54 which happened in the same
 9          testimony, you can see that the same Dr. Borish
10          is explaining that bis-aminopropyl diglycol
11          di-maleate -- I said I wasn't going to repeat it
12          and I just did -- that di-maleate active agent,
13          is that a salt?  Well, he says it's a particular
14          type of salt.  Well, what particular type of
15          salt?  Well, it's a bis-aminopropyl diglycol
16          di-maleate.  Well, describing a particular salt
17          of a maleate, correct?  Specifically, the
18          bis-aminopropyl diglycol di-maleate.
19                        But when you get down to the
20          bottom where again to wrap it up, it says you
21          mentioned before it's a particular type of salt.
22          What type of salt are you referring to?  And he
23          refers to the middle portion, the
24          bis-aminopropyl diglycol di-maleate.
```

```
 1                    If you go back, Dan, to the slide
 2         where -- yeah, that's the middle part.  He keeps
 3         leaving out that di-maleate part with salt.
 4         Well, again a salt needs an ion to form.  This
 5         is their representation again.
 6                    So go back to 55, even so and
 7         again notwithstanding what he said in May of
 8         2018, the bis-amino di-maleate active agent is
 9         not a salt within the context of the '419.  We
10         asked him a month later, well, what is a salt?
11         After dodging and dodging, he says, well,
12         anything that would be a salt.  Well, if that's
13         the case, how can what they were talking about
14         their own active agent is not a salt if he says
15         anything can be a salt.
16                    And I will get to my point here as
17         we walk here, but again, we just want to point
18         out that on Slide 56 is again the statement
19         Olaplex made to the PTAB.  It's a bis-amino salt
20         that's related to maleic acid, but it's not
21         maleic acid.  Well, that makes sense because
22         maleic acid is the free acid.  It's not salt,
23         but they're calling it a bis-amino salt.
24                    So Slide 57, Patent Offices across
```

1    the world are agreeing with this.  Again, this

2    is relevant evidence.  You can see the structure

3    down here on the bottom on Slide 57.  It's D.I.

4    422, Exhibit BC, Pages 6 through 7.  That's the

5    same diamaleate active agent.  They're calling

6    it a salt of maleic acid.

7                 So if you go to Slide 58, same

8    thing in China.  D.I. 422, Exhibit BB at Pages

9    10 through 13, maleic acid salts.  There it is

10   again.  Even though the experts here at the

11   Patent Offices are recognizing that this is a

12   salt of maleic acid.  So Slide 59, again even in

13   Singapore -- well, the point in Singapore is

14   interesting.

15                 They are pursuing claims.  So go

16   to Slide 60.  This is D.I. 462-1, Exhibit D.

17   You can see the claims they're pursuing in

18   Singapore.  Well, here they did something

19   interesting.  They're saying, hey, we can have

20   maleic acid.  And if you see claim 1, they say a

21   monomaleate salt thereof, not just a salt.  This

22   helps support our position when they say salt,

23   it's broader and simple salts, you come in.  But

24   also in claim 2 it's interesting.

```
 1                    You see that the active agent is
 2       selected from the group consisting of on the
 3       left, that's your free maleic acid right there,
 4       and it says and salts thereof just like claim 1
 5       of the '419.  But what else is it saying?  It
 6       says, oh, but excluding and it has this long
 7       line of compound identified di-maleate at the
 8       end.  Well, that's not the exact bis-amino
 9       di-maleate, it's the related one, but that's
10       showing you that that's a type of salt of maleic
11       acid because it's specifically excluding it, and
12       this is Olaplex's representation.
13                    So go to Slide 61.  So in the end
14       when we look at this and you start considering
15       what their positions that they're pursuing on
16       one hand and then making these representations
17       even about its own product, you look at their
18       active ingredient, their di-maleate active
19       ingredient, you can see that it includes a hydro
20       maleate.  You have this same issue and it raises
21       more ambiguities and indefiniteness issues with
22       respect to their positions on maleic acid, much
23       less a salt of maleic acid.
24                    So just to summarize, let's go to
```

```
 1        Slide 62.  Claims are indefinite at least

 2     because again salts thereof, that has to

 3     encompass simple salts.  I think this is very

 4     clear from the intrinsic record alone.

 5     Olaplex's maleic acid positions also introduce

 6     indefiniteness.  And even if the salts thereof

 7     phrase doesn't even render the claims

 8     indefinite, we showed you where the type of

 9     disclaimers here that Olaplex makes about salts

10     from the claim because they're saying that their

11     product isn't covered by the '419 patent.

12                I've been talking a while but I do

13     have one more term.  Shall I press ahead?

14                THE COURT:  Yes.

15                MR. PALYS:  Now, I'd like to turn

16     to the mixture concentration phrase, and we are

17     on Slide 64.  So just to start right off, you

18     can see the constructions here, and this is an

19     interesting discussion we're going to have.

20                Defendants' construction here with

21     respect to the active agent in the mixture, the

22     wherein clause, it tracks what the language

23     says.  And we think that the intrinsic record

24     couldn't be much more clearer in what it says.
```

1          The active agent in the mixture, that's what it

2     says.

3                    Olaplex's construction, whether it

4     was before the PTAB or what the PTAB said aside,

5     is removing that language from the claim, and I

6     will explain why, and replacing it somewhere

7     else with this language that, oh, you know what,

8     it's the weight of the active agent added into

9     the active agent formulation and then it has to

10    be relative to the total weight of this mixture.

11    So basically, you can look at the wherein active

12    agent that's present in the mixture, wipe that

13    out of the claim because they don't even have

14    that representation with their construction.

15                    Defendants' construction, just to

16    be clear, the import of it when we said that is

17    applied to the hair, you're going to see we're

18    not suggesting that it has to be the only thing

19    that's applied on the hair.  It's the mixture

20    just like the claim says that is applied.  So

21    the mixture is created and it's going to be the

22    same mixture that's applied to the hair.

23                    And by the way, with respect to

24    hair coloring agent, it's the same mixture that

1    cannot contain a hair coloring agent.  So if we

2    go to Slide 65, we can see the plain language of

3    the claim, let's follow the claim construction

4    process, mixing creates a mixture, applying the

5    mixture to the hair, wherein the active agent in

6    the mixture is at a concentration and wherein

7    the mixture does not contain a hair coloring

8    agent.  It's all there.  All with antecedent

9    basis, straightforward.

10                   That's all Defendants are trying

11   to really convey with its construction by saying

12   that is applied to the hair.  That just reflects

13   what Step B says.  If you go to Slide 66, I

14   don't think we've got to belabor the point.  I

15   think you understand this.  You don't need this

16   representation, but here it is.

17                   Let's go to Slide 67.  Now, this

18   is important here.  You've heard and you've seen

19   Mr. Paunovich go through this method, Example 3,

20   and you see it in their brief.  They're

21   essentially making it Dr. Freeman versus

22   Mr. Paunovich because they don't have any expert

23   testimony on this.  So what you see in their

24   briefing, what you heard today, what you saw on

```
 1        a screen isn't even in the specification.  It's
 2        not in the claims.
 3                    This is attorneys coming up with
 4        calculations and methodologies to figure out
 5        what concentration is what.  And that's an
 6        important point, because we're going to get back
 7        to this, that they're saying, look, Example 3 is
 8        the only really disclosure that has something
 9        that would support their reasoning for their
10        construction.
11                    But if you go to Example 3, so
12        Column 22 of the '419 patent, that portion of
13        the specification, there's no discussion
14        whatsoever about calculating a concentration or
15        figuring out how to do it.  And here is it on
16        the screen.  You can see Example 3.  It's what
17        Mr. Paunovich was walking through using
18        attorneys' positions of how you would figure out
19        allegedly that there would be a concentration at
20        the end.
21                    Well, without sounding
22        disrespectful, so what.  Who cares how you get
23        or determine a concentration.  That is not in
24        the claim and certainly not in Example 3.  The
```

```
 1        only thing that claim says, Your Honor, is
 2        wherein the active agent in the mixture has to
 3        have a concentration.
 4                    There's nothing in that claim
 5        anywhere or even in Example 3 that says how do
 6        you get there or how do you want to determine
 7        it.  That's an important point because they're
 8        trying to make it sound -- and that's why they
 9        say, oh, you're making gravy.  Again, we're not
10        making gravy.  But everyone knows you would put
11        this amount of ingredients together to come to a
12        conclusion.  You wouldn't put a meter in to
13        measure it afterwards.
14                    Again, it doesn't matter how you
15        get that concentration, but again, we're not
16        talking about gravy.  What he didn't tell you is
17        that Dr. Freeman absolutely said that you would
18        and you could.  There's many tests that you can
19        do when you have that mixture form.  You can do
20        MMR testing and he has it in his declaration and
21        he was asked during his -- I'm sorry, during his
22        deposition about this.  So this isn't gravy.
23        He's trying to figure out what's in the
24        ingredient.  Again, when you look at the claims,
```

1        the claims don't require that.

2                  What does the specification say

3        about this limitation?  You see it here on Slide

4        67.  So the '419 patent, Column 16, Lines 30 to

5        33, just like the simple salt language, it's

6        tracking the language of the claim.  We're

7        talking about highlighting mixture, and I'll let

8        the Court look at it, but up above it's saying

9        that the highlighted mixture is actually formed

10       from this active agent plus a highlighting

11       mixture, so the highlighting mixture includes

12       the active agent with the bleach.

13                 And it's saying here that mixture

14       has to range in exact same amounts that you see

15       in the claim.  There's your description in the

16       specification.  It's not Example 3 because

17       Example 3 doesn't tell you anything about, hey,

18       you have to have this type of concentration.  It

19       just says this is one example that we use.

20                 And by the way, even in their

21       example of describing Example 3, they

22       acknowledge that the maleic acid in that example

23       is the free nonionic maleic acid to make that

24       point.  So it doesn't stop even there.  If you

```
 1      go to the prosecution history, Your Honor, Slide

 2      68, you start to see that's the same thing

 3      happens.

 4                  You kind of mentioned this before.

 5      There's that D.I. 422, Exhibit AE cite that you

 6      brought up.  Yes, Dr. Borish is definitely

 7      saying that the claim, claim 1 of the '419,

 8      identifies the active agent, maleic acid again,

 9      not a hydro maleate and describes the

10      concentration in the mixture.

11                  If you go to D.I. 462-1, Exhibit

12      V, that's Olaplex that's in a patent owner

13      response.  This is them saying, the active agent

14      again, claim 1, maleic acid of salts thereof

15      must be present in the mixture.  You can't be

16      much more clearer than that.

17                  If you go to Slide 69, it even

18      stems back to them doing prosecution before the

19      PTO before this litigation even started when

20      they did the amendment.  They repeated what was

21      there, the active agent in the mixture is

22      present at a concentration.  Again, that's D.I.

