IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
LIQWD, INC., et al.,          :
                              :
            Plaintiffs,       : No. 1:17-cv-0014-JFB-SRF
                              :
      v.                      :
                              :
L'OREAL USA, INC., et al.,    :
                              :
            Defendants.       :
```

Wednesday, December 12, 2018
10:00 a.m.

Oral Argument
Courtroom of Judge Sherry R. Fallon

844 King Street
Wilmington, Delaware

BEFORE:   THE HONORABLE Sherry R. Fallon,
          United States District Court Magistrate

APPEARANCES:

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
BY:  JEREMY TIGAN, ESQ.

              -and-

QUINN EMANUEL
BY:  JOSEPH PAUNOVICH, ESQ.

        On behalf of Plaintiffs

1    APPEARANCES CONTINUED:

2

                    RICHARDS, LAYTON & FINGER, P.A.
3                   BY:  KATHARINE MOWERY, ESQ.
                    BY:  FRED COTTRELL, ESQ.
4
                              -and-
5
                    PAUL HASTINGS
6                   BY:  JOSEPH PALYS, ESQ.
                    BY:  KATHERINE MURRAY, ESQ.
7
                        On behalf of Defendants
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              THE COURT:  Good morning,
 2     everyone.  Let's start with the introductions of
 3     counsel and then I'll have some preliminaries.
 4              MR. TIGAN:  Good morning, Your
 5     Honor.  Jeremy Tigan with Morris Nichols on
 6     behalf of the Plaintiffs, and I'm joined today
 7     by Joe Paunovich from Quinn Emanuel.
 8              MR. PAUNOVICH:  Good morning, Your
 9     Honor.
10              THE COURT:  Good morning.
11              MR. TIGAN:  And our client
12     representative Tiffany Walden.
13              THE COURT:  Good morning.  And for
14     the Defendants, Ms. Mowery?
15              MS. MOWERY:  Good morning, Your
16     Honor.  Kate Mowery from Richards, Layton &
17     Finger on behalf of the Defendants.  I'm here
18     with my colleague Fred Cottrell from Richards
19     Layton and Joe Palys and Katherine Murray from
20     Paul Hastings.
21              MR. COTTRELL:  Good morning, Your
22     Honor.
23              MR. PALYS:  Good morning, Your
24     Honor.
```

```
 1              MS. MURRAY:  Good morning, Your
 2    Honor.
 3              THE COURT:  Good morning again.
 4    All right.  Our hearing today has been continued
 5    a few times for various good cause, so I was
 6    looking at our previous letter outlining how
 7    we're going to use our time today and I just
 8    wanted to make a couple of tweaks to it in light
 9    of the latest developments.  And by the way, I
10    did receive the materials that were filed on the
11    11th of December and I have looked at them in
12    connection with this hearing.
13              I'm going by the letter that was
14    sent on November 28th.  It's Document Item No.
15    520.  With regard to Item No. 2 which related to
16    argument time allotted for Defendants' renewed
17    Motion to Stay pending post-grant review, I'm
18    going to eliminate argument on that today.  I
19    think with that I'll decide it on the papers.
20              I think given the number of
21    discovery disputes by my count, collectively
22    there's 13, possibly 14 discrete issues, I think
23    we're going to need all the time today to
24    address them pretty much.  And I'm certainly
```

1    keeping on oral argument on Defendants' Motion

2    to Dismiss the second Amended Complaint.  So I

3    thought given the time that I've set aside, it

4    makes sense to parse it down to those main

5    issues and I think I can decide the remaining

6    stay issue on the papers.

7                 With that, let's -- let me ask the

8    Defendants first, have you discussed with

9    Plaintiffs' side how you want to present this,

10   if you want to go forward with the Motion to

11   Dismiss first and then hold the discovery issues

12   afterwards or how do you want to use the time?

13               MR. PALYS:  Good morning, Your

14   Honor.  We have not had that discussion with

15   Plaintiffs' counsel, but I think that makes

16   sense from our perspective, proceed with the

17   Motion to Dismiss and save the rest for

18   discovery.

19               THE COURT:  All right.  Are

20   Plaintiffs fine with that, Mr. Paunovich?

21               MR. PAUNOVICH:  Yes, it's

22   acceptable.

23               THE COURT:  And just so counsel

24   knows, I'm going to do my very best in light of

```
 1          where we are in the case to give you bench

 2          rulings on the discovery issues.  So if we're

 3          going to use our time wisely, let's make sure we

 4          leave a lot of time for those.

 5                    Again, we've all I think been

 6          around the block on the issues which are

 7          substantive to the Motion to Dismiss.  I'm not

 8          suggesting in any way, shape or form that the

 9          curtain has come down and my mind is closed to

10          it.  Obviously, I want to hear oral argument on

11          it.  But in terms of how much I need from all of

12          you, I really want you to focus on what I'm sure

13          you can anticipate are going to be the

14          controversial points that came up in the

15          briefing, the opening and answering reply

16          briefs, so those should be your focus.

17                    I don't need a recitation of the

18          law I'm to follow or what cases I'm to follow or

19          construing the facts in favor of the nonmoving

20          party.  All of that background I think would

21          save precious time so that we can use it wisely.

22                    All right.  With that in mind,

23          let's proceed with the Motion to Dismiss the

24          Second Amended Complaint.
```

```
 1              MR. PALYS:  Thank you, Your Honor.
 2    I will do my best to focus on what we think are
 3    key issues.  Let me begin, and I think this sets
 4    the framework of one of the main arguments that
 5    the Defendants have with respect to this issue.
 6    Olaplex's motion, that's D.I. 126, and I think
 7    we have to make clear what Olaplex presented to
 8    this Court at that time.
 9              If we look at D.I. 126, Your
10    Honor, and I'll quote from them and paraphrase
11    where I can, at Pages 5 and 6 of that motion
12    Olaplex made absolutely clear their amendment
13    will not prejudice L'Oreal because the '954
14    patent is a continuation of the currently
15    asserted '419 patent and "the same accused
16    products are at issue."
17              Again, on Pages 5 to 6, the claim
18    of infringement is nearly identical to the
19    claims of the '419 with the sole substantive
20    difference being that the '954 patent does not
21    include, remember this term, hair coloring
22    agent.  So they're taking a position and saying
23    the claims are the same except of this hair
24    coloring agent, so they're making absolutely no
```

1      bones about their positions on the '954 and '419

2      patents.

3                    And to be clear on Page 6 of D.I.

4      126, they begin this argument, Olaplex's

5      amendment is sought in good faith and for

6      "legitimate purpose."  And what was that

7      purpose?  They explained, Olaplex provided an

8      element-by-element infringement analysis

9      detailing L'Oreal's willful infringement of the

10     currently asserted '419 patent, and they

11     continue with this and this is telling, Your

12     Honor.  The newly issued '954 patent is

13     infringed by the same L'Oreal accused products

14     for the same reasons.  Again, same page,

15     L'Oreal's infringement of the '954 patent is

16     clear.  They refer to the hair coloring agent

17     and they say here, the issued claims of the '954

18     do not contain this such limitation and thus,

19     infringement was essentially admitted.

20                    So we think it was absolutely

21     clear the representations that they came to this

22     Court to get their motion granted and we believe

23     the Court relied on those representations when

24     it granted its motion.  So what did Olaplex do

```
 1        in response to this -- and I think that's in the
 2        papers and you can see what our position is on
 3        that.  They presented a new amendment that
 4        changed the definition of accused products,
 5        essentially adding new products.
 6                        They came in first with their
 7        Motion to Amend to say, look, we're going to add
 8        the '954 patent which was just the issue, and
 9        we're going to apply it to the same products,
10        same positions, and that's not what they did
11        after the Court granted their motion.  I can
12        skip around, but let me just get to the heart of
13        this to get to your point.
14                        THE COURT:  Yes, because I do have
15        a few questions.
16                        MR. PALYS:  So the main issue,
17        some of their argument is, well, you know what,
18        we filed the infringement contentions later so
19        no harm, no foul.  And then they admit in their
20        papers, you know what, our pleading really made
21        clear that we weren't asserting Step 2 and Step
22        3 against the '419.  But really when you read
23        their pleading, it did to us.  But I anticipate
24        this from Your Honor, what's the prejudice.
```

1    Look where we are in the case.

2                      THE COURT:  That's exactly my

3    question.  As a practical matter assuming

4    hypothetically that this just violates every

5    rule of procedure that wasn't done through the

6    vehicle of a proper Motion to Amend giving the

7    Defendants an opportunity to respond to adding

8    these products, et cetera, et cetera, as a

9    practical matter where does that leave the

10   parties in the schedule that we have now looking

11   to trial in 2019?  Is there a fix?

12                     MR. PALYS:  Well, we will save

13   that one for a second.

14                     THE COURT:  Well, don't tell me if

15   there's a fix, but I want to hear from the

16   Defendants.

17                     MR. PALYS:  Here is the prejudice

18   with that or the reality that we're in:  Had

19   they came to this Court and actually said what

20   they intended to do back when they did it, we

21   would be arguing this issue under a motion to

22   amend.  What would have happened then?  Maybe

23   the Court would have found for us or maybe they

24   wouldn't, but this issue would have been done.

```
 1              We have not even answered our
 2     Complaint, Your Honor.  We are a week away from
 3     the end of discovery.  We are not going to get
 4     discovery on our counterclaims.  We could have
 5     had that issue taken care of.  So, yes, there is
 6     an extreme prejudice against this issue by them
 7     not following the rules and taking it upon
 8     themselves and asking for forgiveness later by
 9     following this and making us file a Motion to
10     Dismiss on these products.  So on that point,
11     that's where we are.
12              Substantively just to be clear,
13     and I think the papers are pretty clear, the
14     pleadings as it stands we think is willfully
15     deficient on its face on any allegation of any
16     of these products.  If the Court has any
17     question on that, I'm happy to walk through
18     that.  But we think on its face these products
19     should not be included in this amendment.
20              Where does that leave us?  Again,
21     we're coming to the close of discovery.  We're
22     going to talk about a lot of discovery issues.
23     We think it shouldn't be L'Oreal's burden here
24     or affect L'Oreal.  We're not the ones who
```

```
1        caused this issue.  We're trying to defend

2        against it and we're the ones being prejudiced

3        by them not following this procedural rule and

4        taking it upon themselves to do what they did,

5        force us to do why we're arguing it today.

6                    THE COURT:  I know I'm putting you

7        on the spot and I won't hold you to this

8        verbatim based on your response, but do you have

9        a sense of how much discovery you would need to

10       get your arms around in order for you to be in a

11       position if these accused products were added

12       and the Complaint as amended were permitted to

13       be the operative pleading in the case?

14                    MR. PALYS:  How much discovery

15       that we would have to produce?

16                    THE COURT:  No.  You said them

17       adding these accused products puts you in a

18       prejudicial spot of not being able to have

19       discovery with respect to these additions and

20       also with respect to any counterclaims that may

21       be asserted.

22                    MR. PALYS:  I think there's a

23       miscommunication there, so let me clarify.  You

24       had it right at the end.  The prejudice is
```

```
 1        because they didn't do it earlier let's say in

 2        June, we would have had this rectified whether

 3        win or lose.  We would have been able to answer

 4        our Complaint some time maybe in the summer.

 5                    At that point, we would still have

 6        the time in discovery to pursue discovery on our

 7        claims that we haven't presented yet.  Now, to

 8        get to your first point if I understand what

 9        Your Honor is asking, the issue is if Step 2 and

10        Step 3 accused products from Plaintiffs' side is

11        added to this case, that's a separate issue.

12        Now, we're going to have to go through the

13        process of I'm sure they're going to complain

14        here today, we didn't get discovery on these

15        products, et cetera because we've been waiting

16        on a decision on this issue.

17                    There could be deposition topic

18        issues, are we going to present a witness on

19        these, preparing them for this stuff.  And

20        honestly, I know we can't get into the substance

21        because we have many other things to talk about.

22        The futility argument that we raised on these

23        Step 2, Step 3 is real.  You can see what their

24        pleading says even though they're trying to run
```

```
 1        away from it with their infringement

 2        contentions.

 3                     Step 2 and Step 3 just to be clear

 4        are after follow-on type of products.  Step 3

 5        you take home.  What are the claims at issue?  A

 6        method of bleaching that they're accusing at a

 7        salon.  So Step 3 isn't -- I don't know how

 8        they're going to map it to the claim even though

 9        they try to in their infringement contentions,

10        but in their pleading they don't want to do

11        that.  So I think futility still has to come

12        into play here.

13                     I know that doesn't really get to

14        your question of what do we do if you do add

15        these things, and we hope you don't because we

16        think that's the right decision.  But I'm sure

17        there will be discovery issues that I'm sure

18        they're going to fight over that we didn't

19        produce on this.

20                     Our main part on prejudice is when

21        we finally get a chance to tell our side of the

22        story and start going after potential

23        counterclaims and we have -- and in fact,

24        there's been some recent discovery a few days
```

```
 1        ago with the depositions that really put some

 2        color into this case.  We're going to want

 3        discovery on that and frankly, it's cutting off

 4        on the 21st, so there's the prejudice.  Any

 5        other questions?

 6                    THE COURT:  Not on that point, but

 7        go ahead.

 8                    MR. PALYS:  I can keep going --

 9                    THE COURT:  The other issue I had

10        is this whole issue of taking judicial notice in

11        support of the Motion to Dismiss.  Under what

12        framework, rules, local rules, Federal Rules of

13        Civil Procedure, case authorities, how does that

14        get wrapped into what I should consider on a

15        Motion to Dismiss?

16                    MR. PALYS:  The judicial notice

17        only goes to the Step 1, not Step 2 or Step 3 so

18        it doesn't have any effect on that.  And I'm

19        happy to talk about it.  I think the papers laid

20        out we're not presenting it as Olaplex is saying

21        we're presenting it.  In fact, and I state this

22        with caution, Your Honor, I believe this Court

23        did find a judicial notice on our previous

24        Motion to Dismiss for a certain issue.
```

```
 1              I don't know if it's the same
 2      exhibit but I remember reading that.  But the
 3      point is, that notice goes to the Step 1 product
 4      and it shouldn't affect Step 2, Step 3.
 5              THE COURT:  All right.  Thank you.
 6      You will have a chance to respond on rebuttal.
 7      Let me hear from the Plaintiff.  Mr. Paunovich?
 8              MR. PAUNOVICH:  Good morning, Your
 9      Honor.  Joe Paunovich on behalf of the
10      Plaintiffs.  I think Your Honor got right to the
11      heart of the point, where is the prejudice here.
12      And to address it very squarely, I think it was
13      lost a bit in Defendants' presentation what
14      additional discovery would need to occur.
15              We believe it's a single
16      interrogatory response and perhaps one document.
17      These would be a simple reporting of any
18      additional financial revenue units, profit costs
19      that are associated with these products.  The
20      other side actually provided us that information
21      in their first response to our interrogatory and
22      after they took the position that, oh, we're
23      suddenly surprised that these are not part of
24      the case, they began removing it from their
```

```
 1        interrogatories responses.  So we pushed them

 2        over and over again to continue providing us

 3        that information.

 4                    If you recall, Your Honor, we had

 5        an August 1 discovery teleconference and Your

 6        Honor instructed us to provide a detailed letter

 7        with specific financial information that we

 8        needed.  We did that within a few days of the

 9        hearing and we've been trying our best to try

10        and resolve this short of a discovery dispute.

11        It's the very first discovery dispute in our

12        letter.  But to be clear, an interrogatory

13        response and a document reporting those

14        financials.

15                    We do not need -- they are

16        identical to the Step 1 product in that they

17        have the exact same active agent.  In fact, they

18        are sold as a single product as kits.  They are

19        sometimes sold as a stand-alone separate.  But

20        in the majority of the cases -- so this is not a

21        situation on the amendment.  The main issue that

22        Defendants are raising, this is not an issue

23        where it would kick discovery out or have any

24        reason or basis to kick it out.
```

1           What it seems to be the Defendants

2      are saying is, look, we have these secret

3      counterclaims that we refuse to tell anybody.

4      We've served an interrogatory asking identify

5      all of your defenses months and months ago.

6      They refused to provide us with an

7      identification of their defenses.  Standing

8      instead on this long-pending motion saying, we

9      will tell you when we tell you after this has

10     been identified.

11          This is not an instance where they

12     have been precluded from taking discovery on

13     whatever their secret claims might be.  So as

14     we're doing it and hearing it for the very first

15     time here today that we've got these secret

16     claims that we want to take discovery on, if

17     anything, this seems like a manufactured dispute

18     to try and extend our discovery schedule.

19          Whatever those counterclaims are,

20     are totally independent of whether or not Steps

21     2 and 3 should be in the case.  It's a simple

22     financial interrogatory and a document

23     associated with it.  Once we have those, we're

24     good.  Our damages people will be set.  We don't

```
1          need any other technical discovery related to

2          them.  We know exactly what they are, their

3          ingredients and we will be prepared to provide

4          our expert reports just in the same way that we

5          provided our infringement contentions on those

6          products now eight months ago.

7                      Unless Your Honor has any

8          questions, I do think we've laid out all the

9          other issues in the papers.

10                     THE COURT:  Why bring it in

11         through this way?  If you were going beyond the

12         leave that was granted previously with respect

13         to leave to amend, if there was any chance or

14         any concern in Plaintiffs' view that this might

15         be overstepping what the Court admitted, why not

16         tee it up in the normal fashion?

17                     MR. PAUNOVICH:  That is a very

18         good question, Your Honor.  And I will candidly

19         say when we filed our second Amended Complaint

20         and I will take this personally, I didn't notice

21         a definition in the very first paragraph

22         unrelated to the '954 allegations, that second

23         patent that defined accused products, and it was

24         just truthfully overlooking that.
```

```
 1                    The amendment that we made was not
 2         in the traditional cases where people get their
 3         Complaints dinged because they've added entirely
 4         new causes of action or theories or substantive
 5         matter that is changing the scope of the case.
 6         At that point everybody knew including L'Oreal,
 7         that we were accusing all three products.  So we
 8         simply removed the definition so that it was
 9         consistent with the balance of the Complaint,
10         which by the way was already there describing
11         and talking about Steps 1, 2 and 3 at length.
12                    These are dozens of paragraphs of
13         pages that had talked about all of this.  We
14         didn't add those.  They were in the very first
15         Complaint.  In addition to answer your question,
16         well, why didn't we do something or bring that
17         to the Court's attention, our understanding and
18         this is part of what we briefed, we don't need
19         to identify every single product and every
20         single claim that's infringed in a Complaint.
21         Under our local rules in the Phillips v. ASUSTek
22         case which is in our briefing, it's sufficient
23         to identify a single product and single claim
24         that's infringing and you have satisfied your
```

```
 1    duty.

 2                    Our concern and the very small and

 3    simple clarification was not to later have

 4    L'Oreal say, oh, we didn't know about this.  So

 5    that case we do think it seems to be controlling

 6    in the District of Delaware, that the practices,

 7    you identify a product in a claim and then later

 8    you can assert infringement against whatever you

 9    want in the contentions which we did.  And I do

10    apologize, Your Honor.  I hate that we even have

11    to be here having that discussion.

12                    At least from our perspective,

13    there's no doubt that everybody has been on

14    notice.  We were getting discovery before their

15    motion on those products, taking discovery on

16    them and we've continued to do so within a

17    technical nature, et cetera.  Our case will be

18    fully brought in and all we need is just the

19    financial information.  Thank you.

20                    THE COURT:  Thank you.  If you

21    want to respond, Mr. Palys?

22                    MR. PALYS:  Yes, thank you, Your

23    Honor.  Real quick.  Number one, a mistake

24    should not prejudice L'Oreal.  I think this is
```

```
1          going to be a theme you're going to hear

2          especially when we touch on this protective

3          order which is a very serious issue for my

4          client.

5                        As to this discovery of the Step

6          2, Step 3 products, I know I mentioned to Your

7          Honor, look, we have to pursue discovery on our

8          counterclaims and then the Step 2 and Step 3 was

9          them coming for our documents.  I forgot to

10         mention that they have to prove infringement of

11         Step 2, Step 3 so we're entitled to discovery on

12         their basis for that.

13                        THE COURT:  That's what prompted

14         my question.

15                        MR. PALYS:  And I apologize for

16         mixing that up.  So, yes, we do have discovery

17         that we would want on them, how do they operate,

18         what's their basis for their infringement of

19         these claims that they're pursuing.  What

20         Mr. Paunovich was suggesting all relate to the

21         independent claims which have no bearing on

22         these Step 2, Step 3 products.

23                        The third thing I want to bring up

24         is I heard Olaplex's counsel mention we haven't
```

```
 1        blocked any discovery on these issues and

 2        discovery has been going on.  You're going to

 3        hear today that's actually not the case and I'll

 4        give one example, the precursor before

 5        Ms. Murray gets up here and explains the Behind

 6        the Chair litigation, this is a big issue.

 7        They're refusing to give us documents on that.

 8                    Why is that relevant?  It goes to

 9        a lot of things.  At the very least, it relates

10        to a lot of our defenses that we're going to be

11        putting against them in terms of how they're

12        marketing their product.  It goes to many of the

13        issues that Ms. Murray is going to bring up.

14                    Now, they're probably going to say

15        when they get up here because there was a

16        deposition recently, someone from Behind The

17        Chair said, oh, it wasn't relevant.  That person

18        doesn't know what's relevant in our case.  But

19        to get to our point, again L'Oreal is being

20        prejudiced by this and I think, yes, we're

21        coming close to discovery.  And what can we do

22        about it?  Dismiss their claims on these two

23        products.  That's what we can do.  We can just

24        move on and continue on.
```

```
 1                    L'Oreal does not want to extend

 2       the schedule.  Let's be clear about this.

 3       Discovery is on the 21st, we're ready to go and

 4       offer our witnesses and provide our disclosures.

 5       Third-party witnesses may be an issue.  We have

 6       issues on what they're producing and providing

 7       to us.  They just dumped 20,000 documents on us

 8       last week and document production ended a month

 9       ago.  That's when we got the full flow of

10       information.  So we're being prejudiced we

11       believe in our eyes and I know you hear this a

12       lot.  I think the answer here is to dismiss any

13       notion that the Step 2, Step 3 products come

14       into this case.  Thank you.

15                    THE COURT:  All right.

16                    MR. PAUNOVICH:  Your Honor, may I

17       just say one brief word?

18                    THE COURT:  One brief word.

19       Typically, I'm a traditionalist when it comes to

20       dispositive motions like this and I give the

21       moving party the last word.  But Mr. Palys has

22       wrapped in some of the discovery issues coming

23       up, and I think a lot of these issues blend into

24       different categories so I'm fine giving you
```

```
 1        further comments.  Just know my traditional
 2        practice going forward.
 3                        MR. PAUNOVICH:  Understood, Your
 4        Honor.  Ten seconds.  Nothing that he just
 5        raised has anything to do with Step 2, Step 3.
 6        I didn't hear any of that.
 7                        THE COURT:  All right.  Because
 8        this is a dispositive issue that I'm going to
 9        have to write an R&R on, I will take it under
10        advisement so I will be writing on this issue.
11        However, I am ready to speed ahead into the
12        discovery issues.
13                        Let me just reorganize myself on
14        the bench so that I have materials handy.
15                        MR. PALYS:  Your Honor, Mr. Palys.
16        I was just thinking because I know discovery is
17        going to take us to the rest of the time frame,
18        do you want to talk about the protective order
19        now so that it doesn't get lost at the end or do
20        you want to wait until after the discovery
21        issues?
22                        THE COURT:  Well, I was going to
23        ask the parties.  I just presumed that we would
24        go ahead in the manner in which the issues were
```

```
 1        raised chronologically in the papers.  But if

 2        you want to discuss the most recent briefing

 3        first --

 4                     MR. PALYS:  Well, we're happy to

 5        do what Your Honor wants.  It was just a

 6        suggestion.

 7                     MR. PAUNOVICH:  Your Honor, our

 8        preference would be to handle the discovery

 9        given the length of the issues, but of course,

10        we will defer to your preference.

11                     THE COURT:  Okay.  Well, let's go

12        in the order that they were raised.  Does

13        anybody have a PowerPoint on the discovery or

14        are we just going to go issue by issue as if we

15        were on a teleconference?

16                     MS. MURRAY:  No, Your Honor, we

17        don't have any slides.  I don't know if Your

18        Honor wants to go through as they were presented

19        in the respective letters or --

20                     THE COURT:  We'll do it in the

21        fashion that we've been doing it in our

22        teleconferences.  We'll go issue by issue.  I

23        have the first submission that was filed by your

24        client, Ms. Murray, the Defendant Document Item
```

```
 1      No. 525, and the first issue raised in that

 2      document is the Behind The Chair documents, so

 3      why don't we start with that one.

 4                      MS. MURRAY:  Yes, Your Honor.

 5      Following the August conference, the Court

 6      ordered Olaplex to produce relevant documents

 7      from the Behind The Chair litigation.  They did

 8      produce some of those documents, but it became

 9      very clear that not all of them have been

10      produced.

11                      There are deposition transcripts

12      that they will not give us complete copies of

13      there are declarations that they have not

14      produced.  Frankly, Your Honor, we don't

15      necessarily have visibility into everything

16      that's missing because we weren't involved in

17      that litigation.  But just from the minimal

18      documents that we've seen, we know that we don't

19      have complete sets.

20                      Olaplex said, you're not getting

21      anything else.  We've given you what we think is

22      relevant.  We asked for documents from Behind

23      The Chair.  They first said, all right,

24      everything that you guys want was exchanged
```

```
 1          between the parties during that litigation.  We
 2          have a warehouse at our counsel's office.  Let
 3          me figure out the best way to get it to you.
 4                          When I'm waiting for that phone
 5          call back, I get a call from -- and this is
 6          someone from Behind The Chair.  I get a phone
 7          call from an attorney now representing Behind
 8          The Chair saying, we've spoken to Olaplex.
 9          They're going to give you everything, get it
10          from them.  So fine, we understand.  We don't
11          want to bother third parties if the parties have
12          the information.
13                          So we're waiting for Olaplex.  He
14          said, my understanding is Olaplex is going to
15          produce a large volume of documents to you, so
16          you get it from them.  I wait for the documents.
17          Olaplex produces the settlement agreement
18          between Behind The Chair and Olaplex, which we
19          did ask for so they gave us that.  They didn't
20          give us anything else.
21                          I go to back to Behind The Chair
22          and say, unfortunately, we didn't get that big
23          volume of documents that we had requested.  He
24          says, well, we can give you what Behind The
```

```
 1    Chair produced but we can't give you anything

 2    that Olaplex produced.  We can't give you any

 3    testimony from people such as Dr. Hawker and

 4    Dr. Pressly who are the inventors of the patents

 5    asserted in this case because Olaplex has asked

 6    for all of that back.  We don't have it anymore.

 7                  So now, I'm going back to Olaplex,

 8    can we please have these documents?  And they

 9    said, nope, we're not giving you anything else.

10    So that's where we are.  Why is it relevant --

11                  THE COURT:  Well, let me stop you

12    there if you don't mind.  It's my understanding,

13    and I think Mr. Palys referenced it briefly in

14    connection with the Motion to Dismiss, that

15    there was a recent large volume of documents

16    produced and it's mentioned in the papers too by

17    Plaintiffs, that there was a large document

18    production I want to say on December 3rd

19    perhaps.

20                  MS. MURRAY:  Yes.

21                  THE COURT:  Does that contain any

22    of the documents that you're looking for or have

23    you not had an opportunity to go through all of

24    that yet?
```

```
 1              MS. MURRAY:  We have gone through
 2    it as quickly as we can and have not seen those
 3    in there, and our understanding from Olaplex is
 4    when we had these calls on November, so prior to
 5    this last dump is that they are not giving us
 6    more Behind The Chair documents.  We haven't
 7    seen those in the 20,000 pages that have been
 8    dumped on us.  So their position is it's nothing
 9    else that's relevant and you get what you get
10    and that's it.
11              THE COURT:  When we had this issue
12    come up back in August, I indicated that I was
13    not a fan of just saying in a very general
14    unstructured or blanket way that I would grant a
15    blanket unlimited production of documents, that
16    I wanted you to fine-tune specifically the list
17    of documents that you would like produced from
18    that California litigation.  And one of them
19    certainly was the settlement agreement which you
20    have.
21              But how am I to cabin this in
22    terms of management of discovery?  We all know
23    just the volumes and volumes of things that are
24    produced in a large complex, commercial
```

```
 1       litigation and not all of them are necessary or

 2       become relevant, so to speak.

 3                   I guess tangentially they may all

 4       be relevant, but proportionally you don't need

 5       all of them to utilize here in this litigation.

 6       So how do we draw those parameters?

 7                   MS. MURRAY:  Sure.  I think we are

 8       at a slight disadvantage because we don't know

 9       what's been --

10                   THE COURT:  Understood.  But you

11       know what you're looking for and you know what

12       would be helpful.

13                   MS. MURRAY:  We know from a recent

14       deposition of one of the Behind the Chair

15       principals that there were a lot of depositions

16       taken in that case, so we would like the

17       complete depositions with exhibits because we

18       don't have that of Mr. Christal, Drs. Hawker and

19       Pressly.  They've given us some snippets.  They

20       haven't given us complete testimony or the

21       exhibits, so all of those transcripts.  Any

22       transcript of an Olaplex witness.

23                   We understand from the recent

24       depositions that there were depositions of
```