23      422, Exhibit AA.  And at D.I. 422, Exhibit AC,

24      you can see that is Dr. Borish's PGR testimony,
```

 1          the claim describes the active agent present in

 2          the mixture.

 3                          Nowhere do you see if you go to

 4          Slide 70 any discussion about this until now

 5          when we're talking about claim construction.

 6          And then they bring it up to the PTAB in the

 7          PTAB's decision.  But again, they had a

 8          different record before them.  They didn't have

 9          the type of testimony that we're explaining to

10          Her Honor, and you have the opportunity to look

11          at all of this evidence and the unrebutted

12          testimony of Dr. Freeman.

13                          Now, what happens here with

14          Olaplex's construction when you really get to

15          the heart of it.  If this Court applies this

16          construction, the weight of active agent adding

17          into the active agent formulation relative to

18          the total weight of the mixture, first of all,

19          when you look at the claim, there's no step here

20          about adding an active agent into a formulation,

21          no discussion of that.  It just says mixing a

22          formulation comprising an active agent.

23                          So what they're saying is now you

24          have to go back in time and say before you even

1      start making the mixture, and the little picture

2      of the active agent, you have to go one step

3      above that and say now you add this maleic acid

4      to the formulation first and then you can start

5      doing that process of doing the mixture.  But

6      when you do it there, now you're measuring what

7      that active agent is.

8                     So when you put that into the

9      context and look at claim 1, it says wherein the

10     active agent in the mixture is at a

11     concentration plain language, that is gone.

12     They're saying, well, you got to read this claim

13     in the context because everyone knows when you

14     calculate or like making gravy, you have to know

15     the ingredients beforehand.  That's not what is

16     claimed.  They're asking you to rewrite the

17     claim.  It is not the public's fault what they

18     claimed.

19                     If that's what they wanted to say

20     and if that's what they wanted, they should have

21     put it in their claims.  And that is not what is

22     in their claims, and it's not what they even

23     said in their testimony that I showed you.  It's

24     not what's in the specification either.

```
 1                    And again, I want to make sure
 2        that this isn't lost, their run-through on
 3        Example 3 on how you apply the method doesn't
 4        matter.  It doesn't matter at the end of the
 5        day.  If you're talking about infringement, and
 6        again we shouldn't be, and you heard him, he
 7        wants to bring in infringement.  Well, how are
 8        you going to find out if someone has the
 9        concentration.  You're not going to stick a
10        meter in the mixture.  Well, that's one way you
11        can do it, but again it doesn't matter.
12                    The claim doesn't say find out
13        what the concentration is by doing this.  It's a
14        characteristic.  It says unequivocally that
15        mixture has to have an active agent at that
16        specific concentration.  Any rewrite of that we
17        believe would be improper.
18                    They also want to rewrite the
19        claims.  If you go to Slide 71, you can see in
20        their arguments too, and I brought this up
21        earlier, you can see the mention of water.  And
22        they even say it in their briefs.  They're
23        saying, first as explained above, the intrinsic
24        record makes clear that the active agent
```

 1      concentration is assessed by measuring its

 2      weight relative to the overall mixture before

 3      being added to the solution.  Solution doesn't

 4      exist in the claims.  They're trying to say an

 5      aqueous solution.

 6                  When you look at the claims, it

 7      doesn't say that it requires water, but they're

 8      requiring water by making these arguments.  And

 9      if you look at claim 2, which isn't being

10      asserted, it says the active agent can have a

11      bunch of excipients.  It says water.  So claim 1

12      has to be broad enough.  It cannot be limited to

13      water.

14                  Mr. Paunovich even said, this is

15      our invention when he was showing the water

16      bottle there.  It's not in the claim.  That's

17      not their invention.  I think I made this point

18      already.  On Slide 72, again I want to go back

19      to that specification.  They made an argument in

20      their brief at D.I. 423 at 7.  He said, if you

21      follow L'Oreal USA's construction, none of the

22      embodiments described in the spec will be

23      covered by the asserted claims.  That's because

24      they're relying on Example 3 only.

1           And I've already showed you one

2       example.  There's an embodiment right there on

3       the screen, Your Honor, Slide 72, Column 16,

4       Lines 30 through 33.  It expressly tracks what's

5       in the claim.  And that's not described in

6       Example 3.  They're trying to deflect you to say

7       you've got to figure it out some way.  Again,

8       there's nothing in Example 3 that shows you how

9       you have to do the calculation.  That was

10      Olaplex's attorney doing this.

11          So Slide 73, Defendants'

12      construction we think is completely and entirely

13      consistent with the language of the claims and

14      specification.  It tracks it.  And the claim

15      language of the claim says what it says and the

16      specification says what it says.  And their

17      reliance on Example 3 is just a red herring.

18      And their construction is trying to remove

19      limitations and add unclaimed features.

20          The last point I want to make is

21      something Her Honor raised, the problems that

22      are addressed by the Federal Circuit's

23      interpretation, a construction that they pursued

24      about hair coloring agent.  As I showed you in

```
 1      that claim, it says the mixture.  It's the same

 2      mixture.  It has to have a hair coloring agent.

 3      And that construction from the Federal Circuit

 4      that they pursued says you have to assess that

 5      after it's applied to the hair.  And if you

 6      follow their reasoning here, there's no

 7      reconciliation that raises indefiniteness.

 8                  And one more point, on the Federal

 9      Circuit's decision Mr. Paunovich was trying to

10      distinguish that by saying, oh, it's a

11      lexicographer thing.  Well, the Federal

12      Circuit's decision, this is on Page 5 of their

13      opinion, at the bottom it says we reject the

14      Court's construction but they said the claims

15      readily permit, and they go on to explain.

16                  They weren't talking about

17      lexicography.  They're doing the plain language

18      of the claims just like we are relying on the

19      language of the claims.  I know I spoke a while,

20      Your Honor, and I will yield the podium, but

21      unfortunately I think I will be talking next, so

22      can we take a --

23                  THE COURT:  Yes, we can take a

24      stretching break within the courtroom because I
```

```
 1    do want to keep this moving.  So everybody can

 2    take a brief stretching break and get your

 3    bearings --

 4                    MR. PALYS:  Your Honor, can I use

 5    the restroom --

 6                    THE COURT:  Actually, let's take a

 7    quick restroom break and we will come back in 10

 8    minutes or so.

 9                    (Brief recess.)

10                    THE COURT:  Okay.  So before we

11    leave these materials, there were some cases

12    cited in Olaplex's brief from the Federal

13    Circuit that with respect to specifically

14    claiming chemical structures in the claim that

15    you're not -- I think one was the Sumitomo case.

16    I don't have them at my fingertips right now,

17    but simply because you claim a chemical

18    structure in the claim doesn't mean you are

19    impermissibly and you're narrowly tied to that

20    structure.  And I pose that question with

21    respect to your arguments on the maleic acid

22    term.  I think one was the Sumitomo case.

23                    MR. PALYS:  It may be.  I don't

24    think it's going to matter for my response, Your
```

1      Honor.

2                   THE COURT:  Well, they weren't

3      addressed in the briefing.

4                   MR. PALYS:  This is what I will

5      say and I apologize for not being ready for that

6      question in particular.  But I would say I would

7      look at the facts and I think on this record

8      what we're talking about, especially when you

9      even contemplate what they did overseas about

10     calling that the nonionic structure and in the

11     context of the specification and in the context

12     of one of ordinary skill in the art would have

13     understood what we have here, I think that would

14     be the guidepost here.

15                  Case law shouldn't overcome what

16     the science is telling you in this regard and

17     what the representations in the intrinsic record

18     and what they said in the foreign applications,

19     but I don't know if my colleagues have any

20     comment on that.

21                  THE COURT:  All right.  Just for

22     the record, the case was Sumitomo case which is

23     887 Federal 3d at 1153 specifically at Pages

24     1157 to 60, and Ranbaxy, 457 Federal 3d 1284 at

```
 1        Pages 1288 to 90, and it said a claim's chemical

 2        structure encompasses any combination of

 3        enantiomers and not just the ones depicted, and

 4        that was the question posed.

 5                    MR. PALYS:  I feel like if you

 6        want to have briefing on that, I would be happy.

 7        I know it sounds kind of odd, but to answer that

 8        specific question I feel like I want to be able

 9        to anticipate the exact context of what was said

10        there, especially what you just read.  But I

11        would think from our perspective, I think this

12        case is distinguishable from what we're seeing

13        there and what they were considering when they

14        made that statement.

15                    THE COURT:  Okay.  Before we move

16        on to the next term, I just want to ask

17        Mr. Paunovich if there's any responses for items

18        that you've raised, particularly with Mr. Palys'

19        start-off item about what exactly is the

20        Plaintiffs' position with respect to whether in

21        the '954 patent it includes a salt.  He

22        expressed some confusion on that point.

23                    MR. PAUNOVICH:  Sure.  We can

24        start with that point first.  There's no
```

1        confusion about what the constructions are for

2        that matter.  Olaplex's position is that there's

3        no construction needed to active agent terms.

4        That's what we said in our brief.  That's what

5        we said in our presentation.

6                    They have turned then and said,

7        well, you're trying to construe these and you're

8        construing them in some strange way we don't

9        understand.  That's not the case.  We think that

10       the plain meaning is compelled very clearly by

11       the specification.  With respect to the '954

12       patent, it recites the active agent is maleic

13       acid.

14                    And the specification tells us

15       because that's a carboxylic acid, that that

16       embraces expressly both the free acid and its

17       salts even though it doesn't say the word salts

18       in that claim.  With respect to the '419 patent,

19       it's different.  It does not recite the words

20       maleic acid as the spec says in this world where

21       it will embrace both.

22                    So in that claim instead of just

23       relying on a structure and saying that it

24       includes salts is just plainly stated.  You've

1    got the illustrated structure and it says or

2    salts.  So the patentee basically in the spec

3    says you can do it two ways.  You can refer to

4    it as maleic acid and it's going to cover the

5    acid in a salt or you can illustrate the

6    structure and say or salts.  That's the only

7    point we were making.

8              Our position is those terms do not

9    need to be construed.  And I heard counsel

10   say -- a lot of the presentation is focused on

11   this analysis of foreign prosecution.  They

12   said, oh, we're not arguing disclaimer, which is

13   interesting because the standard is so high in

14   clear and convincing evidence.

15             And I think if we look back at the

16   brief, I wasn't able to count it, but in the

17   PTAB as well as the briefing here, they probably

18   used the word disclaimer a half a dozen times.

19   That's what they're arguing that evidence for

20   and what they're relying upon it for as a basis

21   to construe the terms in this way.

22             The claims that they pointed to,

23   Gillette and Starhome aren't even disclaimer

24   cases.  If you look at them closely, they have

1        nothing to do with a foreign prosecution

2        disclaimer.  The Caterpillar case that they

3        cited to actually comes from the PGR denial

4        decision, and it's an exact quote from Note 11

5        of D.I. 426, Exhibit 20 of that Caterpillar case

6        where the PTAB is saying, look, we're not going

7        to look at this evidence.  It's not really

8        relevant.

9                And we walked through the piece of

10       evidence that the PTAB had with the Israeli

11       application.  Review them all.  We're not trying

12       to hide from it.  They all say essentially the

13       same thing, and the PTAB is unequivocal.

14       There's no disclaimer here.  There's no there

15       there.  There's no representations that would

16       rise to that level or force us to construe the

17       active agent terms in a way that's inconsistent

18       with the specification.

19                This comes back to the very simple

20       question that we posed at the beginning, how

21       would a person of ordinary skill in the art read

22       these claims in the context of the spec which we

23       are compelled to do by Phillips and in the

24       general art.  And in that context, it's whether

1    you look at it before it's added into things or

2    at some point after.

3                Counsel said, where are we going

4    to end up if the Court adopts Olaplex's

5    constructions.  That's a very good point because

6    it means that this Court would be entirely on

7    all fours and consistent with a well-reasoned

8    opinion from the PTAB, whereas if we adopt

9    L'Oreal's constructions we would literally flip

10   180 and have to reject every single argument

11   made by the PTAB in order to reach their

12   constructions because they proposed the exact

13   same ones.

14                Just a brief point, you asked a

15   question regarding, well, how do we reconcile

16   this PTAB decision with the Federal Circuit's

17   opinion on hair coloring agent and you also

18   raised, there was Dr. Borish's Declaration that

19   was in connection with the 2017 PGR on the '419.

20   I think you said D.I. 422 at Paragraph 55.  So

21   they're very easily reconciled.

22                Number one, with respect to that

23   earlier PGR, so D.I. 422 for the '419, this issue

24   of calculating concentration wasn't in dispute.