1          Behind The Chair that celebrity stylists were

2          also deposed.  We want those transcripts.  This

3          goes to prior use in our case about the Olaplex

4          product, documents relating to the ownership of

5          the company.

6                         We are aware of documents, Your

7          Honor, that were produced in another litigation

8          abroad by Olaplex relating to the ownership of

9          the company that have not been produced to us in

10         this litigation.  We don't know why that is.  So

11         those have not been produced.

12                        THE COURT:  And when you say a

13         company, it's of Olaplex?

14                        MS. MURRAY:  Yes, of Olaplex.  It

15         can go to inventorship.  And then we're still

16         working through a secret counterclaim but we're

17         working through it, and there are issues

18         relating to the way that Olaplex, not just the

19         counterclaim but even in this particular case,

20         the way that Olaplex manipulated the market, the

21         market that they relied on to seek a preliminary

22         injunction, who was posting things and who was

23         saying things about their product and were they

24         being paid to say things about their product,

1        and that was the underlying whole purpose of the

2        Behind The Chair litigation.

3                    The allegations were that Olaplex

4        was paying Behind The Chair to promote their

5        products in exchange to give Behind The Chair a

6        portion of the company.  And when Olaplex failed

7        to live up to its portion of the deal as alleged

8        in that case, Behind The Chair sued.

9                    So all of these promotions that

10       Behind The Chair and other stylists are doing on

11       behalf of Olaplex and creating this market for

12       Olaplex, was that all paid by Olaplex.  So we

13       would want documents showing those

14       communications between Olaplex and anybody who

15       has marketed the products for Olaplex.

16                   Were they given a cut of the

17       company, were they given something else to

18       market the product.  It goes to the market as an

19       issue in this case.  They're seeking and the

20       Court has recommended an injunction to block

21       L'Oreal's products based on the analysis of the

22       market, so we're looking for those types of

23       documents.

24                   Basically deposition transcripts

1         of anybody related to Olaplex and marketing of

2         their products, to any ownership of the company,

3         and communications, any contracts, any

4         agreements regarding who was making reviews or

5         advertisement about Olaplex in this market.

6                    The other thing that would come

7         into play here, Your Honor, because we don't

8         know who owns this company, it's been very

9         secretive and they won't reveal the information,

10        the value of the company.  Who gets a cut, how

11        much is it.

12                   We understand now from the Behind

13        The Chair litigation that the settlement did not

14        include giving Behind The Chair a portion of the

15        company.  They were just paid out a lot of money

16        in exchange for settlement of that case.  That's

17        fine.  Who else is out there?  We found that one

18        out and we had to dig around to find out about

19        that one.  But what else is there?

20                   Like I said, there's documents

21        showing ownership by other people that have not

22        been produced in this litigation.  They have

23        been produced in other matters and we found them

24        publicly, but we still need documents regarding

```
 1        ownership.  And I'm sure that came up in the

 2        Behind The Chair litigation and we would like

 3        those documents.

 4                    They have the documents.  It was

 5        told to us by counsel for Behind The Chair that

 6        Olaplex had asked for all of this back, so they

 7        should be able to give whatever they've asked

 8        back from Behind The Chair to prevent Behind The

 9        Chair from giving it to us.  They should be able

10        to grab that and just give it to us.

11                    THE COURT:  Anything further

12        before I hear from --

13                    MS. MURRAY:  Not further on Behind

14        The Chair.

15                    THE COURT:  Okay.  I will do issue

16        by issue, so I will hear from the Plaintiffs

17        with respect to this.

18                    MR. PAUNOVICH:  Thank you, Your

19        Honor.  The important lens to look at this issue

20        through is the common one for discovery, is the

21        discovery being sought relevant to any claim or

22        defense being asserted in the matter.  The BTC

23        litigation concerned a contract dispute between

24        Olaplex and a third party.  It's been fully
```

1          resolved with them not owning any of the company

2          Olaplex, much less its IP.

3                          There's literally nothing from

4          that litigation that is relevant to a claim or

5          defense in this case.  What's more, counsel may

6          not know this or may have misrepresented, but we

7          have produced a capitalization table.  We've

8          provided them with a full ownership, shares,

9          information, percentages about our company.

10         They are deposing each of those people.

11                         We are also mistaking -- and this

12         is very critical.  The thread of what they are

13         saying of how this is supposedly relevant to

14         this case tunes back to their standing argument

15         essentially.  They say, well, it's relevant to

16         inventorship.  Ownership of a company and

17         inventorship are two very different things as

18         I'm sure Your Honor is aware of.

19                         If you don't conceive of an

20         invention, you're not an inventor.  You could

21         own a company that owns that patent and not be

22         an inventor of it.  This is the definition of a

23         wild fishing expedition where they have asked

24         for a production of countless documents simply

```
 1        for reasons that have no relationship to the

 2        claims or defenses in this case.

 3                        We did submit the other day, Your

 4        Honor, Docket Entry 569.  You can see

 5        Mr. Zehil's testimony.  He is an owner and

 6        consultant and former lawyer for BTC, and he was

 7        very unequivocal, nothing in that dispute, no

 8        documents, no testimony, straight from him and

 9        this was not on our cross, on their examination

10        of him, had nothing to do with patents.

11                        He says, well, I knew there were

12        patents.  I didn't do any due diligence.  We

13        learned that they were owned by Liqwd.  That's

14        all I got.  There's simply nothing relating to

15        that that's relevant.  The only other remaining

16        issue I would raise unless Your Honor has

17        questions, they said, well, there's a lot of

18        things here about the market, how we've marketed

19        our products.

20                        The only finding in this case

21        relating to market is that it's us and them in

22        the market.  That's it.  How we advertise our

23        products doesn't have anything to do with that

24        foundational finding --
```

```
 1                    THE COURT:  Well, you have to

 2        admit they have a point.  There was as alleged,

 3        and I'm not saying these facts are true but I'm

 4        going by allegations, that there was some type

 5        of transaction, relationship payment or

 6        consideration given to Behind The Chair to

 7        promote Olaplex's products and that promotion

 8        was successful and translates to valuations and

 9        hence, damages issues in this case and there is

10        a connection, a nexus.

11                    MR. PAUNOVICH:  Respectfully, Your

12        Honor, I'm not sure I see it.  Mr. Zehil,

13        although we didn't submit this piece of

14        testimony because it wasn't raised as part of

15        the BTC dispute and in terms of how the issues

16        were teed up in the letters, he also testified

17        at his deposition that BTC was never paid for

18        doing the promotional activities, and that's

19        true.  That was the nature of the dispute

20        between the parties.

21                    They said, oh, we have an

22        agreement, and we said, no, we don't have an

23        agreement.  The parties had a lawsuit.  It

24        lasted a couple of years as they resolved the
```

```
 1    lawsuit.  There's never been no check, no dollar
 2    has ever been exchanged in connection with that
 3    lawsuit for promotional activities.
 4                 BTC and Olaplex has a
 5    going-forward relationship for providing
 6    promotional activities and we've provided
 7    them that.  It's attached to the settlement
 8    agreement.  There's a normal schedule of
 9    promotional activities that any customer
10    including Olaplex can purchase at the rack rate,
11    and we have agreed with them.
12                 We've entered into a contract
13    essentially through this settlement agreement to
14    purchase promotional activities looking forward
15    from the settlement of that suit in December of
16    last year.  We haven't tried to deny discovery
17    on that.  They've taken discovery on that.
18    They've deposed Mr. Zehil for three hours.
19                 We're just not seeing how any of
20    that warrants this wide-ranging fishing
21    expedition to say, hey, back up a truck as
22    counsel said and just get everything together
23    and give it over to us.  These issues were not
24    germane to the claims or defenses in this case.
```

```
 1        And whatever tangential relevance the marketing

 2        may have, we've provided -- the only payments

 3        that we've made and that's new are laid out in

 4        the settlement agreement which we've provided.

 5                    The last thing I will say, Your

 6        Honor, is also it's inaccurate as Defense said

 7        that we only produced that one document.  After

 8        the August hearing, we went back in good faith

 9        as Your Honor asked us to do to look at all of

10        the things that they had specifically

11        identified.

12                    We produced about 170 documents in

13        addition to the settlement agreement.  So there

14        were declarations, pleadings, marketing

15        materials, the things that they say we paid for

16        which we didn't and were the subject of the

17        litigation.  We've produced all of those things,

18        a letter that they had sent and some Facebook

19        posts, things of that nature.

20                    And BTC has also represented that

21        every single post, promotional activity, et

22        cetera, that they did for Olaplex is still

23        publicly available on the Internet on their

24        website.  So what are we doing here?  We're
```

```
 1        going to go back and relitigate a prior

 2        litigation that's been resolved with a third

 3        party looking through hundreds of exhibits, this

 4        and that.  We don't just don't see it.

 5                  Respectfully, Your Honor, we think

 6        between the 170-plus documents we've produced,

 7        the fact that they're getting the discovery into

 8        this ongoing marketing relationship and the fact

 9        that I think it's notable that they've had

10        200,000 pages produced to them, a half dozen of

11        depositions, we don't see a single document or a

12        single piece of testimony from anything that BTC

13        gave them highlighted or cited demonstrating the

14        relevance.  We just have attorney argument here

15        today as to why all of this is needed.  So

16        unless Your Honor has any other questions?

17                  THE COURT:  Yes, I have a few

18        questions.  The docket listings themselves from

19        that case, has that been produced?

20                  MR. PAUNOVICH:  The D.I. Nos.?

21                  THE COURT:  Yes, exactly.

22                  MR. PAUNOVICH:  Everyone can

23        access that on the court --

24                  THE COURT:  That was my question
```

1      because I've been out of the loop and I no

2      longer have my access even to the Delaware state

3      court and I'm just wondering how accessible that

4      is.

5                    MR. PAUNOVICH:  The docket is

6      accessible.  Certain items are filed under seal

7      of course, some are not.  But you can see the

8      titles of them.  And for the items they said,

9      don't look at this and what about this, and we

10     did that after the last August hearing.  We went

11     back.  That was part of what led to our

12     production of 170 or so documents including

13     declarations and what have you that are actually

14     legitimately relevant to the case.

15                   THE COURT:  For any of the

16     witnesses that testified in the Behind The Chair

17     litigation that could be potentially testifying

18     in this trial, have all deposition transcripts

19     with exhibits been produced to L'Oreal?

20                   MR. PAUNOVICH:  No.  So there are

21     certain witness that have already been deposed

22     or may be deposed again in this case that those

23     deposition transcripts have not been produced.

24     Again, I would just point out, for example, they

1          say, well, it's all about ownership.  We've

2          provided the capitalization table.

3                    There's nothing different in terms

4          of D. Christal, X.  Pressly gets X.  Craig

5          Hawker gets X.  The sort of information that a

6          party would traditionally want to say to show

7          bias and say, well, this guy or gal has some

8          incentive here and, therefore, we're going to

9          call into question their credibility, so they

10         have all of that.

11                   They're going to be able to

12         examine these people.  There's no mystery,

13         nothing's being hidden about they get paid a

14         bunch of money.  They came up with a great

15         invention and have a successful company and

16         they're going to be able to examine them on

17         that.

18                   THE COURT:  And you've referred a

19         few times to this capitalization table and/or

20         related documents that discuss ownership.  Do

21         you happen to know to guide the other side at

22         what Bates Nos. in the production this appears

23         or can you provide --

24                   MR. PAUNOVICH:  I can have it

```
 1        before the end of the hearing.  I believe

 2        Ms. Murray and her colleague had discussed it

 3        with my colleague and we had informed them that

 4        we were going to produce that, so I will get the

 5        Bates No. and give that to you to guide them.

 6                    THE COURT:  Okay.  And all

 7        exhibits and attachments to the settlement

 8        agreement have been provided when the settlement

 9        agreement of the Behind The Chair litigation was

10        produced; is that accurate?

11                    MR. PAUNOVICH:  My copy that I

12        have, I was looking through it and I'm missing

13        Exhibit 1 I think it is.  If that was the way it

14        was produced, that was a mistake.  So I will

15        make sure that we get that to the extent that it

16        is missing.  Our intention was to be fulsome and

17        give them all of that.

18                    We're not trying to hide anything

19        regarding -- I believe we think the settlement

20        agreement obviates these issues.

21                    THE COURT:  Okay.  Thank you.

22        That's all of the questions I have.

23                    Ms. Murray?

24                    MS. MURRAY:  Just real quick, Your
```

```
 1      Honor, on that.  The Behind The Chair litigation

 2      was in Los Angeles County Superior Court.  We

 3      are finally going electronic in files, but it's

 4      not there yet so you cannot see everything from

 5      the case on the docket.  You can see documents

 6      that were filed.  You can't access any

 7      documents.

 8                  THE COURT:  I understand that.

 9      Does it --

10                  MS. MURRAY:  It's not like Pacer

11      so certain things are there if they are posted

12      by the clerk.  Discovery applies -- unlike

13      Delaware where you have to post notice of

14      service, that doesn't exist in Los Angeles

15      Superior Court.  So we don't know what discovery

16      was served, what subpoenas were issued.

17                  None of that goes on the docket in

18      that court so we only have visibility as to

19      basically the pleadings like motion for summary

20      judgment, things like that and the name of the

21      document and that's it, which is why we would

22      love to get a list so that we can look through

23      it because that only gets us so far.

24                  THE COURT:  Okay.
```

```
1              MS. MURRAY:  Just a few points of

2       clarification, Your Honor.  Mr. Paunovich said

3       that Olaplex never paid for the promotion.

4       Well, that was the point of the litigation.

5       That's why Behind The Chair had to sue them

6       because they promised to pay and they didn't.

7       And Olaplex paid millions and millions of

8       dollars in settlement as a result of that

9       alleged agreement.

10              And in exchange for that

11       settlement, Behind The Chair is agreeing to

12       continue to promote Olaplex.  It's highly

13       relevant.  And like we said, it's not just

14       Behind The Chair.  It could be other matters

15       there that are implicated.

16              When Mr. Paunovich said that they

17       produced more documents, I was referring to the

18       one page, Your Honor.  After I spoke to Behind

19       The Chair's counsel, he said to me, Olaplex is

20       going to give you a large volume of documents,

21       don't bother us.  And that's when I only got the

22       one page.  We did get those documents that he

23       was referring to back in August but this is much

24       later when we got the one page.
```

```
 1                    They have the documents, Your

 2      Honor.  We don't understand the burden on why

 3      they can't give us the documents.  Mr. Paunovich

 4      is trying to explain how they're going to use

 5      deposition testimony in our case.  We have the

 6      right to see these depositions, especially

 7      people who they may depose in this case.

 8                    Why can't they give us the

 9      deposition transcripts?  I don't think he needs

10      to tell us how we're going to use deposition

11      testimony for the litigation.  It's not just

12      about ownership.  It also goes to the market.

13      It goes to damages.  We just want these

14      documents that they clearly have and for

15      whatever reason, they just don't want us to see

16      them.  That's all I have unless you have

17      questions, Your Honor?

18                    THE COURT:  No further questions.

19      I just have one question and you can remain

20      seated, Mr. Paunovich.

21                    Do you have access to the docket

22      in a more detailed form than Ms. Murray

23      described or is the way the docket appears is

24      the way it appears for everybody, that not every
```

```
 1        notice of service or notice of service of

 2        deposition or deposition subpoena is on the

 3        docket?  Does Plaintiffs have a more

 4        comprehensive document?

 5                    MR. PAUNOVICH:  If we do, we will

 6        be more than happy to provide that.  It may

 7        provide some clarity for them to ask for

 8        specific additional documents.  I do think it's

 9        accurate some courts have a practice of saying

10        notice of service such-and-such discovery, it

11        depends I believe within L.A. Superior Courts,

12        which court it is.

13                    And truthfully, we ended up

14        handling that case but only right before trial

15        so we'll provide whatever form of docket we

16        have.  I do believe with regard to electronic

17        filing, L.A. Superior Courts are very behind in

18        terms of that.  You can simply send a runner

19        which is about a quarter mile from Paul Hastings

20        L.A. office where counsel is located to get

21        these same things, but we're happy to do that as

22        well.

23                    THE COURT:  Anything further,

24        Ms. Murray?
```

```
 1              MS. MURRAY:  No, Your Honor.

 2              THE COURT:  You may be seated.  I

 3     will address this issue and then move on to the

 4     next issue.

 5              I'm going to grant it in part and

 6     deny it in part because again, as I said back in

 7     August I'm just not a fan of a blanket order

 8     saying get everything and produce everything

 9     from another litigation that might have some

10     connections however great or slim to the issues

11     being litigated in this case.

12              I'm a fan of decision-targeted

13     detailed requests for what a party is looking

14     for.  I think the first step is to get docket

15     entries over to the L'Oreal counsel and a

16     comprehensive listing of the docket entries from

17     that California litigation as possible.  Even if

18     that means as you say, Mr. Paunovich, sending

19     out one of your runners to the court to use

20     old-fashioned photocopy machines to photocopy,

21     whether they're handwritten, typed, however

22     they're kept over in L.A. Superior Court;

23     because the listing of docket entries will give

24     us some kind of a road map to what may be out
```

```
 1        there and it may be interesting to L'Oreal if
 2        they had made an argument that it's relevant and
 3        proportional to the needs of this case.
 4                    I would ask that you do that if
 5        you can by the end of this week.  If there's any
 6        impediments to that, just work it out with the
 7        other side, but my point is do it quickly.
 8                    MR. PAUNOVICH:  Will do, Your
 9        Honor.
10                    THE COURT:  The other relief I
11        will grant is I think it's fair game that any
12        witness who has been identified in discovery in
13        this case who will potentially be testifying at
14        trial and who was also a witness that gave
15        deposition testimony in the Behind The Chair
16        litigation, I think it's only fair that those
17        transcripts and exhibits to those transcripts be
18        produced to L'Oreal.
19                    And then also, I will clarify
20        whether or not the settlement agreement that was
21        previously produced to L'Oreal is missing, the
22        exhibits, and make sure that they have all of
23        the exhibits appended to that.
24                    I'm assuming that these
```

1     transcripts and exhibits are within your

2     possession currently and wouldn't take a

3     considerable amount of time to produce them to

4     the other side, but I always ask in these

5     hearings what is a reasonable time frame for you

6     that you will produce those to L'Oreal?