```
 1      Neither party proposed its construction and

 2      that's actually where we find their expert

 3      construing and interpreting the claim in the

 4      exact same way that we did.  His declaration was

 5      at D.I. 425, Exhibit A.  We raised that earlier.

 6                  They said we have no expert

 7      testimony on this issue.  That's quite the

 8      opposite.  Dr. Borish testified exactly as to

 9      how you interpret concentration once we realized

10      that they were going to invent this new dispute.

11      That's at D.I. 288, Paragraphs 66 through 67.

12                  And the PTAB provided a very clear

13      road map rejecting each of these arguments.

14      They said, in fact, in our Demonstrative Slide

15      18, when they're saying this unusual

16      construction proposed by L'Oreal, there's nobody

17      who calculates it this way other than by its

18      paid expert witness.  So that's their new guy,

19      new sheriff in town that says let's calculate it

20      this way.

21                  Everybody else, including L'Oreal

22      and its previous experts and Dr. Borish, the

23      patent examiner, the spec, calculate it another

24      way.  They have no legitimate answer to the
```

1          preferred embodiment point that the PTAB makes.

2          They point to this limited disclosure on their

3          Slide 67 and it's just simply the same claim

4          language, which their approach is let's

5          interpret the claims completely divorced from

6          the specification and how a person of ordinary

7          skill in the art would interpret this.  It's

8          just not the way you do it.

9                    They say, well, it's not our

10         problem that there's no active agent in the

11         mixture.  Well, that's wrong.  There is active

12         agent in the mixture.  The question is what form

13         is it, and this why these concentration terms

14         and maleic terms are connected.  There's active

15         agent there, but it may be ionic or it may be a

16         salt form once you're adding it to the active

17         agent formulation or the bleaching mixture.

18                    The last piece and I just want to

19         say one quick minute on the salts piece.  On

20         salts, it's not an issue that's in dispute.  But

21         if Your Honor wants to construe the language

22         that's actually in the claims, salts, we're

23         happy to have you construe it.  We'll adopt

24         Dr. Freeman's construction.

```
 1                       He testified.  That's at D.I. 460.

 2       We showed it earlier, Exhibit 1, Page 167 Lines

 3       19 through 25.  He provided a simple definition

 4       of salt.  It doesn't resolve anything in this

 5       case.  It's not in dispute, but that's a fine

 6       definition, where there were other examples of

 7       one of their ex-employees that's consistent with

 8       that, that we looked at earlier.

 9                       It's also consistent as we pointed

10       out in our responsive brief with the plain

11       meaning that many courts including in this

12       jurisdiction have applied to the word salts.

13       That's at Pages 6 and 7 of our answering brief

14       D.I. 460.  But L'Oreal is not concerned with

15       that.  They're concerned with this simple salt.

16       What's a simple salt?  That language is not in

17       our claims.  Again, that's a problem for another

18       day, another patent and another jurisdiction.

19                       We don't have the word simple

20       salts, so they're essentially asking this Court

21       to render a patent invalid on claim language

22       that is not even in the patents that we're

23       asserting, the claims that we're asserting.  You

24       just can't do that.  This is not how it works.
```

```
 1                        The last piece is just simply

 2          about all of this examination of Olaplex's

 3          products and what Patent Offices have said

 4          abroad.  Again, we have different laws and

 5          procedures.  We had to contend with some of our

 6          own prior art and unrelated patent family.

 7                        The exceptions provided by 102(a)

 8          and (b) are not available in those

 9          jurisdictions.  Whether some Patent Office in

10          Singapore said, well, I think your active

11          product would read on this claim or not is

12          irrelevant to the issue here today.  And I'm not

13          going to belabor because I think it's total

14          irrelevancy, but we're not conceding any of the

15          points that they made regarding these statements

16          like the U.K. expert or Dr. Borish.

17                        If you look really carefully at

18          them, there's no such admissions, certainly not

19          a disclaimer as they would suggest.  The best

20          case and point example of that is the U.K.

21          testimony that they point to, which is at their

22          Slide 53.  You have their counsel in the U.K.

23          examining our U.K. expert.  And if you look at

24          it really close, it's pretty interesting.
```

```
 1              He says, okay, you had given
 2      evidence as I understood that Olaplex was a salt
 3      in maleic acid but not a simple salt.  And he's
 4      asking a whole bunch of other things.  Were you
 5      talking about the linker and would it have an
 6      effect, we had a longer discussion, et cetera.
 7      And maybe I should look at the longer discussion
 8      which I don't think counsel provided in the
 9      record.  And he asked after this very compound
10      statement, is this your position?  Yes.  Well,
11      what's your position?  There's no definitive
12      issue that's been raised on this.  And again,
13      it's irrelevant to the considerations before us
14      today.  Unless Your Honor has any other
15      questions, we'll move on.
16                   THE COURT:  No.
17                   MR. PAUNOVICH:  Thank you.
18                   THE COURT:  All right.  Mr. Palys?
19                   MR. PALYS:  Real quick on what we
20      just heard.  One, they keep bringing up the PTAB
21      decision.  If we're really going there, why are
22      we talking about the '419 because it's been
23      found unpatentable by the PTAB.
24                   He mentioned disclaimer again.
```

```
 1        It's not clear and convincing.  The actual law
 2   is clear and unmistakable.  And even if that was
 3   the standard with this, we clearly met that.
 4   They mentioned about adopting a salt definition,
 5   but they still haven't told us what they think a
 6   salt is.  They said, oh, use what Dr. Freeman
 7   said, or simple salt, you don't have to address
 8   it.
 9             If simple salt didn't have an
10   issue, they would have just come up here and
11   said this is what simple salt is.  They will not
12   address this and we've been chasing this
13   question for quite some time, and I think their
14   answer is clear because it doesn't have a
15   definition.
16             We need to know the scope of what
17   salt is so we can apply the prior art and the
18   public can too.  So just punting that and
19   ignoring what the intrinsic record shows in
20   saying, well, we don't have to address simple
21   salt, we're not saying -- again, that term needs
22   to be interpreted as simple salt.  It has to
23   encompass it and I think that's clear.  Unless
24   you have any questions, I'd like to move on.
```

```
 1                    THE COURT:  Let's move on.
 2                    MR. PALYS:  So let's go to the
 3       mixing limitations.  My goal is to get through
 4       the rest of these sections in a relatively short
 5       time frame.  I want to leave some time if I can,
 6       Your Honor, for one of our younger attorneys to
 7       present on some terms.  That's my goal.
 8                    MR. PAUNOVICH.  Your Honor, I
 9       don't mean to interrupt but if we can get some
10       clarity as to are we actually stopping at three
11       hours, because at least by our calculation
12       Defendants have 12 minutes left or less and we
13       have about 25 minutes, so I don't want us to end
14       up being short-changed on --
15                    THE COURT:  No, I won't
16       short-change you.  Let's see how far we get.
17                    MR. PALYS:  We're going to do our
18       best to stay within that, and I will leave some
19       time for Mr. Zeilberger.
20                    THE COURT:  All right.
21                    MR. PALYS:  So mixing limitations,
22       so let's go right to Slide 75.
23                    THE COURT:  All right.
24                    MR. PALYS:  So there's two reasons
```

```
 1      why, and it's in our briefing, we believe this
 2      limitation in claims 1 and 10 is indefinite.
 3      One, it's unclear whether the use in the claims
 4      refer to applying the mixture to the hair, and
 5      that's what you see in claim 1 or if it
 6      encompasses other uses.
 7                    And the second reason is when you
 8      look at claim 10's limitation that relates to
 9      what is happening in Step A of claim 1 of the
10      '419 patent, the same with claim 1 of the '954,
11      there becomes a lot of confusion on what it
12      means by having this step occurring prior to the
13      application and mixture to the hair.
14                    So let me jump through this real
15      quick.  So for Slide 76, I will show you the
16      claims just to put it in perspective.  You can
17      see claim 10, that's a dependent claim.  And I
18      mentioned earlier to Your Honor, claim 1 is a
19      two-step method.  The first step is that mixing
20      step.  So when you go to claim 10 and it says
21      the mixing, that's what it's referring to.
22                    And it says claim 10 requires that
23      that mixing occurs at the time of use and prior
24      to application of the mixture of the hair.  So
```

1      let's talk about the time of use.  So Slide 79.

2      If you look at specification, the specification

3      does have a suggestion of use but it's intended

4      to refer to the time when the mixture is applied

5      to the hair.

6                  So what is this time of use?  Does

7      it mean like when you have the formulations that

8      you put together or is it going to be something

9      like the specification suggests the time when

10     that mixture is actually going to be applied to

11     the hair.  Let's go back to Slide 78.  You can

12     see Dr. Freeman addressed this.  When you think

13     about it, without more disclosure like we see in

14     the specification, it would be unclear to a

15     person of ordinary skill in the art how that use

16     recited in claim 10 would have been directed to

17     the application of the mixture of the hair since

18     the claim also requires mixing to occur prior to

19     the application.

20                 So the point here is that when you

21     look at what the specification explains on what

22     use means and you put it in the context of what

23     you see in the claims, it doesn't provide one of

24     ordinary skill in the art the scope of what's

```
 1        the bounds of that use.  Does it really mean

 2        when it's applied to the hair?  But when you

 3        look at claim 1, because again this is talking

 4        about Step A.  Step A says mixing and that's

 5        what claim 10 is talking about.

 6                    Step B is the step for applying it

 7        to the hair, so it provides this unclarity

 8        between when you look at what the specification

 9        says about time of use and putting it into Step

10        A when that's different from Step B.

11                    Now, to the second point which

12        is -- well, I want to point this out on Slide

13        80.  Now, Olaplex has mentioned that -- and this

14        is showing you what Dr. Freeman had to say

15        because he was informed what Olaplex's position

16        was which is time of use may encompass time

17        shortly before the mixture's applied to hair.

18        That's the construction that they want the Court

19        to adopt.  Well, that in and of itself raises

20        questions for construction.