7                    MR. PAUNOVICH:  I need to check

8     with my team, but we'll do it as expeditiously

9     as possible, also recognizing they have some

10    depositions of these witnesses coming up next

11    week, so I will endeavor to have it done by the

12    same deadline as Friday.

13                    THE COURT:  Why don't we make it

14    as the same deadline as the docket entries.  And

15    again, if there are any impediments that you

16    foresee, talk to opposing counsel and work that

17    out, because again the idea is to be as prompt

18    as possible.  And then I haven't heard much of a

19    different spin from Plaintiffs on the way that

20    L'Oreal has spun the litigation in Behind The

21    Chair in terms of what the core litigation was

22    about, alleged failure to comply with the

23    contract obligations to properly and effectively

24    promote Olaplex's products.

```
 1                    I'm not saying that that's a

 2       finding of fact.  But for purposes of this

 3       discovery motion, I'm trying to get a feel or

 4       summary around what the gist of that litigation

 5       was.  And if that is the case and it does center

 6       around an agreement to promote Olaplex's

 7       products, then I agree with L'Oreal that there

 8       may be some connection between those promotional

 9       efforts that may have some relevance to some of

10       the issues being litigated in this case.

11                    I will order that any contracts or

12       documents memorializing any promotional

13       agreements that were the subject matter of that

14       litigation in the Behind The Chair and any

15       agreements or documents memorializing money,

16       cash or any type of consideration paid in

17       connection with those promotional efforts, they

18       be produced to L'Oreal as well.  And again, the

19       sooner, the better.

20                    I don't know what, if anything,

21       exists.  I don't know how this agreement was

22       formulated, but I've got to think if this was a

23       commercial contract dispute to the extent those

24       contracts have not been produced, it would be
```

```
 1        helpful to produce them so that L'Oreal can

 2        figure out what the parties were fighting over,

 3        what material contract terms and alleged breach

 4        or whatever was being fought over in that case.

 5        So I would ask that they be produced.

 6                    Again, I will put the same

 7        deadline on all of this since at least according

 8        to Ms. Murray's representations from her

 9        conversation with counsel for Behind The Chair

10        that apparently all of this is presently in

11        Olaplex's possession.  If it is and that's

12        accurate, then these productions of materials

13        that are already produced in a California

14        litigation shouldn't be too difficult to

15        promptly access and produce to L'Oreal at this

16        time.

17                    MR. PAUNOVICH:  Your Honor, may I

18        ask for a clarification?

19                    THE COURT:  Sure.

20                    MR. PAUNOVICH:  The nature of the

21        dispute was an oral contract.  There was never a

22        signed agreement other than the settlement

23        agreement that we produced.  I'm just worried

24        that there may be -- what the scope of Your
```

1     Honor's order because essentially, parties had a

2     bunch of conversations and there were some

3     negotiations, but never a signed agreement.

4     That was the whole nature of this allegedly oral

5     contract, never consummated so they litigated

6     and decided, you know what, payments -- the

7     settlement was not for anything done in the

8     past.  Either it was for an agreement to go

9     forward and settle their disputes in the classic

10    way that litigations are settled, to take risk

11    up off the table, et cetera.  So I just wanted

12    to understand the scope of your order as far as

13    that is concerned.

14              THE COURT:  I'm going to keep that

15    in my order.  And the way to deal with that if

16    there are no documents that can be produced in

17    response to what I'm ordering, then I would set

18    forth in writing to L'Oreal.  And to the extent

19    as they pull through deposition transcripts and

20    exhibits, if L'Oreal continues to feel that

21    there are documents of any variety that relate

22    to this promotional relationship between the

23    parties that L'Oreal can make an argument

24    relevant and proportional to the needs of the

```
 1     case, it will be without prejudice to L'Oreal to

 2     raise the issue again.

 3                     MR. PAUNOVICH:  Thank you, Your

 4     Honor.

 5                     MS. MURRAY:  Your Honor, can I

 6     respond?

 7                     THE COURT:  Yes.

 8                     MS. MURRAY:  Your Honor, we did

 9     receive Behind The Chair's production and we

10     have not seen like Mr. Paunovich said a formal

11     contract, but there were drafts and there were

12     emails and the big dispute was what was the

13     contract.  And we know that an oral contract in

14     certain situations can be a contract and we know

15     that writings and emails can also constitute a

16     form of an agreement, so there have been emails

17     but we've only seen one side of it, not

18     Olaplex's production side.

19                     So to the extent that emails can

20     form the parts of the contract of what the

21     parties believe they may have agreed to, we

22     think we should have access to those.

23                     THE COURT:  Perhaps if you haven't

24     already, you should share a sampling of those
```

```
 1        types of documents with Olaplex's counsel and my
 2        order encompasses -- it's not just one-sided.
 3        It's any documents going either way from Olaplex
 4        to Behind The Chair and from Behind The Chair to
 5        Olaplex.  And to the extent Olaplex is in the
 6        possession of documents that are part and parcel
 7        to that, that's what I'm ordering to be
 8        produced, documents, emails, letters, whatever
 9        it is in documentary form that relates to this
10        oral agreement for promotional purposes that was
11        at the center of that litigation and that's why
12        I'm ordering it produced.  And that is all I'm
13        going to order produced from Behind The Chair.
14                    As I said, when you get the docket
15        entries if you feel that there's more to ask
16        for, it would not be a given.  You will still
17        have to make your case and meet your burden that
18        it's relevant and proportional under Rule 26,
19        but I'll give L'Oreal an opportunity to ask for
20        anything additional from Behind The Chair.
21                    I think I would ask that the
22        parties meet and confer in good faith and there
23        not be any attempts to hide the ball, so to
24        speak.  Let's get this issue resolved.
```

```
 1      Discovery has to move along.
 2                  I find that we spend a lot of time
 3      sometimes retreading ground that I thought was
 4      concluded or had some closure to it, so I'd like
 5      this to be one of those issues for purposes of
 6      our discovery conferences that has closure to
 7      it.
 8                  MR. TIGAN:  Your Honor, may I
 9      approach?
10                  THE COURT:  Yes, you may,
11      Mr. Tigan.
12                  MR. TIGAN:  I have one suggestion.
13      I know in the past in some of these hearings
14      when both parties have moved on discovery
15      disputes you've had one side select their most
16      important and then the other side and back and
17      forth.  If Your Honor is agreeable to that,
18      maybe we can proceed that way for the remainder
19      of the hearing.
20                  THE COURT:  I do want to address
21      all of them because I'm not sure if I will get
22      an opportunity to have them carry over.  I'm not
23      opposed to going in that fashion.  So in light
24      of that, do you want to pick an issue from
```

```
 1      Olaplex's point of view and then we'll hear that

 2      and then we will get back to L'Oreal?

 3                      MR. TIGAN:  Yes, Your Honor.

 4      Thank you.  I will let Mr. Paunovich select our

 5      most important issue.

 6                      THE COURT:  Okay.

 7                      MR. PAUNOVICH:  Your Honor, it

 8      will be the first topic raised in our dispute

 9      letter which relates to financials and licensing

10      documents.

11                      THE COURT:  All right.

12                      MR. PAUNOVICH:  There are

13      essentially four types of documents that we

14      raised or responses to interrogatories that we

15      raised in this section falling under financials

16      and licensing.  The first is one that you've

17      already heard some discussion on.  We just want

18      an interrogatory response and we're assuming it

19      will be a single document or two documents

20      relating to the financials of Step 2 and 3

21      products.

22                      That would be sufficient for those

23      to put us in a position to assess, evaluate,

24      provide expert reports on the damages relating
```

```
 1        to those products.  The second category within

 2        this subject was the licensing documents.  We

 3        have served both in an interrogatory as well as

 4        a document request asking them to produce

 5        licenses within the hair care space.  We've had

 6        much discussion regarding this and we've had no

 7        licenses produced to us.

 8                    There's a range of potential

 9        damages that we may seek in this case and

10        licenses will be clearly relevant to part of

11        that analysis under Georgia Pacific.

12                    THE COURT:  Hair care products is

13        an awfully broad category.  In your discovery if

14        you want to point me to a specific request, what

15        specific licensing documents -- how would you

16        further refine that request?

17                    MR. PAUNOVICH:  So we had asked

18        for inbound or outbound licenses.  We've asked

19        for any and then at meet-and-confers, we said it

20        should be hair care space.  And as we understood

21        it, I'm not sure if I'm describing it correctly

22        but I think it may be five divisions that

23        L'Oreal has.  One of which was just general

24        consumer products, cosmetics and things that
```

```
 1        would be applied to the face.

 2                  We said, okay, you don't have to

 3        give us those.  We are looking for things that

 4        relate to legitimate hair care.  It can't be

 5        something narrow to say bond builder, for

 6        example, in this case because otherwise we're

 7        not going to see anything, but products that

 8        relate to the treatment of hair, chemical

 9        treatment.  Any other sort of hair care products

10        that -- for lack of a better way to put it,

11        products get put on your hair in a bleaching

12        formulation --

13                  THE COURT:  Are you looking for

14        shampoo products, hair spray products?  How

15        broad is this category?

16                  MR. PAUNOVICH:  I do think those

17        are within the potential realm of comparability.

18        Experts, as I'm sure they will do, will have to

19        assess under the Georgia Pacific factors the

20        relative closeness or comparability of those

21        licenses and they have to adjust up or down, but

22        I think that they are within the scope of the

23        types of licenses that will be relevant to a

24        damages analysis.
```

```
 1                We're not asking for lipsticks,
 2      blushes, other types of products.  L'Oreal is a
 3      very big company.  We didn't say, back up the
 4      truck.  We're looking for those types that could
 5      be within the realm of comparability under
 6      Georgia Pacific.
 7                The third type of document in this
 8      category was the profit and cost information.
 9      We had agreed or I thought we had agreed in
10      discussions between the parties to produce
11      actual Excel spreadsheets with the raw data so
12      the parties could assess what that is.  L'Oreal
13      has provided us with an interrogatory response
14      that seems very much abstracted.
15                We had agreed and produced this
16      financial information to them so we were looking
17      for that.  And the last piece under the
18      financials is a pretty new one under our Supreme
19      Court's precedent and Delaware precedent, but
20      we're looking for their worldwide sales data.
21                This is a really important one
22      because we think that there's a significant
23      portion of financials that's being hidden.  We
24      have had representations from counsel saying
```

```
 1          that they only manufacture and sell products
 2          here in the U.S.  But then we look at those
 3          products and they indicate that they're
 4          manufactured in Spain or perhaps other places
 5          and they have on their labels multiple languages
 6          strongly suggesting that these are ending up
 7          somewhere outside the U.S.  So we've asked for
 8          the worldwide sales information and information
 9          relating to their manufacturing and
10          distribution.
11                    They refused to produce all of
12          that.  Under the WesternGeco and Power
13          Integrations case from Judge Stark, we do think
14          it's relevant.
15                    THE COURT:  Yes.  But do those
16          cases address method patents?  Aren't these
17          method patents?
18                    MR. PAUNOVICH:  They are method
19          patents and I do think that they're squarely on
20          point.  Both WesternGeco and Power Integrations
21          didn't make a distinction between apparatus and
22          method claims.  I think it's very much akin to
23          the analysis that was done in WesternGeco where
24          you've got a component in an apparatus claim and
```

1      we'll say, and I'm shipping it abroad and we

2      combine it and then, voilà, you infringe.

3                  They sell a component.  If they're

4      shipping it abroad or manufacturing it,

5      distributing it abroad through affiliates or

6      something of that nature, then it gets combined

7      with a bleaching formulation and applied to the

8      hair.  It's essentially the same thing.  We have

9      a direct infringement abroad where they are

10     manufacturing a component of that infringing

11     method that's ultimately performed abroad.

12                 Those are the four categories

13     under the financial information, licensing

14     information.  If Your Honor has any questions,

15     I'm happy to answer them.

16                 THE COURT:  Not at this time.  All

17     right.  Let me hear from L'Oreal.  Ms. Murray?

18                 MS. MURRAY:  I believe that

19     Mr. Paunovich combined several different

20     requests so I will just follow his order.  The

21     financials, we have given financials for any

22     Step 2 or Step 3 product that is sold along with

23     a Step 1.  So a lot of the times these products

24     are sold in kits.  If there's a kit that has a 1

```
 1        and a 2 or a 1 and a 3, they have sales of those

 2        products.  We have provided that data.

 3                    In addition, the last set of data

 4        that we've provided we've included additional

 5        kits that we've located that also include a Step

 6        2 combined with the 1 or a Step 3 combined with

 7        the 1.  They have that data.

 8                    THE COURT:  Would there be

 9        combinations sold of Step 2 and Step 3 or Step 2

10        and/or Step 3 in isolation?

11                    MS. MURRAY:  I don't think 2 and 3

12        are combined in a kit by themselves.  3 can be a

13        stand-alone.

14                    THE COURT:  3 can be a stand-

15        alone.  That's the one that Mr. Palys

16        indicated --

17                    MS. MURRAY:  Yes.  I don't why

18        Mr. Paunovich relates that we've given that

19        before.  We haven't because 3 was never accused.

20        We don't believe 3 should be accused as

21        Mr. Palys explained on the Motion to Dismiss.

22        So we've never given sales of 3 as a stand-alone

23        because it doesn't relate to this patent which

24        requires mixing with bleach.  But when 3 is
```

```
 1        combined with a kit with 1, we have provided

 2        those sales.

 3                    THE COURT:  Talk to me about

 4        licensing documents.

 5                    MS. MURRAY:  Yes, so licensing

 6        documents, they've asked an interrogatory about

 7        this.  We've given them an interrogatory

 8        response about this.  L'Oreal USA doesn't have

 9        licensing agreements other than with L'Oreal SA.

10        They've looked for them.  L'Oreal USA doesn't

11        own the IP.  We have agreed to produce the

12        licensing agreements, the technology transfer

13        agreements with L'Oreal SA that L'Oreal USA has

14        entered into.

15                    THE COURT:  Have they been

16        produced yet?

17                    MS. MURRAY:  I don't believe

18        they've been produced.  They were supposed to be

19        produced in the last production.  When I looked,

20        I couldn't find them.  But we have agreed and we

21        will produce them.

22                    THE COURT:  When?  I need a

23        deadline.  Can I put the same Friday deadline?

24                    MS. MURRAY:  Yes.
```

```
 1                    THE COURT:  Thank you.  All right.
 2       No. 3, profit cost info.  They were looking for
 3       Excel spreadsheets with raw data and you
 4       answered an interrogatory.
 5                    MS. MURRAY:  We did and we did it
 6       the same way we did the sales.  We provided all
 7       the data in that interrogatory and it breaks out
 8       the cost and profit by SKU.  This is exactly
 9       what they asked for.  We said at the meet-and-
10       confer this is what we will give them and their
11       counsel said, okay, we will do the same.
12                    They chose to put it in a
13       spreadsheet.  We've given them the data, the
14       same data.  They have the data.  They have the
15       cost and profit data.
16                    THE COURT:  And let's talk about
17       worldwide sales.
18                    MS. MURRAY:  So worldwide sales,
19       so it does matter that it's a method patent.  So
20       in the WesternGeco case the court said when you
21       focus on Section 284 damages, in a given case we
22       must look at the type of infringement that
23       occurred.  And then the court turned to the
24       Section 271(f) analysis shipping components.
```

```
 1         This is not a case about shipping components

 2    anywhere.

 3              You don't practice a method using

 4    components.  And I think it was pretty clear

 5    there's a case from the Federal Circuit, the

 6    sale of equipment or products to perform a

 7    process is not a sale of the process.  So if a

 8    product is made in the United States and sold

 9    abroad and it may infringe a method patent, that

10    doesn't constitute infringement.  It's

11    completely irrelevant.

12              So the larger issue here, Your

13    Honor, is that L'Oreal USA does not sell

14    products outside the United States, so there may

15    be products Mr. Paunovich sees language of these

16    products that's not in English but that doesn't

17    mean that's a sale by L'Oreal USA.  L'Oreal does

18    not recognize or sell its products outside of

19    the United States.  This is not a 271(f) case.

20    They haven't alleged 271(f).

21              THE COURT:  Is that representation

22    under oath anywhere like in an interrogatory

23    response of L'Oreal USA --

24              MS. MURRAY:  Not yet because they
```

```
1       haven't taken a deposition.  Mr. Paunovich

2       deposed the distributor of all three products

3       yesterday and he asked where those products are

4       sold and she testified as a 30(b)(6) witness

5       that all the products are sold in the United

6       States and it was for SalonCentric which is not

7       the sole distributor of the products, but

8       distributes all three of the L'Oreal products, a

9       large chunk of them.  And she said they don't

10      sell outside of the United States.

11              So I don't know what we would have

12      to give them if they wanted it, but I don't

13      think it would even be relevant because it's not

14      a component case.  Even if it were able to fall

15      under 271(f) because there are substantial

16      noninfringing uses for this product, you can

17      have the product and use it with color, you can

18      have the product and use it with relaxer or

19      perms so there is no infringement if this

20      product was shipped outside the United States

21      and used for all of those other purposes.

22              They don't get access to worldwide

23      sales in this case.  And even if they did, they

24      don't have them for L'Oreal USA.  I'm not sure
```

```
 1        what we can give them.

 2                    THE COURT:  Going back to Item No.

 3        1, financials for Step 3 as a stand-alone, do

 4        you have a sense of what volume and how

 5        difficult it would be to produce those

 6        financials?

 7                    MS. MURRAY:  I don't think it

 8        would be difficult.  We provided the other one.

 9        They don't have the documents laying around so

10        we would have to clear the database.  L'Oreal's

11        Finance makes sure that they verify those

12        numbers before they go out.  It's like a step in

13        verification, but it's just clearing the

14        database for those Step 3 products if we had to

15        produce those.

16                    THE COURT:  If the Court were to

17        order that, what is a reasonable time frame for

18        that production?

19                    MS. MURRAY:  They won't release

20        the numbers to me until Finance verifies them.

21        So next week, I can aim for next week.

22                    THE COURT:  Remind me again when

23        is the fact discovery cut-off.

24                    MS. MURRAY:  December 21.  I can
```

```
 1        aim for this week, but I don't want to commit if
 2        I don't --
 3                    THE COURT:  I understand.
 4                    MS. MURRAY:  They're at year-end
 5        right now and it's the worst time for them.
 6                    THE COURT:  Okay.  Anything
 7        further, Mr. Paunovich?
 8                    MR. PAUNOVICH:  Two points of
 9        clarification.  The No. 2 products are also sold
10        stand-alone and if Your Honor is ordering that
11        for the No. 3, we would also request it for the
12        No. 2.  For the licensing topic, we heard that
13        they would produce agreements with L'Oreal that
14        they've entered into with L'Oreal USA.
15                    We've asked for inbound licenses
16        as well.  So the fact that L'Oreal USA says that
17        it doesn't own L'Oreal IP doesn't address any
18        inbound licenses that they would have entered
19        into.  So, for example, if somebody else accuses
20        them of infringement or they want a license for
21        the IP, we do think that those would be
22        relevant.  And to the extent that they have
23        entered into a such license, that should be
24        produced as well.
```

```
 1                      Lastly, on the worldwide sales we
 2        do think that Judge Stark's opinion on this
 3        regarding WesternGeco would compel the
 4        production of it.  We have nothing sworn under
 5        oath.  They just acknowledged we have a
 6        distributor, not the sole distributor who has
 7        testified about not selling things worldwide.
 8                      And Judge Stark, as he said
 9        worldwide patent damages relating to supplying
10        components from the U.S. to be combined outside
11        the U.S. in a manner that would be infringing
12        may be awarded, so we would request an order on
13        each of those items.
14                      THE COURT:  Okay.  Let me ask,
15        Ms. Murray, is Step 2 sold as a stand-alone?
16                      MS. MURRAY:  There is a
17        stand-alone in Step 2, yes.
18                      THE COURT:  Okay.  Thank you.
19                      MS. MURRAY:  Your Honor, it's
20        interesting because the whole time there was a
21        preliminary injunction they want to frame the
22        market as only SalonCentric and this other
23        distributor BSG and now Mr. Paunovich is trying
24        to say that's just one distributor.
```

1       SalonCentric is a huge distributor and supplies

2       a large amount of L'Oreal's products.  They're

3       welcome to ask the 30(b)(6) witnesses where the

4       products were sold.

5                        THE COURT:  And I imagine that

6       they will.  In any event, here's my rulings on

7       all four points to the financials:  With respect

8       to what I will call Category No. 1, the

9       financials for Step 1, Step 2 and Step 3

10      products Mr. Paunovich mentioned, and what's

11      missing from this equation is Step 2 and Step 3.

12      L'Oreal has represented to the extent Step 2

13      and/or Step 3 were grouped with Step 1, those

14      have already been produced.

15                       I'm going to order that the

16      financials for Step 2 as to stand-alone and Step

17      3 as to stand-alone products be produced, and I

18      will give a deadline by the end of next week

19      which is the 21st, which coincides with the end

20      of fact discovery.  And should that generate any

21      additional discovery issues or requests or

22      whatever, then I'm sure you'll be prudent about

23      what the Plaintiff requests from the Court.  But

24      nonetheless, I think giving the timing of things

```
 1        it wouldn't be reasonable to compel L'Oreal to

 2        produce those any sooner given what the process

 3        is within L'Oreal to comply with this court

 4        order and review the production that the Court

 5        is ordering to be produced.

 6                    With respect to Category No. 2,

 7        the licensing agreements, L'Oreal has already

 8        committed prior to this hearing to produce those

 9        licensing agreements with L'Oreal SA.  I will

10        order that those be produced by the Friday

11        deadline.  And to the extent L'Oreal USA is a

12        party to any inbound licenses for hair care

13        products, I will order that they be produced as

14        well by Friday.

15                    MR. PAUNOVICH:  Is that this

16        Friday, Your Honor, or is that also the

17        following Friday for the --

18                    THE COURT:  I will order it by

19        this Friday.  And if there's any impediment, I'm

20        sure counsel will be reasonable in working those

21        out.

22                    It's my understanding that you

23        were already working on getting the L'Oreal SA

24        licensing agreements so it --
```

1           MS. MURRAY:  Yes.

2           THE COURT:  -- shouldn't be any

3    issue or a problem.  To the extent for the

4    inbounds and you need more time for that, just

5    discuss it with Mr. Paunovich how much

6    additional time you need and I'm sure he will be

7    reasonable if there's good reason for pushing

8    that out a little bit further.  And certainly,

9    the Court is flexible on that if it takes some

10   additional time to produce those.

11           With regard to the profit, cost

12   information that was produced in the

13   interrogatory response, I'm going to deny the

14   Motion to Compel with respect to that.  I

15   haven't heard what's deficient, if anything,

16   about the interrogatory response.  It sounded to

17   me that it was presented in a form that you

18   would prefer would have been Excel spreadsheet

19   showing the raw data.  However, that's not

20   without prejudice to the Plaintiff.

21           If you think that there was

22   anything being withheld or that interrogatory

23   response is lacking, you can raise it with the

24   Court.  But I haven't heard that the substantive

1        interrogatory response leaves out anything or

2        any information that wouldn't be provided in an

3        Excel spreadsheet of the raw data having been

4        produced in that format.

5                      With regard to the issue of

6        worldwide sales, at this time I don't feel that

7        there's a record to support compelling

8        production from L'Oreal of worldwide sales, so

9        I'm going to deny Olaplex's request with respect

10       to that.  And I think that involved requests for

11       Production Nos. 47, 49 and 51 which seek

12       information regarding manufacturers, suppliers

13       and distributors of the accused products, et

14       cetera.

15                      And here is my reasoning for that:

16       Olaplex argues that this information is

17       discoverable under Chief Judge Stark's recent

18       decision in Power Integrations v. Fairchild

19       Semiconductor.  The Westlaw citation is 2018

20       Westlaw 48804685.  It's a District of Delaware

21       decision from October 4, 2018.