21                    It seemed to raise more so when

22        you really think about.  So Slide 81, what they

23        put in their opening brief -- no, their

24        responsive brief.  They go to the specification
```

```
 1        and they say, hey, look, the specification
 2        describes this 35-minute processing time.  Well,
 3        when you really look at what they pointed to,
 4        that's actually talking about after it's applied
 5        to the hair.  Then you wait 35 minutes to do
 6        something else, like shampoo it off.  It has
 7        nothing to do about that mixing step where
 8        you're actually creating the mixture before you
 9        put it on the hair, that's one.
10                    Number two, they look to that 35
11        minutes and they call that a lengthy time
12        period.  So their point is, well, look, when the
13        specification wanted to refer to a lengthy time
14        period, they call it a number of 35 minutes.  So
15        by silence, everything else will be a short time
16        period, and that's where they come up with their
17        shortly before.
18                    But my question would be simply
19        this:  What does that mean?  Will one of
20        ordinary skill in the art look at 34 minutes and
21        59 seconds as shortly before?  Where is the
22        bounds?  The scope of the claim is not clear, so
23        we think that renders it indefinite.
24                    And as to the second reason, Slide
```

1    82, this is more like -- I don't want to say

2    commonsense, but look at the language of the

3    claim it's referring to there.  So claim 10, so

4    let's go to claim 10 which is Slide 76.  So

5    claim 10 again says the mixing step.  That's

6    Step A, occurs at the time of use and prior to

7    application of the mixture of the hair.  So

8    claim 10 is telling you that that mixing has to

9    happen before you apply it to the hair.

10                Now, look at claim 1.  Clearly

11   Step A is happening before you apply to hair

12   because that's Step B.  So that means when you

13   look at claim 10 with that limitation, claim 1

14   now has to encompass something that at least

15   covers that or that becomes superfluous.

16                So what does that mean for claim

17   1?  Is it broader?  Can you have a mixing step

18   that happens after you apply it to the hair or

19   before the mixture is made or whatever?  It

20   doesn't make sense.  If you follow the language

21   of the claims, you come up with this issue.  And

22   Dr. Freeman points this out as well, one of

23   ordinary skill in the art would not be able to

24   understand the metes and bounds with reasonable

```
 1          certainty the scope of the claims based on the
 2          language of the claims that we have here.
 3          Unless you have any other questions, I can move
 4          on.
 5                    THE COURT:  No other questions.
 6                    MR. PAUNOVICH:  Your Honor, Joe
 7          Paunovich again.  On the mixing term that's in
 8          claim 1 of the '419 patent, the issue here is
 9          L'Oreal says, well, because of claim 10, mixing
10          in claim 1 could include prior to application or
11          after when it's in the hair and they say, well,
12          that makes no sense.  But that's a really big
13          problem which we identified in our responsive
14          brief and hasn't been addressed, is that the
15          spec describes exactly that type of mixing.
16                    This is in the '419 patent
17          specification, Column 17, Lines 31 through 41.
18          It's talking about the application of the active
19          agent formulation.  It gives two possibilities.
20          You can do it simultaneously with the hair
21          coloring formulation or subsequently to the hair
22          coloring formulation.  No different for a
23          bleaching formulation.
24                    And when you go down to the bottom
```

```
 1        portion of this that's highlighted subsequent to
 2        the coloring of the hair, the active agent
 3        formulation or formulation thereof is applied to
 4        the hair.  They may say it makes no sense that
 5        those formulations could mix on the hair.
 6        There's simply nothing technically or otherwise
 7        that makes that infeasible.
 8                    We know and see how somebody
 9        applies with a brush the bleaching formulation.
10        They do the same thing or just squirt on the
11        active agent formulation.  They're going to mix.
12        They're together.  They're on the hair, and the
13        spec expressly contemplates that.
14                    The only apparent response that we
15        see from L'Oreal to this is they say, well,
16        there's this '926 patent, one of the related
17        patents.  It's a U.S. patent.  It's the parent
18        patent of these.  They say, well, if we look at
19        claim 1 and claim 11 of that patent, it's much
20        longer claims and much longer claim language,
21        but it says you've got the bleaching formulation
22        and the active agent formulation and it
23        describes applying those to hair and you've got
24        another limitation of claim 1 that says you
```

```
 1          would do those two steps simultaneously.  That's

 2          perfectly consistent with this example in the

 3          spec.

 4                     It says you do them each

 5          separately, not as a mixed combination.  You're

 6          applying them simultaneously.  So it's on all

 7          fours with this example in the specification.

 8          They say, well, it doesn't make any sense to us

 9          because if we look at claim 11, that has the

10          same language as your claim 10 of the '419, that

11          is, that the mixture is at the time of the use

12          and prior to the application of the hair.

13                     There's absolutely nothing about

14          those two limitations that are inconsistent when

15          you read them closely.  But in any event, even

16          if there were, the point here, this is similar

17          to that simple salts issue.  If there's an issue

18          between the interpretation of claim 1 and 11 of

19          the '926, that's a problem for that patent, not

20          for this one.  We have an embodiment, although

21          they say makes no sense, is expressly disclosed.

22          So we think the claim 1 mixing indefiniteness

23          argument should be rejected.

24                     Turning to the next issue about at
```

1    time of use, the claim language is very clear.

2    It's just a question -- as we look at claim 10,

3    it says wherein the mixing occurs at the time of

4    use and prior to the application of the mixture

5    to the hair.  So we know it's prior to applying

6    to the hair.  It's just a question of when

7    before applying it to the hair.

8              And as these patents need to,

9    again just like with the other claim terms, be

10   read in view of the specification as a person of

11   ordinary skill in the art, not just Joe Schmoe

12   off the street who knows nothing about

13   bleaching.  And with the knowledge of the art,

14   they understand that these compositions are

15   combined and quickly applied, shortly thereafter

16   applied to the hair because of that instability

17   of that high alkaline pH composition along with

18   hydrogen peroxide.

19             And we asked Dr. Freeman just a

20   week or two ago about these issues.  We're

21   looking at this language and he was very clear.

22   He said, well, what's being described here is

23   you're mixing these components making a bleach

24   formulation just before use.  That's D.I. 460 at

```
1    Column 146, Lines 2 through 12.  He says, you do
2    that because you're trying to get consistent
3    results with that formulation and he expands on
4    that.  This is in the same exhibit.  It's D.I.
5    460, Exhibit 1 at Column 144:23 through 145:13.
6    He reiterates, they're going to be used to
7    bleach hair.  They're mixed together just before
8    they are going to be used.
9              He says, the reason you do this is
10   this would minimize the possibility that the
11   particular formulation would change to a
12   chemical reaction occurring outside away from
13   having been applied to the hair, and that's
14   entirely consistent with L'Oreal's own evidence.
15   That's pretty unequivocal in providing context
16   as a person of ordinary skill in the art would
17   understand it.
18              This is a hair care textbook that
19   they cited at D.I. 422, Exhibit AG at Page 238
20   and it's describing how you create these
21   oxidizing emulgents of hydrogen peroxide along
22   with the alkalizing agent and persulfates.  And
23   it says, well, once you mix those, after 20
24   minutes the partially decomposed hydrogen
```

```
 1        peroxide has virtually no further effect.

 2                    So Nautilus tells us you need

 3        reasonable certainty in the eyes of a person of

 4        ordinary skill in the art.  Not exact certainty,

 5        not precise, not an exact number, but just

 6        reasonable certainty.  And again, it's in the

 7        eyes of a person of ordinary skill in the art.

 8                    Here we know it's before

 9        application of the hair and all the evidence --

10        their expert as well as the evidence that they

11        cited provides reasonable bounds and limits to

12        interpret this claim.  Unless Your Honor has any

13        further questions regarding these two terms, we

14        will see accede the floor to opposing counsel.

15                    THE COURT:  No further questions.

16        Mr. Palys, do you have any further comment?

17                    MR. PALYS:  No, Your Honor.

18                    THE COURT:  Okay.  Plaintiffs will

19        represent the next term.

20                    MR. BLACKBURN:  Good afternoon,

21        Your Honor.

22                    THE COURT:  Good afternoon.

23                    MR. BLACKBURN:  Matthew Blackburn

24        and we're going to talk about bleaching
```

1    formulation and bleach powder if my schedule is

2    correct.  Slide 43, please.  So this is the

3    claim and you can see that the term -- and this

4    is claim 1 of the '954 patent.  And you can see

5    that bleach powder and the developer are two

6    components that make up the bleaching

7    formulation, and you can see that the active

8    agent is mixed into the bleaching formulation.

9    That is what's applied to the hair.

10                   Here's the parties' constructions.

11   And I just want to explain briefly while this

12   slide is up, the term alkaline pH and alkalizing

13   agent, these were touched on during the

14   tutorial.  And on the pH scale, low numbers

15   means something is acidic.  High numbers mean

16   something is alkaline.  And the chemical that

17   causes the pH to go up is called the alkalizing

18   agent.

19                   So what Olaplex's constructions

20   are trying to capture is that a bleaching

21   formulation unless it has a high enough pH even

22   though it has an oxidant in it won't actually

23   bleach anything.  Likewise with a bleach powder,

24   one of the critical components in the bleach

1      powder, it's got to have both the persulfate and

2      the alkalizing agent in order to raise the pH.

3      That's how it works.  Whereas Defendants, they

4      just say plain meaning.

5                    And I think one of the real core

6      principles of claim construction, why Your Honor

7      is investing her valuable time in going through

8      this exercise and having us here today is we're

9      trying to help the jury.  So you have to ask

10     yourself would a lay juror understand what a

11     bleaching formulation is, what its components

12     are, what its pH would be, would they understand

13     what a bleach powder necessarily is in this

14     invention, and I don't think they would.  That's

15     why we have to offer them some help which is a

16     construction.

17                   Now, our constructions don't come

18     out of thin air.  As I think you've probably

19     noticed from our argument today, we've tried to

20     base a lot of our constructions based on what

21     the PTAB has already done in prior proceedings.

22                   You can see this is D.I. 426,

23     Exhibit 20.  And this is the decision denying

24     institution in the one of the PGRs, and they say

```
 1        bleach powder means a dry particulate
 2        composition comprising at least a persulfate and
 3        an alkalizing agent.  That's the construction
 4        we're offering to Your Honor.
 5                      And likewise, they say what
 6        bleaching formulation is and they say that it
 7        requires a sufficiently alkaline pH so that it
 8        works, so we're being consistent with the PTAB.
 9        And I think that point is really important to
10        make.  The claim construction standards that
11        apply to this proceeding which would be Markman
12        and Phillips are going to be different from the
13        PTAB.  The PTAB operates under the broadest
14        reasonable construction.
15                      So if Your Honor were to adopt
16        L'Oreal's constructions which are broader than
17        what the PTAB has decided, you would essentially
18        be saying that the PTAB's construction is not
19        reasonable.  I think it's important to give this
20        decision that the PTAB rendered due weight.  But
21        your construction should be no broader than what
22        the PTAB has construed these terms to mean.
23                      Now, let's go into some of the
24        intrinsic evidence outside of the PTAB.  We've
```

1        got Example 3.  We keep going back to that

2        because that's the one example that uses maleic

3        acid as the active agent and it recites that

4        you've got a developer and you've got a bleach

5        powder in there, so that's consistent.

6                        Now, one of the issues is do you

7        really have to have a high pH in your bleach

8        powder or in your bleaching formulation.  So on

9        this slide we've shown you seven different

10       examples in the record where the art knew that

11       if you had a pH below 9, it didn't work.  It

12       didn't actually bleach, and that bleaching was

13       actually undertaken at the pH of 9 to 11.

14                       And if you look at the record even

15       more carefully, you're going to find there's

16       five additional cites that we put in our

17       briefing, so this shouldn't really be a

18       debatable point.  Now, we're going to go back to

19       the PTAB's decision.  And the reason why I want

20       to show Slide 48 to Your Honor, I just want to

21       prove to you that they're making the same

22       argument to you that the PTAB already said was

23       wrong, and they haven't explained why the PTAB

24       got it wrong.

 1          They specifically argued that

 2    alkaline should not be part of the construction

 3    of this term, and the PTAB said that was wrong.

 4    So there's a purpose of having an alkaline pH

 5    limitation even when the bleaching powder is

 6    required to include an alkaline.

 7          So this is another argument they

 8    make.  They say, well, wait a second.  There's

 9    this other claim in this other application and

10    in that claim you actually put the word alkaline

11    to describe the mixture, so this is for the

12    claim differentiation point.  By implication

13    they're saying therefore there's no alkaline

14    limitation in their claims.

15          Well, that argument was rejected

16    by the PTAB, and there's two reasons for it.

17    One, you can have different language that covers

18    the exact same invention coming from the same

19    disclosure.  That happens all of the time.

20    Second, take a look at the claim that they point

21    you to which is claim 30 in this pending

22    application, and compare that claim to claim 1

23    of the '954 patent and the 419 patent.  They're

24    quite different.  So to the extent that they're

1        saying, wait a second, you're going to render

2        this alkalinity limitation to prove unnecessary,

3        there's other language in there that

4        differentiates the two claims.

5                        And then this point I was going to

6        make before which is Slide 50, the PTAB said,

7        wait a second, let's take a look at what

8        evidence L'Oreal's expert had when he was

9        arguing that there was no requirement for

10       alkalinity.  And they say, he provides no

11       support for those statements.  That record

12       hasn't changed.

13                       And then by contrast, we have

14       abundant evidence and that's that slide I showed

15       you which listed 7 out of the 12 references that

16       we have.  Every bleach powder has both a

17       persulfate and an alkalizing agent.  The one

18       piece of evidence that they cite to, they cite

19       to a textbook that describes a cream bleach.

20       And in that cream bleach, you have two different

21       kinds of formulations.

22                       One is made up with a peroxide

23       which is in a cream and then the other part is

24       this alkalizing agent, and you mix those two up

```
 1        and you put that on the hair.  And then there's

 2        a second embodiment of this cream bleach where

 3        you add an optional bleach powder and they say,

 4        aha, therefore there must not be any alkaline in

 5        the bleach powder, but the reference doesn't say

 6        any such thing.