22                      And Olaplex also cited to the

23       Supreme Court's decision -- both sides discussed

24       the Supreme Court's decision in WesternGeco LLC

1    v. ION Geophysical.  However, this judicial

2    officer views the patents-at-issue in

3    WesternGeco, that they were not method patents

4    in contrast to the '419 and the '954

5    patents-at-issue here.

6              The Fed circuit has held that

7    section 271(f) of the patent statute does not

8    apply to method or process patents.  And as that

9    section does not encompass devices that may have

10   been used to practice the patented method, the

11   relevance of whether or not this information

12   would have any bearing on the claims asserted in

13   this case, it is questionable.

14             And at this point on this record,

15   it may even be a moot point in light of the

16   representations made by the SalonCentric witness

17   that none of the products were being sold

18   abroad, and I suspect that as further

19   depositions are taken, this particular issue may

20   be buttoned up to the extent that L'Oreal's

21   counsel are arguing that L'Oreal USA has been

22   selling products beyond the United States.

23             That's my view of the WesternGeco

24   and Power Integrations rulings.  And this may

```
1       became a moot point.  If it's not, certainly

2       it's without prejudice to the Plaintiffs to

3       raise this issue and it probably is an issue

4       worthy of briefing since it is kind of a new

5       twist, so to speak, I think in my view on Power

6       Integrations and WesternGeco and application of

7       Section 271(f) of the patent statute.

8                    Naturally, any bench rulings I

9       make today on this or other issues are subject

10      to timely objections under Rule 72(a).  The

11      transcript will serve as my order.  I won't be

12      following up with a written order so within 14

13      days of service of this transcript, any party

14      who wishes to take an objection to the District

15      Judge may do so and make a timely objection to

16      the District Judge, Judge Bataillon to determine

17      whether my ruling is clearly erroneous or

18      contrary to law.  So that deals with the

19      financial and licensing issues that were raised

20      by the Plaintiffs.

21                   Let's dial back to the next issue

22      that L'Oreal would like to raise.

23                   MS. MURRAY:  Your Honor, the next

24      issue raised in our letter relates to disclaimer
```

1      of claims document.  On this one, our position

2      is basically to the extent that there's

3      something that is not privileged, we would like

4      to see it.  If it's privileged and it involves

5      prosecution counsel, we want a commitment that

6      it's going to show up on a privilege log.  We

7      have concern as we are touching on with respect

8      to the protective order regarding what's going

9      on with the prosecution counsel.

10                  THE COURT:  We've had so many

11     discovery disputes in this case and in my

12     optimism that with each one will be closure to

13     the issue, it's my recollection that we

14     addressed this in a previous discovery dispute

15     and I ended up following up that dispute with an

16     August 30 memorandum order to which my review of

17     the docket indicates that there were no

18     objections.  Why are we revisiting this issue?

19                  MS. MURRAY:  The issue before the

20     Court before was a request to modify the

21     protective order in light of concerns that

22     counsel in this case were using documents that

23     shouldn't be used.  And the Court said it

24     doesn't look like there's enough there for

```
 1        grounds to modify the protective order.

 2                    We have concerns and we continue

 3        to have concerns that to the extent that it was

 4        revealed that there was more participation than

 5        has been shown to light, we would like to

 6        explore the extent of that participation.  If

 7        it's privileged, they can just put it on a

 8        privilege log, and we would like to see the

 9        extent of that.

10                    It wasn't so much an issue before

11        where we were seeking to modify the protective

12        order, but we continue to have these concerns

13        and we've asked for documents to either put our

14        concerns to rest or if there are concerns, we

15        would just like to know what's going on and we

16        just don't have visibility to that.

17                    THE COURT:  Let me hear from

18        Olaplex.

19                    MR. PAUNOVICH:  Your Honor, we

20        thought this issue had been put to bed as well.

21        We had a discovery dispute after which Your

22        Honor asked for additional briefing, issued an

23        order at D.I. 388, and we thought made very

24        clear that this was a resolved issue.
```

```
 1              My guess is what counsel is asking

 2      for -- they're asking for facially privileged

 3      information or log I guess every communication

 4      that counsel has had subsequent to filing this

 5      suit.  The typical practice and I don't see any

 6      reason to deviate from it, once a suit is filed

 7      everything from there forward is presumptively

 8      privileged.  Now, we're going to privilege log

 9      two year's worth of litigation and PGR

10      proceedings.  I don't understand why we're going

11      through these hoops on a fishing expedition

12      again.

13              Parties have been in negotiations

14      on providing privilege logs and Olaplex is ready

15      to produce its privilege log if not today,

16      probably tomorrow.  To go back and log two

17      year's worth of communications in this suit and

18      in the PGR proceedings is a monumental

19      undertaking.

20              I'm sure if their counsel is

21      anything like ours, we are in communication

22      every single day dozens of times.  It's been a

23      lengthy dispute and respectfully we think this

24      issue should be put to bed here without any
```

```
 1      further orders.  Thank you.
 2                      THE COURT:  All right.  Anything
 3      further, Ms. Murray?
 4                      MS. MURRAY:  Nothing further, Your
 5      Honor.
 6                      THE COURT:  All right.  I'm going
 7      to deny this request for nonprivileged documents
 8      and communications regarding Olaplex's decision
 9      to disclaim claims of the asserted patents.
10      It's a variation of an issue that in my view
11      there's no record to move ahead or look at this
12      differently than the way I've looked at it back
13      in August.
14                      I'm not going to put the
15      Plaintiffs nor would I if a similar request had
16      come from Plaintiffs to L'Oreal, it would be an
17      extreme measure, I think, to require either side
18      to start putting together privilege logs for
19      communications occurring subsequent to the
20      commencement of the instant litigation and/or
21      PGR proceedings.
22                      I addressed the issue before when
23      I rejected L'Oreal's requested relief for
24      modification of the protective order previously
```

```
 1      and I don't see any set of facts which would

 2      cause me to deviate from that view of the

 3      landscape and feel that it's necessary for a

 4      request to disclose any privilege log and

 5      privileged communications relating to

 6      disclaimer, so that is denied.

 7                   It's denied without prejudice.

 8      Should something come to light, I will

 9      reconsider the basis for going in a different

10      direction but I don't see it right now.

11                   So I will switch it back over to

12      Olaplex for its next issue.

13                   MR. PAUNOVICH:  Your Honor, this

14      is Heading No. 2 in our discovery dispute

15      letter, failure to produce alleged clean room,

16      data room custodial documents.  This is a very

17      critical one, Your Honor, from our perspective.

18      We've seen submissions from L'Oreal saying, oh,

19      well, we have this X employee that used to work

20      for us two years ago and he claims that he never

21      got Olaplex's unpublished patent application.

22                   And we have a brewing dispute

23      which we'll hopefully resolve and not have to

24      bring another discovery dispute to Your Honor.
```

```
1        But after that deposition, L'Oreal says, after
2        the fact, we didn't tell you ahead of time but
3        we want to designate his testimony, the
4        ex-employee as our 30(b)(6) testimony about the
5        receipt of this unpublished patent application.
6                    We don't think that's proper.
7        We'll deal with that in separate channels
8        because it's not part of the briefing here.  But
9        I think what it highlights is the importance of
10       these documents that are under this category.
11       There are two very telling documents.
12                    If you look at -- let me just get
13       the exhibits to make sure I have them correctly
14       here, so Exhibit F to our discovery dispute
15       letter.  It's an internal listing of individuals
16       that work for L'Oreal who had access to a
17       so-called clean room and separately, this is
18       important, a data room relating to these
19       discussions and meetings that occurred between
20       Olaplex and L'Oreal back in 2015 that really get
21       to the core of the trade secret and breach of
22       NDA.
23                    And when we look at those lists,
24       we see a high level point, number one, in the
```

1        latest one, Exhibit F, there's about 45

2        employees that are listed on it.  And when we go

3        to L'Oreal's document productions in this case

4        and we look at the metadata to say, did you

5        collect the custodial data from people who are

6        clearly relevant to this case, we see three from

7        that list.

8                         Now, it sounds like a lot and it

9        is, but I didn't create the document.  We've got

10       a document that on its plain face says these are

11       people that are involved in the potential

12       Olaplex proposition and the developments of the

13       accused products and yet, we have no documents,

14       no communications from over 40 of those

15       individuals.

16                        The notion as L'Oreal suggested

17       that they are not relevant, might not have

18       relevant information to this which is belied by

19       the face of the document.  What's more telling

20       is they're relying on this ex-employee two years

21       ago who by his own admission had no access to

22       this clean room, so he wouldn't have sufficient

23       personal knowledge to comment on it in the first

24       place.

1              So they say, well, he testified.

2      We never got anything.  Putting aside the fact

3      that he wouldn't have had access to it anyway on

4      his own admission, what is very notable is if

5      you look at Exhibit H, April 27th and you look

6      at it, so that's pre-May 19, 2015, that's really

7      the key meeting where a lot of these trade

8      secrets and confidential information were

9      disclosed.  And then you look at Exhibit F dated

10     July 2, 2015 and it grows by 30 individuals.

11             If what Mr. Dolden said is true

12     and you never got anything from us, which we

13     strongly contest and we have multiple witnesses

14     who have sworn under oath the opposite, then why

15     would you add 30 people after that meeting to

16     the team that has access to this data room and

17     clean room or one or the other for that matter.

18             So with that sort of preamble, and I

19     apologize for the long wind-up, we are asking

20     for documents that relate to custodial documents

21     for each of the individuals that are on these

22     lists.  We're not asking them to give us the

23     whole computer, but we do think documents that

24     each of them have that is relevant to the claims

1          and defenses in this case including our trade

2          secret and NDA claim should be produced.

3                    We've provided some descriptions

4          of that in our discovery letter.  So unless Your

5          Honor needs me to further articulate those, I

6          can.  But it's sort of a stark moment where

7          we're saying, we want to prove our trade secret

8          and breach claim and we don't have access to any

9          of these individuals' documents to prove that.

10                   We're told that we're going to

11         have to rely on an ex-employee who produced one

12         document in this case under his Bates label who

13         just says, yeah, we never got anything.  It's

14         just not credible on its face.

15                   THE COURT:  All right.

16                   MR. PAUNOVICH:  Thank you, Your

17         Honor.

18                   THE COURT:  Ms. Murray?

19                   MS. MURRAY:  Your Honor, you might

20         be familiar already but the code name for this

21         potential acquisition was Project Olivia.  There

22         are documents like this and I have many, many

23         more and I'm happy to give the Court as many as

24         she wants to see about Project Olivia.

```
 1              I don't know the one sheet of
 2      paper Mr. Paunovich is talking about.  That's
 3      just, I'm sorry to say, ludicrous.  Here is what
 4      happened:  There was a clean room established.
 5      It had three people -- three scientists and five
 6      lawyers.  Those were the people who were set up
 7      to be able to review any confidential, technical
 8      information that Olaplex would have provided at
 9      that May meeting, the one inperson meeting where
10      all of this alleged secret happened, eight
11      people.  That list has never been expanded.
12      There's a separate list --
13                  THE COURT:  Have the custodial
14      documents been produced from those individuals
15      that you've just described for the scientists
16      and lawyers who had access to the clean room?
17                  MS. MURRAY:  Let me back up.
18      There was nothing ever placed in a clean room,
19      so we need to start with that.  There was never
20      anything given to L'Oreal to put in a clean
21      room, so there is a non-existent clean room.
22      This was the clean team that was set up.
23                      The scientists who attended the
24      meeting -- not all of these people were at this
```

1    meeting.  Only one was, and her name was

2    Delphine Allard.  The documents that L'Oreal USA

3    has received for all the meeting notes that were

4    exchanged about this meeting have been produced.

5                    Roger Dolden was at this meeting.

6    Mr. Dolden's notes have been produced.

7    Mr. Dolden took back documents that he did

8    receive, financial documents that were received

9    from Olaplex complex at this meeting.  He had a

10   binder in his office before he retired, two

11   binders.  This is actually one of them.  So his

12   entire Project Olivia binder has been produced.

13   It includes everything that Olaplex provided.

14                    We can't manufacture something

15   that was not given at a meeting.  Let me explain

16   why we have a data room and we can get rid of

17   this suspicion that they're suggesting.  The

18   data room was going to be or was basically a

19   list of people who would know about the

20   acquisition or potential acquisition.  It was

21   mostly finance folks, but not all.

22                    The vast majority of this list

23   that Mr. Paunovich is referring to are not

24   employees of L'Oreal USA.  And why is that?

```
1      Because when L'Oreal USA was looking to do this

2      acquisition, they were also creating help from

3      L'Oreal SA to create international business

4      plans.  Mr. Dolden explained this in his

5      deposition.

6                  So the people who are creating

7      international business plans are not at L'Oreal

8      USA.  They would, first of all, have never

9      received this technical document, this financial

10     document.  And all documents that L'Oreal USA

11     corresponded to with these individuals have been

12     produced.

13                 I can go through the names and

14     there's also a lot of attorneys on this list.

15     Some of those were logged as privileged, but the

16     vast majority of -- the reason it kept expanded

17     is because certain people became aware, hey, I

18     need you to run these numbers, we have to do a

19     business plan on X, Y, Z, can you run these

20     numbers for a potential acquisition.  So you add

21     them to the list.

22                 Adding them to the data room list

23     basically means that you are now on notice.  You

24     cannot talk about this potential acquisition
```

```
 1        with anybody else within the company.  It

 2        doesn't mean they were now handed a secret

 3        technical document.  The data room doesn't

 4        relate to the technical document.  That's the

 5        clean room.  That was eight people.  Notes from

 6        the meeting were produced.

 7                       When Mr. Paunovich says that Roger

 8        Dolden was at this meeting, he was leading the

 9        acquisition.  He wasn't just a former employee.

10        He was the head of mergers and acquisitions of

11        L'Oreal for 30 years.  He was leading this

12        acquisition.  He brought with him one scientist.

13        They sat at the meeting, the tiny table at a

14        public restaurant.

15                       He was testified what was handed

16        over at the meeting.  No, he was not on the

17        cleaning room that would have started

18        reviewing -- I'm sorry, not part of the clean

19        team that would have reviewed the technical

20        information that would have come back from that

21        meeting, but no technical information was

22        provided.

23                       Mr. Dolden testified they're at

24        this table.  If a patent application was crossed
```

```
 1        over to provide to L'Oreal from Olaplex at this
 2        table, Mr. Dolden would have seen it.  So to
 3        suggest that he wouldn't know anything about
 4        what the clean room or what the clean team had
 5        because he's not part of it, he was at the one
 6        and only meeting where this exchange would have
 7        happened.
 8                    His contemporaneous notes
 9        specified what was given to him at the meeting.
10        He explained the financial information that was
11        given to him at the meeting.  His notes say, no
12        new technical documents were shared.  So we're
13        just at a loss as to what we would be looking
14        for that they want that we can give them because
15        we're not going to locate a document that was
16        not provided.  And what was provided to L'Oreal
17        at that meeting has been produced.
18                    THE COURT:  Okay.
19                    MR. PAUNOVICH:  Your Honor, we
20        have approximately 45 employees that we didn't
21        hear from L'Oreal as having documents being
22        collected from them, reviewed or produced for
23        relevance in this case.  They are on this list
24        for a reason.  What did they receive from these
```

1    three people in the clean room?  How did they

2    use it?  Did it end up in the accused products?

3    Each of these questions may be answered by those

4    questions.

5              The fact that they by their

6    admission were part of the list to know about

7    this to get information about the acquisition, I

8    think, clearly tells the story that they've got

9    relevant information and we respectfully request

10   that we should have those documents.  Those

11   documents should be reviewed and produced to the

12   extent that they're relevant.

13             If they go to those 45 employees

14   and search their documents and nothing says

15   Olaplex or they don't have anything about the

16   accused products, so be it.  We're not asking to

17   image their computers and back up the truck.

18   We're asking for relevant information.  The fact

19   that they've given us a select few documents

20   from a few people does not address what we're

21   missing.

22             The people that they mentioned,

23   the three, Hugo Kunetz, this is the guy who is

24   missing in Dubai who they have said they

1       represented at one point and nobody can find

2       him.  We've had process servicers in garages in

3       subterranean Dubai, skyscrapers, can't find him,

4       so we can't depose him, can't get his documents.

5               Delphine Allard, she's the subject of

6       the letter's request that's currently being

7       objected to that was ordered by the Court.  We

8       don't have access to her.  We don't have her

9       documents.  She's supposedly under the umbrella

10      of SA at this point.  Marshall Gringauz, the one

11      attorney who is on this clean room list.  We

12      don't have a privilege log yet and he, to my

13      understanding, works for SA so I'm not sure

14      we're going to get anything logged regarding

15      him.

16              However, we do know that there are

17      45 people that we have no documents from,

18      custodial whatsoever, but clearly had some

19      information.  The last point is there are many

20      documents if Your Honor wanted that we could

21      bring forward that were in the Dolden

22      deposition.

23              We just didn't want to burden the

24      Court with producing a full deposition where

```
1        he's saying to his boss right before they're

2        about to tell Olaplex, we don't want to buy you

3        anymore.  I'm very uncomfortable with this

4        patent -- I'm paraphrasing right now.  I'm very

5        uncomfortable this patent situation.  I want to

6        send you my notes before I send this out to the

7        team, but I just want you to know -- his main

8        boss, the CEO of L'Oreal USA, I'm uncomfortable

9        with this situation.  So we don't have the full

10       story and we just want the full story, whatever

11       that may be.  Thank you.

12                      MS. MURRAY:  Your Honor, just real

13       quick.  If you want specifics, 26 of these

14       people on this list are not L'Oreal USA

15       employees.  As to people that are on the list

16       that are USA employees, Marshall Gringauz, he's

17       an attorney, inhouse counsel for L'Oreal USA.

18       205 documents have been produced with

19       Mr. Gringauz.  Same thing, Boulineau, he's on

20       the list, 407 documents.  Another person from

21       L'Oreal USA, Mr. Koten, 243 documents.  They

22       have documents from each of these people.

23                      If we were to go and have to

24       collect all of their computers to search for a
```

```
 1        patent application that was never handed over in

 2        this case -- I mean, if we can get a

 3        representation from them that if we search all

 4        of these computers and we don't find that

 5        notorious patent application, are they going to

 6        drop the trade secret claim?

 7                    His last suspicion about

 8        Mr. Dolden telling the CEO that he's very

 9        concerned proves our point.  He was concerned

10        because the R&I, the L'Oreal team working on the

11        accused products at the same time had no

12        visibility into what patents were going on, on

13        the Olaplex side, so he was concerned about that

14        because he met with Dean Christal and Dean

15        Christal tells him in September at the end that

16        he's going to get some patent, so he's concerned

17        because he knows that R&I is doing something

18        separate because they're isolated and they have

19        no visibility of what Olaplex is doing and what

20        was going to happen with the product and what

21        was going to happen with the negotiations with

22        Dean Christal.

23                    The cleaning documents, all

24        training, all the guidelines, everybody has
```

1    acknowledged them, they have all been produced.

2    I don't even know what we would search for if we

3    had to go through these custodians, which again

4    I went through this last night, documents from

5    each of these people have been produced in this

6    case.  I don't know what else to give them.

7                    THE COURT:  All right.  On this

8    issue I am denying Olaplex's request without

9    prejudice.  The record reflects that L'Oreal

10   produced numerous volumes of documents regarding

11   the potential acquisition in 2015.  And L'Oreal

12   has indicated that no records were kept

13   regarding these documents replacing the clean

14   room and L'Oreal cannot produce that because it

15   doesn't have individuals on the data room

16   permission list and knowledge relevant to

17   potential acquisition, but L'Oreal has indicated

18   that to the extent custodial searches were

19   performed for some of those individuals for

20   L'Oreal USA, those documents have already been

21   produced and for other individuals on that data

22   room permission list had knowledge but did not

23   have access to confidential technical

24   information.

```
1              It's disproportional I find at

2      this stage for the Court to order custodial

3      searches for all 45 individuals, who 26 L'Oreal

4      represented are not employees of L'Oreal USA,

5      particularly since many of these individuals are

6      not employed by L'Oreal or no longer employed by

7      L'Oreal and are attorneys whose communications

8      are privileged.

9              If there is a specific individual

10     on this list that because of other information

11     that's been produced in discovery the Plaintiffs

12     can make a reasonable argument that there ought

13     to be a custodial search, I'll hear it.  But I'm

14     not at this stage inclined to order searching

15     computers for 45 people in the hopes that

16     something can be found beyond what has already

17     been searched for and produced in this

18     litigation at this time.  So that is my ruling

19     on that issue.

20              MR. PAUNOVICH:  Your Honor, may I

21     ask a point of clarification?

22              THE COURT:  Yes.

23              MR. PAUNOVICH:  It was unclear to

24     me whether a representation was actually made
```

```
 1          that the custodians that they represented they

 2          produced the documents relating to them, whether

 3          they've actually searched for those individuals.

 4          From the metadata what we see is they produced

 5          documents that actually have -- they're from

 6          somebody else and might have a person's name on

 7          it, but it's not clear to us at all from the

 8          metadata where you would identify a custodian

 9          that they've actually searched for these

10          people's documents, so I think that's where

11          there might be a disconnect.

12                    I can give you one narrowing

13          immediately, for example.  Anthony Potin is an

14          inventor on the L'Oreal patents.  He's part of

15          this 45-person list that developed the accused

16          products, who supposedly had access to this

17          information.  I don't believe that we have any

18          metadata indicating that he was a custodian.

19                    The last point being, L'Oreal

20          seems to shuffle people around a lot but

21          maintains documents.  So they mention a bunch of

22          people, 26 apparently that work for SA.  But I

23          think the question is do they have possession,

24          custody and control of anybody's documents.
```

```
 1                         I understand Your Honor's ruling,
 2           but those were a couple of points that were
 3           unclear to me whether we're getting the right
 4           representation about what we have.
 5                         THE COURT:  Well, I think you need
 6           to clarify that with the other side first and
 7           meet and confer.  And if you're convinced
 8           there's a basis to ask the Court to order
 9           L'Oreal to do a custodial search, then I'll hear
10           you out on that.  Let's just leave it at that at
11           this point.  Let's move on to the additional
12           issues.
13                         L'Oreal, next issue.
14                         MS. MURRAY:  I think our next
15           issue is a quick one, Your Honor.  It's Request
16           No. 81 concerning the validity of the asserted
17           patent.  We don't believe we've received all of
18           the foreign filings from Olaplex.  Their
19           response is that they had produced their foreign
20           PGR filings, but our request was not limited to
21           that.
22                         There were representations made
23           about these patents in foreign jurisdictions is
24           relevant, so we weren't limiting it to PGR.  If
```

```
 1      their position is they've given us everything

 2      they've filed in these foreign jurisdictions

 3      that's relevant, we'll have to take them at

 4      their word.  It sounds like they've only given

 5      us one PGR filing.

 6                      THE COURT:  All right.

 7      Mr. Paunovich?

 8                      MR. PAUNOVICH:  I know that that

 9      is not true.  We have provided foreign patent

10      filings.  Anything that's been publicly filed

11      we've provided to my knowledge.  They're ongoing

12      prosecutions so I don't have the exact data in

13      hand.  I think it was maybe three or four months

14      ago.  We have literally backed the truck up and

15      gathered every foreign filing from our foreign

16      patent agents and provided it to them.

17                      If there's something they're aware

18      of that they think they're missing, we're happy

19      to go back and see if we have it and produce it,

20      but I'm not aware of anything.

21                      THE COURT:  So the production from

22      the foreign patent prosecutions of publicly

23      available documents was made how long ago?

24                      MR. PAUNOVICH:  I have to get the
```

```
 1    date for you, Your Honor.  I think it was just a

 2    couple of months ago.  As you recall, in the

 3    claim construction proceeding, we saw extensive

 4    examples of those cited.  If you look at those

 5    documents, they have Olaplex labels on them.  So

 6    at least as of the time of the briefing for

 7    claim construction, we had provided this

 8    substantial production.

 9              I know and it might be in our

10    papers, but it's thousands of pages of foreign

11    prosecution filings and there was no intent to

12    withhold any of them.  We literally asked for

13    everything and produced it at that time.

14              THE COURT:  What I'll ask on this

15    issue is that you supplement.  As you said to

16    the extent that there are prosecutions which are

17    ongoing, that you make a supplemental production

18    by the close-of-fact discovery by December 21st

19    of any additional materials from these foreign

20    prosecutions.

21              MR. PAUNOVICH:  That deadline I

22    will do our absolute best.  I'm not sure we will

23    be able to meet that.  We have over 100 patent

24    applications in a ton of jurisdictions.  I do
```

1       recall the last time we did this because we had

2       to coordinate with perhaps 10 or a dozen or more

3       foreign patent agents, we may be slightly at the

4       whim of people that are in far-afield locations.