 7                    And I think this is also

 8        important.  If you look at D.I. 460, Exhibit 2,

 9        that's the denial of the hearing in this

10        PGR2018-24 where they tried again to argue the

11        same point that was rejected by the PTAB, and it

12        was again denied.  So this is not just the

13        second bite of the apple.  This is the third

14        bite of the apple.

15                    And then the final point, unless

16        Your Honor makes more questions, they make some

17        allusions to Dr. Borish's testimony now.  He

18        somehow undercuts this argument.  And I would

19        just counsel the Court to look at that testimony

20        carefully.  Part of the testimony is at D.I. 421

21        which is Exhibit H at Lines 48, 49.

22                    And what Dr. Borish says is

23        potassium for oxodisulfates is the same thing as

24        peroxodisulfate.  That's all he says on those
```

```
 1   pages.  They never asked him ever, is it
 2   possible for bleach powder to not include
 3   alkaline?  They never asked that question so
 4   there's no such testimony from Dr. Borish.
 5   Unless you've got further questions.
 6               THE COURT:  I don't.  Thank you.
 7               MR. BLACKBURN:  Thank you, Your
 8   Honor.
 9               MR. PALYS:  Your Honor, we're
10   going to start with bleaching formulation and
11   shift over to bleach powder.  Before I start, I
12   want to get back to you about those cases that
13   you identified.
14               THE COURT:  Yes.
15               MR. PALYS:  I think was the
16   Sumitomo and the Ranbaxy cases.
17               THE COURT:  Yes.
18               MR. PALYS:  And my colleagues took
19   the time to review those, and they confirmed to
20   me what I told you that was accurate, that those
21   cases are distinguishable on the facts.  They
22   didn't hold a general proposition of what you
23   were saying.
24               THE COURT:  Okay.  I will take a
```

```
 1        look at them again.  Thank you.
 2                    MR. PALYS:  You're welcome.
 3        Starting with bleaching formulation, so I want
 4        to start real quick with the -- they mention in
 5        their tutorial, Slide 84, about alkaline pH and
 6        what you need and you need to have a pH level of
 7        9 to 11 to do bleaching.  Keep in mind as I
 8        mentioned in the beginning, claims don't require
 9        any pH level.
10                    So for them to say that you have
11        to have effective bleaching, the specification
12        doesn't describe a pH level needed to effect any
13        type of bleaching so they have to go outside the
14        intrinsic record to get there.  And even their
15        own slides if you look at their presentation on
16        Slide 47, they cite to D.I. 99-1, Exhibit F to
17        Borish Rebuttal Declaration.  And in there, it
18        even says poor bleaching effect.
19                    They're trying to make this point
20        you have good bleaching when it's 9 plus, but
21        poor bleaching when the pH is less than 9.  It's
22        still bleaching.  There's no level of bleaching.
23        Again, it's required by the claims in the '419
24        and the '954, so even their own documents that
```

```
 1        they cite to point to that.

 2                     And here it is, you can see this

 3        is Slide 47 right there on D.I. 99, poor

 4        bleaching effect results when a pH is less than

 5        9.  That's still bleaching.  If they're saying

 6        that now you have to have excellent bleaching or

 7        really good lift or something like that, that's

 8        in the claims, now we're going down a road that

 9        we don't want to go down.

10                     THE COURT:  Taking that a step

11        further, where is it in the intrinsic record a

12        suggestion that acidic bleaching formulations

13        are sufficient to bleach hair?

14                     MR. PALYS:  That raises a good

15        point.  Number one, the specification is silent

16        on that either way.  So the claims have to not

17        have a limitation on any type of pH.  I think

18        that's how that claim in the intrinsic record

19        should be read.  Number two, when you look at

20        what they're saying is a sufficient level of

21        alkaline, what does that mean?  Is it 9 to 10?

22        Is it 8 point something?  Is it something around

23        there?  And it doesn't even get into the acidic

24        level of it.
```

```
 1                    They're just trying to basically
 2          avoid prior art.  That's why we're looking at
 3          what they're doing for a bleach powder and
 4          bleaching formulation.  And there is evidence in
 5          the record of acidic bleaching.  That's the
 6          DeGeorge patent reference, and I believe we cite
 7          to that in a briefing and I will give that cite
 8          to you or my colleagues will.  There is a
 9          reference that does disclose that you can do
10          bleaching at acidic levels.
11                    THE COURT:  But that was mentioned
12          in the PTAB decision, was it not?  And that
13          DeGeorge reference used an acidic lightening
14          composition only after the hair had been treated
15          with alkaline, did it not?
16                    MR. PALYS:  That I don't know.  I
17          would have to ask my colleagues on that one.
18                    THE COURT:  So I'm just trying to
19          find out whether to accept your client's
20          position that the DeGeorge reference actually
21          supports the finding that an acidic composition
22          would effectively lighten hair in the absence of
23          any residual alkali from any prior treatment.
24                    MR. PALYS:  I'm going to have to
```

```
 1      do my homework on that one to make sure I don't

 2      misrepresent what's there, but I believe it says

 3      what it says in our brief.  I will say it this

 4      way as I sit here:  The point here is what's in

 5      the claim about bleaching formulation if we

 6      start off with exactly where we started in this

 7      case, so Slide 85, when we started this case

 8      they're up here saying, oh, we got to have this

 9      interpretation.

10                  Right off the bat with their first

11      PI motion they have said and their experts said

12      everything gets its plain and ordinary meaning

13      and, in fact, bleaching formulation was a

14      chemical mixture that lightens hair.  Never said

15      anything about alkaline.  You have to ask

16      yourself why are they doing this now.  It's

17      because of the prior art that's before them.

18                  Now, they're changing their minds

19      and they're trying to do that.  Now, you can put

20      that aside because again, we're talking about

21      claim construction.  The motivation for doing

22      that, okay.  Now, let's do that.  Let's go to

23      the claims.  The claims don't say anything, if

24      you go to Slide 86, about what a bleaching
```

1       formulation is.  It just says there's the

2       bleaching formulation.

3                       It doesn't explain that it has to

4       have a certain level of pH, whether that's

5       acidic or some level of alkaline.  Again, it

6       surely doesn't tell you what sufficient means.

7       In the specification, if you go to Slide 87,

8       just mentions it in general.  Bleaching

9       formulation typically needs a bleaching agent to

10      lighten the hair.  It doesn't say sufficiently

11      alkaline pH level.

12                      And when Olaplex actually wanted

13      to say in their claims, hey, we want alkaline pH

14      level, they did it.  If we go to Slide 88,

15      remember in the beginning I showed you the chart

16      of the family of patents and down the bottom was

17      that new patent '478, so this is part of that

18      same specification.  They actually put that in

19      their claims.

20                      Now, it says bleaching mixture.

21      But make no mistake about it, we pointed this

22      out in our briefs, bleaching mixture is

23      bleaching formulation.  They use this

24      synonymously.  And Dr. Borish himself used the

1    word mixture when he defined bleaching

2    formulation.  But here they say it, having an

3    alkaline pH.  Okay, so if that's the case then,

4    we're going to come back and interpret claim 1

5    of the '954 and the '419 patents having

6    bleaching formulation to have that

7    interpretation.  We have an issue here, again

8    because now that a child application is actually

9    expressly saying that it has to have an alkaline

10   pH.

11           In the end if you go to Slide 89

12   to summarize, Olaplex started this case as plain

13   ordinary meaning so that has to drive to

14   Question 1, why are we here.  There is no

15   requirement in the intrinsic record anywhere

16   that says what type of alkaline levels are

17   needed in the claims and the disclosures.

18           The fact that they're using the

19   sufficient alkalinity language raises

20   indefiniteness issues in and of itself.  The

21   last point I want to make is the specification

22   actually does use pH ranges for something else.

23   If you go to Column 3 --

24           THE COURT:  Let me catch up.

```
 1              MR. PALYS:  No, I'm sorry, Column

 2     7.  We can bring it up for you.  So here we're

 3     talking about formulations.  And down on Column

 4     7 of the '419 patent you can see right around

 5     Line 24, to start off in Line 14, we're talking

 6     about the active agent formulations.  In Line 24

 7     it says, hey, these formulations render the pH

 8     formulation neutral pH or a pH ranging from

 9     about 3 to 12.  It's telling you that the active

10     agent formulation can have a pH range.  It's

11     expressly saying that.  They don't do that for a

12     bleaching formulation.  So that's the first

13     point.

14              The second point is if we're going

15     to look at claim 1 and start adding a pH level

16     to bleaching formulation as Olaplex wants, then

17     shouldn't we be doing the same with the active

18     agent formulation and why is that not being

19     addressed when the specification clearly shows a

20     range.

21              Why are we picking one particular

22     element out of the claims and saying, oh, let's

23     add something that's not described in the

24     specification when the actual disclosure does
```

```
 1        give you that.  I think that's it for bleaching

 2        formulation.  Unless Your Honor has any more

 3        questions, I can shift over to bleach powder.

 4                      THE COURT:  No questions.

 5                      MR. PALYS:  So for this term, Your

 6        Honor knows the dispute here.  They're trying to

 7        add this limitation that, look, a bleach powder

 8        is a dry particulate composition.  They say i.e.

 9        powder, so they define powder here.  I don't

10        think we're going to quibble with that.

11                      So the rest of their limitations

12        really describe what a bleach is.  Comprising a

13        persulfate and an alkalizing agent, you put it

14        together.  When it boils down to it, you have to

15        have this alkalizing agent as you heard

16        Olaplex's counsel say.  We think that the bleach

17        powder has its plain meaning.

18                      If you look at the claim term on

19        itself, it's a powder, particulate composition

20        that lightens hair.  That's consistent with

21        where we started in this case.  Dr. Borish and

22        them saying everything gets its plain meaning

23        and they refer to bleaching as lightening.