5       And the person who coordinates that, Rivka

6       Monheit who is our prosecution counsel, is being

7       deposed next Wednesday, so I'm sure she will be

8       involved in getting ready for that deposition.

9                   Your Honor, we would do the same

10      thing if it's okay with Your Honor.  If there's

11      some problem with that, we will speak with

12      opposing counsel.  But it may be that it takes a

13      little bit longer than that.

14                  THE COURT:  I would direct you to

15      do that and I would direct L'Oreal's counsel if

16      there are specific items that you're looking for

17      in that patent prosecution, rather than be a

18      document dump, that you assist Mr. Paunovich and

19      whatever team needs to be assembled to

20      supplement to look for specific things in those

21      foreign prosecutions.

22                  MS. MURRAY:  Absolutely, Your

23      Honor.

24                  MR. PAUNOVICH:  Thank you, Your

1    Honor.  Your Honor, the next topic is No. 3 in

2    Plaintiffs' dispute letter, failure to produce

3    certain lab notebooks and related documents.

4    This is another one where we thought it had been

5    put to bed back in the August 1st discovery

6    hearing.

7                L'Oreal was ordered by Your Honor

8    to produce all lab notebooks responsive to our

9    request.  We identified specific lab notebooks

10   for about 12 or so people during that hearing

11   and Your Honor had ordered those to be produced.

12   The only exception to that order that Your Honor

13   made was that L'Oreal could redact for

14   nonresponsiveness, meaning it relates to

15   something far afield.  But very directly in

16   field were the inventors on the specific patent

17   applications that we think are incredibly

18   germane and relevant to our trade secret claim.

19                We have not gotten all of those

20   lab notebooks.  L'Oreal has told us after some

21   pressing that they deem the lab notebooks

22   relating to those patents as being nonrelevant.

23   Yet when we look at the claims that are within

24   the second of the two patent applications, we

```
 1          see that it maps one-for-one onto their accused

 2          products down to the ingredient on the

 3          ingredient list.

 4                    Just as a reminder, pre-May 19,

 5          2015 meeting we saw the one patent application

 6          that's going to be on their planned bond

 7          builders and it uses a different active agent,

 8          malonic acid, so it's about two weeks before

 9          they file that.  And they meet with us, get our

10          patent application and other materials, and they

11          file a new application, the second of two that

12          we've called attention to, same set of inventors

13          and lo and behold, it has maleic acid as an

14          active ingredient.  We think it's clearly

15          relevant.

16                    In addition, among the lab

17          notebooks that they have produced, there are 17

18          cross-referenced documents.  So we have lab

19          notebooks that they said, these are relevant,

20          although they contend now that maybe they don't

21          think they're relevant anymore but that's a

22          dispute for another day.  And within those lab

23          notebooks the inventors are going down and it

24          says, go look at this other document.
```

1              It doesn't matter what you call

2       the other document, whether it's a lab notebook

3       or a napkin.  It cross-references.  Go look at

4       this.  There are 17 of those.  So we asked for

5       them and L'Oreal said, well, they're not lab

6       notebooks.  We said, well, they're

7       cross-referenced.  They're clearly relevant.  We

8       need to see them so that we can probe that and

9       make that determination ourselves.

10              The fact that they're in a

11      relevant section of a lab notebook and

12      cross-referenced, we think is prima facie

13      evidence of their relevance and that those

14      should be produced as well.  Unless Your Honor

15      has any questions?

16              THE COURT:  No questions.

17              MR. PAUNOVICH:  Thank you.

18              MR. PALYS:  So where did this come

19      from, these lab notebooks, this issue?  It's the

20      last comment that Mr. Paunovich raised which was

21      we produced hundreds and hundreds of pages of

22      documents and they found these L numbers in some

23      presentation and then they tried to track that L

24      number to a notebook.  So in L'Oreal's language,

```
 1      sometimes lab notebooks have L and number,

 2      number, number.  That doesn't mean that's the

 3      only thing those L numbers might represent.

 4                   I believe there was a

 5      communication, they give a list of L numbers to

 6      us and said, where are these.  We can't find

 7      them in the production.  So we went and looked

 8      and this was during the middle of a deposition

 9      when Mr. Dolden was deposed so a little bit of

10      delay there.  We finally did that.

11                   Long story short is this:  We have

12      looked.  And from what we understand right now,

13      and it's in our letter to Her Honor, the list of

14      documents, the ones that we did find were not

15      relevant.  And you may recall when we had the

16      discussion with you about producing lab

17      notebooks back in August where Your Honor

18      recognized these notebooks may have information

19      that has nothing to do with any of the accused

20      products, that's what we're dealing with, with

21      those numbers that were not relevant.

22                   Some of the L numbers were even

23      lab notebooks.  And out of the ones that were

24      remaining, we said we would look.  Absolutely
```

```
 1        just yesterday I had my hands on three of the

 2        notebooks that we found.  So we're already in

 3        the process of scanning and we're going to

 4        produce them.  But just to let the Court know,

 5        we heard Mr. Paunovich say this is the smoking

 6        gun, it's going to be information from what I

 7        understand is already in other notebooks.  It

 8        has nothing to do with any detailed things about

 9        inventorship and patent application, but they'll

10        see this.

11                    It's going to be maybe four pages

12        of one notebook is mostly empty.  The second one

13        is going to be a handful of pages out of another

14        notebook that's going to have to be heavily

15        redacted because it has nothing to do with this

16        case and the third one is going to be the same

17        way.  And some of these relate to people that --

18        one I believe is a temporary employee that

19        wasn't around long at L'Oreal.

20                    These aren't groundbreaking

21        notebooks that they're waiting on, but we're

22        going to give it to them.  Hopefully we're

23        getting them scanned today, we'll redact them

24        and we'll send it to them.  Other than that,
```

 1    that's not much else we can give to them --

 2                    THE COURT:  What you said you'll

 3    produce, what you've just described will be sent

 4    by Friday?

 5                    MR. PALYS:  Yes, three documents.

 6    I think the redactions shouldn't take long so

 7    we'll do our best to send it by Friday.

 8                    THE COURT:  What about the 17

 9    cross-references whether they go to other

10    documents or other lab notebooks?  Mr. Paunovich

11    mentioned there's 17 cross-references that are

12    noted in the lab notebooks that have been

13    produced thus far.

14                    MR. PALYS:  I think that's what I

15    was referring to, this whole category.  Some are

16    not relevant, some are not notebooks and the

17    ones that we found we're producing.  Thank you.

18                    THE COURT:  Okay.

19                    MR. PAUNOVICH:  Your Honor, I just

20    want clarification.  Are they producing the lab

21    notebooks on the 12 or so inventors that they

22    were ordered back in August to produce on the

23    malonic acid and maleic acid patent

24    applications?  We do not have those and they

 1          claim they're nonresponsive because in their

 2          view they're not relevant.  We clearly made them

 3          relevant.

 4                    I thought I heard counsel to be

 5          talking just about the 17 documents and that's

 6          what he was referring to.  He said they're going

 7          to produce three.  So there's 17 of those plus

 8          the lab notebooks of the inventors.  So it's

 9          certainly way more than three so I'm concerned

10          by the --

11                    THE COURT:  How many inventors are

12          there that you feel that the lab notebooks are

13          still lacking for?

14                    MR. PAUNOVICH:  So we've gotten

15          lab notebooks from Kimberly Dreher Hamilton.

16          I'm not going to name all of them, but I know

17          that I can get that in the space of this

18          hearing.  But there are 12, Kimberly Dreher

19          Hamilton, Fabian Boulineau, Caroline Goget,

20          Jeremy Puco, Gerard Provot, Dariusz Danielski,

21          Anthony Potin, Allison Chin, Michael DeGeorge,

22          Mara Applebum, Mary Soliman, Ashley Figatner,

23          Megan Pauker, Emanuel Appiah-Amponsah, each of

24          these are in our discovery letter.  But I know

```
 1        the majority of those we have no lab notebooks

 2        from.

 3                    There are inventors on patent

 4        applications.  The two that straddle on this key

 5        meeting we would like to have those.

 6                    MR. PALYS:  Your Honor, I think we

 7        addressed this before.  If we have a notebook

 8        that was relevant, we produced it.

 9        Mr. Paunovich was giving a list of names but

10        doesn't seem to know what was produced.  Let me

11        just give you an example, some of the list that

12        he just identified doesn't have any notebooks.

13        We've told this to them over and over.  We

14        cannot produce what we don't have.

15                    We have done the research.  If we

16        found a notebook that was relevant, we produced

17        it.  If we didn't, it doesn't exist.  So the

18        only ones that we have found right now from the

19        complaints that they are these three remaining

20        that I don't believe are named inventors so I

21        don't know what else to tell the Court.

22                    THE COURT:  Mr. Paunovich, do you

23        want to address the --

24                    MR. PAUNOVICH:  The key question
```

1        is what's relevant.  And we were told at the

2        meet-and-confers that they don't deem the lab

3        notebooks relating to the filing of these two

4        patent applications as being relevant.

5                        THE COURT:  You're referring to

6        the '625 and 663 patent applications?

7                        MR. PAUNOVICH:  Correct.  So are

8        we getting those?  I don't think they should be

9        hiding behind the relevancy determination that

10       we're not able to make.  So if we're getting

11       those lab notebooks related to those two

12       inventions, then I'm satisfied.

13                        THE COURT:  All right.  Can you

14       speak to those, Mr. Palys?

15                        MR. PALYS:  Your Honor, if we

16       don't have a notebook, we don't have a notebook.

17       That's the response.  When I was referring to

18       relevancy, that was in the context of Her

19       Honor's discussion back in August, in other

20       words, if it has nothing to do with the accused

21       products, then that would not be considered

22       something relevant.

23                        In other words, when we're

24       redacting a notebook, a formulator or some

1     chemist is working on some other project, we

2     will redact it.  That's what I was referring to.

3     I don't know what else to say.  We produced what

4     we could find to the extent it was directed and

5     relevant to this case.

6                    MR. PAUNOVICH:  Are we getting

7     the --

8                    THE COURT:  I think I can put this

9     to rest.  I'm going to order a supplemental

10    production of lab notebooks to the extent they

11    exist even if those lab notebooks are addressing

12    the '625 and the '663 applications.  I think

13    that there's a sufficient record made here and

14    the basis for that given that Plaintiffs

15    described in their moving submission that those

16    applications both describe hair treatment

17    compositions and shows L'Oreal's transition from

18    malonic acid to maleic acid.

19                    So to the extent there's some

20    withholding, I'm not saying that there has been

21    because I truly don't know, but if lab notebooks

22    have been held on relevancy as relating to these

23    two patent applications as opposed to

24    patents-in-suit, then I would ask that L'Oreal

```
 1        go back and make a production of them.

 2                     And if there's some issue still

 3        with regard to producing them to the extent they

 4        exist, I will hear it.  If there are still

 5        relevancy objections and reluctance to produce

 6        them on that basis, we will have to find some

 7        other process going forward either by a

 8        declaration from some expert that brings the

 9        relevance to light for the Court and/or an

10        in-camera review of them by the Court or

11        whatever, but there has to be a means to get to

12        the end.

13                     For right now I will order the

14        production.  To the extent they exist not to be

15        excluded on the basis that they relate to the

16        '625 and '663 applications, that won't be a

17        sufficient relevancy objection, so that should

18        clarify.

19                     MR. PAUNOVICH:  Thank you, Your

20        Honor.

21                     THE COURT:  The next issue for

22        L'Oreal.

23                     MS. MURRAY:  Your Honor, I think

24        we're moving into the interrogatories on our
```

```
1     end.  So we would like a response to

2     Interrogatory No. 13.  We believe the response

3     is incomplete.  We want to know how their

4     product and any derivation was created made to

5     use.  This goes to many issues in the case.

6              It can go to invalidity.  It can

7     go to when there was public use of the product.

8     It can go to claim construction.  We should have

9     a right to know what's in their product.  And

10    all they say is, well, you're going to get the

11    information because you've subpoenaed the

12    manufacturer.

13             Well, the manufacturer gave us

14    very little information and the manufacturer is

15    telling us that they're not available for

16    deposition.  So we're asking the party, the

17    party who should know how their product is made,

18    can you tell us and explain that process.

19             All we really got from the

20    interrogatory response was a list of ingredients

21    and it basically just refers us to their

22    manufacturer which is kind of a dead-end because

23    they're not responding to our subpoena.  And

24    with respect to documents, they gave us invoices
```

1      and communications but not the information that

2      we've requested.  It seems like a kind of

3      straight-up request, but they don't want to give

4      us information about their product.

5                      THE COURT:  Mr. Paunovich?

6                      MR. PAUNOVICH:  Your Honor, we

7      think that this interrogatory is not

8      proportionate to the needs of the case.  They're

9      asking for literally every potion that might

10     have ever been created relating to our

11     commercial product.

12                      What's in our commercial product,

13     much less some other earlier version of it is

14     not relevant to any claim or defense in this

15     case and calls for potentially, incredibly

16     lengthy and burdensome narrative about how we

17     bottle a product.  It's very confusing to me why

18     or how that would bear on the validity of our

19     patent.

20                      On how we mix it, where do we buy

21     our ingredients from, how is this relevant to

22     any claim or defense in this case.  It has no

23     relevance to invalidity.  We're talking about a

24     separate patent that covers a different active

1      agent as the parties have talked about and

2      explained.  And how that bears on validity is

3      lost on us.

4                     This seems to be sort of a make-

5      work exercise that's going to serve no purpose

6      in this case.  They are deposing our inventors

7      for whatever little knowledge that they may have

8      and essentially every employee that works at

9      Olaplex, by the way which is a very small

10     company still, and they designated topics

11     relating to the manufacturer of our products.

12     They have an opportunity to depose these people.

13                     I'm not saying it's relevant to

14     anything, but somebody will be there and they

15     can answer whatever information that they have.

16     I think our papers lay out very clearly why the

17     information called for by this interrogatory is

18     neither relevant to validity or to public use,

19     and L'Oreal is just insisting, well, you've got

20     to respond to this.  There has to be some limit.

21                     We have been dumped on a huge

22     amount of discovery from L'Oreal in the last

23     month.  After two years of litigation, they

24     decided to serve over 20 subpoenas or deposition

```
 1        notices, 120 document requests, nearly every

 2        single one of their interrogatories -- there has

 3        to be some limit here, especially when it has no

 4        bearing or relevance in this case.  Unless Your

 5        Honor has any questions?

 6                    THE COURT:  No questions.

 7                    MR. PALYS:  Your Honor, if I can,

 8        let me enlighten the Court on that.  Maybe

 9        Mr. Paunovich doesn't know the relevance here.

10        Your Honor, remember when we had this claim

11        construction argument a few weeks ago and we

12        were talking about their representation that

13        their product isn't covered, we have a right to

14        know what's in their product, how it's made.

15                    In other words, are they using

16        maleic acid that eventually transforms into some

17        other compound.  We have a right to know that

18        because it goes to the disclaimer.  Validity,

19        Mr. Paunovich has no clue on how that happens.

20        It's prior use.

21                    Their story is they came up with a

22        formulation in a garage on a certain date and

23        then from there, it transformed into something

24        that's Olaplex.  We're entitled to know what was
```

1          in those formulations that they were handing to

2          stylists years before they filed the patent

3          application because it goes to prior use.

4                    Priority can be attacked from the

5          patent application so it does make it relevant.

6          So, yes, we are asking for every iteration of

7          every portion that they had come up with, and we

8          think it's very relevant to this and they should

9          be compelled to produce documents and notes.

10                   My last point here, Your Honor, is

11         if they're going to say that they don't have

12         anything or they don't know how their process is

13         made, that's on them.  But they can't come into

14         trial and try to explain something different.

15                   THE COURT:  I hear what you're

16         saying and I think we're dealing with two

17         different issues here.  Any issue that comes up

18         at trial is considered "sandbagging" if the

19         initial discovery has not been provided.  That's

20         something that you're going to address with the

21         trial judge and presumably object to exclude, et

22         cetera.

23                   What we're dealing here with is

24         information that you're looking for about how

1      their product is created and --

2                   MR. PALYS:  Previous derivations,

3      the development to it.

4                   THE COURT:  And I understand

5      you're asking for all iterations.  But I'm

6      trying to grasp how that can possibly be

7      answered in the form of an interrogatory.  Is it

8      a better process for you to go forward with

9      these depositions with the various individuals

10     who may have knowledge of a part or all in the

11     best-case scenario or at least different pieces

12     of it and if you feel that there is still

13     something missing, then that becomes a more

14     narrow and not such a broad category for a

15     response that you're seeking?

16                  MR. PALYS:  I agree with you.

17     And, yes, we're going to ask those questions.

18     But we think that shouldn't prevent them or

19     preclude them from putting it in writing as

20     well.  How can they write this?  They can tell

21     us what was in the alleged formula, what was in

22     the bottle, what was the concentration, what did

23     you give the stylists when they were testing it,

24     what was contained in there, because this is

```
 1        information that we're getting the run-around on

 2        since the beginning of this case.

 3                    Many of the stylists and I don't

 4        think we're talking about them today, but none

 5        of the stylists are available for depositions,

 6        all of them, you heard that today.  So we can't

 7        get to the meats and bones of any of their

 8        formulas.  We had deposed Dr. Pressly, one of

 9        the inventors, on this issue way back in the

10        beginning of the case.  And he made it very

11        clear, I don't keep notes; I keep everything in

12        my head in terms of production and stuff like

13        that.

14                    So if Olaplex has a product that

15        it's putting out and they don't know, number

16        one, in their current product how it's made and

17        they're pointing us to go to the manufacturer to

18        figure out, if that's going to be their

19        position, then it should be absolutely clear

20        that that's their position, we don't know how

21        our product is made.

22                    And in terms of the previous

23        development of those products which goes to the

24        relationship of their asserted infringement
```

```
 1        claims, if they don't know what was in there,

 2        now we're talking about conception and reduction

 3        to practice issues, so it's very relevant.  And

 4        we think they should put it in an interrogatory

 5        response.

 6                    And then the time limit of all of

 7        the topics on this deposition, they're putting

 8        up Mr. Pressly for a lot of topics and we have

 9        seven hours with them.  Will we be able to get

10        that from them -- oh, no, they're not giving us

11        a witness on this topic.  I just found that out,

12        so we won't have that opportunity.

13                    MR. PAUNOVICH:  Your Honor, our

14        witnesses have been deposed already and early on

15        in this case it had been asked, they have always

16        used what this bis-aminopropyl diglycol

17        dimaleate, this is what they testified that has

18        been used from Day 1.  Now, apparently L'Oreal

19        wants us to go back and describe, you know, I

20        had a liter here and a liter there and I put it

21        in this-shaped bottle and then later we switched

22        to this bottle.  What are these issues relevant

23        to?  They're not relevant to anything here.

24                    And as Your Honor said, they're
```

1      going to have an opportunity to depose our

2      inventors, essentially almost every single

3      employee of Olaplex.  Let's keep in mind, this

4      was a garage start-up.  To this day, it has no

5      brick and mortar building.  We don't have

6      machines that mix and do these things.  We have

7      a supplier that does all of these things.

8                  They made it originally with the

9      same ingredient.  They testified to that.  It's

10     never been changed.  Your Honor, maybe it will

11     be obviated in short order whenever Your Honor

12     issues her claim construction order, but this is

13     that concentration term.  Do you measure

14     concentration when by referencing the ingredient

15     that you add to the solution or do you assess it

16     at some indeterminate time in the future.  That

17     is this issue.

18                  If Your Honor rules in our favor

19     on that particular claim construction, then this

20     is an absolutely dead issue and makes this

21     discovery even more futile and pointless to the

22     claims and defenses in this case.

23                  MR. PALYS:  Your Honor, one other

24     point.  That's not true.  It's not the mixture

```
 1     issue.  It's prior use issue.  If their product
 2     was disclosed prior to the date that it is
 3     available for prior art, it's prior art.  Thank
 4     you.
 5                    THE COURT:  I'm going to grant
 6     L'Oreal's request and order to compel Olaplex to
 7     answer Interrogatory No. 13.  How much time is
 8     reasonable for that?
 9                    MR. PAUNOVICH:  So next week we
10     have over 20 depositions occurring on Monday.
11     There's five alone.  All of the team members are
12     fully deployed other than some of these limited
13     document production, so I would request that we
14     be able to provide this response after the
15     close-of-discovery which will also take
16     advantage of the deposition testimony that will
17     likely be given.
18                    I just don't know honestly that
19     we're in a position to do that any sooner, but
20     we would do it expeditiously and very quickly
21     after that.
22                    THE COURT:  And the depositions
23     may have some bearing on the fashioning of the
24     responses of the interrogatory.  Will they all
```

1           be completed by the end of next week?

2                         MR. PAUNOVICH:  Yes.

3                         THE COURT:  So if I order it one

4           week subsequent to that?

5                         MR. PAUNOVICH:  Yes.  Thank you,

6           Your Honor.

7                         THE COURT:  My order is that a

8           response to Interrogatory No. 13 be provided one

9           week after the conclusion of next week's

10          depositions, so that will make it December 28th.

11                        All right.  We have two additional

12          issues from the Plaintiffs.  There's the

13          deposition date issue and document hold and

14          preservation and --

15                        MR. PAUNOVICH:  Yes, Your Honor.

16                        THE COURT:  Before you get into

17          your argument, Mr. Paunovich, in trying to move

18          things along because we're getting short on

19          time, with regard to this, the Court's default

20          order never really compels a party to provide

21          this type of information that you're seeking.

22          So what would make it ripe for an exception to

23          the default standard?

24                        MR. PAUNOVICH:  Your Honor, I

1    think that the testimony and exhibits that we

2    used with Mr. Dolden make this a clear

3    exception, an exception that this Court as well

4    would typically look at for providing this type

5    of information.

6                THE COURT:  Aren't you putting the

7    cart before the horse?  Doesn't the Court have

8    to make a finding that evidence has not been

9    preserved or has a spoliation issue here before

10   I even get to the relief that you're seeking?

11               MR. PAUNOVICH:  We tried to tee

12   that up, Your Honor, in our discovery dispute

13   letter.  If Your Honor would like more briefing

14   on that issue to flush it out a little bit more

15   given all of the issues here, we can certainly

16   do that.

17               But in essence, Mr. Dolden, the

18   lead for this potential acquisition of Olaplex,

19   testified that essentially they anticipated

20   litigation all the way back in 2015.  And he

21   also testified that L'Oreal has document

22   destruction practices, as large corporations

23   typically do, and there was no document hold

24   notice issued to him or anyone else on the team

1    that he led at that time when they anticipated

2    litigation.

3                    So we have now all the

4    foundational facts to know that, look, you

5    anticipated litigation, you have document

6    destruction policies that if they're not ceased

7    or put on hold, that documents are going to get

8    destroyed.

9                    What we don't know is, okay, when

10   did you issue your first document hold notice

11   and what was the nature of that first document

12   hold notice.  So when is an important fact and

13   that might otherwise appear on a privilege log.

14   But we think just as importantly is the

15   substance of that document hold notice.