24        Nonetheless, here we are with this limitation
```

 1        that has come into play.

 2                    Olaplex is really hanging their

 3        hat on what the PTAB did.  And they're asking

 4        this Court, hey, just give deference to what the

 5        PTAB did.  I think you know the ramifications of

 6        that.  It goes full-bore and I won't to keep

 7        repeating the obvious of patentability on the

 8        '419 patent.

 9                    But, yes, you can consider that

10        and, yes, there were positions that the PTAB

11        didn't accept, but they didn't have the record

12        that we have before you.  There's expert

13        testimony here on these points.  There's

14        evidence here and there is disclosure about the

15        idea that you can have a bleach powder and still

16        call it a bleach powder whether it's

17        persulfate -- we're not going to quibble whether

18        a bleach powder has to have a persulfate or some

19        form of it.  But you don't necessarily have to

20        have an alkalizing agent at that time and you

21        call it a bleach powder.

22                    Now, their point is, well, you

23        can't really do bleaching without having this

24        alkalizing agent because you have to adjust the

1    pH to make it alkaline.  That may be the case,

2    but we have shown in our evidence literature and

3    expert testimony that says, well, yes, you can

4    have what's called the "bleach powder" and you

5    can add something that's considered an

6    alkalizing agent while you're making the

7    bleaching formulation, and that's the point I

8    want to make sure the Court -- it doesn't get

9    past you.

10                  It's not that you may end up using

11   an alkalizing agent.  It's bleach powder itself

12   doesn't require that.  And the reason why

13   they're doing this is, again, it's for prior

14   art, because if their position is that every

15   persulfate of bleach powder, if you will,

16   automatically includes an alkalizing agent, that

17   means the prior art that has persulfate bleach

18   powders automatically includes alkalizing agent.

19   This is one of the positions that they used to

20   try to get around certain prior art.  They say,

21   oh, the prior art does not have an alkalizing

22   agent so, therefore, it's not a bleach powder.

23                  And I'll finish with this point on

24   this, I can't stress enough that their basis for

```
 1        their adding an alkalizing agent is not in the

 2        claims and not in the specification.  It comes

 3        from extrinsic if it comes from what they say as

 4        what one of ordinary skill in the art would

 5        understand.

 6                    So if that's the case, then they

 7        are representing then, well, every person of

 8        ordinary skill in the art would understand that

 9        a persulfate must have an alkalizing agent.  And

10        if that's the case, then we have to revisit what

11        was said about these prior art references that

12        allegedly didn't have expressly seen alkalizing

13        agent in it, and what the PTAB said about that.

14                    With that, I think I'll yield the

15        podium to my opposing counsel here.  Thank you.

16                    MR. BLACKBURN:  Just brief

17        rebuttal.  If you've got any questions about

18        what Mr. Palys said, I'm happy to address any

19        question.

20                    THE COURT:  You may be addressing

21        this issue with the '478 patent that includes

22        the language about the alkalinity and also the

23        last point about the argument that is made by

24        L'Oreal that bleach powder itself doesn't
```

```
 1      require the alkalizing agent.  Otherwise, how do
 2      you explain all of that with the prior art
 3      addressing bleach powder.
 4                  MR. BLACKBURN:  Let's start with
 5      the related application, so Slide 88 from their
 6      slide.  Again, this is a claim differentiation
 7      argument that they're trying to make and compare
 8      that claim with the claims that we're dealing
 9      with.  And when you look at it carefully, you're
10      going to start seeing lots of differences.
11                  Step A talks about combining a
12      developer with maleic acid or salts thereof.
13      That phrase doesn't appear in any of the other
14      claims.  And then Mr. Palys keeps glossing over,
15      well, this one says bleaching mixtures and the
16      other one says bleaching, but that means the
17      same thing, trust me, I know.
18                  I don't know.  We haven't
19      construed that term.  The literal words of this
20      claim and the other claims are not the same.  So
21      to the extent that there is the word alkaline pH
22      in this claim, it's still going to have a
23      different scope from the other claims that we're
24      dealing with, so claim differentiation can't
```

1       possibly affect the outcome here.

2                    I think the bigger point, the

3       point that is more commonsense, you can use

4       different language to cover the exact same

5       thing.  And so having been through the process

6       of getting PGR, seeing what art that they're

7       filling up, our prosecutor is being clever and

8       they're looking to try to come up with language

9       that's going to address some of the art.

10      Mr. Palys made a big deal.

11                   He said, well, wait a second, at

12      the start of the case Dr. Borish said that all

13      the bleaching formulation is something that

14      would lighten hair.  Well, at that time the only

15      issue that was in front of us was L'Oreal's

16      infringement.  And when you look at their

17      products and you look at their instructions,

18      it's crystal clear that they have bleach powder,

19      that they have developer that they're putting

20      the additive into it and got a bleaching

21      formulation.  There was no dispute about that so

22      there's no reason to construe the terms.

23                   Then when we get into the PGR

24      which was filed against the '954 patent in

1     January of this year, they put in that DeGeorge

2     reference.  And that DeGeoge reference, as Your

3     Honor correctly summarized, describes an acidic

4     peroxide formulation that's applied to hair

5     that's been pre-alkalized.  So again, there's no

6     reference in this record that shows you can

7     achieve bleaching without alkali.

8               Mr. Palys was very clever in how

9     he phrased some of his discussion.  There's a

10    reference in the record and it's Ogawa, it's

11    D.I. 421 and it's Exhibit G in there.  And in

12    that reference it does not use the phrase bleach

13    powder.  It uses the word persulfate.  And in

14    the PTAB we argued about whether or not the

15    disclosure of persulfate by itself met the

16    meaning of bleach powder as in our claims.  And

17    they said, no, it did not and they denied

18    institution and they denied rehearing on that

19    issue.

20              So now he wants Your Honor to say,

21    well, anytime someone says persulfate, that

22    implicitly says they've also got alkali in

23    there.  Well, that's not what the PTAB said and

24    that's not what the record supports.  We're

```
 1        construing a specific term in this claim which

 2        is bleach powder and the intrinsic record shows

 3        that bleach powder requires both a persulfate

 4        and an alkaline.  Did I answer both of your

 5        questions, Your Honor?

 6                    THE COURT:  You did.

 7                    MR. BLACKBURN:  So are we moving

 8        to breakage now?

 9                    THE COURT:  I think Defendants are

10        going to take the lead on that.

11                    MR. PALYS:  Joe Palys again, Your

12        Honor.  So Slide 96, please.  So it's really

13        three reasons, core reasons, with respect to the

14        indefiniteness of the hair breakage terms, and

15        this is the '954 patent claims 14 through 16 and

16        claims 24 through 26.  And it's really unclear

17        what hair is used to make the comparison, and I

18        will walk through that with Her Honor.

19                    Second, the claims really don't

20        explain how the breakage can be quantified in

21        comparison to levels that you see in the claim.

22        Third, there are many tests that lead to various

23        results.  There is no one industry standard test

24        that Olaplex is trying to say occurs out there
```

```
 1        and that comes from their construction when you

 2        see -- Olaplex's proposed construction is

 3        visible broken fibers of hair upon industry

 4        standard testing.

 5                    The fact of the matter is there's

 6        many ways of assessing breakage, damaging hair

 7        with varying results.  That's all explained in

 8        our briefs.  Let me start with the first

 9        position.  So Slide 98.  I just want to walk

10        through the claim first to frame this.

11                    So claims 24 through 26 just like

12        14 through 16, they depend on different claims

13        but the point here is following a Step C and

14        this is the '954 patent.  If you remember, there

15        were three steps and Step C is applying to the

16        hair, so it's after that.

17                    This says following that step, you

18        have breakage of the hair is decreased by at

19        least -- and I will stick with claim 24 -- 5

20        percent compared to hair bleach with the

21        bleaching formulation in the absence of the

22        active agent.  So Slide 99.  So it's compared to

23        the claims.  When you look at what the claim

24        says, the claim says you have the breakage of
```

1          the hair, we went through that step in claim 1,

2          and it's compared to hair that has been treated

3          by bleaching without the active agent.

4                          When you go to the specification,

5          what hair is that?  Now, the disclosure says,

6          well, that hair has to come from the same

7          individual.  So that's the question.  But when

8          you look at the claim and you go back to Slide

9          98, look at what the claim says, breakage of the

10         hair.  So now the hair.  We're talking about the

11         hair in claim 1.

12                          So let's use me as an example

13         because I have long locks.  So I go through the

14         process of claim 1, that's my hair.  And now the

15         claim is saying the breakage in my hair has to

16         be decreased by 5 percent compared to hair

17         bleached with bleaching formulation in the

18         absence of the active agent.  Is that my hair?

19         Is that someone else's hair?  Where is this

20         comparison coming from?

21                          So back to Slide 99.  The

22         specification is saying, look, in one example

23         you can be the same individual.  But again, the

24         claim isn't so limiting.  The claim just says

```
 1        hair, so it's not very clear on what the scope
 2        is.  How can one of ordinary skill in the art
 3        ascertain the scope to determine whether they
 4        meet the claim or whether they went in the
 5        confines of the claim when it's not very clear
 6        on its face with respect to the claim language,
 7        especially in the context of the specification.
 8                    And when we really think about
 9        this, Your Honor, let's use the example again
10        Olaplex is asserting against salon services so
11        let's put that in that perspective.  You go into
12        a salon to -- to meet their claim limitations,
13        go to the step of the '954 patent, so you go
14        through the steps to apply it to the hair and it
15        has all the characteristics that they named, the
16        exact concentration of the active agent in the
17        mixture, et cetera.
18                    So go to Slide 98.  So when you
19        get to these claims, it says okay, now, we got
20        done with that.  So I just had my hair treated.
21        Now, the breakage in my hair has to be decreased
22        by 5 percent compared to if it's the same
23        individual's hair, which I believe is their
24        position, does that mean when I went into my
```

```
 1        treatment in the context of this patent, if

 2        they're applying it to salon services that what

 3        part of my hair has been treated, and then for

 4        some reason we have to go through a process of

 5        bleaching my hair without the active agent and

 6        then do this grooming test that they want, that

 7        they say is the industry standard test and then

 8        look at the fibers and compare it and decide if

 9        there's a 5 percent difference or is it someone

10        else's hair?  Is it your hair versus mine when

11        we get there?

12                    So if you follow along with their

13        logic, meaning what the specification is

14        describing, it doesn't make sense.  Unless

15        they're saying that the claim is limited to

16        swatch testing and then are they coming from the

17        same individual which is what their examples

18        described, but they're trying to apply it to

19        salon services.

20                    With respect to the second

21        limitation or the second reason for

22        indefiniteness, so Slide 101, so the

23        specification provides no guidance on how

24        breakage can be quantified.  What is this
```

1       breakage?  Keep in mind, their patent talks

2       about bonds being broken at a molecular level,

3       and they talked about other types of damage that

4       can occur on the hair.  And what Olaplex is

5       trying to do with their presentation, they're

6       trying to say breakage is different from damage

7       and you saw that in your presentations.

8                    You can get frizziness.  You can

9       have broken hair shafts and all of these things

10      and I believe their position is that breakage

11      means literally the shafts of the hair are

12      breaking, but that's not what's in the

13      specification.  It provides no guise on what

14      that means.  But what the patent does describe

15      is, well, you can have some broken bonds.  It

16      says you can have these molecular broken bonds

17      so does that mean breakage?  That's one level of

18      inquiry that we have with respect to the

19      indefiniteness.

20                   The second one is there's no

21      guidance on how you quantify that 5 percent, 10

22      percent or 15 percent that's in the claims.  How

23      do you come to that determination of level of

24      breakage when you get past all of the other

```
 1        issues that I've explained with these claims.

 2                    In fact, we have testimony of

 3        Dr. Freeman on Slide 102 on this point.  A

 4        person of ordinary skill in the art would not

 5        know what the claims intended for the hair

 6        breakage to be compared, and he provides support

 7        to several exhibits.  You can see that here on

 8        Slide 102.  In fact, in Slide 103 he explained

 9        there's literature explaining there's many, many

10        ways that you can assess hair damage, different

11        types of tests.

12                    They have this grooming test that

13        they're saying is industry standard and we're

14        going to talk about that in a second.  There's

15        all testing.  There's mechanical testing.  You

16        can have a visual inspection of the hair, but

17        realistically in the patent they say under the

18        example they say visibly broken or visibly

19        damaged, I'm paraphrasing what was in there.