16                   Were people told to just maintain,

17   for example, things relating to perhaps a narrow

18   reading of the Olaplex acquisition or were they

19   asked to maintain things also relating to the

20   development of the accused products.  Each of

21   those twin towers of this case, we think, would

22   have relevant information.

23                   We've got witnesses who swear on

24   our side to providing all of this confidential

1    information to the other side, and one guy is

2    saying, no, we never got anything.  Yet all over

3    his documents he's saying, I think we're going

4    to get sued, I'm very concerned.  I'm

5    uncomfortable with this and admitting that

6    there's no document hold notice.

7              We do recognize that it is a rare

8    exception, but we think the foundational facts

9    are laid here supporting the Court's ruling to

10   provide this information.

11             THE COURT:  All right.

12   Ms. Murray?

13             MS. MURRAY:  Your Honor, I think

14   you're right here, there hasn't been any

15   findings of spoliation.  Mr. Paunovich has taken

16   Mr. Dolden's testimony out of context.  If he

17   was asked if there was a litigation hold notice

18   issued when he sent this email, it was him

19   giving his thoughts to the CEO.  And when he was

20   asked was there a litigation hold issued, he

21   said, I don't think so and I don't know a reason

22   why there would be.  There wasn't a situation

23   where there was a company who's feeling that

24   they were going to be sued.

```
 1              In any event, Your Honor, as
 2    Mr. Paunovich has just acknowledged, all over
 3    Mr. Dolden's documents there are emails about
 4    this acquisition.  All of these emails went
 5    before this September 5, 2015 day that they're
 6    saying it should have cleared a hold notice.
 7    The documents produced relating to the
 8    acquisition go all the way back to the beginning
 9    of the talks with Olaplex, early 2015.  February
10    2015 is when the decisions were made to start
11    having these talks.  They have all been
12    produced.
13              And prior to that all of the
14    technical documents date back to 2014, so I'm
15    not sure where there's a concern that something
16    is missing.  Again, this does not allow you to
17    accuse a company of spoliation, so this seems
18    premature.
19              MR. PAUNOVICH:  Your Honor, does
20    Mr. Dolden that they now say, well, this is just
21    one guy's opinion, this is the guy that they
22    want to designate after the fact as a 30(b)(6)
23    for the company that they supposedly didn't
24    receive this document, who is not part of the
```

```
 1        clean room by his own acknowledgement.

 2                    There's ironic tension in my view

 3        in that position.  This is the executive vice-

 4        president who says he managed the whole thing,

 5        who says, I anticipated litigation and he puts

 6        it in writing and says, there's document

 7        destruction policies and we didn't issue a hold

 8        notice.  So I don't know how you can get closer

 9        to demonstrating that there is a potential

10        spoliation here.

11                    If we don't see a hold notice

12        until 2016 when we first sued them, that's a

13        long time for a corporate company who's

14        destroying documents on a one- or two-month or

15        whatever it may be basis.  I'm sure we've got

16        some things, but what don't we have.

17                    I think like in all trade secrets

18        cases, you never have the smoking gun.  It is

19        always circumstantial evidence.  And to the

20        extent that things have been destroyed, we would

21        like to inquire into that and we may ask the

22        judge, our trial judge in this case, to issue an

23        instruction relating to that.  We need this

24        information in order to be in a position to make
```

that request to the Court.

THE COURT: At this time, I'm going to deny the request. I just feel that there isn't a sufficient basis for the Court here to assume potential spoliation and then go to the next level and carve out an exception for production of documents. That will clearly be an exception to our default standard for discovery.

I'm not saying that I'm not listening to your argument. I'm just saying on this record I'm not comfortable making that exception today. And it sounds like this issue may be wrapped in with the 30(b)(6) designation after the deposition that you have previewed me may be an issue coming before the Court in another matter for another day. Perhaps this issue is part and parcel with that.

I will deny it without prejudice. Today I won't grant the request for compelling documents and communications relating to L'Oreal's document destruction and retention policies at this time.

I think the next issue is the

1    deposition scheduling issue or are we still on

2    L'Oreal's interrogatory responses?

3                    MS. MURRAY:  Yes, Your Honor.

4    Interrogatory No. 15 is related to the No. 13,

5    so this one asked for all bases for their

6    position that their products are not covered.

7    And in anticipating your question of why don't

8    we just ask that in a deposition, we did put it

9    in our 30(b)(6) witness.  They've identified who

10   they plan to produce.  They will not produce a

11   witness on this topic.

12                   THE COURT:  Well, I always try to

13   figure out in my own mind where that line is

14   drawn between factual testimony and expert

15   witness testimony and foundational facts on

16   which an expert needs to rely in order to give

17   an opinion.  Shouldn't we defer this until after

18   expert exchanges have been made?

19                   MS. MURRAY:  None of the factual

20   witnesses have testified that the products are

21   not covered, so we would like the basis to

22   understand the basis for them saying that.  All

23   we're asking for is why are you saying that and

24   what are you relying on.  They say that's very

```
 1        early in the case.
 2                    We're not looking for the expert
 3        testimony.  That can come later, but the basis
 4        for the factual witnesses' testimony that the
 5        products aren't covered.  And Mr. Palys just
 6        reminded me they made these representations to
 7        the Fed Circuit, so this is prior to expert
 8        discovery.  All we're saying is, what are those
 9        representations based on.  Please put it in into
10        an interrogatory.
11                    THE COURT:  Mr. Paunovich?
12                    MR. PAUNOVICH:  Your Honor, this
13        is expert contentions.  This is back to that
14        concentration term claim construction for better
15        or for worse.
16                    THE COURT:  All right.  I'm going
17        to deny the motion to compel Olaplex to respond
18        Interrogatory No. 15.  I think there are a
19        number of ways to obtain what it is that L'Oreal
20        is seeking here.  First off, I think it is in
21        the realm of expert testimony and we certainly
22        have avenues of relief if you believe once those
23        expert exchanges are made in the form of the
24        reports exchanged and then expert depositions.
```

1          If you feel you have a basis for a

2     *Daubert* motion after doing that if there's not

3     sufficient facts to support it or if Olaplex

4     brings in facts and evidence, documents, et

5     cetera, that were not previously disclosed in

6     discovery, you have avenues of relief, but I

7     don't see how this can be more fully developed

8     without expert exchanges.

9               MR. PALYS:  Can I comment?

10              THE COURT:  Go ahead.

11              MR. PALYS:  The problem we have

12    with this is that they have told the PTAB, they

13    have told this Court, they've told the Federal

14    Circuit without expert testimony that their

15    product isn't covered, so why should we not be

16    able to have access to what is their basis.  If

17    they did not have a basis when they made this

18    representation to the Federal Circuit, the PTAB,

19    we should be able to know that as well.

20              THE COURT:  Well, haven't these

21    witnesses been asked in your depositions what's

22    your basis for that, for making that statement?

23              MR. PALYS:  This is the

24    representation by Olaplex the company.

1    Ms. Walden has made that representation.  I

2    believe she was asked that and I can't remember

3    if we followed up with the reasons.  We believe

4    we have a right to ask that question and have

5    them answer it in an interrogatory and in a

6    deposition.

7              By precluding them to answer this

8    in an interrogatory and then not providing a

9    witness, we're completely barred from

10   understanding their factual representation and

11   basis for telling the Federal Circuit, the

12   public, the PTAB and this Court that their

13   product is not covered.  And as you know, it's a

14   big issue in this case.  It's a very big issue

15   in this case and we think that the Court would

16   benefit from that insight as well as the parties

17   and the public for that matter.  It is their

18   patents on this.  It's a very important issue,

19   Your Honor.  Thank you.

20             THE COURT:  You can respond

21   briefly.

22             MR. PAUNOVICH:  I don't think it

23   warrants any further response.  We think Your

24   Honor has it right.

```
 1              THE COURT:  At this time, I'm not
 2     going to compel it.  Again, I believe it's in
 3     the realm of expert testimony.  Attorneys take
 4     positions in litigation all the time and that's
 5     why we have litigation to test the truthfulness
 6     or the correctness of what position is
 7     ultimately going to prevail.
 8              In terms of whether or not
 9     Olaplex's product is or is not covered by the
10     asserted patent, that's going to be one of the
11     issues litigated aggressively here and has been
12     litigated aggressively here.  I think that
13     you're not prejudiced by not having it answered
14     at this point.
15              I think it's more appropriate to
16     go into the realm of expert discovery.  And if
17     you want to come back and keep pressing for an
18     answer to Interrogatory No. 15 or if you want to
19     take further action such as a Daubert motion or
20     other request for relief after expert reports
21     are in, there are avenues to pursue this.  At
22     this time, I'm not going to compel an answer to
23     Interrogatory No. 15.
24              MR. PAUNOVICH:  The last issue in
```

1        Plaintiffs' discovery dispute relates to

2        deposition dates, Your Honor.  There's been

3        extensive meet-and-confers so I don't want to

4        suggest that that hasn't been the case.

5        Ms. Murray, my colleague and myself among others

6        have been doing that.

7                    The three individuals that we

8        called out, what I understand and I will just

9        ask counsel to correct me if this is not

10       accurate of the current understanding, is that

11       Caroline Goget, who used to be a L'Oreal USA

12       employee in some time in the recent past, has

13       now been transferred to L'Oreal SA in this sort

14       of shuffling that occurs, and they are going to

15       agree to put her up in addition to possibly

16       Delphine Allard or whichever SA employee will be

17       put up for deposition in connection with the

18       letter request provided what they told us they

19       said they'll do that, provided Judge Bataillon

20       denies their objections to the Court's order.

21                    So with that understanding, I

22       think that would be obviated, although it's

23       unclear when we would get those depositions.

24       I'm a little concerned that there's an existing

```
1        order that should be applied absent an objection

2        being sustained, and they're not going to do

3        that until some time later.  If the Court is

4        okay with that, we'll take the depositions

5        whenever we get them.

6                     THE COURT:  How about the other

7        two?

8                     MR. PAUNOVICH:  The other two they

9        had indicated to us that they represent them and

10       accepted service of our subpoenas.  But then

11       we've never gotten dates.  We sort of waived the

12       white flag the other day and we sent out other

13       subpoenas to serve them directly.  We were

14       successful with Mr. Puco but not yet with

15       Ms. Morris.  If they represent them and

16       previously accepted service, we would simply ask

17       that their depositions be set.  That's it.

18                     THE COURT:  All right.

19                     MR. PAUNOVICH:  Thank you.

20                     THE COURT:  Can we get depositions

21       of these other two -- let's start with the two

22       that are not subject to the objections on the --

23                     MS. MURRAY:  Sure.  We never

24       accepted service for these people.  They're not
```

```
 1      L'Oreal employees.  So they're former L'Oreal

 2      employees.  What we said is that L'Oreal was

 3      going to offer to represent them as it does

 4      every time there's a former employee.  My

 5      understanding is that Olaplex is going to

 6      subpoena them, so they are in the process of

 7      doing that.

 8                  We will work to get their dates,

 9      but I believe one of them has not been

10      subpoenaed yet.  We don't control them.  We

11      don't have authority to accept service for them,

12      but we will arrange their dates if and when

13      they've been served and try to work with them.

14                  Ms. Goget, she wasn't transferred

15      to SA.  She's a L'Oreal SA employee.  She was on

16      the road at the time at USA.  What we've offered

17      to them because given the time constraints

18      because she is in France and there's procedures

19      for that, we're not going to force them to go

20      through a new letter of request for process

21      given the time.

22                  What we said is we will rope that

23      in -- if they get to The Hague, they can seek

24      it.  We haven't made representations about
```

```
1        anything, any other witnesses there.  We've

2        identified witnesses like Ms. Goget on our

3        initial disclosures.  We've identified

4        Ms. Allard on our initial disclosures.  They

5        have to go through the process.  There's nothing

6        we can do on that.  We're not withholding

7        witnesses.

8                    We've got a host of third-party

9        witnesses, Your Honor, that we have been trying

10       to depose and we're getting no response from.

11       There are a lot of stylists, for example.  When

12       I talked to Olaplex's counsel about whether they

13       were going to appear on behalf of these people,

14       they said let me check.

15                    The next thing I know I get a call

16       from a new lawyer saying, I represent all of

17       these stylists.  I said, who do you represent.

18       She said, all of these people on this list.

19       It's about six stylists in Chicago,

20       Philadelphia, Los Angeles.  None of them are

21       available before your discovery cut-off.  That

22       was the response I got.

23                    I said, well, how do you know what

24       discovery cut-off you have.  She also told me
```

1    that she hasn't spoken to all of these stylists,

2    but she understands that she represents them.

3    Her only representation to me is none of them

4    are available.

5                I said, we have a discovery

6    cut-off but we can try to be flexible with

7    respect to third parties, and we will seek

8    relief from the Court.  We just need some

9    guidance on how we're going to get these third

10   parties, which we have strong suspicion they're

11   being controlled by Olaplex in order to retain

12   counsel to tell me that none of them are

13   available before the discovery cut-off.

14               We are willing to be flexible and

15   take some of these third-party depositions

16   whenever these people are available.

17               THE COURT:  I think I have a

18   solution for this unless you have further

19   comment.

20               MS. MURRAY:  No.  I mean, there's

21   more.  Their manufacturer is not available for

22   deposition.  Even though on our end, the third

23   parties that they have subpoenaed on our end

24   that are affiliated with L'Oreal, one went

```
 1    yesterday.  They were available and they were

 2    deposed.  Another one is going next week.  We're

 3    not hiding witnesses.  We're just having

 4    difficulty getting these scheduled.

 5                 THE COURT:  What I was going to

 6    suggest is specifically with regard to Caroline

 7    Goget, I think that it is properly put in

 8    abeyance until Judge Bataillon rules on any

 9    objections to my ruling on The Hague Convention.

10                 With respect to the other

11    witnesses who are not within the control of

12    L'Oreal to the extent that L'Oreal can confirm

13    and accept process for them to be available for

14    deposition, I think the parties need to figure

15    out who that category of witnesses is.

16                 And if you need a written court

17    order because you're getting the run-around from

18    third parties who won't commit, just get

19    together and either submit a joint form of order

20    or submit each of your proposals if you can't

21    agree on a joint form of written order and I

22    will enter an order that says on or before X

23    date, these depositions of these witnesses shall

24    take place and the parties are willing to work
```

1    with the witnesses to do it in a mutually

2    convenient time.  But absent cooperation from

3    the parties, the Court will designate deposition

4    dates for them and they will be compelled to

5    appear or otherwise the Court should find that

6    they are in civil contempt or something to that

7    effect.

8              MR. PAUNOVICH:  Just one quick

9    point, Your Honor.  I'm not sure how we hijacked

10   this topic to a bunch of third parties, but

11   putting that aside, we noticed these people back

12   on November 7th and we were told that Paul

13   Hastings was representing them and would accept

14   service.  Here nor there we're trying to get

15   them in before the discovery cut-off.

16              We have an extremely compacted

17   schedule right into expert discovery on January

18   11th.  L'Oreal has served over 25 deposition

19   notices or subpoenas in the last two to three

20   weeks.  We don't represent them.  I wasn't part

21   of the conversations that counsel has said

22   occurred.

23              It sounds like most of these

24   people are well outside the District of Delaware

```
 1      and aren't even represented by counsel here in

 2      Delaware, so that's another issue for another

 3      day.  What I'm talking about right now are these

 4      three people that we're asking about.  I guess

 5      if counsel is no longer representing them, then

 6      we will call these people on the phone and speak

 7      with them ourselves.

 8                  We've been hesitant to do that

 9      because of the representation that they're

10      representing them and --

11                  THE COURT:  Has that been

12      represented in writing?  Have you sent a letter,

13      Ms. Murray, to Mr. Paunovich or the attorneys

14      for the other side indicating -- how can we get

15      these people deposed?  Either they get

16      subpoenaed or they don't.  Either you produce

17      them or you don't.

18                  MS. MURRAY:  We don't have

19      authority to accept service on behalf of a

20      former employee.  If and when they're served,

21      one of them has been served, we will offer to

22      provide counsel and represent them at their

23      deposition.  We will get from them the dates.

24      Again, they have another job, they're working
```

1    somewhere else.  But we didn't have authority to

2    accept service.

3              I never agreed to accept service

4    on behalf of people who are former employees.  I

5    don't have that authority, but we are offering

6    to represent them.  We assume they'll take us up

7    on the offer, it's free counsel, and we will

8    work to arrange their availability.  That's the

9    two witnesses.

10             THE COURT:  So they may be

11   defending them at deposition, Mr. Paunovich, but

12   they can't facilitate the scheduling of those

13   depositions.

14             MS. MURRAY:  We can facilitate the

15   scheduling.  So we'll talk to them and say, when

16   are you available.  Once they've been served,

17   when are you available and we'll work on the

18   schedule and we will work with them on that

19   schedule.  We have no problem doing that.  We're

20   not getting that same cooperation on their third

21   parties.

22             THE COURT:  Well, that's another

23   matter for --

24             MR. PAUNOVICH:  I don't represent

```
 1        them.
 2                    THE COURT:  With these two
 3        witnesses that you want, subpoena them and I'm
 4        presuming you have good addresses --
 5                    MR. PAUNOVICH:  Well, I'm just
 6        going to reach right out to them.  If they're
 7        not currently representing them, I'm free to
 8        reach out to any third party that I want and
 9        call them, so that's what we'll do and try to
10        make sure they get served.  And if they become
11        representative in the future, we will speak to
12        their counsel.
13                    THE COURT:  All right.  That's the
14        plan.
15                    MS. MURRAY:  I have serious
16        concerns regarding these stylists where I got a
17        call from a lawyer who tells me she has a list
18        of names from Olaplex and she now represents all
19        of them all across the country and yet they're
20        telling me that they don't control these
21        stylists.
22                    THE COURT:  Well, that's something
23        that is the subject of a meet-and-confer.  I
24        don't know that I have enough information to go
```

1        down that path today.  As I said, if it would

2        assist the parties to have a court order to the

3        extent certain witnesses are agreed to be

4        third-party witnesses that one side or the other

5        doesn't control notwithstanding suspicions

6        aside, I will enter an order, any order that you

7        get over to me, to put some teeth in the

8        requirements for counsel that is not involved in

9        the litigation who may be representing them that

10       they know the time-sensitivity of getting these

11       depositions on record and the seriousness with

12       which the Court takes this application to have

13       them deposed.

14                    MS. MURRAY:  We appreciate that.

15       Thank you, Your Honor.

16                    MR. PAUNOVICH:  Your Honor, if I

17       may, I just have one point because we're going

18       to end up meeting and conferring about this.

19                    THE COURT:  Sure.

20                    MR. PAUNOVICH:  The Court ordered

21       100 hours of deposition in this case.  We've got

22       no less than literally five depositions a day or

23       a lot that are occurring next week.  L'Oreal has

24       38 hours of deposition time left in this case,

```
 1      and we've got it sounds like dozens of possible
 2      deponents.
 3                      At some point we're going to have
 4      to come back to this Court.  There has to be
 5      reasonable limits which the Court set in this
 6      case already.  They've chosen to depose people
 7      two or three times and spend all day long
 8      deposing people.  At some point even with all of
 9      these third parties, we would just simply ask
10      that the Court take that into consideration that
11      there will be a time when their minutes run out.
12                      THE COURT:  Well, if there's an
13      application to expand deposition limit time from
14      either side or a joint stipulation to that
15      effect, I will certainly consider it.
16                      I think that covers all of
17      Olaplex's issues; is that correct,
18      Mr. Paunovich?
19                      MR. PAUNOVICH:  Yes, Your Honor.
20                      THE COURT:  We have more
21      interrogatory responses at issue.
22                      MS. MURRAY:  I'm going to try to
23      lump them together so we can keep them quick,
24      Your Honor.  Some of these they'll answer part
```

1          of an interrogatory; these are Interrogatory

2          Nos. 11, 14, 17 and 18.  They answer some of it,

3          but they don't really answer the question.

4                    For instance with Interrogatory

5          No. 1, we want them to describe all testing that

6          was done with the accused products and they

7          basically just point us to their infringement

8          contentions and a declaration submitted by their

9          experts.  Well, what we were looking for is what

10         investigation they had done prior to the lawsuit

11         regarding the accused products and they haven't

12         articulated that here.

13                   On 14, we've asked for all of the

14         underlying facts to support their claim that

15         their bond multiplier rebuilds glycol -- they

16         basically provided a theory that they have and

17         that's it.  On some of these if their position

18         is they don't have more information, then we're

19         going to have to accept that.  But it seems like

20         they're not giving us a full response to the

21         interrogatories and just cherry-picking one part

22         of it to respond.

23                   THE COURT:  The problem is you

24         haven't real cabined or outlined for me a

1    specific deficiency.  It's coming across to me

2    in the way I've read -- and I understand that

3    the parties are limited in what they can write

4    about in these papers with the page limits, but

5    it sounds like it's more of a case of I don't

6    like the answer I'm given as opposed to this

7    answer doesn't meet the requirements of

8    responding to an interrogatory under the Federal

9    Rules of Civil Procedure.

10             It's a little bit hard for me as a

11   judge when it's more of a subjective I don't

12   like this answer to enter into any fashion in

13   any way any relief on that point.

14             MS. MURRAY:  I understand, Your

15   Honor.  If we just look, for example, at

16   Interrogatory No. 11, we asked for testing of

17   the accused products.  We wanted to know who was

18   involved in the testing, the date of the testing

19   and the testing that was performed.

20             We didn't get any identification

21   of people or when the testing was.  It was see

22   our infringement contentions and the

23   declaration.  So what we would like on that one

24   is an identification of the people involved in

```
1     the testing and the date of the testing and the

2     details of the testing.

3                    THE COURT:  Mr. Paunovich, can

4     that be provided?

5                    MR. PAUNOVICH:  No, Your Honor.

6     The information they're asking for would be

7     privileged, our presuit investigation of the

8     accused products.  And to the extent that

9     they're saying this is like a back door Rule 11

10    challenge, I think through the pendency we've

11    demonstrated and then some that we have a

12    sufficient basis on which to bring suit, so I'm

13    not sure to what end that this is necessary.

14    And in any event, our presuit investigation

15    would absolutely be privileged.

16                    We are going to be logging

17    communications amongst counsel that are presuit.

18    Beyond that, we're not going to be in a position

19    to produce anything.

20                    THE COURT:  All right.  Anything

21    further, Ms. Murray?

22                    MS. MURRAY:  On that one, Your

23    Honor, we're not asking for privileged

24    information, but anything else that we think
```

1      we're entitled to.  It's not like we don't like

2      their answer.  It's that they haven't provided

3      any answer.  Do you want me to stop there?  I

4      can do the other ones.

5                      THE COURT:  What about

6      Interrogatories 17 and 18?  They relate to

7      deposition --

8                      MS. MURRAY:  17, the ingredients,

9      chemical structure, composition prior to the

10     first launch of their product.  So this is kind

11     of related to the other ones about first use,

12     prior use and they're not giving us a witness

13     and they're not telling us here, so how do we

14     get the information.  That shouldn't be

15     privileged.  So we should be able to get that

16     for Interrogatory 17.  The answer doesn't give

17     us the information that we're asking for.

18                      MR. PALYS:  If I can expand on

19     what Ms. Murray was saying.  Specifically,

20     Interrogatory 17 states prior to first launch so

21     we're talking before launch of the product.  And

22     in their response in one instance, they give a

23     list of -- they say the results for summarizing

24     the following table which is on Page 56 of their

1   response, and it looks like this.  This exact

2   table was in the prosecution history.  That's in

3   2015.  That's after their product launched so

4   it's nonresponsive to what we're asking.

5                MS. MURRAY:  And 18, Your Honor,

6   we wanted to know what else was involved prior

7   to the first launch.  We're wanting stuff before

8   the first launch of the product and we're just

9   not getting that information.  That's not

10  expert.  That's not privileged and they're not

11  giving us the witnesses.