20                    But visibly, they're assuming that

21        can even mean -- I'm just running my hands

22        through the hair as a person of ordinary skill

23        in the art would.  Visible can also mean images

24        that were created from SEM testing, electronic
```

1    microscope so you can visibly look at the shafts

2    and see the damage which is what happens in this

3    industry, and there's evidence of that and

4    expert testimony on that.  And we submitted all

5    of this as exhibits.

6              So the point here is that you can

7    have different results based on the test to use.

8    I may look at a piece of hair and say, that

9    looks fine.  But when I look under a tensile

10   test or something, I might say, well, that's

11   broken.  That's a different type of damage.  And

12   in the Federal Circuit we cited to case law in

13   our brief saying that when you have these types

14   of variances, it leans toward indefiniteness

15   like we have here.

16             Your Honor, I'm going to talk

17   about some confidential information.  So what

18   we're going to do here -- are we clear?  Is

19   everyone good?

20             THE COURT:  Is --

21             MR. PALYS:  Okay.  We were being

22   careful so we wouldn't have to close the

23   courtroom.  So why don't we go straight to Slide

24   105.  I want to address some of the points that

```
 1        Olaplex raised in its briefing.  First they
 2   said, well, you know what, look what L'Oreal
 3   did.  L'Oreal did this type of testing, and
 4   that's really setting up the industry standard,
 5   how can they say this is not the type of testing
 6   you do.
 7              Then they also said, well, there
 8   was an industry standard and it was a grooming
 9   test by evidence.  Two points on that; they
10   cropped one piece of evidence out of hundreds
11   and hundreds of pages of information that we
12   submitted to them to say, well, look what they
13   did for a test.  But in reality when you look
14   at -- let's go to Slide 108.  We submitted many
15   documents.
16              First of all, to the extent this
17   is relevant what L'Oreal did after the
18   contemporaneous time of what these patents are,
19   they're not even the same time frame,
20   internally, inside behind their walls even is
21   relevant to what one of ordinary skill in the
22   art would understand with respect to these
23   claims.  Putting that aside, what they pointed
24   to you ignores the amount of evidence that we
```

```
 1        put forth to them.

 2                    There was many, many tests and

 3        this is just an example on Slide 108.  They

 4        pointed to a particular number.  I think it's

 5        the 770 test, one of these tests.  The number

 6        that they pointed to -- the document that they

 7        have is not this document.  They said, look,

 8        they did this test and it's grooming so they

 9        know that's the way to do it.

10                    Now, there were tensile testing

11        and there was all of those types of other things

12        that were performed, so to the extent this Court

13        is even going to consider what a third party has

14        done after the relevant dates of this patent

15        internally as evidence of what is an industry

16        standard or what should be done, we think you

17        should look at the entire record of what was

18        submitted to Her Honor and you can see that

19        that's just not really accurate.

20                    The second point, and I'll back up

21        and this will be the last point I want to make,

22        they also said, well, we use TRI and they did

23        the industry standard test.  So we did a little

24        research on TRI, and if you go to their website,
```

```
 1        they don't say that that grooming test is the

 2        standard.  In fact, the top part of this slide,

 3        106, which is in our briefing comes from -- I

 4        just noticed the cites are not showing up, but

 5        we have the cites for the record on our slides.

 6        They never said that that was the industry

 7        standard.

 8                  When they use the word industry

 9        standard, they're talking about something else,

10        tensile testing, MTT.  So in their brief they're

11        trying to make this representation that, look,

12        there's a grooming test; that's the industry

13        standard.  So their construction when it says,

14        well, we want to do visible inspection based on

15        industry standard testing and everyone knows

16        that the industry standard testing is this

17        grooming thing because L'Oreal did it, and I

18        already explained that, and that's the industry

19        standard from TRI.  That's just not accurate.

20                  The fact of the matter is there is

21        expert testimony and literature that shows that

22        there is no one standard and there's various

23        types of results that can come from the

24        different types of assessments of hair.  And
```

```
 1        then going backwards, the language of the claims

 2        clearly shows that the scope of what those

 3        claims are could not be reasonably ascertained

 4        by one of ordinary skill in the art, and that's

 5        supported by the evidence and expert testimony.

 6        Thank you.

 7                  THE COURT:  Okay.

 8                  MR. BLACKBURN:  So breakage in

 9        hair.  Now, Mr. Palys was up here talking for a

10        long time and one of the things I did not hear

11        him give Your Honor was a cite to the record of

12        where there's any method that will provide you a

13        percentage decrease in hair breakage.  Among all

14        of the tests L'Oreal conducted of all of the

15        tests they cite, he did not identify a single

16        test that would give you the parameters actually

17        required in our claim.

18                       And if Your Honor looks through

19        the record, there's only one test that provides

20        that number, and that's this TRI repeat grooming

21        test that's in the record at D.I. 426, Exhibit

22        28, and that is an article from 2010 which

23        predates the patent.

24                       Now, they -- and again, I think
```

1    it's important to understand the context.  We

2    have these claims.  They've litigated this issue

3    with the PTAB.  And they said, hey, these claims

4    are invalid.  And the PTAB said, no, we don't

5    think these claims are invalid.  We think these

6    claims are going to survive the PGR.  So they're

7    faced with the prospect of having to litigate

8    these claims in front of Your Honor.

9              And they've got in their files

10   evidence from the testing that they did using

11   the industry standard test that shows they

12   infringe these claims.  And they come to the

13   Court and say, somebody of ordinary skill in the

14   art would know what these claims mean.  Come on,

15   that can't be a credible position.

16             Now, we tried to limit the number

17   of words that got construed in the term and we

18   say that visibly broken fibers upon industry

19   standard testing.  The reason why we chose that

20   language is because he's correct that there

21   isn't an expressed teaching in our application

22   that used the TRI method to determine hair

23   breakage.

24             But fortunately for us, there's no

1      requirement to do so in the case law.  And we

2      cited the case in our opening brief and we

3      talked about it in our answering brief, and it

4      was never discussed by L'Oreal.  And that case

5      is Wellman v. Eastman, 642 F.3d 1355, and that's

6      a Federal Circuit case from 2011.

7                  And what it says and it says it

8      very clearly, is that well-known standards don't

9      need to be repeated in your patent application.

10     So if everybody knows how to do hair breakage

11     testing, you don't have to teach it.  And the

12     case goes on and says something else that's also

13     pertinent to some of the arguments that they've

14     made.

15                 They say, well, wait a second, you

16     might get different numbers if you use Joe's

17     hair or my hair or if you change the humidity

18     and, therefore, you don't know if you're within

19     the scope of the claims.  Well, the Wellman case

20     says a POSITA would know how to follow standard

21     instructions.  That's enough.

22                 And if you take a look at that

23     article, Exhibit 28 from D.I. 426, the Evans

24     Park article, it says exactly how to do the

1        test.  It says normalize the hair; it says take

2        one tress and bleach it; take the other tress

3        with your additive or your conditioner, bleach

4        that too and then put it into your test, 10,000

5        brush strokes and literally count the fibers

6        that break after 10,000 brush strokes and just

7        do a percentage.  That's what the test says.  A

8        person of ordinary skill in the art would well

9        know that.

10                      This is just to show that the PTAB

11       did consider this issue, D.I. 426, Exhibit 20,

12       and they said that it was sufficient, what we

13       described in our patent application.  Here's the

14       TRI test just so you have in the record where it

15       is.  That's a picture of Dr. Evans.  He's very

16       well-known in the testing world.

17                      Mr. Palys made a big deal, well,

18       wait a second, we did all of these tests.  We

19       did tensile testing.  We did protein loss tests.

20       And here they are.  If you take a look at them,

21       none of them actually provide the parameter

22       that's required by the claims.

23                      The claims are very specific.

24       They say you need to have a percentage decrease

1        in the breakage when you compare bleach plus

2        additives versus bleached hair.  None of these

3        tests do that.  For example, this slide

4        references protein loss testing.  So in protein

5        loss testing, essentially you subject the hair

6        to the bleaching and you wait before and after

7        and you get a number which is the difference in

8        the weight.  Well, that's not a percentage in

9        decrease of breakage.

10                    So I asked their expert, how is

11       this relevant?  And eventually after some back

12       and forth, he said, well, I might be able to

13       correlate protein loss to what you're claiming

14       in your claims.  Now, let's turn to Dr. Freeman.

15       I asked him, Do you know of any test method that

16       would give you this percentage of decrease in

17       hair?  He said, No.  He said he didn't know.

18                    Well, what's interesting about it

19       is the issue was debated in the PGR.  The PGR is

20       part of the intrinsic evidence that's required

21       for claim construction.  And yet either he never

22       asked for it or his counsel never gave him that

23       information because he never looked at it.

24                    Can we pull up D.I. 460, Exhibit 1

```
 1        and it's Transcript 133, Lines 6 to 12.  So I

 2        was sort of curious.  He's telling me on the

 3        slide I just showed he didn't know how this was

 4        tested.  Yet I knew it was discussed in the PGR.

 5        He should have been looking at the PGR record in

 6        connection with claim construction.  He had

 7        never been given it.  His opinions, I think, are

 8        diminished in their credibility in this area

 9        because he simply wasn't given sufficient

10        information.

11                    Now, let's go back to Slide 66.  I

12        think this timeline is important but I have to

13        give a little context.  So in May of 2018 is

14        when we told the PTAB, here is the gold

15        standard, here is how you assess this percentage

16        of decreasing hair breakage.  Here is the TRI

17        test.

18                    At that time, we didn't know what

19        testing L'Oreal had done.  We didn't know that

20        they had actually used TRI to do the gold

21        standard testing.  We only found that out months

22        later.  So the fact that what we identified as

23        the gold standard is actually corroborated by

24        L'Oreal because they used the test that we said
```

```
 1        was the standard.  There can't be any better

 2        evidence of that.

 3                     They haven't shown that there's

 4        some other test that gives you different

 5        results.  In fact, their expert said he didn't

 6        know of any test.  Well, they had it in their

 7        file.  They just didn't give him the testing

 8        that they did.  Unless Your Honor has more

 9        questions, that's all I have on that.

10                     THE COURT:  No questions.

11                     MR. BLACKBURN:  Thank you.

12                     MR. PALYS:  Just a couple of

13        points, Your Honor, and then I'll let

14        Mr. Zeilberger take the podium so you can stop

15        listening to me.  I wanted to bring up something

16        on the DeGeorge comment that you brought up.  I

17        think if you look at our D.I. 420 at 13, you can

18        see our citations there.

19                     Basically, if you look at it, it

20        makes clear that you have a lightening

21        composition, i.e., a bleaching composition and

22        that's adding an acidic condition.  I think

23        regardless of whether there is any pretreatment,

24        if you will, it's still considered a bleaching
```

```
 1        composition or a lightening composition at an

 2        acidic level.

 3                   The last point I want to discuss,

 4        we heard the discussion of the Evans paper and I

 5        think in D.I. 462-1, Exhibit AN, we cite to this

 6        in our -- actually, it might be our opening

 7        brief.  There's a critique of that.  And we put

 8        that in our brief.  It's in the record before

 9        they raised this Evans paper.  So to the extent

10        that Evans is the gold standard test, not

11        everyone seemed to agree with it.  It's D.I.

12        422, Exhibit AN just to be clear.

13                   And with that, I'm going to allow

14        my colleague Mr. Zeilberger to take the stand

15        and I will finally stop talking.