12               MR. PAUNOVICH:  Your Honor, this

13  is frustrating because we have dispute letters

14  in order to try and distill arguments and I'm

15  trying to do things on the fly, I don't even

16  have the interrogatories in front of me.  I

17  really do think this is an example of them just

18  simply not liking our responses.

19               We've tried to provide as fulsome

20  responses of nonprivileged information as we

21  can.  The interrogatories that they're

22  referencing if you actually read them in whole

23  they are much more extensive and have nuances

24  and dips and details than is being suggested

1      here.

2                     Frankly, the things we're doing

3      right now completely on the fly are not -- I'm

4      handicapped to be able to respond to that in

5      realtime.  I do think taking, for example, the

6      ingredients, they deposed our people on these

7      subjects.  And they said, look, we have that

8      really long name, bis-aminopropyl diglycol

9      dimaleate.  I'm happy, if we have the time, to

10     pull out the interrogatories and we can go

11     through them in detail, but this is sort of an

12     ambush of now we want you to do this, and it's

13     not even in their dispute letter.

14                     MS. MURRAY:  It is in our letter,

15     Your Honor.

16                     THE COURT:  Here is what I'm going

17     to do:  I'm still of the mindset that this is

18     more in the nature of a complaint of we don't

19     agree and we don't like the answer we're given

20     as opposed to what exactly is deficient.

21                     I'm going to order that if L'Oreal

22     wants to pursue more sufficient responses to

23     these interrogatories at Issues 11, 14, 17 and

24     18, that you specifically outline what it is you

1    want for Plaintiffs to provide that is not

2    privileged that is responsive to these

3    interrogatories, and then the Plaintiffs are to

4    respond within a week of that letter, if not

5    sooner.

6              So get a letter to them by Friday

7    explaining the deficiencies.  And this way I

8    would have that letter, I would have the

9    Plaintiffs respond if needed for a future

10   discovery hearing and we will be able to go

11   forward on that basis.

12             With respect to Mr. Paunovich's

13   comments to Interrogatories 11 and 14, there's

14   some concerns that you're diving into

15   information that may be subject to privilege.

16   The parties are still preparing to exchange

17   privilege logs as I understand it, so I think

18   that may be reserved for another time.

19             So presently I'm not compelling

20   responses to these four interrogatories, but

21   that is without prejudice to pursue relief in

22   the future.

23             MR. PAUNOVICH:  Your Honor, to the

24   extent that they provide us a letter Friday, can

```
 1        we have longer than one week because of what's

 2        going on next week?

 3                    THE COURT:  How much longer?

 4                    MR. PAUNOVICH:  Well, we have

 5        added four more interrogatories and we have the

 6        one on the 28th, if we're able to get some more

 7        leeway on the 28th, that will be appreciated but

 8        we can go for the 28th.

 9                    THE COURT:  Go for the 28th, and

10        if there's issues I'm sure the parties will be

11        discussing timing issues when they see each

12        other at depositions or some other time.

13                    MS. MURRAY:  I would just ask if

14        we can have more time, if we can have more time

15        than the two days?

16                    THE COURT:  Work it out, whatever

17        is a sufficient time frame.  I'm trying not to

18        go too far afield of the December 21 cut-off,

19        but I certainly understand.  So if the

20        Plaintiffs need more time, then Defendants ought

21        to have a leave of 10 days to respond depending

22        on the intervening depositions and holidays

23        there are.

24                    And that brings us to subpoenas to
```

1    UCSB.  Is that resolved?

2                    MS. MURRAY:  It hasn't been

3    resolved, Your Honor.  So counsel for Olaplex is

4    not here, Mr. Blackburn who also represents

5    UCSB.  All we really want -- we have received

6    documents from UCSB.  All we really want is

7    Dr. Hawker and Pressly's personnel files.  Now,

8    it was termed as an employment agreement from

9    Olaplex.  And during the deposition of UCSB, it

10   came out that they don't have employment

11   agreements in the typical sense that

12   corporations have employment agreements, but

13   there are personnel files and those are

14   maintained.

15                    We just want the personnel files

16   for Dr. Hawker and Pressly.  They worked at the

17   university.  We want to know what the policies

18   were with respect to them using the university

19   facilities and things of that nature.  That's

20   all we're asking for, the personnel files.

21                    THE COURT:  But the personnel

22   files potentially have, and I'm just

23   speculating, reviews, performance reviews, sick

24   days, family leave.  Things that would be of a

```
 1          private nature.
 2                    MS. MURRAY:  We don't want
 3          anything private.  We don't need that and they
 4          can redact that.  We just want policies that
 5          were in place and applied to them.  We don't
 6          know when their start date was.  I asked the
 7          witnesses.  We put it in as a 30(b)(6) topic and
 8          the witness they presented could not tell me the
 9          date that Dr. Pressly was employed at the
10          university.
11                    We're not getting it from the
12          depositions.  We're not moving to compel at this
13          point, but can we get a document that identifies
14          when they started and what policies were in
15          place for the use of the facility?  And also the
16          assignments of patents, assignments of
17          inventions, we would like to get some clarity on
18          that.
19                    So they have produced university
20          policies.  All we really want now is just the
21          part of the personnel file that deals with when
22          they started, how long they were employed and
23          what the policies were in effect at the time.
24          It's not called employment agreement but
```

```
 1      whatever is akin to an employment agreement at

 2      the university.

 3                      MR. PAUNOVICH:  Respectfully, Your

 4      Honor, I think we have to observe some of the

 5      federal rules here.  UCSB has no -- there's no

 6      jurisdiction in Delaware over UCSB.  This is a

 7      third party.  Whether they're represented by

 8      Matt Blackburn, my co-counsel, is an irrelevant

 9      point.  They subpoenaed UCSB.

10                      And again following with the

11      rules, they didn't ask for these files.  I don't

12      represent them so I don't know that information.

13      My firm has a conflict with UCSB so I don't

14      personally know that information.  But this has

15      been subject of correspondence between counsel

16      for UCSB, a California public university, and

17      L'Oreal's attorneys.

18                      As I understand it, they did not

19      ask for the files that they are now seeking.  I

20      would note as a casual observer that if they

21      don't want any of the sick days and personal

22      information and this and that, why do they even

23      want the personnel files in the first place.

24      But beyond that, I do think just the formalities
```

1      of the fact that that party is not before here,

2      I'm not sure why we're bringing that dispute

3      before this Court.

4                    THE COURT:  Ms. Murray, I've

5      encountered issues before where I've instructed

6      parties to go to the jurisdiction for which the

7      subpoena was issued in order to seek relief or

8      compliance.  I'm not sure that there's any

9      relief that the District of Delaware can give.

10                   If you narrowed your request just

11     for length of employment, policies regarding use

12     of university facilities and patent assignments

13     and inventions, I'm not sure why there would be

14     a reluctance or a resistance on the part of

15     counsel for UCSB to provide that information.

16     But you are in a better position to know that

17     than me.

18                   MS. MURRAY:  I don't know either

19     why they won't give it to us because we

20     basically just want to know when did they start

21     and what policies were in place at the time.  We

22     were just trying to get guidance from the Court

23     given that the same counsel represented them, if

24     they can work with UCSB.  We're trying to move

1     things along.  We don't want to delay the

2     schedule.

3              We could open a case in the

4     Central District of California and try to move

5     to compel that way, but we just think because

6     the Court has access to the same counsel, if we

7     can get some help in just getting this narrow

8     information from Mr. Blackburn --

9              THE COURT:  I just can't put

10    Plaintiffs' counsel in a position if there's

11    some conflict --

12             MS. MURRAY:  Well, co-counsel

13    represents them.  Mr. Blackburn represents them.

14             THE COURT:  Mr. Paunovich, is

15    there any assistance that can be provided to

16    move this matter along?

17             MR. PAUNOVICH:  We shifted.  They

18    said we want the personnel file.  We don't want

19    anything actually in it.  And then counsel said,

20    we're looking for the policies and when they

21    started.  My understanding is the university

22    policies so, for example, what they're really

23    getting at is does UCSB has any ownership right

24    in these patents.

```
 1              All of those policies as to my

 2      understanding have been produced and they

 3      examined a 30(b)(6) witness who is an incredibly

 4      intelligent and well-prepared 20- or 30-year

 5      lawyer for the university on these very

 6      subjects.  They didn't like the answers they got

 7      because it doesn't support some defense or

 8      standing argument and they want something more.

 9              They have the policies much in the

10      same that they said.  I can't give you more on

11      that, that we don't have.  They have the

12      relevant policies.  For the personnel file, I

13      don't know the answer to that or frankly, why

14      it's relevant to anything.

15              Certainly, I can speak with my

16      co-counsel who represents UCSB and see if he can

17      work with them in some way to coordinate that.

18      Beyond that, I don't have any power over UCSB.

19              THE COURT:  And the Court so

20      agrees.  I would instruct L'Oreal to use

21      whatever means are necessary.  And to come down

22      the line for requiring some type of form of

23      order from this Court, I'm not sure what type of

24      order I would fashion if the parties and counsel
```

```
 1        that are subject to this are all out in

 2        California.  I'm not going to compel the

 3        Plaintiffs to produce this information.

 4                    MS. MURRAY:  I understand, Your

 5        Honor.  My one concern is you mentioned with

 6        respect to the third parties we can come back

 7        here and try to fashion something or provide an

 8        order.  Are we going to have that same issue?

 9        Some of these stylists are not all in Delaware.

10        I don't know that any of them are in Delaware.

11        So how are we going to be facing the same

12        problem if the Court issues an order on these

13        third parties?

14                    THE COURT:  Again, it's depends on

15        the location of the witness.  I don't know where

16        they're located.  You're correct, there may be

17        an issue as to the extent to which the Court has

18        enforcement power over the subpoena of the third

19        parties.

20                    MS. MURRAY:  And we can take care

21        of that and handle enforcement.  The bigger

22        issue on the third parties, a lot of them are

23        saying, well, we don't have to offer to you

24        because we understand there's this cut-off on
```

1    the 21st.  And what we would like to do is to

2    let these witnesses know that we are requesting

3    relief from the Court so that can give us other

4    dates beyond --

5                    THE COURT:  Well, it may be as

6    simple as sending over a joint stipulation with

7    respect to the third-party witnesses that you

8    may have to go through the hoops of issuing

9    subpoenas from other districts, just a

10   stipulation that the Court has approved for the

11   purpose of getting these depositions in, an

12   extension of the discovery deadline so they

13   don't feel that December 21st was an absolute

14   cut-off.  Maybe it's as simple as an extension

15   of discovery for a limited purpose.

16                    MS. MURRAY:  That makes sense.

17   Thank you.

18                    MR. PAUNOVICH:  Your Honor, it

19   would be Olaplex's intention to not stipulate to

20   that and request briefing on that subject.  We

21   really feel rope-a-doped in this situation where

22   we go 24 months in litigation and then two dozen

23   third parties are subpoenaed at the very last

24   minute.

```
 1                    We have prosecuted our case

 2        diligently and we are going to be bringing in

 3        all of the depositions and evidence by a

 4        deadline.  We've got an incredibly compacted

 5        schedule.  And if L'Oreal is previewing some

 6        plan for these grand counterclaims, it would be

 7        our intention for whatever those are and what we

 8        think these third parties are directed to seek

 9        bifurcation of any claims that are totally

10        unrelated, permissive and don't arise from the

11        original transaction.

12                    So respectfully, we would request

13        briefing if that does happen because we would

14        not be in agreement to extend any schedule.  We

15        would want to get to trial.  We have a

16        preliminary injunction that we hope Judge

17        Bataillon will enter and we want to move the

18        case forward.

19                    THE COURT:  I understand your

20        issue, but I think there's a central issue here

21        and there may be a lot of tentacles flowing from

22        it.  The issue here that I'm trying to resolve

23        is one that I don't see candidly as being

24        created by L'Oreal.  Certainly, there's always a
```

1    risk in terms of timing of subpoenas that you're

2    not going to get things in if you wait and run

3    up on the discovery cut-off to issue them.

4              At this point, there's nothing in

5    front of me to say that their timing was so

6    close to the discovery cut-off as to have the

7    Court infer some negative conduct on their part.

8    We still have a discovery cut-off on December

9    21st.  They technically issued those subpoenas

10   in advance of that cut-off.

11             They are being told by whoever is

12   representing these third parties that these

13   third parties that they didn't anticipate

14   issues, whether they misunderstood or

15   miscalculated on how much cooperation they would

16   get from the Plaintiffs or whatever the reason

17   for these depositions now witnesses are

18   reluctant to come forward and appear absent

19   enforcement of subpoenas, and here these

20   witnesses are going to rely on the discovery

21   cut-off as a sword.

22             All I'm saying at this point is

23   under those circumstances, I think it would be

24   quite appropriate for the Court to issue an

1          order extending the discovery cut-off to get

2          those witnesses in.  Now, if you feel that

3          Olaplex must move forward and that there's too

4          many witnesses and the testimony will be

5          cumulative or disproportional, that there should

6          be limits on the timing of how much hours these

7          depositions should go short of the full seven

8          hours issued, if you feel that it's a waste of

9          time and L'Oreal uses its time remaining for

10         deposition limits to do them and it shouldn't be

11         granted any further leeway -- these are all

12         other tentacles as I said that come off of this.

13         I'm just trying to deal with the imminent

14         problem of getting these witnesses to testify in

15         the first place.

16                     If there's other relief or reasons

17         that you feel that not all of these witnesses

18         should be taken or should be limited in scope or

19         limited in time for whatever reason or relief

20         you're seeking, I think that's another issue for

21         another day.

22                     You're free to raise it with the

23         Court, but it sounds like the parties haven't

24         even met and conferred on some aspect of that.

```
1        There may be a path forward to work it out.  I

2        don't know.

3                     MR. PAUNOVICH:  That's fair, Your

4        Honor.  We will brief those issues for another

5        day.  Thank you.

6                     THE COURT:  All right.  Is the

7        30(b)(6) witness left or is that for another --

8                     MR. PALYS:  Your Honor, I know

9        it's late but we really would like to discuss

10       the protective order issue.

11                    THE COURT:  The protective order,

12       I understand.

13                    MR. PALYS:  Is the Court willing

14       to hear?

15                    THE COURT:  I am going to hear it.

16       I said I would and I will.

17                    MR. PALYS:  Hopefully, because

18       we're at the end of this hearing, Your Honor, I

19       know we're all tired, but the gravity of this

20       one I don't want it to lose its bite.  It

21       doesn't have anything to do with presentation

22       and trying to make theatrics here.  This is a

23       serious issue, Your Honor, and it boils down to

24       protective order violation.
```

1          Let me preface it by saying

2    L'Oreal's sensitive financial information has

3    been put into the public eye by Olaplex's

4    counsel just days after we had a discussion with

5    Her Honor about the concerns that we had about

6    our information being put out there in the

7    public domain.

8          Let me preface this or at least

9    begin with this argument.  So Olaplex has

10   committed two protective order violations.  The

11   first violation relates to Defendants' third

12   supplemental objections and responses to

13   Plaintiffs' secondary interrogatory.

14          Within that interrogatory that

15   Olaplex has submitted as an exhibit is L'Oreal's

16   financial information, and we have copies and we

17   can certainly give that to Your Honor.  But rest

18   assured, it includes very important information

19   from our client.  Honestly, our client is beside

20   themselves that this information is out there,

21   and we have to explain to them why the

22   protective order didn't protect their

23   information.

24          So what happened?  On November 16,

1        2018 on Friday evening after close of business

2        of the PTAB, Mr. Blackburn, who is counsel for

3        PGR and also litigation counsel, his team or he,

4        himself, publicly filed this document as Exhibit

5        27.  And because they waited until the end of

6        that day on Friday after evening when they

7        discovered this, Mr. Blackburn had sent an email

8        to the PTAB and said, oh, this shouldn't have

9        been made public, please remove it.

10                      The problem was that was

11       after-hours.  So it sat on the public site

12       Friday evening, Saturday, Sunday, all the way up

13       through Monday just before noon which is when

14       the PTAB finally acknowledged, oh, yeah, we

15       changed the designation so it's not available.

16                      Now, I know I've jumped ahead a

17       little bit because it's getting late.  Their

18       argument is going to say it was an honest

19       mistake.  Inadvertent, advertent, whatever, it

20       still happened.  I believe that the color that

21       happened before this response that we're hearing

22       from Olaplex and we heard Mr. Blackburn say,

23       it's unfortunate that this happened.  We think

24       that color -- the activities or the events that

```
 1        occurred before they were put to task on this

 2        issue is important.  What is that?

 3                      So after Mr. Blackburn sends this

 4        email to the Board on Friday evening right after

 5        it happened, what did he do?  Nothing.  It sat

 6        there.  Did he contact any of the third parties

 7        or start looking through the Internet?  Did he

 8        contact the litigation counsel?  Did he contact

 9        PGR counsel?  Yes, he sent an email and said

10        that this happened.  But what was he doing and

11        his team doing to rectify this situation?

12        Nothing.

13                      The only reason -- and it didn't

14        come out in our letter because we wanted to be

15        brief in our letter, the only reason that any

16        actions were starting to be taken care of in

17        what Olaplex puts in their letter, look what

18        we've done to rectify this situation is after

19        litigation counsel, us, contacted him and said,

20        hey -- and we have all of these communications,

21        Your Honor, all of the emails, I have them here.

22        I'm not going to waste too much time reviewing

23        them, but shows the lack of understanding of the

24        gravity of the situation by Mr. Blackburn.
```

```
 1                    We pointed out, hey, what are you

 2          doing to fix this problem?  We noticed on Docket

 3          Navigator it's there.  His response was not, oh,

 4          I'm sorry, it's unfortunate.  It's, oh, thank

 5          you for identifying that.  I'm going to contact

 6          them to take it down.  Seven hours later we get

 7          an email that it was taken down.

 8                    What else did he do?  Nothing.  So

 9          L'Oreal has to police its own information that's

10          been put out there, and I can go through the

11          examples but I will just get to the point.  We

12          think it's absolutely clear that it's been a

13          clear violation of this Court's protective order

14          near days that we were imploring the Court to

15          please protect our information.  You didn't see

16          it our way in terms of the protective order that

17          we were looking for.  But it was pretty clear in

18          that discussion we had concerns and this

19          happened.  Mistake or not, it happened.

20                    This issue was brought up to the

21          PTAB.  And the reason I mentioned that is

22          because my understanding is that the Board

23          actually wants to hear from this Court on this

24          issue, so they're waiting to hear how this plays
```

1      out before they rule.

2                  I believe they have another

3      follow-up call.  PGR counsel and Mr. Blackburn

4      had this discussion with the PTAB.  And there's

5      a transcript.  If the Court wants it, we can

6      provide it to you, but there were concerns from

7      the PTAB.  They said that they understand that

8      we're going to talk about this today and they

9      wanted to hear from you.

10                 What we're asking for here, Your

11     Honor, at least in this case is somewhat in the

12     lines of what the PGR counsel is asking from the

13     PTAB.  But honestly, it's very hard to quantity.

14     How do we quantify the level of damage that's

15     out here?

16                 Let me put it in examples so the

17     Court can appreciate it.  It's not just this

18     case.  It's just that our financial information

19     was provided and Olaplex's people may have had

20     access to it and it's not limited to just a

21     ramification of this case.

22                 The competitors of L'Oreal now

23     could have accessed this.  We don't know if they

24     accessed this financial information which goes a

```
 1        long way.  It could affect them years down the
 2        road in another litigation or some business
 3        transaction.  We don't know so it's hard to
 4        quantify that.
 5                    The best we can do is again come
 6        to this Court and say, help us protect our
 7        information.  What can we do to make sure that
 8        this doesn't happen.  Mr. Blackburn who's not
 9        here -- every time we have a protective order
10        issue he doesn't show up for an argument.  He
11        could explain this.
12                    But when he went to file this or
13        whoever filed this, he made a representation in
14        the email to us and said, you know what, by
15        default when you go to use the e2e system in the
16        PTAB, it designates information public or
17        private and you know that, right.  Well, that's
18        not the full story.
19                    There's actually protections in
20        the e2e system that gives you a pop-up that
21        says, are you sure, do you want to put this on
22        as public or private.  It gives a warning to the
23        person filing this.  And the reason why I bring
24        this up is because there wasn't enough caution
```

1      taken.  We just got a recent production just a

2      few days ago from the prosecution counsel that

3      we're going to be taking deposition of in this

4      case and there's communications from the PGR,

5      it's all public.

6                  And I found interesting, I saw a

7      communication from Matt Blackburn to the Board.

8      He's saying, out of abundance of caution we're

9      going to designate a certain exhibit private,

10     but then we want to withdraw it later, so he

11     knew about the caution.

12                 I just found it interesting that

13     the one document that happened to make its way

14     through is probably one of the top two most

15     sensitive documents that could make its way

16     through the Internet.  Again, mistake or not it

17     doesn't matter.

18                 So in terms of relief, Your Honor,

19     I'm not sure what else we can do.  But for the

20     first thing, I felt like the PTAB had a good

21     example or at least a suggestion, we think that

22     this Court should order Olaplex to pay for a

23     third-party service to go through and start

24     polling the Internet and find out what other

1    services and who else may have downloaded this

2    information.

3                    Now, as we pressed Mr. Blackburn

4    to do this with Docket Navigator, Unified

5    Patents, these different reporting services, he

6    would follow back and say, oh, we looked at them

7    and they said they've taken it down.  That's

8    fine.  There may be others.  But what we don't

9    know is who downloaded that information, so

10   that's one.  We feel it should be a mutually

11   agreed third-party service that Olaplex has paid

12   for and they report back and do what they can to

13   make sure that this information is taken down.

14                   The second thing is obviously we

15   want to reimburse our client for the fees and

16   cost with respect to this issue.  Mistake or no

17   mistake L'Oreal seems to always be taking it on

18   the chin when it's their information that's

19   getting loosely used by Olaplex and its counsel.

20                   THE COURT:  The fees and cost

21   for --

22                   MR. PALYS:  Relating to dealing

23   with this protective order issue, Your Honor.

24   It's reasonable.

```
 1                    THE COURT:  Both here and in the
 2       PTAB?
 3                    MR. PALYS:  I don't know if you
 4       actually have jurisdiction for --
 5                    THE COURT:  I know.  You're
 6       anticipating my next question.
 7                    MR. PALYS:  For here, Your Honor,
 8       and I believe PGR counsel can pursue that with
 9       the PTAB.
10                    THE COURT:  Well, that was my
11       first question.  Why is this even coming before
12       me?  Isn't this an issue that the parties ought
13       to be dealing with in the PTAB?
14                    MR. PALYS:  No, it's this
15       protective order that was violated, Your Honor.
16       So there's a protective order that I want to
17       touch on, on this second violation issue that I
18       want to talk about.  They have their own
19       protective order and their own issues.  We are
20       only asking for things that you can control.
21                    THE COURT:  Understood.
22                    MR. PALYS:  And frankly, I think
23       there should be some representation just to be
24       sure written or in some way of knowing that
```

1    Olaplex itself, any of its employees, people who

2    were not entitled to see this information under

3    the protective order did not download that

4    information while it was available, because we

5    don't know if that's not the case.  That's where

6    we stand on this first protective order

7    violation.

8              The second violation -- it's

9    actually two violations, Your Honor.  One is

10   PTAB-related so we're not asking the Court to

11   touch on that, but we believe it's a straight

12   violation of the protective order that was

13   entered in the '954 proceeding, which

14   specifically calls out by the way that use of

15   any information in that proceeding is limited to

16   that proceeding, you can't use it.

17             So what happened?  Let me set the

18   stage.  So we had a discussion with Her Honor on

19   the use of some material from this case into the

20   PGR proceeding that was pending, and that was

21   the '954 proceeding.