16                   THE COURT:  Very well.

17                   MR. ZEILBERGER:  Good afternoon,

18        Your Honor.

19                   THE COURT:  Good afternoon.

20                   MR. ZEILBERGER:  Daniel Zeilberger

21        on behalf of Defendants.  May it please the

22        Court?  In the context of the '419 and '954

23        patents, the term about is indefinite and let me

24        explain.  Turn to Slide 111, please.  So it's
```

```
 1        important to keep in mind how the claims of the

 2        asserted patents use the term invalid.

 3                    As you can see in both the '419

 4        and '954 patents, they recite essentially the

 5        exact same language; from about 0.1 percent by

 6        weight to about 50 percent by weight.  And the

 7        question that these claims raised is what is the

 8        endpoint of this range.  What is the lower

 9        endpoint and what is the upper endpoint.  And

10        the problem with the patents is they never

11        provide an answer to that question.

12                    So Slide 112.  Now, we've

13        excerpted here from the specification of the

14        '419 and '954 patents, in the '419 patent Column

15        16, Lines 26 to 36, an example -- really the

16        only specific example where ranges are defined

17        in the context of what's arguably a bleaching

18        mixture and it's noted by a mix with the term

19        about.  So Olaplex didn't have to use the term

20        about in the claims if it didn't want to.

21                    And you can see that, for example,

22        about four lines from the bottom of the excerpt,

23        they say preferably at least 0.1 percent by

24        weight to large amounts such as up to 50 percent
```

1        by weight, so the word about doesn't appear

2        there.  And to be sure, it does appear elsewhere

3        in the specification, the word about, but they

4        never explain what it means.

5                     So Slide 113.  I think this issue

6        is really crystallized in the testimony from

7        Olaplex's expert Dr. Borish in the PGR where he

8        was asked, and this is Line 16 of D.I. 421,

9        Exhibit E, Page 80, what does the word about

10       before the 0.1 percent and the 50 percent mean

11       to you?  And he couldn't give a straight answer.

12       He kind of waffled.  He said maybe it means plus

13       or minus 10 percent but it depends, and it's

14       really indefinite.

15                     Can you go to Slide 114, please.

16       And in addition to the testimony from

17       Dr. Borish, we also have testimony from

18       Dr. Freeman that affirmatively confirms two

19       things.  One, that this plus or minus 10 percent

20       concept doesn't show up anywhere in the

21       specification by the patent.  It's simply silent

22       about the meaning of about.

23                     And the second point is just that,

24       the specification doesn't explain what about

1   means.  Slide 115, please.  So we think the

2   facts here are very similar to the Amgen v.

3   Chugai case from the Federal Circuit.  That's

4   927 F.2d 1200 and the cite for this section is

5   1218, where the Federal Circuit found the term

6   about to be indefinite in a case where there was

7   nothing in the specification, prosecution

8   history, prior art to indicate what about meant,

9   and there was no evidence from the experts to do

10  that.

11           In fact, here I think it's even a

12  stronger case because you have nothing in the

13  specification or prosecution history that gives

14  any guidance.  And here the expert testimony

15  actually affirmatively confirms that the word

16  about is indefinite.

17           So Slide 116, please.  So Olaplex

18  has really made two points in response.  One,

19  they point to a passage from Dr. Wickett, his

20  declarations in the PGRs.  He was L'Oreal's

21  expert where he touched on this plus or minus 10

22  percent concept, but their reliance on his

23  testimony is misplaced.

24           There he was just saying that the

```
 1        specification doesn't have support for that plus

 2        or minus 10 percent concept and for that reason,

 3        the specification doesn't have adequate support

 4        for the term about.  And if you look at the

 5        bottom half of this Slide 116, you see that

 6        Olaplex itself actually is conceding that the

 7        term about in the context of these patents

 8        doesn't have a precise definition.

 9                    Now, I would like to pull up, I

10        think this is important, Slide 73 from Olaplex's

11        demonstratives which has three cases that I

12        don't think showed up in any of the briefs, and

13        I think it's important to touch on them.

14                    First, the title of this slide

15        says that Delaware has consistently held about

16        as definite.  In fact, none of these three cases

17        held the term about to be definite.  In the

18        first case as Olaplex says, the court declined

19        to construe the term about and declined to

20        decide the issue.

21                    In the second two cases, there

22        weren't any indefiniteness arguments made.  The

23        second point that I think is important,

24        specifically with respect to the Ansell case,
```

1        you see there kind of the excerpted part, you

2        see the passage where the court says, I am

3        dubious of Defendants' arguments.  But if you

4        pull up the Ansell case specifically, I think

5        context is key here.

6                    The yellow highlight there of the

7        Ansell case is the part that shows up in

8        Olaplex's slide where it says, I am dubious of

9        Defendants' arguments.  But what's important is

10       four words before that, they say on the one hand

11       I am dubious.  But if you look after that in the

12       orange highlighting, on the other hand the

13       Federal Circuit in considering indefiniteness

14       challenges as to similar language has looked to

15       guideposts in the patent informing a skilled

16       artisan of how to measure a term of degree, and

17       that's what's missing here.  The '419 and '954

18       patents don't give any guideposts about what the

19       scope is of the term about, and for that reason

20       it's indefinite.  Unless Your Honor has any

21       questions, that's all I have.

22                    THE COURT:  No questions.

23                    MR. BLACKBURN:  We're getting to

24       the end, Your Honor.  So we're going to go to

```
 1        Slide 68.  This is just the claim to get some
 2        context.  I think as an ordinary lay juror when
 3        you say the word about, you know what it means.
 4        It means that those numerical limitations are
 5        not precise.  They're not hard stops.
 6                   So you could have an amount of
 7        concentration of the active agent and the
 8        mixture that's a little bit below .1 or a little
 9        bit more than 50 weight percent and you would
10        still be within the scope of the claim.  And in
11        fact, they use approximate words like about
12        which is quite common in claim language.
13                   So our construction since it has
14        plain words that jurors can understand is that
15        there's no need to construe it.  And you saw in
16        the Delaware cases that were just shown to Your
17        Honor, that in the first case that's what the
18        court did.  The court basically said, I don't
19        need to construe a term that a juror would
20        readily understand.
21                   And then the other two essentially
22        gave it a synonym.  They said about means
23        approximately.  Defendants say the term is
24        indefinite because there's no test or standard
```

1       set forth in the specification for how much

2       about varies.

3                    What was interesting in the

4       presentation and in their briefing is they don't

5       cite to any legal precedent, any at all, binding

6       or otherwise that says that's required.  The

7       only case that they cite that goes their way is

8       this Amgen v. Chugai case.  And when you take a

9       look at that case, it's actually quite different

10      from our facts.

11                   And forgive me, but I will have to

12      get into a little bit of detail about the

13      prosecution.  But the claims had a numerical

14      limitation and it said that the specific

15      activity had to be greater than 120,000, and the

16      examiner found a piece of prior art that had

17      128,000, so they modified the claim language to

18      go and say about 160,000.

19                   And in that context, the Federal

20      Circuit was troubled because it wasn't clear

21      whether they were still trying to capture the

22      subject matter that they gave up because of the

23      prior art.  It wasn't clear to the court whether

24      or not about 160,000 went all the way down to

1      128,000.

2                      What the Federal Circuit was

3      counseling prosecutors in that situation to do

4      is not use about because it's not clear.  But in

5      this case, we have lots and lots of evidence

6      that a person of ordinary skill in the art would

7      understand what about means in this claim.

8                      Now, Mr. Zeilberger tried to say,

9      well, don't pay attention to Dr. Wickett.  He

10     was just talking about some other issue, but his

11     words are his words.  He said, a skilled artisan

12     2014 would have interpreted about in this very

13     patent to refer to amount that's plus or minus

14     10 percent.

15                     If that's true, if their expert's

16     position is true, that's dispositive.  The claim

17     can't be indefinite.  And they mentioned

18     Dr. Borish.  Here's his testimony.  I don't like

19     the yellow highlighted version, so I reproduced

20     it here.  He says in the top part that basically

21     about means it's not necessarily exactly .1, a

22     term of approximation.  That's consistent.

23                     And then he's asked by their

24     counsel, is 10 percent below or above?  And he

```
1        says, it depends.  It's not unreasonable.  But
2        again, it's an indefinite, but it's a word of
3        approximation, but, yeah, that's reasonable.  So
4        we've got our second person of ordinary skill in
5        the art that says plus or minus 10 percent is
6        okay.  That's how they understand the claims.
7        With that factual basis, there simply is no
8        indefiniteness here.
9                     These are the three cases, and we
10       just checked very quickly and we couldn't find
11       these claims cited in our brief and I apologize
12       for that.  But I think the main point I want to
13       make is that in the top case, the court declined
14       to construe about so that the lay juror would
15       understand what it means.
16                     And in the bottom two, they just
17       said about means approximate.  They didn't have
18       a requirement for some stringent standard set
19       forth in the specification.  No case says that.
20       And then finally, we're going to make the same
21       point we've been making to Your Honor all day.
22       They tried this argument several different ways
23       with the PTAB and it was rejected again and
24       again and again.
```

```
 1                    Your Honor should take a look at

 2         the PTAB decisions and see that they didn't have

 3         any trouble understanding what about meant.  If

 4         you have any questions?

 5                    THE COURT:  No questions on this

 6         term.  Anything further, Mr. Zeilberger?

 7                    MR. ZEILBERGER:  Very briefly,

 8         Your Honor.  I think just the two points I want

 9         to clarify with respect to the testimony that

10         was shown on the slides, one was with respect to

11         Dr. Wickett.  I think one thing that was said

12         that actually didn't show up in the declaration

13         was in this patent, opposing counsel said that

14         Dr. Wickett said about means this in this

15         patent.

16                    If you look at the record, he

17         actually didn't use those terms.  He just said,

18         generally maybe this is a meaning of what about

19         may mean, but in this patent that actually

20         doesn't show up in the specification.  There's

21         no support for it and for that reason, the term

22         about doesn't have support in the specification.

23                    The other thing that I think is

24         notable that you didn't hear that I had brought
```

1       up in the opening is with respect to Dr. Borish,

2       that he said it's an indefinite really, and his

3       words should hold.  If Olaplex's own expert

4       thinks it's indefinite and can't stand by a

5       particular meaning, that shows it's consistent

6       with the Amgen case, consistent with the Ansell

7       case that Olaplex submitted but left off the

8       second sentence, and, Your Honor, I can give you

9       the Westlaw cite for that.  It's 2017 Westlaw

10      1021844, since I don't think it shows up in the

11      slide.  We think the evidence here is very

12      analogous to the Amgen case and the about term

13      here is indefinite.  Thank you.

14                  THE COURT:  All right.  Well, I

15      want to thank everyone for your presentations,

16      very helpful.  I will take this under

17      consideration and I will issue the claim

18      construction Report and Recommendation within

19      the time I indicated in the scheduling order.

20                  With that, is there anything

21      further from the Plaintiffs?

22                  MR. PAUNOVICH:  No, Your Honor.

23                  THE COURT:  Anything further from

24      the Defendants?

1                    MR. PALYS:  No, Your Honor.

2                    THE COURT:  All right.  We will

3      stand in recess.  Thank you.

4                        (The proceedings ended at

5      2:35 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1           C E R T I F I C A T I O N

2

3           I, Taneha Carroll, Professional

4    Court Reporter, certify that the foregoing is a

5    true and accurate transcript of the foregoing

6    proceeding.

7

8           I further certify that I am neither

     attorney nor counsel for, nor related to nor

9

     employed by any of the parties to the action in

10

     which this proceeding was taken; further, that I am

11

     not a relative or employee of any attorney or

12

     counsel employed in this case, nor am I financially

13

     interested in this action.

14

15

16
            /s/ Taneha Carroll
17          Taneha Carroll

18          Professional Reporter and Notary Public

19

20

21

22

23

24