22             THE COURT:  Right, and I limited

23   that ruling to specific documents that were

24   identified as opposed to general categories of

1    documents, but I don't recall expressly

2    restricting the ruling to the '954 patent PGR

3    proceeding even though it was made in that

4    context with the understanding it was brought up

5    in the context of what could be used from this

6    litigation in a PGR proceeding.  So if it was

7    used in the '419 proceeding even though it came

8    up in the context of the '954 patent proceeding,

9    tell me how that is significant.

10                  If I would have allowed it for

11   one, I would have allowed it for another.  My

12   concern was on cabining and restricting what

13   documents could be used here and go over there.

14                  MR. PALYS:  So there are a couple

15   of responses to that, Your Honor.  First, it

16   goes to something very similar to the Motion to

17   Compel, which is you've got to look at what

18   happened, transpired, what did they do in their

19   Motion to Compel to convince the Court to grant

20   their motion.  Same thing here, what did Olaplex

21   tell this Court when they were saying, hey, let

22   us use this information in the PGR proceeding.

23                  If you look at the transcript, the

24   November 1st transcript, Page 5, Lines 9 through

1    12, this is Olaplex saying, we want to use this

2    information with the '954 patent.  Page 5, Lines

3    20 to 21, we're looking to do the same thing in

4    the '954 PGR.  Page 22, Line 22 to Page 23, Line

5    1, we would like to use it in the '954 PGR to

6    demonstrate nonobviousness.  Over and over they

7    were referring to the PGR.

8              Now, you might hear Olaplex's

9    counsel saying, well, I saw a plural word, I say

10   PGR proceedings.  And even Her Honor used the

11   word PGR proceedings, but that couldn't be.  And

12   this is why it couldn't apply to the '419

13   because the '419 was over.

14             That jurisdiction didn't even

15   exist to the PTAB at that point because it was

16   up at appeal at the Federal Circuit, so it would

17   be impossible to supplement the record or even

18   submit evidence into the '419 at that time.

19   That's why all of these representations you see

20   that they wanted to use it in the '954.  So we

21   believe that the order was limited and it could

22   only have been limited to the '954.

23             THE COURT:  By the time the Fed

24   Circuit gets appeals, they have their own set of

 1    rules for filing documents under seal and --

 2                    MR. PALYS:  That's true, Your

 3    Honor.  I'm going to get to that, and here is

 4    the problem with that:  The record is closed

 5    when you go up to the Federal Circuit.  I'm

 6    preaching to the choir here, but you file a

 7    joint appendix, the record cannot be

 8    supplemented with something.

 9                    So even if they tried to add a new

10    document which they essentially did, which

11    violated one of the Federal Circuit rules, I

12    don't know if they realized this, when you try

13    to do a redaction, it has to be documents of the

14    record below, not new things.  But having said

15    that, the point is we absolutely believe that

16    the order had to be limited to the '954

17    proceeding.

18                    So what happened?  They took one

19    of our documents that was submitted in the '954

20    proceeding and they quoted it in their reply

21    brief.  Now, they redacted it in the public

22    version.  We're thankful for that.  We don't

23    have an issue with that.  They did redact it.

24    But the issue is the fact that they were even

```
 1        trying to use this information in another

 2        proceeding, much less the '419's appeal is a

 3        clear violation that we believe of what this

 4        Court was giving the authority to use our

 5        information for the '954.

 6                    THE COURT:  Well, supposed if it

 7        were going up to the Supreme Court, as a

 8        magistrate judge I'm supposed to restrict what

 9        the Supreme Court has available to look at?

10                    MR. PALYS:  Your Honor, you're

11        chuckling but this is really serious --

12                    THE COURT:  I understand the

13        significance.  I'm not making light of it.  I'm

14        just trying to understand the interplay of what

15        my role is in terms of protection when you are

16        in a higher court that is very cognizant,

17        particularly the Fed Circuit of the sensitivity

18        of information that it's dealing with on appeal.

19        I'm just not sure you're getting there as to

20        what I can do and how this is problematic for

21        all of you.

22                    MR. PALYS:  It's problematic

23        because they, again, have taken our confidential

24        information and put it into a proceeding that
```

1    wasn't what the information was supposed to be

2    used for.  Now, the Federal Circuit has

3    mechanisms to provide.  You can refer to other

4    documents, judicial notice type of documents.

5    Those are public documents.

6              We're talking about something

7    that's confidential.  Why did they do this?

8    They wanted to -- they kind of alluded this in

9    their letter.  They wanted to take a statement

10   out of context to make us look bad without the

11   ability for a rebuttal on that.  Regardless of

12   the motivation for that, what we have here is we

13   believe another violation.  I believe even the

14   PTAB was kind of looking at it in terms of

15   technical violation as well.

16             The last point on this '954, '419,

17   one thing that they didn't give Your Honor when

18   that discussion was going on, they didn't give

19   you a copy of the '954 patent protective order,

20   when you were saying the information will be

21   protected on either side.  And in fact, I

22   believe the PTAB even mentioned this is the

23   problem when you have competing protective

24   orders between the PTAB and the District Court.

```
 1                    At the end of the day we believe

 2         it is a violation.  What are we asking for?

 3         We're simply asking for an order to tell them to

 4         withdraw that document, withdraw what you filed.

 5         That's all we're asking for because we think it

 6         was improper and it was beyond the scope of the

 7         authority of the use of our documents.

 8                    Obviously with respect to this

 9         issue and the first issue, Your Honor, we're

10         open to any suggestions that Her Honor has to

11         help us to protect our information so we can go

12         back to our clients and say, we're doing the

13         best we can to protect your information, because

14         this isn't the first time that this had

15         happened.

16                    It happened when they filed their

17         Complaint.  It happened when they filed their

18         Federal Circuit appeal brief for the '419.  We

19         had to tell them that they violated their

20         authority, and then they had to withdraw.  Thank

21         you.

22                    MR. PAUNOVICH:  Your Honor, I will

23         start with the first point and I just want to be

24         absolutely clear that Plaintiffs take these
```

1    allegations incredibly seriously.  We didn't

2    have notice yesterday that L'Oreal was going to

3    file the letter that they did with the Court,

4    and the Court gave us about a three-hour window

5    to provide a response which we did.

6              There was no relief requested in

7    that letter and the relief that's now being

8    requested is also very serious.  L'Oreal's

9    counsel says intent doesn't matter, but it does.

10   And this was an honest and inadvertent mistake

11   which happens very rarely.  A lot of these other

12   allegations which I will address, but it happens

13   very rarely.  But when it does, Paul Hastings,

14   Quinn Emanuel, the courts, a lot of folks

15   recognize that sometimes these inadvertent

16   things do happen.

17              The bombastic story that was told

18   by L'Oreal could not be further from the truth,

19   and we didn't have an opportunity to get this

20   all in our letter on the short notice.  But

21   Mr. Blackburn my co-counsel, there was an

22   administrative filing mistake in checking boxes

23   among the many, many exhibits, forgot to check

24   the box for one exhibit not to be public.

1            It was not purposeful.  Nobody

2     from Olaplex has downloaded this information.

3     They've had numerous meet-and-confers with the

4     Paul Hastings firm as well as the PTAB firm

5     that's handling L'Oreal's dispute.  No one has

6     identified anyone who has downloaded this

7     document from the Internet.

8            Mr. Blackburn immediately realized

9     his mistake in three minutes from the filing

10    that I forgot to check that box.  He emailed the

11    PTAB, the Board and PGR counsel and said, I made

12    this honest mistake, I'm very sorry, I'm taking

13    action to correct this immediately.

14            This is not an issue of he got

15    called on it.  By the way, we're crisscrossing

16    the country.  This isn't Mr. Blackburn not

17    wanting to show up here.  He is incredibly

18    conciliatory about this and feels terrible about

19    this and has apologized up and down and been on

20    numerous meet-and-confers.

21            We're crisscrossing the country

22    and preparing witnesses.  Otherwise, he would be

23    here and would love to answer this for himself.

24    There was an extensive email that he exchanged

1       just late last night with PTAB counsel

2       describing all of the things that he has done of

3       his own accord since this happened, self-

4       reporting, immediately having the Board make

5       this private again.

6               He was made aware by counsel of

7       three companies that have mirrors of the PTAB's

8       docket and once he knew of those, he immediately

9       contacted them and I believe it was only with

10      one that it had reproduced and scraped and put

11      that document on its site and made sure it was

12      taken down.

13              He subsequently contacted 10

14      different mirror companies to see, do you have

15      the documents from the docket.  In all cases the

16      other ones were simply mirrors and did not

17      scrape the document.  There's been no

18      information of anyone accessing this document.

19      Litigation counsel Daniel Zeilberger at a meet-

20      and-confer yesterday or the day before with

21      Mr. Blackburn confirmed that they have no

22      awareness of anybody else having access to this.

23              In addition, Mr. Blackburn of his

24      own accord has already retained a third-party

1      company, Avea, to continuously monitor for at

2      least the next 30 days and scrape the Internet

3      for any evidence that this document remains

4      somewhere in a public forum or that somebody may

5      have downloaded this.  He's paying for that of

6      his own accord.  It's something like $300 a

7      month for the monitoring service.

8               I'm just re-reading his email here

9      that he sent to PTAB counsel, which I'm happy to

10     provide you the string.  The bottom line is

11     this, Your Honor, we do take this incredibly

12     seriously.  This is not something Plaintiffs are

13     giving short trip to.  It was not purposeful.

14     The record clearly and abundantly indicates

15     that.

16               We are willing to do what's

17     reasonable and think we've already taken every

18     step to ensure that this document is nowhere and

19     that nobody has downloaded it, and we will

20     continue doing that over the next 30 days.  The

21     relief that L'Oreal has requested for this

22     inadvertent mistake which -- we're talking about

23     people here that make inadvertent mistakes.

24     It's very serious.

```
 1              They've never told us they're

 2      seeking their fees, but whatever those fees

 3      are -- we got a letter yesterday from them.

 4      They had a meet-and-confer and here we are

 5      today.  It's not to tamp down the seriousness of

 6      this.  We understand that.  We've taken all of

 7      the precautions on this.  But to the extent that

 8      the Court is inclined to grant such serious

 9      relief, we would request at least some briefing

10      on that.

11              I think when the Court sees the

12      full record of what Mr. Blackburn has done in

13      response of this completely inadvertent

14      administrative mistake, we hope that the Court

15      will be satisfied as well by our representation

16      that we will do everything in our power to make

17      sure that something like that does not happen in

18      the future.

19              As far as the other allegations

20      that were sort of tossed in there at the end,

21      I'm not sure what they're referring to and I

22      don't believe there are any violations.  But

23      again, that's not part of the briefing.  If we

24      need to address things, we're happy to do so.
```

1           This feels like it really is

2    leading into the second issue which is the

3    Federal Circuit, was there something done wrong

4    there.  Respectfully, Your Honor, you issued a

5    ruling.  I would request that the Court look at

6    Pages 12 through 14 of that transcript where

7    it's very clear in our colloquy and discussion,

8    you asked me point-blank on that call, you said

9    something to the effect of I want to be clear in

10   what you're seeking out of this order.  It's an

11   order to use all documents produced in this case

12   in the PGR proceedings.

13           And we had a discussion.  Yes, we

14   did discuss the '954 because there was an

15   imminent deadline associated with that.

16   However, we've got the proceedings on both of

17   our patents and this information is relevant to

18   both of them.  And once it's also part of the

19   '954 proceeding, it's part of the intrinsic

20   record to also be part of the '419 proceeding.

21           If we really distill this down and

22   I don't -- again, we do understand the

23   seriousness of what's happened here.  But now

24   the relief they're requesting is let's deny to

1    our Federal Circuit the potential to look at

2    some of this key evidence that demonstrates that

3    they didn't invent this, that what they're

4    telling the Federal Circuit isn't entirely true.

5                    And relatedly and also not part of

6    the briefing unfortunately because of the

7    timing, the whole reason that that document was

8    cited is L'Oreal itself brought a new document

9    that wasn't part of the '419 proceeding record.

10   It cited in that Federal Circuit opposition for

11   the '419 proceeding, so this was in direct

12   rebuttal to what they raised.

13                   So the complaint of, well, this

14   was not part of the record is because they did

15   the very same thing and it was responsive to.

16   It's a pretty telling document.  The CEO of all

17   of L'Oreal worldwide says, it would have been

18   great if we would have invented it, but we

19   didn't.  This is in contrast to the alleged

20   independent invention story.

21                   Your Honor, I'm happy to answer

22   any questions.  I'm happy to give you the email

23   string from Mr. Blackburn and PTAB counsel where

24   he lays out in detail, it's more than two pages

```
 1        long where he describes -- and this is what he

 2        was asked by the PTAB, describe the efforts to

 3        identify and mitigate public disclosure, third-

 4        party monitoring or mitigation and any forms of

 5        additional relief.

 6                    I think there was some inaccurate

 7        description of what the PTAB was asking for.

 8        And my understanding is that the PTAB said,

 9        okay, we understand this is serious.  You've

10        taken the actions to mitigate.  We want to hear

11        what more you might do to mitigate which is what

12        Mr. Blackburn addresses.  They by no means

13        suggested that they were decided on what was

14        going to happen.

15                    I think the reason they were

16        looking to this Court is, PTAB counsel said,

17        well, there's a violation of the PTAB protective

18        order and that wasn't true.  The order from this

19        Court allowing that document, among the small

20        set of others, to be used in the PTAB

21        proceedings is the real protective order that

22        was inadvertently violated and quickly

23        corrected.

24                    So the conclusion of that first
```

```
 1       call with the PTAB as I understand it was they
 2       said, okay, we now understand that really this
 3       is an issue of the District of Delaware's
 4       protective order it violated.  And before we do
 5       anything, we'll just wait and see what that
 6       Court has to say about it.  If you have any
 7       other questions, I'm happy to answer them.
 8                    THE COURT:  I don't have any
 9       questions.  I think this lends itself to
10       briefing.  Be seated.
11                    Mr. Palys, do you want to add
12       anything before --
13                    MR. PALYS:  I know we're all tired
14       so I will try to --
15                    THE COURT:  Well, I have an
16       appointment at 2:00 to make, but I don't want to
17       rush counsel out because I want to figure this
18       out.
19                    MR. PALYS:  I appreciate that.  So
20       the '954 PGR protective order was an
21       acknowledgement like all protective orders have,
22       I blank affirm that I have read the modified
23       protective order.  I will abide by its terms and
24       then I will use the confidential or highly
```

1    confidential information only in connection with

2    this proceeding, that's PGR proceeding.

3                    So when Mr. Paunovich was saying,

4    well, I don't see how there's a violation in the

5    '954 protective order, them taking an exhibit

6    that they submitted in the '954 and using it in

7    the Federal Circuit like they did is a clear

8    violation of that order.

9                    This Court obviously is not going

10   to address that, but I raise that because the

11   PTAB is looking to this Court.  So wherever the

12   Court is leaning, I want to make sure there's no

13   indication that if the Court is going to say

14   that there wasn't a violation of this Court's

15   protective order, it has no bearing on the PGR's

16   protective order.  I just want to make that

17   clear.

18                    Are there any other questions,

19   Your Honor?

20                    THE COURT:  No questions.  I think

21   in light of the issue of violation of protective

22   order which the Court does take really

23   seriously, I think it's appropriate to have the

24   parties brief the issue with declarations

 1    explaining all of the facts that have been

 2    argued.

 3              At this point all I have are

 4    attorney arguments, and I understand that's

 5    because of the time-sensitivity and they were

 6    submitted the day before we had the hearing and

 7    I'm not faulting counsel for that.  But I think

 8    this type of an issue is deservant of

 9    declarations.

10              I would like to see the transcript

11    of what was discussed in the PTAB about the use

12    of the confidential material and I do want to

13    see the email string, Mr. Paunovich, that you

14    referred to with respect to this issue, so that

15    can be part of any declaration that you will

16    submit.

17              How soon can this matter be

18    briefed because I'd like to get to this sooner

19    rather than later?

20              MR. PALYS:  We can be prepared --

21    we're assuming it will be simultaneous

22    submissions; is that right, Your Honor?

23              THE COURT:  I think opening,

24    answering and reply.

```
 1                    MR. PALYS:  So we would open?

 2                    THE COURT:  Yes.

 3                    MR. PALYS:  Can we have until

 4      Monday?  Is that too late?

 5                    THE COURT:  And you've got

 6      depositions also?

 7                    MR. PALYS:  We have depositions

 8      between now and the 21st.  I'm not going home

 9      until the 22nd.

10                    THE COURT:  Let me ask

11      Mr. Paunovich, if L'Oreal gets its opening

12      position to me on Monday -- can we limit this by

13      pages?  I'm thinking a 10-page limit rather than

14      a 20-page limit under the local rules.

15                    MR. PALYS:  Yes, 10 pages.  I

16      don't think we need that much.

17                    THE COURT:  So 10 pages opening,

18      answering and 5 pages for the reply.

19      Mr. Paunovich, if I get L'Oreal's brief and any

20      supporting declarations they want to put in by

21      Monday, how much time would you need?

22                    MR. PAUNOVICH:  I hate to make

23      this ask, but I would request two weeks because

24      I literally have the entire team out on the road
```

```
 1      next week.  Five depositions on Monday, I think

 2      we have 20 depositions next week or around about

 3      there.  So if that's acceptable because I don't

 4      think that anyone realistically will be able to

 5      even begin looking at it until after the 21st.

 6                   And we would certainly accommodate

 7      L'Oreal as well.  We don't want to jam you by

 8      having you give your brief by Monday.  If we all

 9      want to do the briefing after the depositions.

10                   MR. PALYS:  We'll do it on Friday,

11      Your Honor.  That's how serious this is.  We're

12      under the same schedule as them.  I'm busy,

13      she's busy, our whole team is.  If the Court

14      would like to hear it earlier, we will put it in

15      by Friday or Monday.  We don't certainly want to

16      extend this off any further.

17                   THE COURT:  Well, I am willing to

18      give Mr. Paunovich some additional time given

19      the nature of the number of depositions and the

20      resources that will be put into those

21      depositions.  I'm giving Mr. Paunovich until the

22      28th.  If Defendants would need additional time,

23      when --

24                   MR. PALYS:  When would our letter
```

```
 1    be due then?
 2                    THE COURT:  You can have some --
 3                    MR. PALYS:  When you say the 28th,
 4    did you mean their response --
 5                    THE COURT:  Theirs would be the
 6    28th.  Do you want the 21st, the end of next
 7    week?
 8                    MR. PALYS:  We will do it December
 9    21st.  Thank you.
10                    THE COURT:  And then the reply on
11    January 4th or do you want to do it sooner?
12                    MR. PALYS:  January 1st.  No, I'm
13    just kidding.  The 4th sounds fine.  I don't
14    have a calendar in front of me.
15                    THE COURT:  I think that's a
16    Friday.
17                    MR. PALYS:  So that will work,
18    Your Honor.
19                    MR. PAUNOVICH:  Your Honor, we
20    would be getting their brief now Friday the 21st
21    which is the weekend of Christmas and the court
22    being closed on the 24th and 25th.  I don't want
23    to overextend the asks here to the Court, but if
24    there could be a small amount of additional
```

1      time.  Maybe that Monday after the 28th, that

2      would allow people --

3                    THE COURT:  What about the 31st?

4      Would you be prepared to file it by the 31st of

5      December?

6                    MR. PAUNOVICH:  Yes.  Thank you,

7      Your Honor.

8                    THE COURT:  And then the reply

9      brief on January 4th?  All of you know the

10     issues.  What I need is the declaration from

11     Mr. Blackburn and what I need from L'Oreal is a

12     declaration just supporting the facts as you've

13     laid them out and any type of authorities or

14     support that you want to give for the type of

15     relief that you've asked.

16                    I'm really interested, now that

17     you know and you've heard the representations of

18     Mr. Paunovich, that a third-party entity, that

19     Mr. Blackburn has taken upon himself to engage a

20     third-party entity at his expense to look into

21     whether or not this confidential information

22     appears elsewhere in the public realm, your

23     position on that.  So the parties know the

24     issues.  I'm not sure the time of filing is

```
 1       going to make --
 2                    MR. PALYS:  Like I said, we'll do
 3       it as soon as possible, Your Honor.  We don't
 4       have an issue with the timing.  On that point,
 5       you brought up a good point on the monitoring.
 6       Is there a way -- we need more information on
 7       this.  Maybe we will reach out to counsel and
 8       hopefully, they will give us the information we
 9       need so we can make a proper representation to
10       the Court in our letter.
11                    THE COURT:  Okay.  Everybody knows
12       what I'm looking for.  The timing of it, I'll
13       put a briefing schedule together.  So the 21st
14       of December for opening brief.  The 31st of
15       December for answering brief and declarations,
16       and January 4th for the reply brief.  And you
17       know the information as I've stated on the
18       record that the Court is seeking to be able to
19       resolve this.
20                    Why don't you send me over the
21       PTAB transcript by the end of the day since you
22       already have that.  No need to wait for the
23       brief for me to read that.  I can start looking
24       at that.
```

```
 1                    MR. PALYS:  I have one right here,
 2        Your Honor.
 3                    THE COURT:  If you have an extra
 4        copy, my law clerk Ms. Polito can make an extra
 5        copy and return it to you.
 6                    MR. PALYS:  You can keep that,
 7        Your Honor.
 8                    THE COURT:  Okay.  Are there any
 9        matters on behalf of L'Oreal before we adjourn?
10                    MS. MURRAY:  I don't believe we
11        have other matters.
12                    THE COURT:  Mr. Paunovich, on
13        behalf of Plaintiffs any other matters?
14                    MR. TIGAN:  Your Honor, just one
15        quick question:  When you say 10, 10 and 5 pages
16        on the briefs, you mean the actual briefs to be
17        double-spaced as opposed to long letters?
18                    THE COURT:  Yes -- well, I don't
19        care what format they're in.  However, you want
20        to maximize the use of 10 pages as long as the
21        parties are observing the same format.  In other
22        words, I don't want a full formal brief from one
23        side and a letter brief from the other.  I want
24        the size of the briefs to be fair and a level
```

```
 1          playing field.  Work out the format and I'm fine

 2          with whatever counsel agree upon.

 3                          MR. TIGAN:  Thank you, Your Honor.

 4                          MR. PALYS:  Thank you, Your Honor.

 5                          THE COURT:  All right.  Hearing no

 6          other matters, I want to thank counsel for the

 7          presentations.  It was a bit lengthier than I

 8          anticipated, but I hope we made some progress.

 9          The rulings that I've made on the record, just

10          follow the objection procedures.

11                          To the extent any objections are

12          going to be lodged, the procedure is spelled out

13          in our local rules and under Federal Rule of

14          Civil Procedure 72(a).  With respect to any

15          other matters that I've reserved, I will do my

16          best to get to them promptly once I receive the

17          supplementation needed to resolve them.

18                          Thank you, counsel, and I wish

19          everybody a happy holiday season.

20                          MS. MURRAY:  Thank you, Your

21          Honor.

22                          MR. PALYS:  Thank you, Your Honor.

23                          MR. PAUNOVICH:  Thank you, Your

24          Honor.
```

1                          MR. COTTRELL:  Thank you, Your

2       Honor

3                          MS. MOWERY:  Thank you, Your

4       Honor.

5                          MR. TIGAN:  Thank you, Your Honor.

6                          (The proceedings ended at

7       2:20 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                 C E R T I F I C A T I O N

2

3              I, Taneha Carroll, Professional

4    Court Reporter, certify that the foregoing is a

5    true and accurate transcript of the foregoing

6    proceeding.

7

8              I further certify that I am neither

     attorney nor counsel for, nor related to nor

9    employed by any of the parties to the action in

10   which this proceeding was taken; further, that I am

11   not a relative or employee of any attorney or

12   counsel employed in this case, nor am I financially

13   interested in this action.

14

15

16
             /s/ Taneha Carroll
17           Taneha Carroll

18           Professional Reporter and Notary Public

19

20

21

22

23

24